00/00/2013  12:19:27 FAX 2132499

Philip D. Dracht, SBN 219044
**FABIAN & CLENDENIN**
215 South State Street, Suite 1200
Salt Lake City, UT 84151-0210
Telephone: (801) 531-8900
Facsimile: (801) 596-2814

Thomas G. Foley, Jr., SBN 65812
Robert A. Curtis, SBN 203870
**FOLEY BEZEK BEHLE & CURTIS, LLP**
15 West Carrillo Street
Santa Barbara, California 93101
Telephone: (805) 962-9495

*Attorneys for Plaintiff Dana Bostick*

FILED
CLERK, U.S. DISTRICT COURT

APR - 8 2013

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

DANA BOSTICK, a California citizen,
on behalf of himself and all others
similarly situated, and on behalf of the
general public,

　　　PLAINTIFF,

vs.

HERBALIFE INTERNATIONAL OF
AMERICA, INC., a Nevada
Corporation, HERBALIFE
INTERNATIONAL, INC., a Nevada
Corporation, HERBALIFE, LTD a
Cayman Island Corporation.

　　　DEFENDANTS.

Case No. **CV 13 - 02488** ᴾᴬ
　　　　　　　　　　　　　　(RZx)

**CLASS ACTION COMPLAINT**

**DEMAND FOR JURY TRIAL**

### INTRODUCTION TO THE CASE

1.　　Herbalife told Dana Bostick that if he "put in the time, effort, and commitment," he could make money from retail sales and, by recruiting others to become Herbalife distributors, he could make money off them. Bostick paid Herbalife $95.95 and became a distributor. He ordered Herbalife products – enough products that he jumped up the chain and qualified for additional discounts and commissions from potential recruits' purchases.

1

COMPLAINT

2.      Bostick did not make money as promised. Like the hundreds of thousands of Herbalife distributors before and after him, Bostick failed. He failed even though he was committed and put in the time and effort. He failed because he was doomed from the start. He was doomed from the start by an Herbalife marketing plan that systematically rewards recruiting over retail sales. A marketing plan that for every dollar that Bostick and other distributors pay for Herbalife product Herbalife pays $0.46 to $0.64 cents in recruiting rewards, regardless of distributors' retail sales. A marketing plan that pays millions to those few at the top in recruiting rewards at the expense of the many at the bottom.

3.      Accordingly, Dana Bostick, for himself, all others similarly situated, and the general public alleges:

## TYPE OF ACTION

4.      Bostick sues for himself and for all persons who were Herbalife distributors from April 2009 until the present under California's Endless Chain Scheme Law (California's Penal Code § 327 and California Civil Code § 1689.2), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.*; California's Unfair Competition Law (Business and Professions Code Section 17200 *et seq.*), False Advertising (Business and Professions Code § 17500) against Herbalife International, Inc., Herbalife International of America, Inc., and Herbalife, Ltd for the operation and promotion of an inherently fraudulent pyramid scheme.

## PARTIES

5.      Plaintiff Dana Bostick is and at all relevant times was an individual who resides in Los Angeles County, California. Bostick entered into an Agreement of Distribution with Herbalife and became an Herbalife distributor in April of 2012.

6.      Defendant Herbalife International of America, Inc. is and at all material times was a Nevada corporation headquartered in Los Angeles. Defendant Herbalife International of America, Inc. is a wholly-owned subsidiary of Herbalife

International, Inc. and an indirectly wholly-owned subsidiary of Herbalife, Ltd, and is employed by those entities to conduct their U.S. operations.

7.    Defendant Herbalife International, Inc. is and at all material times was a Nevada corporation headquartered in Los Angeles. Herbalife International, Inc. is an indirect wholly-owned subsidiary of Herbalife Ltd. Herbalife International, Inc. was the former parent company of "Herbalife" but it and its subsidiaries were acquired on July 31, 2002 by an entity that became Herbalife Ltd. Herbalife Ltd. employs Herbalife International, Inc. to manage its global marketing company.

8.    Herbalife Ltd. is "one of the largest network marketing companies in the world." Herbalife Ltd. is and at all material times was a corporation organized under the laws of the Cayman Islands with its corporate headquarters in Los Angeles. Herbalife Ltd. is a publicly held corporation traded on the NYSE as "HLF." Herbalife Ltd. is the architect, implementer, and operator of a global enterprise that is and has been an illegal and fraudulent pyramid scheme, the "Herbalife Pyramid."

9.    Although the three entities are legally distinct and have distinct roles within the Herbalife Pyramid, in Herbalife's dealings with Bostick and the Class, Herbalife generally does not distinguish between the three corporate entities but instead refers to itself singularly as "Herbalife." This Complaint, therefore, also refers to Herbalife Ltd., Herbalife International, Inc., and Herbalife International of America, Inc. collectively as "Herbalife."

10.    John Tartol, an Herbalife Chairman's Club member, is a California resident. Leslie Stanford, an Herbalife Founder's Circle member, is a Colorado resident. Geraldine Cvitanovich, an Herbalife Founder's Circle member, is a Hawaii resident. Susan Peterson, an Herbalife Founder's Circle member, is a Colorado resident. Doran Andre is an Herbalife Chairman's Club member. Maurice Smith, an Herbalife President's Circle member, is an Arizona resident.

11.     Tartol, Stanford, Cvitanovich, Peterson, Andre, Smith, and other President's Circle, Founder's Circle and Chairman's Club members were at all relevant times, primary beneficiaries and promoters of the Herbalife scheme, the "**Beneficiaries and Promoters."**

## JURISDICTION AND VENUE

12.     Defendants Herbalife International, Inc., Herbalife International of America, Inc., and Herbalife Ltd. are subject to the jurisdiction of this Court. They have been engaged in continuous and systematic business in California. Defendants have designated agents for service of process in this State or have their principal place of business here and have committed tortious acts in this State. Plaintiff Bostick is a resident of California.

13.     Because Bostick asserts claims under the Racketeer Influenced Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961 – 1968, this Court has jurisdiction over this action under 28 U.S.C. § 1331. This Court may exercise supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367.

14.     Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) and 18 U.S.C. § 1965(a) and (b) because a substantial number of the acts and transactions that established the claims of the Plaintiff and the class occurred within this District. Defendants conducted business, solicited business, and transmitted communications by mail or wire relating to the illegal scheme in this district. Defendants transacted their affairs, resided within California and this judicial district, and Defendants' wrongful acts occurred in this District and have directly impacted the general public of this district.

15.     Bostick and the class have also executed an "Agreement of Distributorship" with Herbalife, which requires all claims to be "resolved exclusively in a judicial proceeding in either the Superior Court or the United States Court, both located in Los Angeles, California."

## THE LAW

16.     In *Webster v. Omnitrition Int'l. Inc.*, the Ninth Circuit adopted the "*Koscot* test" for determining what constitutes a pyramid scheme:

> Pyramid schemes are "[s]uch contrivances . . . characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users."

*Webster v. Omnitrition Int'l. Inc.*, 79 F.3d 776, 781 (9th Cir. 1996) ("*Omnitrition*") quoting *In re Koscot Interplanetary, Inc.*, 86 F.T.C. 1106, 1181 (1975), aff'd mem. sub nom. ("*Koscot*").

17.     The second element of the *Koscot* test is the determining element for a pyramid scheme:

> The satisfaction of the second element of the *Koscot* test is the *sine qua non* of a pyramid scheme: "As is apparent, the presence of this second element, recruitment with rewards unrelated to product sales, is nothing more than an elaborate chain letter device in which individuals who pay a valuable consideration with the expectation of recouping it to some degree via recruitment are bound to be disappointed."

*Omnitrition*, 79 F.3d at 782. The Ninth Circuit held that "the operation of a pyramid scheme constitutes fraud for purposes of several federal antifraud statutes." *Id.*.

18.     A multi-level sales organization where members obtain monetary benefits primarily from the recruitment of new members rather than from selling goods to *bona fide* consumers is an endless chain scheme. Endless chain schemes are inherently deceptive because most participants are doomed to failure, even if some retail sales occur:

> "The promise of lucrative rewards for recruiting others tends to induce participants to focus on the recruitment side of the business at the expense of their retail marketing efforts, making it unlikely that meaningful opportunities for retail sales will occur." Thus, the fact that some retail sales occur does not mitigate the unlawful nature of the overall arrangement.

*Omnitrition*, 79 F.3d at 782, citing *In re Ger-Ro-Mar Inc.*, 84 F.T.C. 95, 148-49 (1974), rev'd on other grounds, 518 F.2d 33 (2d Cir. 1975).

19.     "Like chain letters, pyramid schemes may make money for those at

5
COMPLAINT

the top of the chain or pyramid, but 'must end up disappointing those at the bottom who can find no recruits.'" *Omnitrition*, 79 F.3d at 781 (quoting *Koscot*, 86 F.T.C. 1106, 1181 (1975), aff'd mem. sub nom., *Turner v. F.T.C.*, 580 F.2d 701 (D.C. Cir. 1978)).

20.     Endless chain schemes are inherently fraudulent by nature because the futility of the plan is not apparent to the participant:

> Misrepresentations, knowledge and intent follow from the inherently fraudulent nature of a pyramid scheme as a matter of law. As to justifiable reliance, the very reasons for the *per se* illegality of Endless Chain schemes is their inherent deceptiveness and the fact that the "futility" of the plan is not "apparent to the consumer participant."

*Omnitrition*, 79 .3d at 788 (citations omitted).

21.     Section 327 of the California Penal Code prohibits endless chains:

> Every person who contrives, prepares, sets up, proposes, or operates any endless chain is guilty of a public offense, and is punishable by imprisonment in the county jail not exceeding one year or in state prison for 16 months, two, or three years.

> As used in this section, an "endless chain" means any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant.

> Compensation, as used in this section, does not mean or include payment based upon sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme.

22.     In *Herbalife International of America, Inc. v. Ford et al*, Central District Court, Case No. 2:07-cv-02529-GAF-FMO, Herbalife sued distributors leaving Herbalife. Those distributors counterclaimed against Herbalife, claiming that the Herbalife Sales and Marketing Plan was an "endless chain" under California Penal Code §327. The Court denied Herbalife's motion for summary judgment on the distributors' endless chain-scheme counterclaim, finding that there was:

> a genuine issue as to whether Herbalife distributors must pay Herbalife to become supervisors—a threshold requirement under the

*Koscot* analysis—precludes the Court from granting summary judgment for either side on the endless-chain-scheme claim. As noted above, Herbalife's Sales and Marketing Plan provides that a distributor may qualify to become a Supervisor by achieving 4,000 Volume Points in a given month or 2,500 Volume Points in each of two consecutive months. A minimum of 1,000 of these Volume Points must consist of Unencumbered Volume, while the rest may consist of Encumbered Volume. Because both Unencumbered Volume and Encumbered Volume may consist of volume purchased not by the distributor herself but those in her downline, a distributor could qualify to become a Supervisor without purchasing anything.

...

Moreover, in the Court's view, Herbalife's entire business model appears to incentivize primarily the payment of compensation that is "facially unrelated to the sale of the product to ultimate users because it is paid based on the suggested retail price of the amount ordered from [Herbalife], rather than based on actual sales to consumers." *Omnitrition*, 79 F3d at 782 (emphasis and internal quotation marks omitted). Nevertheless, the conflicting evidence before the Court is sufficient to create a triable issue regarding the "payment of money" element of the Koscot analysis that only the trier of fact may resolve. Accordingly, the parties' cross-motions for summary judgment are **DENIED** as to the endless-chain-scheme claim

*Herbalife International of America, Inc. v. Ford et al*, Central District Court, Case No. 2:07-cv-02529-GAF-FMO, "Memorandum and Order Regarding Cross-Motions for Summary Judgment," [Docket No. 374], 8/25/2009.

## FACTS

## SUMMARY OF FACTS

23.    From 2009-2012, Herbalife made disclosures of "Statements of Average Gross Compensation of U.S. Supervisors" that were deceptive and misleading as to the likelihood that a distributor could reach the level of Supervisor and earn money from the scheme. Herbalife included these disclosures in the Sales and Marketing Plan received by Bostick and the class. Herbalife also posted these disclosures online. None of these disclosures provided any information that would allow a potential or actual distributor to meaningfully evaluate their likelihood of success in the scheme. Copies of the 2009-2012 disclosures are attached as **Exhibit A** and are referred to as the **"2009-2012 Statements"**

24.    As recently disclosed by Herbalife in their February 2013 Statement of Average Gross Compensation Paid by Herbalife to United States Distributors in

2012 (attached as **Exhibit B**, and referred to as the **"2013 Statement"**) the majority of Herbalife's U.S. distributors earn nothing from Herbalife. In 2012, Herbalife's real business opportunity was:

      a.  Herbalife paid nothing to over 87.9% of all distributors;

      b.  Herbalife paid $1 to $1,000 to 8.43% of all distributors;

      c.  Herbalife paid $1,001 to $5,000 to 2.2% of all distributors;

      d.  Herbalife paid $5,001 to $10,000 to 0.5% of all distributors;

      e.  Herbalife paid $10,000 to $25,000 to 0.393% of all distributors;

      f.  Herbalife paid $25,001-$50,000 to 0.230% of all distributors;

      g.  Herbalife paid $50,000-$100,000 to 0.109% of all distributors;

      h.  Herbalife paid $100,001-$250,000 to 0.092% of all distributors; and

      i.  Herbalife paid more than $250,000 to 0.039% of all distributors.

25.    These real numbers are in direct contrast to the deceptive earning claims referenced in Herbalife's promotional materials, including videos on Herbalife's website, YouTube, and Herbalife distributor's websites, often featuring the Beneficiaries and Promoters, and Herbalife's prior Statements of Average Gross Compensations distributed to Bostick and the class.

26.    An undisclosed fact is that there is little to no opportunity for an Herbalife distributor to earn a "retail profit" on the sales of Herbalife products because Herbalife sets the "Suggested Retail Price" (**"SRP"**) at a price so high that few if any Herbalife distributors can earn retail profits.

27.    Herbalife sets the SRP so high because for every dollar a distributor pays Herbalife for Herbalife product (not including packaging, handling, shipping, and tax) Herbalife pays out $0.46 to $0.64 to its top distributors as recruiting bonuses. Herbalife makes these payments upline whether the distributor sells the product at retail and whether the distributor sells the product at SRP.

28.    Besides setting the SRP at an inflated price, Herbalife charges its distributors a 7% fee for "Packaging and Handling" and a 2.5% to 4% fee for

1   shipping, based solely on the inflated SRP and not on Herbalife's actual or

2   estimated costs for packaging, handling, and shipping. This makes it even harder for

3   a distributor to make retail profits as it drives their retail price even higher.

4       29.    An undisclosed fact (from at least April 2009 to February 2013) is that

5   a large majority of all distributors (approximately 71%) make few if any retail sales

6   and are forced to self-consume the Herbalife products.

7       30.    An undisclosed material fact is that the vast majority of participants in

8   Herbalife's Pyramid scheme drop out within one year of becoming Herbalife

9   distributors and have usually lost most, if not all, of their investment and thousands

10  of dollars expended to build their supposed "business opportunity."

11      31.    To avoid being a pyramid scheme, a multi-level marketing plan must

12  have effective provisions to ensure that its distributors sell most products to

13  consumers not a part of the marketing system. Herbalife does or did not employ or

14  enforce such provisions.

15                  **THE HERBALIFE SALES AND MARKETING PLAN**

16      32.    As a direct-sales company, Herbalife operates a multi-level

17  distribution system – the Herbalife Sales and Marketing Plan – relying on

18  individual distributors to market, promote, and sell its products.

19      33.    A copy of the Herbalife "Sales and Marketing Plan and Business

20  Rules" (**"Sales and Marketing Plan"**) purchased by Bostick as part of his

21  International Business Pack is attached as **Exhibit C.** The Sales and Marketing Plan

22  is an incredibly complex set of rules and regulations.

23      34.    Anyone can become an Herbalife distributor if they purchase an

24  Herbalife International Business Pack (**"IBP"**) or a mini-IBP at a cost of $95.95 or

25  $57.75 respectively, apply to become a distributor, and are sponsored by an existing

26  Herbalife distributor.

27

28

35.     Herbalife recruits prospective participants by offering them the opportunity to participate in a "tested proven business plan" "designed to maximize rewards for effort and provide substantial and ongoing income."

36.     Herbalife recruits prospective participants by promising them "Immediate Retail Profit," "Daily Wholesale Profit," "Monthly Override Income," "Monthly Production Bonuses," "Annual Bonuses" for Top Achievers, and "Special Vacations and Training Events" that will "teach you how to meet your goals, increase your earning power and build an international business without leaving the comfort of your own home!"

37.     Herbalife's distributors promise recruits and other distributors that they can "be your own boss – take charge of your life," achieve "financial freedom," earn "extra income," "retirement/pension," and "leave a legacy."

38.     Herbalife recruits prospective participants by boasting that the Herbalife Sales and Marketing Plan is "[t]he best Marketing Plan in the industry" and that it pays out up to 73% of product revenues to distributors in "Retail and Wholesale Profits, Royalty and bonus income and incentives." Herbalife stresses:

> Each Distributor's success is dependent on two primary factors: The time, effort and commitment a Distributor puts into their Herbalife business and the product sales made by a Distributor and their downline organization. These two factors raise the importance of a Distributor's responsibility to train, support and motivate their downline organization.

39.     Herbalife divides the "73% of product revenue" by apportioning 23% of the SRP to "Royalty, bonus income, and incentives" and 50% to "Retail and Wholesale Profits" Herbalife's 73% payout claim depends on a distributor reselling the product at 100% of the SRP.

40.     By basing these "Retail and Wholesale Profits, Royalty and bonus income and incentives" off the SRP, Herbalife masks that for every dollar the purchasing distributor spends on Herbalife product, Herbalife pays from $0.46 to $0.64 upline in the form of recruiting rewards.

41.     Because so much money is paid upline in recruiting bonuses so that Herbalife can retain its "most active and productive distributors," Herbalife's SRP is an inflated price that bears no relation to the actual market price distributors can get for Herbalife's products in sales to retail customers.

## BOSTICK IS RECRUITED TO HERBALIFE

### "Position Determines the Pay," "You Determine Your Position"

42.     Dana Bostick responded to an internet advertisement for a "trial offer." It offered an "Internet Business Starter Pack" where Bostick paid $9.95 in Shipping and Handling and would be charged an additional $39.95 if he did not return the package within fourteen days. Interested in earning monthly and residual income, Bostick signed up for the pack. The Internet Business Starter Pack was mailed to Bostick sometime between late-March and early-April 2012.

43.     Bostick reviewed the pack, which is attached **Exhibit D**, and the DVD video enclosed in that pack, which revealed the "business" as Herbalife.

44.     Bostick watched the DVD. A spokeswoman explained that within Herbalife, "the position determines the pay - meaning, the higher you start the more money you can make."

45.     On the video, Beneficiary and Promoter Maurice Smith reiterates that "position determines the pay" and that "you determine your position." Smith tells viewers that an average Herbalife distributor earns "between $100 and $300 per month - part time." And Success Builders "have the opportunity to earn between $400-$600 - part time." Smith encourages recruits to become a "Supervisor," a level in the Herbalife Pyramid that requires a significant purchase of product but where distributors, if they have a downline, can start to earn recruiting rewards:

> Supervisor is the highest level that you can choose to position yourself at today. And, this is very important to know, Supervisor is the gateway to the rest of the levels of the marketing plan. You cannot get to the higher income levels without first becoming a Supervisor.

46.     The graphics on the video display that Supervisors can earn between $500-$1500 a month. Smith explains that a World Team member can earn $1,500-$3000 a month, GET Team member can earn $3,500-$7,000 a month, Millionaire Team can earn between $7,500-$15,000 a month, and President's Team members typically earn between $25,000-$100,000+ a month. Images of Smith's presentation and representations of potential distributor's earnings are attached as **Exhibit E**.

47.     Smith explains why it is so important to become a Supervisor: "It's the highest paying position that you can start at today. You've set yourself up for retail profits of 50% so you've doubled your money for the same work you've been doing." A Supervisor is at the "gateway to the rest of the marketing plan," because Supervisors can begin to get royalties, production bonuses, spontaneous bonuses, 1% annual bonus pool, and paid vacations.

48.     Bostick viewed this video, Herbalife's website, and various other Herbalife related websites. Upon viewing these materials, Bostick believed that retailing Herbalife products and recruiting distributors would be a way for him to build a business where he could earn both monthly income and residual income.

49.     Bostick ordered an IBP for $95.95. It was sent to him by FedEx. The IBP contained the magazine, *Live the Good Life! Herbalife* (relevant portions of which are attached as **Exhibit F)** and four distributor workbooks: "Your Business Basics" (relevant portions of which are attached as **Exhibit G** to the Complaint); "Using and Retailing Your Products"; "Building Your Business" (relevant portions of which are attached as **Exhibit H** to the Complaint); and the "Sales & Marketing Plan and Business Rules" (Exhibit C). Bostick reviewed the IBP and the materials in the IBP.

50.     On April 6, 2012, Bostick went online and signed an Agreement of Distribution. That agreement is attached as **Exhibit I**.

51.     Bostick worked hard to build his business. He bought and used products himself so he would know what he was selling. He set up three websites.

Two were set up to sell Herbalife products to the public and one was to recruit downline distributors. He paid for "coaching" sessions where the coaches "taught" him how to recruit downline distributors to build a downline. In spite of his hard work, the only recruit he made was a long-time friend.

52.     On April 6, and 26, 2012, May 21, 2012, June 18, 19, 22, and 27, 2012, and July 20, 2012, Plaintiff Bostick ordered products from Herbalife. Besides the purchase price for product, Herbalife added a 7% "Packaging and Handling" fee and a shipping fee of anywhere from 2.5% to 4%, solely based on the SRP of the product and not on the actual or estimated costs.

53.     On June 22, 2012, he attempted to "pay for his position" by coordinating with his friend. They were supposed to both purchase enough product to become a Supervisor, the "gateway to the rest of the marketing plan." On June 22, 2012, he made a single order. That order cost him over $1,800 for the product alone. Bostick's downline did not make the purchase and Bostick did not advance to Supervisor.

54.     When he tried to resell the product he purchased to qualify as a Supervisor, Bostick learned that there was little opportunity for him to earn monthly income or residual income with Herbalife. The SRP alone was an uncompetitive price in the market, and, when Bostick would add the shipping, handling, and packaging fees to recoup his costs, the retail price was so high that there were virtually no retail purchasers willing to pay the full retail price. And other distributors were selling Herbalife products online on Craigslist and EBay at or below their cost, making retail profits in the amounts promised by Herbalife even more almost impossible to achieve.

55.     As to the over $3,000 (SRP) worth of Herbalife products that Bostick purchased that he has not self-consumed or given away to family members, Plaintiff Bostick has tried to sell it on Craigslist at or around his purchase cost.

56.     Bostick's experience is the same as most Herbalife distributors. As Herbalife's 2013 Statement shows, most Herbalife distributors earn nothing from Herbalife. Even if he would have qualified as a Supervisor, only 33% of Newly Qualified Supervisors requalify.

57.     Bostick's failure and the other distributors' failure are not for lack of time, effort, and commitment to Herbalife. These failures are due to a marketing plan that, by its design, systematically rewards recruiting over retailing and systematically rewards those Beneficiaries and Promoters at the top at the expense of the many distributors at the bottom.

## MECHANICS OF THE SALES AND MARKETING PROGRAM

58.     Within the Herbalife Pyramid, there are 11 levels of Herbalife distributors. The bottom four categories are Distributors,[1] Senior Consultants, Success Builders, and Qualified Producers. Herbalife calls the bottom four categories "Non-Sales Leaders" (**"NSL"**). The top seven categories are Supervisors, World Team, Global Expansion Team, Millionaire's Team, President's Team, Chairman's Club, and Founders Circle. Herbalife calls these distributors "Sales Leaders" (**"SL"**). Bostick was always an NSL.

59.     Herbalife assigns a new distributor to an existing "line of sponsorship" to which the recruiting distributor already belongs. A line of sponsorship includes a hierarchy of distributors starting with the newly-recruited distributor and proceeding by seniority up to a distributor heading the line of sponsorship. These distributors at the heads of the lines of sponsorship are members of the Founder's Circle and the Chairman's Club – Beneficiaries and Promoters.

60.     Junior (or "downline") distributors purchase products from more senior (or "upline") distributors within their line of sponsorship or from Herbalife directly. Herbalife pays bonuses upline to distributors based on purchases from

---

[1] The use of a lower-case "distributor" refers to all Herbalife distributors, regardless of level. The use of a capitalized "Distributor" refers to the first-level Herbalife distributor.

Herbalife by downline distributors. Any distributor at any level may sponsor new distributors.

61.     Herbalife protects its distributors' downlines. A distributor who wants to change their sponsor must obtain a written, notarized release from their Sponsor and upline distributors. Herbalife can still deny the request. The distributor changing sponsors can only keep her downline if her upline agrees.

62.     To move up the Herbalife Pyramid and qualify for higher levels of compensation, Herbalife requires a distributor to "achieve" (either through their own purchases of Herbalife products or through their downline's purchases) specific "Volume" during specified time-periods.

63.     Herbalife calculates a distributor's Volume by using **"Volume Points."** Volume Points are point values that Herbalife assigns to each of their products. In the U.S., Herbalife uses a Volume Point to dollar ratio to assign Value Points to specific products. It displays a product's Value Points on the price sheet.

64.     For 2012, in the United States, the dollar to Volume Point ratio ranges from $1:0.57VP to approximately $1:0.905VP. Most Herbalife Products in 2012 have a ratio of approximately $1:0.905. In 2011, the average ratio was approximately $1:0.9167.

65.     If a distributors order products the distributor collects "Personally Purchased Volume" points.[2] The Volume Points that a distributor accumulates either through Personally Purchased Volume and through the Volume Points purchased by the distributor's downline become the distributor's sales production. Herbalife uses Volume Points to qualify distributors for higher levels, sales commissions, royalties, bonuses, and other incentives and benefits. Herbalife calculates Volume Points monthly.

---

[2] **"Personally Purchased Volume"** is defined as "The volume purchased directly from Herbalife using your [the distributor's] Herbalife Identification Number." All defined terms from the Sales and Marketing Plan are found on Exhibit C, pp. 21-22.

## NON-SALES LEADERS: DISTRIBUTORS, SENIOR CONSULTANTS, SUCCESS BUILDERS, & QUALIFIED PRODUCERS

### Distributors (NSL)

66.     Herbalife calls its first-level distributors "Distributors."

67.     A Distributor buys Herbalife products at a 25% discount off the SRP, whether for personal use or resale. In its promotional materials, Herbalife characterizes the 25% discount as an opportunity for the Distributors to earn 25% in retail profits from reselling the Herbalife products.

68.     If a Distributor purchases a product with an SRP of $100, the cost is $75. Herbalife pays the Distributor's upline $48 of the $75 cost – $25 upline in "Wholesale Profits" and $23 in Royalty Overrides, bonuses, and other incentives – even if the Distributor cannot resell the product for $100.

69.     For a Distributor's purchase, $0.64 out of every dollar <u>paid</u> for Herbalife product goes upline ($0.33 in Wholesale Profits and $0.31 in royalties, bonuses, and incentives).

### Senior Consultants (NSL)

70.     Herbalife promotes a Distributor to "Senior Consultant" if they buy 500 or more Personally Purchased Volume Points, or, if their recruited distributors provide 500 Volume Points in "Downline Volume."[3]

71.     Senior Consultants buy Herbalife product at a 35% discount off SRP and are eligible for a 10% commission off their downline Distributor's purchases, so long as that distributor remains a Distributor. Herbalife calls this commission "Wholesale Profit."

72.     A Distributor can also qualify for Senior Consultant if the distributor gets 2,000 Volume Points in a month, either through Personally Purchased Volume or through Downline Volume. That Senior Consultant gets a 42% discount off of

---

[3] **"Downline Volume"** is defined as "As a non-Supervisor, Downline volume is based on volume which is placed by your downline Distributors directly from Herbalife or order between 25% to 42% discount."

1    SRP, both on the qualifying purchase and on purchases in the qualifying month.

2    The next month their discount is 35% off of SRP.

3        73.    A Distributor can become a Senior Consultant without purchasing or

4    reselling Herbalife product if the Distributor recruits downline distributors and

5    those distributors purchase the required 500 or 2,000 Volume Points in a month.

6        74.    If a Senior Consultant with a 35% discount purchases a product with

7    an SRP of $100, the cost is $65. Herbalife pays the upline $38 of the $65 cost – $15

8    in "Wholesale Profits" and $23 in Royalty Overrides, bonuses, and other incentives

9    – even if the Senior Consultant does not resell the product for a $100.

10       75.    For a Senior Consultant's purchase with a 35% discount, $0.58 out of

11   every dollar <u>paid</u> for Herbalife product goes upline ($0.23 in Wholesale Profits and

12   $0.35 in royalties, bonuses, and incentives).

13                        **Success Builder (NSL)**

14       76.    A Distributor or Senior Consultant becomes a "Success Builder" if the

15   distributor places a single order of 1,000 Personally Purchased Volume Points.

16   Success Builders get a 42% discount on that order and on other purchases in the

17   same month they qualify. A Success Builder becomes a Senior Consultant with a

18   35% discount the next month.

19       77.    Herbalife and the Beneficiaries and Promoters encourage Distributors

20   to become Success Builders to get "higher retail profits" because of the discount. In

21   the video called "Senior Consultant & Success Builder," which is hosted at

22   http://www.youtube.com/watch?v=8b2pyw3A6FA and on the official Herbalife

23   website www.video.herbalife.com, Beneficiaries and Promoters John Tartol and

24   Leslie Stanford encourage distributors to become Success Builders. Tartol explains

25   in minutes 5:20-6:18 how a distributor can "qualify right away" for a 35% discount

26   "with just one order" and "enjoy a substantial 42% discount immediately." He tells

27   distributors that "this will get you the highest discount for the least expenditure."

28                        **Qualified Producer (NSL)**

78.     A Distributor, Senior Consultant, or Success Builder becomes a "Qualified Producer" if the distributor purchases 2,500 Personally Purchased Volume Points within one to three months, or the distributor can combine up to 1,000 Downline Volume (Volume placed by downline distributors) Points and 1,500 Personally Purchased Volume Points in a single month.

79.     A Qualified Producer gets a 42% discount off SRP for a full year and qualifies for up to 7% to 17% of commissions on the Qualified Producer's downline distributors' (below the level of Qualified Producer, Success Builder, or Senior Consultant with a 42% discount) purchases.

80.     If a Qualified Producer (or Senior Consultant or Success Builder) with a 42% discount purchases a product with an SRP of $100, the cost is $58. Herbalife pays the upline $31 of the $58 cost – $8 upline in "Wholesale Profits" and $23 in Royalty Overrides, bonuses, and other incentives – even if the Qualified Producer does not resell the product for $100.

81.     For distributors with a 42% discount, $0.53 out of every dollar paid for Herbalife product goes upline (~$0.13 in Wholesale Profits and ~$0.40 in royalties, bonuses, and incentives).

82.     According to Herbalife's recently revised 2013 Statement, Distributors, Senior Consultants, Success Builders, and Qualified Producers (all NSLs) and Supervisors without a downline made up 83% of their total distributors in 2012.

83.     Unless an NSL is participating in the Herbalife Advantage Promotion (an automatic monthly product shipment program) and has orders for 12 consecutive months, the NSL must pay an Annual Processing Fee of $15.00 on their "anniversary date" to remain an Herbalife distributor. Supervisors also must pay an Annual Processing Fee of $79.99. Herbalife has described this fee as necessary because "The fee keeps you on our system by letting us know that you are still

enjoying working your Herbalife business. If it is not paid then your Distributorship is subject to deletion."

84.   In Herbalife's 2004 and 2005 10-Ks to investors, Herbalife disclosed that for the reporting year, "more than 90% of our distributors that are not supervisors turned over." Herbalife stopped disclosing the turnover rate of Non-Sales Leaders in their 10-Ks and never disclosed turnover rates of its NSL's to Bostick and members of the class. Based on the 2004 and 2005 disclosures and Plaintiff's own experience with distributors in his own upline and downline, Plaintiff is informed and believes that the non-Supervisor turnover rate for 2009-2013 is approximately 90%.

## SALES LEADERS: SUPERVISORS, WORLD TEAM, TAB TEAM, PRESIDENT'S TEAM, FOUNDER'S CIRCLE, CHAIRMAN'S CLUB
### Supervisor (SL)

85.   Becoming a "Supervisor" means a distributor moves from being what Herbalife classifies as an "Non-Sales Leader" to a "Sales Leader," or **"SL."**

86.   According to Herbalife's Statements of Average Compensation distributed in 2009-2012 (Exhibit A), approximately 25% of Herbalife's Distributors become Supervisors and above.

87.   A distributor can qualify to become a Supervisor in one of three ways:

88.   **One-Month Qualification** – by "achieving" 4,000 Volume Points in a month. A minimum of 1,000 of these Volume Points must be "Unencumbered Volume"[4]

---

[4] **"Unencumbered Volume"** is defined as "all volume produced by anyone in [a distributor's downline], down to the first qualified Supervisor who achieves less than 2,500 Volume Points in one Volume Month," plus all of the distributor's "Personal Volume," and which is volume that is not used by anyone else for Supervisor qualification purposes.

**"Personal Volume"** is defined as "The volume purchased by you as a Fully Qualified Supervisor and all others in your downline organization, excluding any 50% orders by Qualifying Supervisors and Qualified Supervisors."

89.   **Two-Month Qualification** – by "achieving" 2,500 Volume Points in each of two consecutive months. A minimum of 1,000 of these Volume Points must be "Unencumbered."

90.   **Accumulated Qualification** – by buying 5,000 Personally Purchased Volume Points within 12 months or 1,000 Downline Volume Points with 4,000 Personally Purchased Volume.

91.   Under the One and Two Month Qualifications, a distributor can qualify as a Supervisor without purchasing or reselling any Herbalife products if 1000 of the downline Volume Points are Unencumbered.

92.   This was the problem identified by the Court in the *Herbalife International of America, Inc. v. Ford et al* order described above: "Because both Unencumbered Volume and Encumbered Volume may consist of volume purchased not by the distributor herself but those in her downline, a distributor could qualify to become a Supervisor without purchasing anything."

93.   A distributor can also qualify for Supervisor under any method making no retail sales.

94.   A distributor who does not become a Supervisor before their downline distributor becomes a Supervisor has one year to become a Supervisor. Otherwise, Herbalife takes away that Supervisor and that Supervisor's downline from the distributor and gives them to the first upline Supervisor.

95.   Herbalife requires that a Qualifying Supervisor be sponsored by the first upline Supervisor. The Sponsoring Supervisor must match the Qualifying Supervisor's Volume Points in the qualifying month with "Total Volume."[5]

---

**"Encumbered Volume"** is all volume produced by any downline distributor qualifying for Supervisor, down to the first qualified Supervisor, who achieves 2,500 Volume Points or more at a 25% to 42% discount in one Volume Month. The basic difference between the two forms of volume is that Unencumbered Volume is volume that no other distributor uses to qualify to become a Supervisor.

[5] **"Total Volume"** is defined as "the combined total of Personal Volume plus Group Volume."

96.     A Sponsoring Supervisor can sponsor the Qualifying Supervisor without purchasing or reselling any Herbalife products if their downline generates sufficient Total Volume to match the Qualifying Supervisor's Volume Points in that qualifying month.

97.     If the Supervisor sponsors a distributor who becomes a Supervisor that Supervisor is called a first-level Supervisor. If that first-level Supervisor sponsors a Supervisor that Supervisor becomes the original Supervisor's second-level Supervisor. If that second-level Supervisor sponsors a Supervisor that Supervisor becomes the original Supervisor's third-level Supervisor. Supervisors can earn royalties on all three of these downline level Supervisors' volume.

**Benefits for Supervisors**

98.     A Supervisor can purchase Herbalife's product at a 50% discount off the SRP and can earn from 25% - 15% - 8% in commissions from their downline's purchases. The commissions decrease as the Supervisor's downline distributors' discounts increase – 25% - 35% - 42%.

99.     If a Supervisor purchases a product with an SRP of $100, the cost is $50. Herbalife pays the upline $23 of that $50 cost in Royalty Overrides, bonuses, and other incentives – even if the Supervisor does not resell the product for $100.

100.    For a Supervisor's purchase, $0.46 out of every dollar paid for Herbalife product goes upline in Royalty Overrides, bonuses, and other incentives.

101.    A Supervisor also qualifies for "Royalty Overrides," if that Supervisor has first or second or third level Supervisors in their downline.

102.    A Royalty Override is a commission that a Supervisor receives on the Volume Points accrued by Supervisor's downline (the First, Second, and Third Level Supervisors). In its 10-Ks, Herbalife calls Royalty payments "compensation

---

**"Group Volume"** is defined as "Orders purchased at a temporary 50% discount, by Qualifying Supervisor(s) in a Supervisor's personal organization."

to distributors for services rendered including the development, retention and the improved productivity of their sales organizations."

103.   The percentage (1%-5%) of Royalty Overrides that a Supervisor can earn depends on the number of Total Volume Points the Supervisor accumulates in that month. Supervisors can qualify for Royalty Overrides from their three levels of downline Supervisors. In their Sales and Marketing Plan, Exhibit C, p. 13, Herbalife illustrates Royalty Override as:

| Royalty Override Sliding Scale | |
| --- | --- |
| Your Total Volume Points | Royalty Override Earning % |
| 0–499 | 0% |
| 500–999 | 1% |
| 1,000–1,499 | 2% |
| 1,500–1,999 | 3% |
| 2,000–2,499 | 4% |
| 2,500 plus | 5% |

**Royalty Override Example**

| | | | |
| --- | --- | --- | --- |
| YOU | 2,500 Volume Points | = | Your Total Royalty Override = 1,500 Royalty Points |
| First-Level Supervisor | 10,000 Volume Points | = | 5% = 500 Royalty Points |
| Second-Level Supervisor | 10,000 Volume Points | = | 5% = 500 Royalty Points |
| Third-Level Supervisor | 10,000 Volume Points | = | 5% = 500 Royalty Points |

104.   To qualify for Royalty Overrides, a Supervisor must certify that they comply with Herbalife's "10-Retail Customer Rule" and "70% Rule." Under these rules, a Supervisor "must personally make sales to at least 10 separate retail customers each month," and "at least 70% of the total value of Herbalife products a Distributor purchases each Volume Month must be sold or consumed that month." A copy of the Earnings Certificate form is found on page 48 of Exhibit C.

105.   Herbalife Supervisors must requalify annually by paying the Annual Processing Fee and by meeting similar volume requirements as the original qualification requirements.

106.   In Herbalife's 10-Ks, Herbalife reported that for the years 2012, 2011, 2010, and 2009, its Sales Leader retention rate was approximately 51.10%, 48.6%, 43.3%, and 42.2%, respectively.

## **World Team (SL)**

107.   Herbalife promotes Supervisors to the World Team if they meet one of the three following requirements. They achieve 10,000 Total Volume Points in one month after becoming a Qualifying or a Fully-Qualified Supervisor. Or if they achieve 2,500 Total Volume Points each month for four consecutive months. Or if they are awarded 500 Royalty Override Points in one month. World Team members get special planning and training sessions targeted to accelerate their progress to TAB Team membership and all the benefits of being a Supervisor.

108.   According to Herbalife's 2012 Statement, World Team members' average annual earnings are $6,224 and the median compensation is $5,659 in payments from Herbalife.

**TAB Team (SL)**

109.   Supervisors are eligible to become members of the "Top Achievers Business Team" (**"TAB Team"**), which includes three steps: Global Expansion Team (**"GET"**), Millionaire Team, and President's Team.

110.   TAB team members are eligible for Production Bonuses. The TAB Team Production Bonus is a bonus on the downline Organizational Volume (the volume on which a Supervisor is paid a Royalty Override).

**GET Team (SL)**

111.   Herbalife promotes a Supervisor to the GET Team if that Supervisor accrues 1,000 Royalty Override Points each month for three consecutive months.

112.   As a GET Team member, the distributor gets all the benefits of a Supervisor and can earn TAB Team Production Bonuses based on the qualification level, can qualify for vacation and training events and can participate in special advanced trainings and conference calls.

113.   A GET Team member can qualify for a monthly 2% TAB Team bonus payment of the downline Organizational Volume, which Herbalife describes as a partial reward for the team member's "undivided loyalty" to the company.

114.   According to Herbalife's 2012 Statement, GET Team members have an average annual earnings of $22,766 and median compensation of $19,417 in payments from Herbalife.

## Millionaire Team (SL)

115.   If a Supervisor achieves 4,000 Royalty Override Points each month for three consecutive months, Herbalife promotes that Supervisor to the Millionaire Team the following month and, after a waiting period of two months, that Millionaire Team member can earn a 2-4% monthly TAB Team bonus off the downline's Organizational Volume. Millionaire Team members also get all the benefits of being a Supervisor.

116.   According to Herbalife's 2012 Statement, Millionaire Team members earn an average of $100,195 and median of $97,303 in payments from Herbalife.

## President's Team (SL)

117.   Herbalife promotes a Supervisor who accrues 10,000 Royalty Override Points in three consecutive months to the President's Team where, after a waiting period of three months the President's Team member can earn a 2%-6% Production Bonus.

118.   To qualify for the President's Team, a Supervisor must accrue 20,000 to 50,000 Royalty Override Points in three months. The TAB Team bonuses range from 2% to 7%, depending on the number of Royalty Override Points the Supervisor accrues.

119.   For all TAB Team members, the Production Bonus decreases from the maximum percentage depending on whether there are other TAB Team members in the Tab Team member's downline earning Production Bonuses on the volume.

120.   According to Herbalife's 2012 Statement, President's Team members (which include the Chairman's Club and Founder's Circle Members) earn an average of $514,638 and median of $336,901 in payments from Herbalife.

## Chairman's Club (SL)

24

121. Herbalife promotes a distributor to the Chairman's Club if the distributor has five Fully-Qualified President's Team members in five separate lines of the distributor's downline organization.

122. Chairman's Club Members are eligible for a percentage of Herbalife's global sales. This bonus is the "Mark Hughes Bonus Award."

123. The Mark Hughes Bonus Award is a bonus pool representing a 1% of Herbalife's *worldwide* product sales (calculated using SRP). Herbalife distributes this bonus annually among the Chairman's Club and Founder's Circle Members. A copy of the 2010 Mark Hughes Bonus Award Qualifications and Rules (available by searching google for "'MH Bonus' Herbalife") is attached as **Exhibit J**.

124. The rules to qualify for a Mark Hughes Bonus are incredibly complex. They largely depend on a distributor having President's Team Members within their downline who meet certain production requirements, the Royalty Override Points that Herbalife awards the distributor, and their overall organization production. Notably, there are no rules requiring additional retail sales beyond the "10-Retail Customer Rule" and "70% Rule."

125. Herbalife can also exercise discretion in awarding the MH Bonus. Chairman's Club and Founder's Circle members are encouraged to

> Demonstrate leadership and Herbalife spirit. ...Support, promotion and participation in Herbalife efforts, including Company meetings and other efforts such as conference calls, Herbalife Broadband Network (HBN), audio/visual recordings, promotions, marketing and sales, projects, suggestions and working with the Company as it develops strategic plans and leads the effort to enhance the Company's overall business… Attendance of the Distributorship at major events.

126. This discretionary element of the MH bonus creates symbiotic relationship between Herbalife and the Beneficiaries and Promoters. It is not enough for a Beneficiary and Promoter to build their downline; instead, the Beneficiary and Promoter must actively work with Herbalife to promote the scheme and "enhance [Herbalife's] overall business."

127.   Plaintiff is informed based on information found at http://www.herbalife.com/chairmansclub and believes there are only forty-three Chairman's Club members, worldwide, as of April 4, 2013.

### Founders Circle (SL)

128.   The pinnacle of the Herbalife Pyramid is the Founder's Circle.

129.   Herbalife promotes a distributor to the Founder's Circle if the distributor has ten first-line, Fully-Qualified President's Team members in ten separate lines of that distributor's downline organization.

130.   Founder's Circle members are also eligible for the "Mark Hughes Bonus Award."

131.   Plaintiff is informed based on information found at http://www.herbalife.com/chairmansclub that as of April 4, 2013, there are only eight Founder's Circle members, worldwide.

### THE ILLEGAL SCHEME

132.   Herbalife's compensation structure rewards recruiting of new participants over retail sales and leads to abuses.

133.   These abuses include: (1) Herbalife and Beneficiaries and Promoters making outlandish statements about potential earnings and the business opportunity for potential and actual distributors; (2) distributors focusing on recruiting new distributors rather than on making retail sales of products; (3) distributors purchasing more products than they can feasibly sell to actual retail customers to meet volume requirements (a practice known as "inventory loading"); (4) Herbalife and Beneficiaries and Promoters encouraging other distributors to make "one-time" purchases to jump up the pyramid to higher levels ("pay determines position" and "position determines pay"); and (5) Herbalife and Beneficiaries and Promoters encouraging their downline distributors to recruit other distributors so they can use those distributors' purchases to move higher up the Herbalife Pyramid and get the Royalty Overrides, bonuses, and other incentives.

134.   Herbalife Ltd.'s 2011 and 2012 10-Ks describes this compensation structure as necessary to keep "its most active and productive distributors" – the Beneficiaries and Promoters:

> Once a distributor becomes a sales leader, he or she has the opportunity to qualify by earning specified amounts of royalty overrides for the Global Expansion Team, the Millionaire Team or the President's Team, and thereby receives production bonuses of up to 7%. We believe that the opportunity for distributors to earn royalty overrides and production bonuses contributes significantly to our ability to retain our most active and productive distributors.

Based on their 10-Ks, Herbalife Ltd. books the payment of these Royalty Overrides, bonuses, and other incentives on its own balance sheet as an expense.

135.   In its 2011 10-K, Herbalife Ltd. admits its business depends upon it success in recruiting and retaining distributors:

> Our ability to remain competitive depends, in significant part, on our success in recruiting and retaining distributors through an attractive compensation plan and other incentives. We believe that our production bonus program, international sponsorship program and other compensation and incentive programs provide our distributors with significant earning potential.

In its 2012 10-K, Herbalife changed that to mention its products: "Our ability to remain competitive depends on having relevant products that meet consumer needs, a rewarding compensation plan, and a financially viable company."

136.   With the 2004 and 2005 disclosures by Herbalife regarding its NSL turnover of 90% (who make up 83% of its total distributors) and disclosures that of the remaining 17% who are Supervisors and above, 43%-51% of its Supervisors do not requalify, historically, most Herbalife distributors will fail.

137.   As illustrated best by Exhibit B, Herbalife's 2013 Statement, the Herbalife Pyramid makes money for those few at the top of the pyramid – the Beneficiaries and Promoters – and those are the distributors Herbalife tries to retain to remain competitive in the industry – and disappoints the many at the bottom who cannot make retail profits and who give up on the Herbalife "business opportunity" in droves.

**Herbalife's Inducement of New Recruits**

138.   Herbalife induces new recruits to join the Herbalife program through material false representations that such recruits can re-sell Herbalife products for retail profit and can move up the pyramid and earn commissions, bonuses, and other incentives because of their recruiting activities.

139.   Besides representations made in the IBP or mini-IBP, Herbalife also promotes the scheme using distributor testimonials. In testimonials Herbalife published on its website, Herbalife tells recruits and distributors:

   a.   Natalie and Justin M. say that "'Now we control our destiny.' … 'We researched different business opportunities,'…'But Herbalife offered the chance to work from home, coupled with solid earning potential.'"

   b.   Scotty M. says that "'After just two years working the business, I was able to quit my job and become a full-time Distributor.' 'I wanted to be my own boss.' … 'I've been able to upgrade to a bigger home and nicer car.'"

   c.   Wendy W. says "'I'm the owner of an International business!' … 'If you have little or no business experience, don't worry; determination can go a long way!'"

These statements taken from Herbalife's website are attached as **Exhibit K**.

140.   In Herbalife's IBP and Mini-IBP, Herbalife includes a magazine called *Live the Good Life! HERBALIFE* (Exhibit F). There, with images of currency, luxury vehicles, boats, and expensive homes, Herbalife tells recruits that it is a "part-time opportunity," "[a] full-time Opportunity,": and "[t]he opportunity to earn more than you ever thought possible and make your dreams come true!" Recruits are also told this is "[a] business opportunity for everyone that's fun, simple and magical!" and that all they need to do is: use the products, wear the button, and talk to people – "Use, Wear, Talk."

141.   In *Live the Good Life! Herbalife,* Herbalife provides the following example of potential ways that new recruits can earn income. For both of these examples in the below representation.

## Earn an income several different ways





**Direct Sales**
- As a Distributor $25 of every $100   **25%**
- As a Success Builder $42 of every $100   **42%**
- As a Supervisor $50 of every $100   **50%**

**Downline organization**
- Commission checks
- Royalty checks
- Bonus checks

**Plus:**
- **Recognition**
- **Promotions**
- **Training**

## How to earn even more income

| Example 1 | Example 2 |
|---|---|
| You = Supervisor (2,500 Volume Points) | You = Supervisor (2,500 Volume Points) |
| You recruit & retain 2 supervisors | You recruit & retain 3 supervisors |
| • 2 Supervisors each produce 2,500 Organizational Volume Points | • 3 Supervisors each produce 2,500 Organizational Volume Points |
| • = 5,000 Volume Points   R.O. = $250/month | • = 7,500 Volume Points   R.O. = $375/month |
| They each recruit & retain 2 Supervisors | They each recruit & retain 3 Supervisors |
| • 4 Supervisors each produce 2,500 Organizational Volume Points | • 9 Supervisors each produce 2,500 Organizational Volume Points |
| • = 10,000 Volume Points   R.O. = $500/month | • = 22,500 Volume Points   R.O. = $1,125/month |
| They each recruit & retain 2 Supervisors | They each recruit & retain 3 Supervisors |
| • 8 Supervisors each produce 2,500 Organizational Volume Points | • 27 Supervisors each produce 2,500 Organizational Volume Points |
| • = 20,000 Volume Points   R.O. = $1,000/month | • = 67,500 Volume Points   R.O. = $3,375/month |
| Total of 35,000 Volume Points, Your R.O. = $1,750 Plus Production Bonus of 2% = $700 | Total of 97,500 Volume Points, Your R.O. = $4,875 Plus Production Bonus of 4% = $3,900 |
| **Total of Checks $2,450/mo.** | **Total of Checks $8,775/mo.** |

## Imagine...4 or 5!

*The incomes presented are applicable to the individuals depicted and are not a guarantee of your income, nor are they typical. For the Statement of Average Gross Compensation for U.S. Supervisors, go to www.Herbalife.com or www.MyHerbalife.com.

41

Based on Herbalife's 2013 Statement, a distributor receiving checks of $2,450 a

month or $8,775 a month would be at least in the top 0.23% or 0.092% of all U.S. distributors, respectively. Prior to Herbalife's 2013 Statement, a prospective or actual distributor had no way to know how atypical Herbalife's examples were.

142.   Herbalife also distributes a magazine through the U.S. Mail called *Herbalife Today*. *Herbalife Today* follows a format where Herbalife Ltd.'s CEO and President, Michael Johnson, has a letter to distributors, as well as product advertisements, as well as a section called "Success Stories," featuring a President's Circle member, along with other success stories of TAB Team and GET Team members.

143.   In the *Herbalife Today* magazine, Issue No.156, which Herbalife distributed in the third quarter of 2012, and which Herbalife sent to Plaintiff Bostick and other members of the class, Michael Johnson writes, "[m]illions of people's lives are being improved through our products and our business opportunity." Selected portions of *Herbalife Today*, Issue No. 156 are attached as **Exhibit L**. Bostick reviewed *Herbalife Today* as they were sent to him.

144.   For the "Success Story," *Herbalife Today*, Issue No. 156, p.11-12, features a Chairman's Club member, Paulina Riveros. Herbalife tells a tale of Paulina working part-time using "a proven and surprisingly simple approach to breathe life into her organization: using the products, wearing the button, and talking to people." "This is how Paulina began climbing the Marketing Plan and earning amazing income. … Today she lives in a spacious ranch in Florida, and has a lifestyle that she couldn't have imagined in her wildest dreams."

145.   *Herbalife Today*, No 156, also features a section called "Where Inspiration Meets Success: At a crossroads in their lives, these Distributors took the high road, and turned their inspiration into success." There, distributors like Deisy T., advises readers:

> You only have to put in the hard work along with the dedication, patience and discipline, attributes you can learn at the events. Herbalife is a real opportunity for everyone who is willing to focus

1    and work for his or her goals. Plant a seed every day and you will
harvest lifetime success.

2    146.   *Herbalife Today* is full of "success" stories of distributors like the

3    Beneficiaries and Promoters. They boast of: their "successful international business

4    that I managed to build from scratch"; leaving high-paying jobs to join the

5    Herbalife business; enjoying "a lifestyle that they always dreamed of"; replacing

6    "two engineering salaries with Herbalife income"; and "making more money than

7    he could have ever imagined." Herbalife has published similar testimonials in

8    *Herbalife Today* for the last four years.

9    147.   Herbalife also has its own official YouTube channel,

10   http://www.youtube.com/user/HerbalifeIntl. There, a video entitled "Why

11   Herbalife, Why Now? Building your Business"( uploaded on December 22, 2008

12   and available through the date of filing, <http://www.youtube.com/watch?v=-

13   990eOlwchw>) demonstrates the Herbalife "pitch."

14   148.   Herbalife Ltd.'s Chairman and CEO, Michael Johnson, introduces that

15   video, saying "boy do we have a solution to help you in these tough economic

16   times." Highlighting the economic uncertainty at the time, the video asks "why

17   Herbalife?" To that question, various distributors respond: "it's recession proof."

18   "When everybody else is having troubles, listen – we're flourishing." "When the

19   economy is bad our business is fueled." "I got started in a recession – this is my

20   fourth recession. I'm more excited about today than ever before." And "This

21   opportunity can be your answer."

22   149.   In that video, Distributors tell viewers that with Herbalife "you get to

23   be your own boss," "earn extra money," "work from home," "raise your own

24   children," "make your own hours," "make part-time or full-time money," "take

25   your family on vacations," "give your family all the extras that they deserve,"

26   "change your lifestyle to do whatever you want to do." When asked again, "why

27   Herbalife, " recruits are told "because you can finally earn what you're worth."

28

150.   The video ends with the Herbalife's Chairman and CEO exclaiming, "So why are you waiting. Come on – at Herbalife we've got the answer to these tough economic times. Contact the person who sent you this video and start improving your life right now. Become an Herbalife independent distributor today."

### Beneficiaries and Promoters' Inducement of New Recruits & Rallying the Troops

151.   Herbalife features the Beneficiaries and Promoters on its website www.herbalife.com/chairmansclub (visited April 8, 2013) and at www.video.herbalife.com. There, many of the Beneficiaries and Promoters have videos detailing their expensive lifestyles, lavish homes, luxury cars, and their "rags-to-riches" stories, all purportedly made possible through Herbalife.

152.   Herbalife also prominently features the Beneficiaries and Promoters in literature, flyers, and public events.

153.   Herbalife sponsors what it calls an "Herbalife Extravaganza." The Herbalife Extravaganza is annual convention that Herbalife promotes in *Herbalife Today*, online and through emails. A the Extravaganza, Herbalife distributors come from around the country for sales and marketing advice and tips from Beneficiaries and Promoters.

154.   In one video taken from the Herbalife 2010 Extravaganza in Los Angeles, California, Beneficiary and Promoter Geri Cvitanovich, in minutes 1:40-3:00, tells a convention hall filled with distributors that the Herbalife plan "is a confidence plan … to take you from where you are to wherever you want to go," grooming them to become multimillionaires:

> all of us are getting groomed to become multi-millionaires. That is an awesome opportunity. Now you can take advantage of it. Or you only want to make $60,000, $100,000, couple $100,000. But the fact that we are all here getting groomed to become millionaires in today's marketplace to me is an awesome privilege to be a part of. And I just want those of you who are new to know that you are in the right place at the right time. The fastest amount of growth in the shortest amount of time in our history. And we are doing nothing but going up.

That video can be found at http://www.youtube.com/watch?v=PmeLJHHKoDk (visited April 8, 2013).

155.   In another video taken at the Herbalife 2011 Extravaganza in Las Vegas found at http://www.youtube.com/watch?v=cVbd8bw4MlQ (visited April 8, 2013) Beneficiary and Promoter Susan Peterson tells attendees, at minutes 1:03-1:58 that, if they are not getting rich in Herbalife, "it's wrong" and that they are taking things for granted:

> A lot of us, we built our organizations not when it was easy but when it was hard. When it was terrible. When it was tough. And to make a fortune in the tough times is really something. But to make it in the easy times you would think everyone would do it and to not do [it] is just to me wrong. I mean if you are not getting rich today in Herbalife, I'm going to say be honest, it's wrong. It's really wrong. It means you're taking things for granted.

Peterson instructs attendees at minutes 3:00-5:42 that to increase their royalty checks, they should focus on recruiting people looking for opportunity:

> If you want to recruit somebody who loves the products and who wants to be your discounted customer because they love the products … I would say keep doing that and it's wonderful. But you can't count that in business-building recruiting. If you want to move the check, you need to find other people that want to make money and represent the Herbalife products and the Herbalife opportunity. People that are like you that want to be distributors….find those people that are looking for opportunity. That want to change their family's lives and their financial situation. [Those are the] people you need to work with. [Those are] the people you need to find. And believe me, there has never been an easier time to find people like that, okay, because our economy is bad in America. But at the same time our opportunity has never been stronger. Our brand, our product, our company, our direction. And if you aren't going after this, shame on you. Because you're going to miss the greatest time-period to literally go here [gestures with her hand down] to here [gestures with her hand up] with your royalty check. It doesn't happen often. It has happened two times in my Herbalife career. This is number three. This is the time to work. This is the time to recruit. This is the time to build a new organization. This is the time. There has never been a time this easy. You've gotta go for this.

156.   In a video profile of Beneficiary and Promoter Doran Andre found at http://www.youtube.com/watch?v=2dYK605bAaU (visited April 8, 2013) Andre tells about how, at minutes 1:08-2:00, he went from working for a company at 22 building his own Herbalife distributorship:

> There [were] people in the company that wanted to mentor us. There was a support system, an infrastructure, a business model that all we needed to do is execute. And then before you know it, in four months working the same amount of hours, two to three hours a week, [our] income hit $1,500 a month…and in 90 days our income hit $10,000 a month. And our very first calendar year our income hit $350,000. And our second year… our income hit a million one.

Andre goes on to remark, after a tour of his luxury home and images of his red Ferrari, at minutes 4:00-4:15:

> You know it's really amazing. I step out of the Ferrari or Bentley or whatever and people go 'what does that guy do for a living?' and I go I'm an Herbalife independent distributor. And people are absolutely amazed at that that's what I do. It's an incredible quality of life.

Andre also operates what he calls the "Financial Success System." In a video found at http://vimeo.com/20317153 (visited April 8, 2013) promoting his system, he shows his $30,000,000 home, luxury cars and motorcycle and tells his audience: "the big money hasn't even been made in Herbalife…. The biggest money in the shortest period of time is going to be in the next 3-5 years."

157.   These types of grand overstatements regarding distributors' potential earnings and opportunities are part of a pattern and practice throughout the Herbalife Pyramid. One Herbalife distributor's website, http://www.cwgteam.com/, (visited April 8, 2013) promises that:

> how far you take your Herbalife business and the income you require or desire is your decision. However, you may be interested in the following statistics:
>
> o    Lottery Win: 1 in 13 million chance of becoming a millionaire
> o    Herbalife Distributor: 1 in 26,000 chance of becoming a millionaire
> o    Herbalife Supervisor: 1 in 2,600 chance of becoming a millionaire
> o    Herbalife World Team member: 1 in 800 chance of becoming a millionaire
> o    Herbalife Global Expansion Team member: 1 in 80 chance of becoming a millionaire
> o    Herbalife Millionaire Team member: 1 in 8 chance of becoming a millionaire
> o    Herbalife President's Team member: becoming a millionaire is a certainty

**Herbalife's Deception Regarding Potential Earnings**

158.   When making statements regarding their wealth and the potential wealth for new recruits, Herbalife and the Beneficiaries and Promoters routinely refer the readers or viewers (with an asterisk and a footnote) to the Herbalife "Statement of Average Gross Compensation of U.S. Supervisors." They disclaim, "Incomes applicable to the individual (or example) depicted and not average. For average financial performance data, see the Statement of Average Gross Compensation of U.S. Supervisors at Herbalife.com and MyHerbalife.com."

159.   At a meeting with Wall Street analysts in 2007, Herbalife's Chairman and CEO Michael Johnson characterized these Statements of Average Gross Compensation as "transparent" to distributors:

> We are transparent with our earnings potential among supervisors. The staff [*sic.*] on this page which is the average gross compensation of U.S. supervisors is a public document, it is available on our website and is part of our introductory business pack that all new distributors receive. So, every new distributor in this Company knows exactly where they stand and what their opportunity is inside the Company.

160.   As Johnson explains, throughout 2009-2013, Herbalife distributed its "Statements of Average Gross Compensation of U.S. Supervisors" to all of its U.S. distributors both in Book 4, the Sales and Marketing Plan, as well as on the internet.

161.   At the bottom of each of its disclosures made from 2009-2012 (Exhibit A) Herbalife tells its distributors: "The figures stated above are not a guarantee nor are they a projection of a typical Distributor's earnings or profits. Like any other independent business, the achievement or failure of a Distributor depends upon his or her skill set, commitment and desire to succeed. At Herbalife, the opportunity to earn more is always available to each and every Distributor."

162.   From at least 2009 through February 2013, however, Herbalife cherry-picked the data set that they used to create their 2009-2013 Statements. They only reported the incomes of "Supervisors" and above, and further limited that data set to "Active Leaders" – those who "generated at least 2,500 points of volume in" in the year "after becoming Supervisor."

163.   According to their 2011 Statement, "Active Leaders" only make up 39.4% of Herbalife's "Leaders." Thus, not only did Herbalife fail to disclose any earnings as to majority of distributors who were NSLs, Herbalife failed to disclose the earnings of 60.6% of SLs in their statements distributed in 2012. Below is the Statement that Herbalife distributed to Bostick in his Sales and Marketing Plan. A full copy is attached as part of Exhibit A:

## STATEMENT OF AVERAGE GROSS COMPENSATION OF U.S. SUPERVISORS

Herbalife offers its Distributors an opportunity to achieve a lifetime of better health through its scientifically advanced weight-management and nutrition products. While many of our Distributors join the Herbalife family simply to enjoy our life-changing products, others want to share their results and take advantage of the many income benefits our business opportunity provides. With Herbalife, you can work part time and earn a supplemental income, or focus solely on your Herbalife Distributorship and increase your financial potential. It's completely up to the individual how much he or she wants to achieve! A Distributor earns profits by buying Herbalife products at wholesale and reselling them at retail. If the Distributor wants to increase his or her involvement in the business and enjoy the possibility of higher levels of income, he or she may sponsor others into the business and develop an organization.

Over 25% of Distributors reach the rank of Supervisor and above ("Leader"), qualifying them for additional compensation, which is paid by Herbalife based upon the sales production of those they have sponsored directly and indirectly. The annual gross compensation paid by Herbalife to all Leaders during 2011 averaged $2,900. Over 39% of Supervisors are "Active" (defined as those who generated at least 2,500 points of volume in 2011 after becoming Supervisor). The annual gross compensation paid by Herbalife to Active Leaders during 2011 averaged approximately $7,300.

| ACTIVE LEADERS | | | |
|---|---|---|---|
| Earning Level | % of Total Leaders | % of Active Leaders | Average Earnings (USD) |
| President's Team | 0.2% | 0.6% | $ 515,689 |
| Millionaire Team | 0.7% | 1.7% | $ 100,195 |
| GET | 2.6% | 6.5% | $  22,766 |
| World Team | 2.9% | 7.3% | $   6,224 |
| Supervisor | 33.1% | 83.9% | $     901 |
| Total | 39.4% | 100.0% | $   7,348 |

The amounts above do not include the income Distributors can earn from their retail or wholesale income, so the actual compensation can be somewhat higher, depending upon each Distributor's personal-selling efforts.

The figures stated above are not a guarantee nor are they a projection of a typical Distributor's earnings or profits. Like any other independent business, the achievement or failure of a Distributor depends upon his or her skill set, commitment and desire to succeed. At Herbalife, the opportunity to earn more is always available to each and every Distributor.

164.   In February 2013, Herbalife released an updated and extended disclosure. A full copy is available at Exhibit B. A portion is below:

| Single-Level Distributors (No Downline) | | | |
|---|---|---|---|
| **Economic Opportunity** | Distributors* | | The economic rewards for single-level Distributors are the wholesale pricing received on products for consumption by the Distributor and his or her family as well as the opportunity to retail product to non-Distributors. Neither of these rewards are payments made by the company and therefore are excluded from this schedule |
| | Number | % | |
| • Wholesale price on product purchases<br>• Retail profit on sales to non-Distributors | 351,065 | 71% | |

| Non-Sales Leaders** With a Downline | | | |
|---|---|---|---|
| **Economic Opportunity** | Distributors | | In addition to the economic rewards of the single-level Distributors above, which are not included in this chart, certain non-sales leaders with a downline may be eligible for payments from Herbalife on downline product purchases made directly with Herbalife.<br><br>2,466 of the 4,449 eligible Distributors earned such payments in 2012. The average total payments to the 2,466 Distributors was $104. |
| | Number | % | |
| • Wholesale price on product purchases<br>• Retail profit on sales to non-Distributors<br>• Wholesale profit on sales to another Distributor | 60,333 | 12% | |

| Sales Leaders** With a Downline | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Economic Opportunity** | Distributors | | | All Sales Leaders with a Downline | | | |
| | Number | % | Average Payments from Herbalife | Number of Distributors | % of Total Grouping | Average Gross Payments | |
| • Wholesale price on product purchases<br>• Retail profit on sales to non-Distributors<br>• Wholesale profit on sales to another Distributor<br>• Multi-level compensation on downline sales<br>  • Royalties<br>  • Bonuses | 82,464 | 17% | >$250,000 | 194 | 0.2% | $724,030 | This chart does not include amounts earned by Distributors on their sales of Herbalife products to others |
| | | | $100,001-$250,000 | 452 | 0.5% | $148,808 | |
| | | | $50,001-$100,000 | 539 | 0.7% | $68,912 | |
| | | | $25,001-$50,000 | 1,136 | 1.4% | $35,581 | |
| | | | $10,001-$25,000 | 1,940 | 2.4% | $15,538 | |
| | | | $5,001-$10,000 | 2,552 | 3.1% | $7,008 | |
| | | | $1,001-$5,000 | 11,307 | 13.7% | $2,216 | |
| | | | $1-$1,000 | 39,151 | 47.5% | $292 | |
| | | | 0 | 25,193 | 30.6% | $0 | |
| | | | Total | 82,464 | 100.0% | $4,485 | |

* 30,621 of the 351,065 single-level Distributors are sales leaders without a downline
** Sales leaders are Distributors that achieved the level of Supervisor or higher. See details on Herbalife's marketing plan at www.myherbalife.com.

165.   Plaintiff is informed and believes based on Herbalife's 2013 Statement that Herbalife's representation in its 2009-2012 Statements that "[o]ver 25% of Distributors reach the level of Supervisor and above" is false and misleading. The 2013 Statement disclosed that 83% of all of its distributors in 2012 were NSLs, leaving only 17% as Supervisors and above in 2013. Including the 30,621 distributors who became Supervisors through their own Personally Purchased Volume, brings the percentage of Supervisors to 22.89% of all distributors.

166.   Herbalife's 2013 Statement discloses that 71% of all U.S. Distributors – 351,065 distributors – are "Single-Level Distributors" with no downline.

167.   Herbalife's 2013 Statement discloses that there are only 60,333 NSLs with a downline (Senior Consultants and Qualified Producers). Of that number, only 2,466 of those distributors earned "Wholesale Profits." Even then, the average "wholesale profits" of those 2,466 distributors was $104 for a total payment of $256,464 paid to NSLs in 2012 in "Wholesale Profits."

168.   Herbalife's 2013 Statement also discloses that a "majority of those Distributors who earned in excess of $100,000 in 2012 had reached the level of Herbalife's President's Team. During 2012, 47 U.S. Distributors joined the level of President's Team. They averaged 9 years as an Herbalife Distributor before reaching President's Team, with the longest being 20 years and the shortest being less than three years."

169.   Similarly, Herbalife's 2013 Statement discloses that besides the 82,464 SLs, there are 30,621 SLs who "paid for their position."

170.   In its 2012, 2011, 2010, and 2009 10-K disclosures, Herbalife makes at least some disclosure to investors and potential investors that it retains 51.1%, 48.6%, 43.3%, and 42.2% of its Sales Leaders; until the 2013 Statement; Herbalife, however, failed to disclose this same fact to distributors and potential distributors. Finally, in the 2013 Statement Herbalife provided distributors the same information

that it thinks is important for investors: "51.0% of all sales leaders as of February 1st, 2011, requalified by February 1st, 2012 (including 33% of first time sales leaders)."

171.   All of the information not disclosed in 2009-2012 is relevant for: recruits deciding if Herbalife really is the "answer to these tough economic times"; recruits deciding to become Herbalife distributors; distributors deciding to purchase Herbalife product; distributors reading glowing profiles on *Herbalife Today*; distributors evaluating their chances of earning "Wholesale profits," distributors deciding whether to purchase product to "pay for position"; distributors deciding whether to recruit other distributors; and distributors evaluating Founder's Circle members telling them they are "groomed to become multi-millionaires" and that if they are not "getting rich today in Herbalife…It's really wrong."

**Herbalife's Recruiting Rewards Price-Out Products**

172.   Because Herbalife sends such a large percentage of every dollar received by it upline as Wholesale Profits, Royalty Overrides, bonuses, and incentives – $0.46 to $0.64 of every dollar paid it for product – Herbalife sets the SRP at an inflated price well over what Herbalife's products sell at in the open marketplace.

173.   While Herbalife's "competitive compensation structure" supposedly pays out up to 73% of product revenues to distributors in "Retail and Wholesale Profits, Royalty and bonus income and incentives," it falls on the Herbalife distributor retailing the product to recoup this 73%.

174.   This inflated markup necessary for the "competitive compensation structure" makes Herbalife's products uncompetitive for retail sale at SRP.

**Overcharges on Packaging and Handling**

175.   On top of this inflated SRP, Herbalife charges a 7% "packaging and handling" fee based on the SRP for products ordered directly from Herbalife. A

distributor must add that 7% fee to the SRP to recoup their costs and earn the promised retail profits.

176.   Besides this 7% surcharge, Herbalife charges its distributors up to anywhere from 2.5% to 4% of the SRP if they have products shipped to them instead of picking them up at an Herbalife distribution center (there only six centers in the U.S.). For a distributor to earn the promised profit on a retail sale, the distributor would need to resell the product at 109.5% to 111% of SRP.

177.   Based on Herbalife's 2009-2012 10-Ks, Herbalife's average revenue for North America for "packaging and handling" and shipping is 10.33%, 10.50%, 10.59, and 10.7% of its total "Retail Sales" (which it uses the SRP to calculate).

178.   In an April 21, 2011 letter to the SEC, Herbalife states "[t]he shipping and handlings costs for 2010, 2009, and 2008 were $58 million, $49 million and $48 million, respectively." Herbalife's 2010 and 2009 10-Ks, however, account for Herbalife's revenues for North America (which includes Canada, Jamaica, and Aruba) from shipping and handling for 2010, 2009, and 2008 as $102.70 million, $87.30 million, and $80.8 million, respectively.

179.   Plaintiff is informed and believes based on the discrepancy between these reported numbers that Herbalife overcharged members of the class in 2009 and 2010 by millions of dollars for packaging, shipping, and handling. Because Herbalife has not changed its formula to calculate the "Packaging and Handling" and shipping costs since 2009, Plaintiff is informed and believes that Herbalife has similarly overcharged and profited from Bostick and the class from their supposed "Packaging and Handling" and "Shipping" fees during 2011, 2012, and 2013.

180.   Plaintiff is further informed and believes that Herbalife uses this surcharge on top of the SRP as a way to avoid having to pay $0.46 to $0.64 of the actual revenue it receives from purchases upline. By using a surcharge, Herbalife can increase its profit margin without dramatically raising the SRP on its products

(and without having to share those price increases with the Beneficiaries and Promoters).

181.   Because of the inflated SRP and the packaging, handling, and shipping fees, the prices distributors pay for Herbalife's products are so high that the profit Herbalife promises on retail sales at the Distributor level is almost impossible.

182.   While there is a retail component to the Herbalife Pyramid, the inflated SRP of the products and inflated shipping and handling fees make it unlikely that Herbalife distributors have meaningful opportunities to have retail sales. As Herbalife pays out "Wholesale Profits," royalties, bonuses, and other incentives regardless of whether the downline distributor sells the product at SRP, there is a systematic incentive to recruit other distributors.

183.   Herbalife's system of graduated discounts depending on the distributor's position exacerbates this problem. Distributors who purchase Herbalife products at a 25%, 35, or 42% discount must compete on price with other distributors higher up the pyramid who can purchase products at greater discount and sell those same products at or around cost.

184.   Based on Bostick's experience in selling Herbalife products and competing in the marketplace, he is informed and believes that Herbalife's distributors routinely discount Herbalife products on EBay, Craigslist, and on various websites from the SRP, and there is little opportunity for retail profits.

185.   Because the distributors are Herbalife's actual customers and consumers of its products and those actual customers and consumers are overpaying $0.46 to $0.64 on the dollar for product, those distributors drop out at overwhelming numbers, and Herbalife requires an ever expanding network of so-called distributors.

### Herbalife's Sales and Marketing Plan Does Not Have or Follow Safeguards

186.   In *In re Amway Corp., 93 F.T.C. 618 (1979)* ("*Amway*") the FTC ruled that Amway did not violate the FTC Act because it adopted and enforced four rules that would help a direct marketer avoid the characteristics of an FTC Act violation: the initial investment rule, the 70% rule, the buyback rule, and the 10 customer rule.

187.   These rules are designed to deter inventory loading and encourage retail sales. In *Omnitrition*, the Ninth Circuit explained that where "a distribution program appears to meet the *Koscot* definition of a pyramid scheme, there must be evidence that the program's safeguards are enforced and actually serve to deter inventory loading and encourage retail sales." *Omnitrition*, 79 F.3d 776 (1996).

188.   **The Initial Investment Rule**. The FTC decision noted that illegal schemes require a payment or initial disbursement by a new participant for the right to sell products and the right to earn rewards, in return for recruiting other participants into the program and which are unrelated to sale of product to the ultimate user. The FTC found that Amway did not require such an investment because "the Amway system does not involve an 'investment' inventory by a new distributor. A kit of sales literature costing only $15.60 is the only requisite." *In re Amway Corp.*, 93 F.T.C. 618, 716 (1979).

189.   Defendant Herbalife requires each new Herbalife distributor must purchase an International Business Pack (IBP) or mini-IBP at a cost of $95.55 or $57.75, respectively. This requirement, by itself, does not constitute an "investment inventory" under the rule.

190.   Because Herbalife increases its discount off the SRP on a graduated basis for Distributors, Senior Consultants, Success Builders, Qualified Producers, and Supervisors, however, Herbalife requires an initial investment well beyond the price of the IBP if a distributor wants to compete in the marketplace for retail consumers of Herbalife products or move up the Herbalife Pyramid to a place where they can earn commissions, Royalty Overrides, bonuses, and incentives.

Following the mantra of "pay for your position" and "position determines the pay," Herbalife and Beneficiaries and Promoters pressure distributors to make a significant investment to "buy their discount" and get the "highest discount for the least expenditure."

191.   In the IBC, Booklet 3, Building Your Business (Exhibit H) Herbalife encourages its distributors on page 18 to invest in product inventory for customer orders:

> Here are some areas you may want to consider putting money towards:
> ● Product Inventory for customer orders
> ● Personal product inventory
> ● Advertising for your business
> ● Training events/seminars
> ● Business costs, such as office supplies
> ● And, most of all, yourself!"

192.   In explaining why it is important to build an investment inventory, Herbalife tells distributors on page 19 of Exhibit H:

> ●You can't sell what you don't have. Carry enough inventory on hand to cover all your local sales
> …
> ● Many people purchase product on the spot. Carry enough product on hand to accommodate spur-of-the-moment sales. You don't want to make a paying customer wait
> …
> ● If you are doing a one-on-one presentation, don't make the customer wait for product…"

193.   Like here, in *Omnitrition* there was no significant charge to become a distributor and the distributors had no quota of product to buy. *Omnitrition*, 79 F.3d at 780. Similar to Herbalife, however, to receive any "non-retail" benefit from the Omnitrition system or to move up to the next level as a "Bronze Supervisor," the Omnitrition distributors had to purchase and convince three other recruits to purchase a certain amount of product. *Id*. Omnitrition argued that its business plan did not meet the first element of the *Koscot* test because: "it does not charge for the right to sell its products at the distributor level." The Ninth Circuit disagreed,

finding that while that may be the case for the "distributor" level, considering the "supervisor" level, a reasonable jury could conclude the *Koscot* factors are met:

> A participant must pay a substantial amount of money to Omnitrition in the form of large monthly product orders. In exchange for these purchases, the supervisor receives the right to sell the products and earn compensation based on product orders made by the supervisor's recruits. This compensation is facially "unrelated to the sale of product to ultimate users" because it is paid based on the suggested retail price of the amount ordered from Omnitrition rather than based on actual sales to consumers. On its face, Omnitrition' s program appears to be a pyramid scheme. Omnitrition cannot save itself simply by pointing to the fact that it makes some retail sales.

*Id*. at 782 (emphasis added).

194.   **The "70%" Rule**: In the *Amway* decision, the FTC explained the 70% rule as follows: "[t]o ensure that distributors do not attempt to secure the performance bonus solely on the basis of purchases, Amway requires that, to receive a performance bonus, distributors must resell at least 70% of the products they have purchased each month.... Amway enforces the 70% rule." *Amway*, 93 F.T.C. 618, 646, ¶73.

195.   Herbalife's 70% rule, found at page 71 of Exhibit C is:

> In order to qualify for and receive Royalty Overrides, Production Bonuses, and other bonuses paid by Herbalife, at least 70% of the total value of Herbalife products a Distributor purchases each Volume Month must be sold or consumed that month. For the purpose of fulfilling the certification requirements of this Rule, a Distributor may count any or all of the following:
>
> • Sales to retail customers;
> • Sales at wholesale to downline Distributors;
> • Product used for personal or family consumption; and
> • *Product consumed at Nutrition Clubs.
>
> If the Distributor fails to timely certify to Herbalife that they have sold or consumed 70% of the product purchases made that Volume Month, Royalty Overrides, Production Bonuses, and other bonuses will not be paid to the Distributor.
>
> *If a Distributor utilizes Nutrition Club sampling activity towards compliance, the Distributor shall maintain a log of member visits for at least two years, setting forth the name of the member, dates of visits, and contact information, and shall make those records available for verification purposes if requested by the Company.

196.   Herbalife's 70% Rule does not require that Herbalife's distributors resell at least 70% of the Herbalife products to resale customers because it allows "[p]roduct used for personal or family consumption" to satisfy the rule. As reiterated by the 9th Circuit in *Webster v. Omnitrition Intern., Inc.*, self-consumption does not count as a retail sale: "If *Koscot* is to have any teeth, such a sale [for self-consumption] cannot satisfy the requirement that sales be to 'ultimate users' of a product." *Omnitrition*, 79 F.3d 776, 783 citing *Koscot*, 86 F.T.C. 1106,1181.

197.   Herbalife does not require a Supervisor to make *any* retail sales as the rule allows "[s]ales at wholesale to downline Distributors." Again, as explained by the 9th Circuit in *Omnitrition* in finding that where Omnitrition also allowed sales to downline distributors to count for the 70% rule it did not comply: "Importantly, the [70%] requirement can be satisfied by *non-retail* sales to a supervisor's own downline [distributors]. This makes it less likely that the rule will effectively tie royalty overrides to sales to ultimate users, as *Koscot* requires." *Omnitrition*, 79 F.3d 776, 783.

198.   The 70% Rule is not applied to NSL distributors (or Supervisors who do not have a First, Second, or Third Level) even though those distributors can qualify for compensation in promotions up the chain, increased discounts on purchases, and commissions on downline purchases.

199.   While Herbalife requires Supervisors and above to certify that they have complied with the 70% rule, Plaintiff is informed and believes based the Court's finding of fact in its August 25, 2009 Memorandum & Order Regarding Cross-Motions for Summary Judgment, *Herbalife International of America, Inc. v. Ford et al. Case* No. 2:07-CV-2529-GAF-FMO (C.D. Cal.), that "Herbalife does not perform audits to determine compliance with the 70% Rule unless there is an ongoing 'ethical investigation' of a Supervisor suspected of violating Herbalife's policies." *See Memorandum & Order* (Docket No. 374), 8:16-19.

200.   **The Ten Customer Rule**: The "ten customer rule" approved by the FTC in *Amway* provided that "distributors may not receive a performance bonus unless they prove a sale to each of ten different retail customers during each month. . . . The ten customer rule is enforced by Amway and the Direct Distributors. . ." *Amway*, 93 F.T.C. 618, 646, ¶74.

201.   Herbalife's Rule is: Rule 18-B The 10 Retail Customers Rule

A Distributor must personally make sales to at least ten (10) separate retail customers in a given Volume Month to qualify for and receive Royalty Overrides, Production Bonuses, and other bonuses paid by Herbalife. For the purpose of fulfilling the certification requirements of this Rule, a Distributor may count any or all of the following each Volume Month.
•      A sale to a retail customer;
•      A sale to a first-line Distributor with up to 200 Personally Purchased Volume Points (and no downline Distributors) may be counted as a sale to one (1) retail customer; and
•      *A Nutrition Club member who consumed products during ten (10) visits to a Nutrition Club within one Volume Month may be counted by the Nutrition Club operator as a sale to one (1) retail customer.

If the Distributor fails to timely certify to Herbalife that they have sold to at least ten (10) retail customers in a given Volume Month, Royalty Overrides, Production Bonuses, and other bonuses will not be paid to the Distributor.

202.   Herbalife's Ten Customer Rule does not mandate sales to customers not already Herbalife distributors. Herbalife allows "[a] sale to a first line Distributor with up to 200 personally purchased Volume Points (and no downline Distributors) which may be counted as a sale to one (1) retail customer," to count to satisfy the Retail Customer Rule. Herbalife's exception takes the "teeth" out of *Koscot*.

203.   Distributors can also satisfy this Herbalife's rule by giving away free samples of Herbalife products at their Nutrition Clubs. This does not constitute an "actual sale" under *Omnitrition* or *Koscot.*

204.   Herbalife does not apply the Ten Customer Rule to NSL distributors and Supervisors (who do not have a First, Second, or Third Level), even though they can obtain performance bonuses in promotions up the chain, increased discounts on purchases, and commissions on downline purchases.

205.   Herbalife's 10 Customer Rule and 70% Rule are ineffective in ensuring its distributors focus on retailing the products over recruiting. Because only distributors eligible for Royalty Overrides, bonuses, and other incentives must comply with the rule, to even become a distributor subject to the rules a distributor must recruit heavily and would be in at least the top 10% of all Herbalife distributors.

206.   **The Buy Back Rule.** Amway had a buy back rule where participants had to buy back from any person they recruited any saleable, unsold inventory upon the recruit's leaving Amway. *Amway*, 93 F.T.C. 618, 716. As the 9th Circuit explained: "The buy-back rule is only effective if it can reduce or eliminate the possibility of inventory loading by insuring that program participants do not find themselves saddled with thousands of dollars' worth of unsaleable products." *Omnitrition*, 79 F.3d 776, 784.

207.   Herbalife has a 30-Day Money Back Guarantee for "retail customers." When a retail customer returns product, they return the product to the distributor who sold them the product. That distributor is required, within 30 days of paying the refund to the customer, to send back the unused portion of the product or the containers. Then Herbalife exchanges the returned product with an identical replacement product for the Distributor, regardless of whether that distributor has another customer who wants to purchase the product or products.

208.   Herbalife has no such "Money Back Guarantee," for a distributor.

209.   The distributor can return products *purchased from Herbalife* within the prior 12 months on the following conditions:

    a.   The distributor must resign as an Herbalife Distributor (and forfeit all of their downline).

    b.   Herbalife reimburses a distributor the SRP of a product less that distributor's discount to purchase the product, less a 10% restocking fee.[6] A distributor does not receive a reimbursement of the 7% packaging and handling fee of the SRP or the shipping fee.

    c.   If the distributor has received Royalty Overrides, that distributor must return all of their records relative to the 70% rule.

An "Inventory Repurchase Request Form" is found at page 50 of Exhibit C.

210.   If a distributor purchases products from distributors in their upline (and not directly from Herbalife) this return policy does not apply. As NSLs can purchase product from their sponsor or their first upline Supervisor, unlike Amway's rule mandating that participants had to buy back recruit's product, Herbalife leaves its NSLs at the mercy of their upline to determine whether they will accept the return.

211.   As Herbalife took a 10% restocking fee from 2009 through May of 2012, Herbalife has not complied with the *Amway* rule.

212.   As Herbalife does not reimburse the distributor for the inflated packaging and shipping fees, Herbalife has not complied with the *Amway* rule.

213.   Herbalife knows of, approves, promotes, and facilitates the systematic noncompliance with or breach of, the rules that purportedly protect against the operation of an illegal scheme.

**Herbalife is Bound to Operate as Pyramid Scheme**

---

[6] Plaintiff is informed that the 10% restocking fee was discontinued sometime in May of 2012.

214.   Herbalife cannot fix itself even if it wants. In Herbalife's 2012 10-K, it explains it is contractually bound to continue implementing and operating this pyramid scheme:

> This agreement with our distributors provides that we will not change certain aspects of our marketing plan without the consent of a specified percentage of our distributors. For example, our agreement with our distributors provides that we may increase, but not decrease, the discount percentages available to our distributors for the purchase of products or the applicable royalty override percentages, including roll-ups, and production and other bonus percentages available to our distributors at various qualification levels within our distributor hierarchy.

215.   As Plaintiff Bostick has never made such an agreement with Herbalife, Bostick is informed and believes that the agreement Herbalife refers to is between Herbalife and Beneficiaries and Promoters and others. This agreement solidifies and memorializes that symbiotic relationship between Herbalife and the Beneficiaries and Promoters.

### Class Action Allegations

216.   Plaintiff Bostick brings this action as a class action under Federal Rule of Civil Procedure 23.

217.   **Class Definition:** All persons who were Herbalife distributors from April 2009 until the present.

Excluded from the class are the Defendants, their employees, family members, and any distributor who has been a member of the President's Circle, Founder's Circle, Chairman's Club, Millionaire Team, or the GET Team.

218.   Plaintiff Bostick also seeks relief for himself and all members of the class who agreed to a choice of law of California under California's Unfair and Deceptive Practices Acts, and California's Unfair Competition Act.

219.   Plaintiff Bostick seeks to pursue a private attorney general action for injunctive relief for himself and all members of the class who agreed to a choice of law of California, and he satisfies the standing and class action requirements.

COMPLAINT

220.   The members of the class number are over 400,000 and joinder of all Class members in a single action is impracticable.

221.   There are questions of law and/or fact common to the class and subclass, including but not limited to:

    a.  Whether Herbalife is operating an unlawful scheme;

    b.  Whether Herbalife and Beneficiaries and Promoters were operating an unlawful scheme;

    c.  Whether distributors paid money to Herbalife for (1) the right to sell a product and (2) the right to receive, in return for recruiting others, rewards which were unrelated to the sale of the product to retail consumers

    d.  Whether distributors had to make an initial investment;

    e.  Whether Herbalife had a 70% Rule and enforced it;

    f.  Whether Herbalife had a Ten-Customer Rule and enforced it;

    g.  Whether Herbalife had a buy-back rule and enforced it;

    h.  Whether Herbalife's Sales and Marketing Plan constitutes an endless chain under California state law.

    i.  Whether Herbalife or the Beneficiaries and Promoters omitted to inform Bostick and the plaintiff class that they were entering into an illegal scheme where an overwhelming number of participants lose money;

    j.  Whether Herbalife's Statements of Average Gross Compensation distributed from 2009 through 2012 were deceptive and misleading;

    k.  Whether Herbalife's business model primarily incentivizes the payment of compensation facially unrelated to the sale of the product to ultimate users because it is paid based on the suggested retail price of the amount ordered from Herbalife rather than on actual sales to consumers;

l.   Whether Herbalife overcharged for Packaging and Handling;

m.   Whether Herbalife or the Beneficiaries and Promoters engaged in acts of mail and/or wire fraud in direct violation of RICO;

n.   To what extent the conduct injured Bostick and the class;

o.   Whether Herbalife's conduct constitutes an unlawful, unfair and/or deceptive trade practice under California state law;

p.   Whether Herbalife's conduct constitutes unfair competition under California state law; and

q.    Whether Herbalife's conduct constitutes false advertising under California state law; and

222.   These and other questions of law and/or fact are common to the class and predominate over any question affecting only individual class members.

223.   Bostick's claims are typical of the claims of the class in that Bostick was a distributor for Defendant Herbalife and lost money because of the illegal scheme.

224.   Bostick will fairly and adequately represent the interests of the class. Bostick's claims are typical of those of the class. Bostick's interests are fully aligned with those of the class. And Bostick has retained counsel experienced and skilled in complex class action litigation.

225.   Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged, because such treatment will allow many similarly-situated persons to pursue their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

226.   Bostick knows of no difficulty likely to be encountered in the management of this case that would preclude its maintenance as a class action.

**FIRST CLAIM FOR RELIEF**

**(ENDLESS CHAIN SCHEME; California Penal Code §327**

**and Section 1689.2 of the California Civil Code)**

**Against All Defendants**

227.   Plaintiff realleges the previous allegations.

228.   California Penal Code § 327 renders endless chain schemes illegal. Section 1689.2 of the California Civil Code provides:

> A participant in an endless chain scheme, as defined in Section 327 of the Penal Code, may rescind the contract upon which the scheme is based, and may recover all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme.

229.    Herbalife is operating an endless chain scheme.

230.   Bostick and the class have suffered an injury in fact and have lost money or property because of Herbalife's business acts, omissions, and practices.

231.   Bostick and the class are entitled to recover all consideration paid under the scheme, less any amounts paid or consideration provided to the participant under the scheme.

232.   As punishment for violation of California Penal Code §327 is punishable by imprisonment for over one year, violation of California Penal Code §327 can provide the basis for a RICO predicate act of racketeering.

**SECOND CLAIM FOR RELIEF**

**(RICO 18 U.S.C. § 1962(a))**

**Against All Defendants**

233.   Plaintiff realleges the previous allegations.

234.   Herbalife and others willfully and intentionally violated and continue to violate RICO and California law with the goal of obtaining money, directly and indirectly, through a pattern of racketeering activities in violation of the mail and wire fraud statutes,18 U.S.C. §§ 1341 and 1343, 18 U.S.C. 1962(a), and California Penal Code §327.

235.   Herbalife International of America, Inc., Herbalife International, Inc., and Herbalife, Ltd. and the Beneficiaries and Promoters are engaged in activities

affecting federal interstate and foreign commerce and are entities capable of holding a legal or beneficial interest in property. Herbalife International of America, Inc., Herbalife International, Inc., and Herbalife, Ltd. and the various Beneficiaries and Promoters are "persons," as that term is defined by 18 U.S.C. §1961(3).

### The Herbalife Enterprise

236.   Herbalife International of America, Inc., Herbalife International, Inc., and Herbalife Ltd. and the Beneficiaries and Promoters make up the "Herbalife Enterprise" as an association of entities and individuals associated in fact to operate an illegal pyramid scheme. The Herbalife Enterprise is not a legal entity within the meaning of "enterprise" as defined in 18 U.S.C. § 1961(4). Herbalife and the Beneficiaries and Promoters have been members of the Herbalife Enterprise from at least April 2009 and continuing until the present. Herbalife and the Beneficiaries and Promoters are separate entities from the Herbalife Enterprise and play separate and distinct roles in the operation of the Herbalife Enterprise.

a. Herbalife Ltd. is the founder, architect, and beneficiary of the Herbalife Pyramid. Through interstate wire and mails, it coordinates the Herbalife Enterprise, a worldwide scheme. It also pays and awards the Royalty Overrides, bonuses, and other incentives to the Beneficiaries and Promoters and others. This includes the Mark Hughes Bonus, which Herbalife Ltd. exercises discretion in awarding, based on the Beneficiaries and Promoters' participation in promoting the Herbalife Enterprise.

b. Herbalife Ltd. employs Herbalife International, Inc. to coordinate the operations of the Herbalife Pyramid in the countries in which Herbalife operates, including determining and coordinating Royalty Points, Royalty Overrides, bonuses, and other incentives. Herbalife International, Inc. also coordinates the global marketing and promotion of the Herbalife Pyramid.

c.   Herbalife Ltd. employs Herbalife International of America, Inc. as its operational arm of the Herbalife Enterprise in the U.S. Herbalife Ltd. employs Herbalife International of America, Inc. to conduct racketeering activities in the U.S.

d.   Herbalife employs the Beneficiaries and Promoters to induce new recruits into the Herbalife Pyramid, to induce distributors to purchase Herbalife product, and to induce distributors to recruit additional distributors into the Herbalife Pyramid. The Beneficiaries and Promoters also have an agreement with Herbalife Ltd. mandating that Herbalife will not reform its fraudulent marketing plan without their consent.

237.   From at least April 2009 and continuing until the present, within the Central District of California and elsewhere, Herbalife International of America, Inc., Herbalife International, Inc., and Herbalife Ltd., in association with each other and in association with the Beneficiaries and Promoters, did knowingly, willfully and unlawfully conduct and participate, directly and indirectly, in the conduct of the affairs of the Herbalife Enterprise through a pattern of racketeering activity.

238.   From at least April 2009 and continuing until the present, Herbalife International of America, Inc., Herbalife International, Inc., and Herbalife Ltd., with each other and the Beneficiaries and Promoters, executed a *per se* scheme to defraud through a pattern of racketeering made up of distinct acts of mail and wire fraud under 18 U.S.C. §§ 1341 and 1343. The Herbalife Enterprise engaged in and affected interstate and foreign trade. The Herbalife Enterprise transacts business through the instrumentalities of interstate commerce such as telephones, facsimile machines, the internet, email, and the United States mail and interstate commercial carrier to communicate in furtherance of the activities of the Herbalife Enterprise. The Herbalife Enterprise advertises, markets, and sells products and services throughout the United States. The operation of the enterprise continued over several

years, including activities in every state, and has affected and damaged, and continues to affect and damage, commercial activity.

239.   To further the goals of the Herbalife Enterprise, which were to (1) earn money through fraudulent means, (2) entice individuals to become Herbalife distributors, (3) entice individuals to purchase products from Herbalife; (4) entice individuals to recruit others to become Herbalife distributors and profit off those recruits' purchases of Herbalife products, and (5) reap large profits for themselves based on false representations, Herbalife International of America, Inc., Herbalife International, Inc., and Herbalife Ltd. and the Beneficiaries and Promoters engaged in various forms of illegal activity, including (a) mail fraud, (b) wire fraud, and (c) conspiracy.

240.   The pattern of racketeering activity alleged is distinct from the Herbalife Enterprise. Each act of racketeering activity is distinct from the Herbalife Enterprise in that each is a separate offense committed by an entity or individual while the Herbalife Enterprise is an association of entities and individuals. The Herbalife Enterprise has an ongoing structure and/or organization supported by personnel and/or associates with continuing functions or duties.

241.   The racketeering acts set out above and below, and others, all had the same pattern and similar purpose of defrauding Bostick and the class for the benefit of the Herbalife Enterprise and its members. Each racketeering act was related, had a similar purpose, involved the same or similar participants and methods of commission and had similar results affecting Bostick and the class. The racketeering acts of mail and wire fraud were also related to each other in that they were part of the Herbalife Enterprise's goal to fraudulently induce Bostick and the class to join the illegal scheme, purchase products, and recruit others to join the scheme.

242.   Herbalife's and members of the Beneficiaries and Promoters' wrongful conduct has been and remains part of Herbalife Enterprise's ongoing way

of doing business and constitutes a continuing threat to the property of Bostick and the class. Without the repeated acts of mail and wire fraud, the Herbalife Enterprise's fraudulent scheme would not have succeeded.

243.   Revenue gained from the pattern of racketeering activity, which constitutes a significant portion of the total income of Herbalife and the Beneficiaries and Promoters, was reinvested in the operations of the Herbalife Enterprise for the following purposes: (a) to expand the operations of the Herbalife Enterprise through additional false and misleading advertising and promotional materials aimed at recruiting new distributors; (b) to facilitate the execution of the illegal scheme; and (c) to convince current distributors to recruit new distributors, and purchase Herbalife products.

244.   Bostick and the class were injured by the reinvestment of the racketeering income into the Herbalife Enterprise because they invested billions of dollars of their own money through their purchasing of IBP's, promotional materials, and Herbalife products, all of which were packaged and shipped at inflated charges.

245.   In connection with promoting and executing their illegal scheme, members of the Herbalife Enterprise knowingly and recklessly placed and caused to be placed in the United States mail or by interstate commercial carrier, or took or received therefrom, matters or things to be sent to or delivered by the United States mail or by interstate commercial carrier comprising, among other things product, invoices, letters, promotional materials, brochures, products and checks to Bostick and the class and received communications between and among themselves through the United States mail, in all fifty states and the District of Columbia. It was reasonably foreseeable that these mailings or receipts would take place in furtherance of the fraudulent scheme.

246.   In connection with promoting and executing their illegal scheme, members of the Herbalife Enterprise engaged in wire fraud, in violation of 18

U.S.C. § 1343, by, among other things, knowingly and recklessly transmitting or causing to be transmitted with wire communications, in interstate and foreign trade, materials promoting the illegal Herbalife Pyramid on internet web sites, radio, satellite radio, television, email, facsimile, telephone, and text messages, including promotional materials, registration information, product information, and invoices. Herbalife and Beneficiaries and Promoters maintain websites on the internet where Herbalife distributors can and do buy products and are given inducements to continue working as distributors within the Herbalife Pyramid. Herbalife maintains various websites hosting promotional videos featuring the Beneficiaries and Promoters promoting the unlawful scheme and other marketing materials featuring the Beneficiaries and Promoters promoting the illegal scheme. Herbalife sent and received these interstate wire communications to and from all fifty states and the District of Columbia.

247. Each Defendant has promoted the Herbalife Pyramid and Herbalife Enterprise. Each use of the mail or wire by Defendants and the Beneficiaries and Promoters done in furtherance of the Herbalife Pyramid is an act of racketeering.

248. The pattern of racketeering activity through which the affairs of the Herbalife Enterprise were conducted and in which Herbalife and the Beneficiaries and Promoters participated consisted of the following:

### Racketeering Act Number One

249. In April 2012, plaintiff Bostick received, through private commercial interstate carrier, the International Business Pack featuring the magazine *Live the Good Life! Herbalife*, which promoted the Herbalife Enterprise and contained material false representations regarding the success distributors could achieve through Herbalife by purchasing products and recruiting others to do the same. Herbalife includes *Live the Good Life! Herbalife*, in all International Business Packs and mini-IBP's. Because of his receipt of *Live the Good Life! Herbalife*, and the representations contained therein, Plaintiff Bostick signed up with Herbalife,

purchased Herbalife products, and recruited others to do the same. *Live the Good Life! Herbalife* was sent by Herbalife International of America, Inc. with the purpose and intent of promoting the Herbalife Enterprise's illegal scheme, all in violation of 18 U.S.C. § 1341.

### Racketeering Act Number Two

250. In April 2012, plaintiff Bostick received, through private commercial interstate carrier, the International Business Pack, which promoted the Herbalife Enterprise and the Herbalife Pyramid through the Sales and Marketing plan, and which contained material false representations regarding the success that distributors could achieve through Herbalife by purchasing products and recruiting others to do the same. The Sales and Marketing Plan contained a "Statement of Average Gross Compensation of U.S. Supervisors," which contained deceptive and misleading information regarding the likelihood of success in becoming a Supervisor as well as the average earnings of distributors and the amount of product revenues that are paid out by Herbalife to distributors in the form of Wholesale Profits, Royalty and bonus incomes and incentives. Because of his receipt of the International Business Pack, and the representations contained therein, Plaintiff Bostick purchased Herbalife products, signed up as an Herbalife distributor, and recruited others to do the same. Herbalife International of America, Inc. sent the International Business Pack with the purpose and intent of promoting the Herbalife Enterprise's illegal scheme, all in violation of 18 U.S.C. § 1341.

### Racketeering Act Number Three

251. On April 13, 2012, April 26, 2012, May 21, 2012, June 18, 19, 22, 27, 2012, and July 20, 2012, Plaintiff Bostick ordered, through interstate wire transmissions over the internet on myherbalife.com, an Herbalife hosted website, Herbalife products associated with Volume Points, which were promoted by the Herbalife Enterprise as the means by which distributors such as Bostick could "pay for his position" and get greater retail profits. Herbalife International of America,

Inc. hosted these websites. Bostick paid Herbalife International of America, Inc. for these products using an electronic transfer of funds. Herbalife International of America, Inc. shipped Bostick these products through private commercial interstate carrier. Herbalife International Inc., coordinated through interstate wires on at least a monthly basis following the order the collection and accruing of the Volume Points associated with those purchases. Herbalife Ltd., paid 22% of the SRP from Bostick's purchases in Royalty Overrides, bonuses, and other incentives monthly following Bostick's order. Herbalife Ltd., paid 1% of the SRP from Bostick's purchases in Mark Hughes Bonuses annually. Because of the promised "Volume Points," "Retail Profits," and opportunity to advance up the Herbalife Pyramid, Plaintiff Bostick purchased Herbalife Products, paid for those Herbalife Products, and received those products, using instrumentalities of interstate commerce. This violated 18 U.S.C. §§ 1341 and 1343.

### Racketeering Act Number Four

252.   On a quarterly basis throughout 2012, and occurring from 2009-the present, plaintiff Bostick, as an Herbalife distributor, received, through the United States mail, *Herbalife Today* featuring the "Royalty Achievers" "President's Team," "Millionaire Team," and "Lifetime Achievers," including members of the Beneficiaries and Promoters, which promoted the Herbalife Enterprise and contained material false representations regarding the success that a distributor could achieve through Herbalife by purchasing products and recruiting others to do the same. Because of his receipt of the *Herbalife Today* and the representations contained therein, Plaintiff Bostick purchased Herbalife products, and recruited others to do the same. Bostick continued to receive Herbalife magazines and catalogs through the United States mail. Herbalife International of America, Inc. sent the Herbalife magazines and catalogs with the purpose and intent of promoting the Herbalife Enterprise's illegal scheme. This violated 18 U.S.C. § 1341.

### Racketeering Act Number Four

253.   Throughout 2012 as an Herbalife distributor, plaintiff Bostick received, through email, numerous emails from Herbalife that promoted the Herbalife Enterprise and contained material false representations regarding the success that a distributor could achieve through Herbalife by purchasing products and recruiting others to do the same. Because of his receipt of these emails the representations contained therein, Plaintiff Bostick purchased Herbalife products and tried to recruit others to do the same. Herbalife International of America, Inc. sent those emails with the purpose and intent of promoting the Herbalife Enterprise's illegal scheme. This violated 18 U.S.C. § 1343.

### Racketeering Act Number Five

254.   Throughout April of 2009 and continuing, Herbalife distributed information by interstate wire transmissions over the internet, such as www.herbalife.com, https://www.myherbalife.com/, and http://www.herbalifemail.com/ In April of 2012 and throughout 2012, Bostick reviewed information on Herbalife's websites. The Herbalife websites promoted the fraudulent scheme through videos of Beneficiaries and Promoters containing material false representations regarding the business opportunity available to distributors, and the wealth that a distributor could get by agreeing to become an Herbalife distributor. Because of the representations on Herbalife's websites, Bostick became an Herbalife distributor and maintained his position as an Herbalife distributor and continued to order Herbalife products and recruit others to do the same. This violated 18 U.S.C. § 1343.

### Racketeering Act Number Six

255.   In late March to early April 2012, plaintiff Bostick received, through the United States mail or through private commercial interstate carrier, the Internet Business Starter Pack, including the DVD featuring Maurice Smith, which promoted the Herbalife Enterprise and contained material false representations regarding the success that a distributor could get through Herbalife by purchasing

products and recruiting others to do the same. Because of his receipt and review of the Internet Business Starter Pack, and the representations contained therein, Plaintiff Bostick purchased Herbalife products, and recruited others to do the same. Beneficiaries and Promoters sent Bostick the Internet Business Starter Pack Herbalife with the purpose and intent of promoting the Herbalife Enterprise's illegal scheme. This violated 18 U.S.C. § 1341.

### Racketeering Act Number Seven

256.   Throughout 2012, Bostick purchased Herbalife products and was charged a 7% "Packaging and Handling" fee and a shipping fee. Herbalife International of America, Inc. charged Bostick this fee via interstate wire communications and fraudulently represented that such Packaging and Handling fees and shipping fees were owed through the interstate wire communications, when they were not. Because of the representations of Herbalife, Plaintiff Bostick purchased Herbalife products and paid "Packaging and Handling" fees. Herbalife did this with the purpose and intent of profiting off of the Herbalife Enterprise's illegal scheme. This violated 18 U.S.C. § 1343.

### Racketeering Act Number Eight

257.   Throughout 2012, Beneficiaries and Promoters Tartol, Stanford, Cvitanovich, Susan Peterson, Andre, and other President's Circle, Founder's Circle and Chairman's Club members distributed information by interstate wire transmissions over the internet promoting Herbalife, such as the videos described in paragraphs 43-47, 77, 147-150, 151, 154, 155, and 156. Just as the Smith's video contained material misrepresentations regarding the potential for success, these videos promoted the fraudulent pyramid scheme and contained material false representations regarding the wealth that a recruit or Herbalife distributor could achieve if that recruit became an Herbalife distributor and if a distributor purchased Herbalife products. This violated 18 U.S.C. §1343.

258.   Herbalife's and the Beneficiaries' and Promoters' representations and omissions were the proximate cause of Bostick and the class joining the fraudulent scheme and purchasing the products.

259.   To the extent proof of reliance is legally required, in engaging in the aforementioned wire and mail fraud, Herbalife and the Beneficiaries and Promoters knew that Bostick and the class would reasonably rely on their representations and omissions which would cause the plaintiffs and the class joining the fraudulent pyramid scheme and purchasing the products.

260.   Defendants and the Beneficiaries and Promoters knew that the misrepresentations and omissions described above in promoting and executing the fraudulent scheme were material because they caused Bostick and the class to join and participate in the illegal scheme.

261.   Had Bostick and the class known that Herbalife and the Beneficiaries and Promoters were promoting an illegal scheme, they would not have joined the Herbalife Pyramid scheme.

262.   Herbalife's and the Beneficiaries' and Promoters' acts of mail and wire fraud were a proximate cause of the injuries that Bostick and the class suffered. Because of Herbalife's and the Beneficiaries' and Promoters' pattern of unlawful conduct, Bostick and the class lost billions of dollars.

263.   Under 18 U.S.C. § 1964, Bostick and the class are entitled to treble their damages, plus interest, costs and attorney's fees.

### THIRD CLAIM FOR RELIEF

### (RICO 18 U.S.C. § 1962(c))

### Against All Defendants

264.   Plaintiff realleges the previous allegations.

265.   Herbalife and the Beneficiaries and Promoters are associated with the Herbalife Enterprise. In violation of 18 U.S.C. § 1962(c), Herbalife and the Beneficiaries and Promoters conducted and/or participated in the conduct of the

affairs of the Herbalife Enterprise, including participation in activities in furtherance of the Herbalife Defendants' fraudulent scheme, through the pattern of racketeering activity earlier alleged.

266.    As a direct and proximate result of Herbalife's and the Beneficiaries' and Promoters' violation of 18 U.S.C. § 1962(c), Bostick and the class were induced to, and did, become distributors in the Herbalife Pyramid scheme and purchased billions of dollars of the Herbalife products and recruited others to do the same. Bostick and the class were injured by Herbalife's and the Beneficiaries' and Promoters' unlawful conduct. The funds used to buy Herbalife products constitute property of Bostick and the class within the meaning of 18 U.S.C. § 1964(c).

267.    Under 18 U.S.C. § 1964(c), Bostick and the class are entitled to treble their damages, plus interest, costs and attorney's fees.

## FOURTH CLAIM FOR RELIEF

### (RICO 18 U.S.C. § 1962(d))

**Against All Defendants**

268.    Plaintiff realleges the previous allegations.

269.    Herbalife and the Beneficiaries and Promoters agreed to work together in a symbiotic relationship to carry on the illegal scheme. Under that agreement, Herbalife International of America, Inc., Herbalife International, Inc., Herbalife, Ltd, the Beneficiaries and Promoters and others conspired to violate 18 U.S.C. § 1962(a) and (c), in violation of 18 U.S.C. § 1962(d).

270.    As a direct and proximate result of Herbalife's and the Beneficiaries' and Promoters' violation of 18 U.S.C. § 1962(d), Bostick and the class were injured by Herbalife's and the Beneficiaries' and Promoters' unlawful conduct. The funds used to buy Herbalife products constitute property of Bostick and the class under 18 U.S.C. § 1964(c).

271.    Under 18 U.S.C. § 1964(c), Bostick and the class are entitled to treble their damages, plus interest, costs and attorney's fees.

**FOURTH CLAIM FOR RELIEF**

**(Unfair and Deceptive Practices Claims Under**

**Cal. Bus, & Prof. Code § 17200, *et seq.*)**

**Against All Defendants**

272.    Plaintiff realleges the previous allegations.

273.    Plaintiff brings this cause of action for himself for himself and all other Herbalife distributors in the class who signed a distributor agreement with Herbalife governed by California law.

274.    Herbalife has engaged in constant and continuous illegal, unfair, and fraudulent business acts or practices, and unfair, deceptive, false and misleading advertising within the meaning of the California Business and Professions Code § 17200, *et seq*. The acts or practices alleged constitute a pattern of behavior, pursued as wrongful business practice that has victimized and continues to victimize thousands of consumers.

275.    Under California Business and Professions Code § 17200, an "unlawful" business practice violates California law. Herbalife's business practices are illegal because they involve the creation and promotion of an illegal pyramid scheme or "endless chain" under California law. Herbalife is engaged in an illegal pyramid scheme or "endless chain" as defined under California Penal Code § 327. Herbalife utilizes this illegal pyramid scheme with the intent, directly or indirectly to dispose of property, in Herbalife products, and to convince distributors to recruit others to do the same.

276.    Under California Business and Professions Code § 17200, an "unfair" business practice includes a practice that offends an established public policy, or that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers. Herbalife's promotion and operation of an illegal pyramid scheme is unethical, oppressive, and unscrupulous in that Herbalife is duping consumers out of billions of dollars through the illegal pyramid scheme.

277.   Under California Business and Professions Code § 17200, a "fraudulent" business practice is likely to deceive the public. Herbalife's business practice is fraudulent in that they have deceived and continue to deceive the public by misrepresenting their business. Herbalife has made numerous misrepresentations about the income that a recruit or a distributor can realize by becoming a distributor and participating in the scheme and have failed to inform the public they are operating an illegal pyramid scheme. Bostick and the class have relied, and continue to rely on Herbalife's misrepresentations and omissions to their detriment.

278.   Because of these unlawful acts, Herbalife has reaped and continues to reap unfair benefits and illegal profits at the expenses of Bostick and the class members. Defendants should be made to disgorge these ill-gotten gains and return to Plaintiff Bostick and the class the wrongfully taken revenue.

279.   Defendants' unlawful, unfair and fraudulent acts and/or omissions, will not be completely and finally stopped without orders of an injunctive nature. Under California Business and Professions Code section 17203, Bostick seeks a judicial order of an equitable nature against all Defendants, including, but not limited to, an order declaring such practices as complained of to be unlawful, unfair, fraudulent and/or deceptive, and enjoining them from undertaking any further unfair, unlawful, fraudulent and/or deceptive acts or omissions related to operating the illegal pyramid scheme.

## FIFTH CLAIM FOR RELIEF

### False Advertising

**(California Business and Professions Code § 17500, *et seq.*)**

### Against All Defendants

280.   Plaintiff realleges the previous allegations.

281.   Plaintiff brings this cause of action for himself and all other Herbalife distributors in the class who signed a Distributor Agreement with Herbalife governed by California law.

282.    Defendants' business acts, false advertisements and materially misleading omissions constitute unfair trade practices and false advertising, in violation of the California Business and Professions Code § 17500, *et seq*.

283.    Defendants engaged in false, unfair and misleading business practices, consisting of false advertising and materially misleading omissions likely to deceive the public and include, but are not limited to:

  a.    Defendants failing to disclose to consumers that they were entering into an illegal pyramid scheme;

  b.    Defendants misrepresenting the money that a distributor would earn;

  c.    Defendants misrepresenting the "Packaging and Handling" fee in connection with the "Shipping" fee. Defendants misrepresented the fee as imposed to recover the costs associated with processing the order, packaging the order, and handling the order. The "Packaging and Handling" and shipping fees are a profit generator for Herbalife, unrelated to the packaging, handling, and shipping of products and designed to maximize Herbalife's overall profit. Herbalife made this misrepresentation to all U.S. distributors.

284.    Defendants' marketing and promotion of the illegal pyramid scheme and the "Packaging and Handling" fee constitutes misleading, unfair, and fraudulent advertising in connection with their false advertising to induce consumers to purchase products and join the illegal pyramid scheme. Defendants knew or should have known, in exercising reasonable care, that the statements they were making were untrue or misleading and deceived members of the public. Defendants knew or should have known, in exercising reasonable care, that distributors, including Bostick, would rely, and relied on Defendants' misrepresentations and omissions.

285.    Because of Defendants' untrue and/or misleading representations, Defendants wrongfully acquired money from Bostick and the class members to which it was not entitled. The Court should order Defendants to disgorge, for the

benefit of Bostick and all other Herbalife distributors in the class who signed a Distributor Agreement with Herbalife governed by California law their profits and compensation and/or make restitution to Bostick and the class.

286.   Under California Business and Professions Code section 17535, Plaintiff Bostick and the class seek a judicial order directing Defendants to cease and desist with all false advertising related to the Defendants' illegal pyramid scheme, and "Packaging and Handling" fee, and such other injunctive relief as the Court finds just and appropriate.

## PRAYER FOR RELIEF

The named Plaintiff Bostick and the Plaintiff class request the following relief:

a.   Certification of the class;

b.   A jury trial and judgment against Defendants;

c.   Damages for the financial losses incurred by Bostick and by the class because of the Herbalife Defendants' conduct and for injury to their business and property, all because of the Herbalife Defendants' violations of § 1964(a), (c) and (d) and that such sum be trebled under 18 U.S.C. § 1964(c);

d.   Restitution and disgorgement of monies, under the California Business Code;

e.   Temporary and permanent injunctive relief enjoining Herbalife and the Beneficiaries and Promoters working in concert with Defendant Herbalife from further unfair, unlawful, fraudulent and/or deceptive acts, including, but not limited to, false advertising;

f.   The cost of suit including reasonable attorneys' fees under 18 U.S.C. § 1964(c) and under California Code of Civil Procedure § 1021.5 and otherwise by law.

g.   For general, compensatory and exemplary damages in an amount yet to be ascertained; and

1        h.    For such other damages, relief and pre- and post-judgment interest as

2  the Court may deem just and proper.

3  DATED: April 8, 2013             FABIAN & CLENDENIN, P.C.

Philip D. Dracht

Thomas G. Foley, Jr.
Robert A. Curtis
FOLEY BEZEK BEHLE & CURTIS, LLP

*Attorneys for Plaintiff*

## DEMAND FOR JURY TRIAL

Bostick demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

DATED: April 8, 2013

FABIAN & CLENDENIN, P.C.

Philip D. Dracht

Thomas G. Foley, Jr.
Robert A. Curtis
FOLEY BEZEK BEHLE & CURTIS, LLP

*Attorneys for Plaintiff*

68
COMPLAINT