Philip D. Dracht, SBN 219044
**FABIAN & CLENDENIN**
215 South State Street, Suite 1200
Salt Lake City, UT 84151-0210
Telephone: (801) 531-8900
Facsimile: (801) 596-2814
pdracht@fabianlaw.com

Thomas G. Foley, Jr., SBN 65812
Robert A. Curtis, SBN 203870
Justin P. Karczag, SBN 223764
**FOLEY BEZEK BEHLE & CURTIS, LLP**
15 West Carrillo Street
Santa Barbara, California 93101
Telephone: (805) 962-9495
Facsimile: (805) 962-0722
tfoley@foleybezek.com
rcurtis@foleybezek.com
jkarczag@foleybezek.com

*Attorneys for Plaintiff Dana Bostick*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANA BOSTICK, a California citizen, on behalf of himself and all others similarly situated, and on behalf of the general public,<br><br>PLAINTIFF,<br><br>vs.<br><br>HERBALIFE INTERNATIONAL OF AMERICA, INC., a Nevada Corporation, HERBALIFE INTERNATIONAL, INC., a Nevada Corporation, HERBALIFE, LTD a Cayman Island Corporation,<br><br>DEFENDANTS. | Case No.: 2:13-cv-02488-BRO-RZ<br><br>**MEMORANDUM IN OPPOSITION TO HERBALIFE'S MOTION TO DISMISS**<br><br>Hearing Date: July 29, 2013, 1:30 p.m. |

# <u>TABLE OF CONTENTS</u>

STATEMENT OF FACTS ................................................................ 1

    A.    Herbalife's Recruiting Rewards and Excessive Fees Price-Out Products ...................................................................... 3

    B.    Mechanics of the Program. ................................................ 4

    C.    Herbalife Creates Categories of Distributors With Varying Benefits Based On Inventory Purchased or Recruiting Success. ..................... 5

    D.    Royalty Overrides, Bonuses, and Other Incentives. .......................... 7

ARGUMENT ......................................................................... 7

I.    BOSTICK'S COMPLAINT MEETS THE TEST FOR AN ENDLESS CHAIN AND PYRAMID SCHEME. ........................................... 8

    A.    Bostick and All Other Herbalife Distributors Paid To Participate. ................................................................ 9

    B.    Herbalife Pays Compensation Based On Internal Sales. .......... 12

        1.   Section 327 Prohibits Payments Based On Internal Sales 12

        2.   There's No "Herbalife Loophole" To Section 327. ......... 14

        3.   Participants in Herbalife Are Not "Ultimate Users." ....... 15

    C.    Herbalife's Refund Policy Does Not Break The Chain. .................. 16

II.    Bostick Has a Right To Complete Relief. ................................. 18

III.    HERBALIFE VIOLATES THE UNFAIR COMPETITION AND FALSE ADVERTISING ACTS. .................................................. 19

IV.    CONCLUSION ...................................................... 25

# TABLE OF AUTHORITIES

## CASES

*Boschma v. Home Loan Center, Inc.*, 198 Cal.App.4th 230 (2011) ......................21

*Bounds v. Figurettes, Inc.*, 135 Cal. App. 3d 1 (1982)........................................9, 14

*Carruth v. Fritch*, 36 Cal.2d 426 (1950) ..................................................................18

*Citizens for Open Access to Sand & Tide, Inc. v. Seadrift Ass'n*, 60 Cal.App.4th 1053 (1st Dist. 1998)........................................................................15

*Davis v. HSBC Bank*, 691 F.3d 1152 (9th Cir. 2012)...............................................22

*Douglas v. Ostermeier,* 1 Cal. App. 4th 729 (1991)..................................................19

*Duncan v. The McCaffrey Group, Inc.*, 200 Cal. App. 4th 346 (Cal. App. 2011) ...........................................................................................................24

*F.T.C. v. Pantron I Corp.*, 33 F.3d 1088 (9th Cir. 1994) ........................................16

*F.T.C. v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263 (S.D. Fla. 1999).......................16

*F.T.C. v. Think Achievement Corp.*, 312 F.3d 259 (7th Cir. 2002) ........................16

*Freedom Newspapers, Inc. v. Orange Cnty. Employees Ret. Sys.*, 6 Cal. 4th 821 (1993)...................................................................................................15

*Hinesley v. Oakshade Town Ctr.*, 135 Cal. App. 4th 289 (2005)............................23

*In re Amway Corp.*, 93 F.T.C. 618 (1979) .......................................................8, 9, 17

*In re Cnty. of Orange*, 31 F. Supp. 2d 768 (C.D. Cal. 1998) ..................................15

*In re Real Estate Associates Ltd. P'ship Litig.*, 223 F. Supp. 2d 1109 (C.D. Cal. 2002) ...............................................................................................19

*In re Tobacco II Cases*, 46 Cal. 4th 298 (2009) ................................................23, 24

*In the Matter of Koscot Interplanetary, Inc., et al.*, 86 F.T.C. 1106 (1975)................................................................................................................passim

*Kasky v. Nike, Inc.* 27 Cal.4th 939 (2002)...............................................................20

*Klien v. Farmer*, 70 Cal.App.2d 51 (1945) ..............................................................18

*Mattei v. Hopper,* 51 Cal. 2d 119 (1958) .................................................................18

*Montgomery Ward & Co. v. F.T.C.*, 379 F.2d 666, 671 (7th Cir. 1967)................16

*Morrison v. Amway Corp.*, 517 F.3d 248, 255 (5th Cir.2008) ................................18

*Napa Valley Educators' Assn. v. Napa Valley Unified Sch. Dist.*, 194 Cal. App. 3d 243, 251, 239 Cal. Rptr. 395 (Ct. App. 1987) .............................15

*Payne v. National Collection Systems, Inc.*, 91 Cal.App.4[th] 1037 (2001)..........................................................................................14, 15

*People v. Babdaty*, 139 Cal. App. Supp. 791, 793 (App. Dep't Super Ct. 1934) ..........................................................................................10

*People v. Bestline Prods., Inc.*, 132 Cal. Rptr. 767, 789 (1976) ......................14, 15

*People v. Pacific Land Research Co.* 569 P.2d 125 (Cal. 1977)......................14, 15

*People v. Shira*, 62 Cal. App. 3d 442, 461 (1976) ...................................................10

*Ron Greenspan Volkswagen, Inc. v. Ford Motor Land Dev. Corp.,* 32 Cal. App. 4th 985, 992, (1995)..............................................................23

*Stegeman v. Vandeventer*, 57 Cal.App.2d 753, 760-762 (1943) ...........................19

*Trujillo v. Santa Clara Cnty.,* 775 F.2d 1359 (9th Cir. 1985) .................................15

*U.S. v. Gold Unlimited, Inc.*, 177 F.3d 472, 481 (6th Cir. 1999) ...........................11

*Victa v. Merle Norman Cosmetics, Inc.,* 19 Cal.App. 4th 454 (2nd Dist. 1993)..........................................................................................14

*Wayne v. Staples,* 135 Cal. App. 4th 466 (2006).....................................................25

*Webster v. Omnitrition*, 79 F.3d 776 (9th Cir. 1996) ........................................passim

*Whole Living, Inc. v. Tolman*, 344 F.Supp. 2d 739 (D. Utah 2004).......................10

*Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938-39 (9th Cir. 2008)............passim

## **STATUTES**

Federal Trade Commission Act
   15 U.S.C. §45(a) ...........................................................................8, 9, 16

California Business and Professions Code
   § 17200 ..................................................................................passim
   § 17500 ..................................................................................passim

California Civ. Code
   § 1668 .........................................................................................23
   § 1689 ...........................................................................................9
   § 1691 .........................................................................................18
   § 1692 .........................................................................................19
   § 1693 .........................................................................................18
   § 1812 .........................................................................................16

OPPOSITION TO MOTION TO DISMISS

California Penal Code
§ 327 ...................................................................................................passim

**RULES**
Federal Rules of Civil Procedure
§ 12(d)..................................................................................................15

**TREATISES**
1 Witkin, Summary of Cal. Law
(10th ED. 2005) Contracts, § 304,..................................................23

Herbalife is right about this: Dana Bostick complains that Herbalife repeatedly told him that if he put in the "time, effort, and commitment," he could "make money" as a distributor. But data recently released by Herbalife in February 2013 shows how wrong that claim was: Herbalife paid nothing to 87.9% of everyone who was an Herbalife distributor in 2012, less than $300 on average to another 8.4%, and less than $2,250 on average to another 2.2%, not including expenses, which can be substantial.

Bostick did not know this before becoming a distributor. He was, instead, promised repeatedly that he could "earn income several different ways." So Bostick signed up, paid Herbalife the initial fees, bought thousands of dollars' worth of products, and paid excessive shipping fees and vague "Packaging & Handling" fees based on the suggested retail price of all products ordered.

Bostick did not make money as Herbalife promised. This is because Herbalife "systematically rewards recruiting over retail sales" and overcharges for shipping and Packaging and Handling fees, ensuring that, while the top of the pyramid and Herbalife profit, almost everyone who signs up is doomed to fail.

This case will show, as detailed in Bostick's Complaint, Herbalife's claimed "business opportunity for everyone" does not exist. Despite Herbalife's attempts to window-dress itself as a "buyers' club,"  it is a club for a select group of people – those who excel in recruiting others – to make money at the expense of hundreds of thousands of "distributors" in the United States each year.

## STATEMENT OF FACTS

Herbalife is a direct-sales multi-level marketing company. It relies on individual distributors to buy, sell, and promote its products.[1]

Herbalife lured Bostick (and many others) to become distributors with promise after promise of a "business opportunity for everyone," claiming, for example, that "millions of people … have tapped into this incredible opportunity,"

---

[1] Complaint ¶32.

that it is an "opportunity to earn more than you ever thought possible," and that a distributor can "[e]arn an income several different ways," including a "Part-Time Opportunity," "[a] Full-time Opportunity," and "[t]he opportunity to earn more than you ever thought possible and make your dreams come true!"[2] Herbalife's CEO, Michael Johnson, called Herbalife "a solution to help you in these tough economic times."[3] Herbalife heavily promotes the "business opportunity" of Herbalife.[4]

Herbalife's statements regarding the "business opportunity"—as alleged by Bostick—are and were false and are and were a pattern and practice of overstating potential earnings and opportunities.[5] Recent disclosures by Herbalife in February 2013 show that 434,125 of Herbalife's 493,862 distributors in the United States in 2012 (87.9%) "received no payments from Herbalife," another 39,151 (7.9%) received on average $292, and another 11,307 (2.2%) received on average $2,216.[6] These numbers do not include expenses incurred by a distributor such as Bostick in the operation or promotion of the business, which can be substantial as in Bostick's case.[7] This data was released in February 2013 and was not provided to Bostick.

The "business opportunity" is that Herbalife claims it pays out up to 73% of product revenues to distributors in "Retail and Wholesale Profits, Royalty and bonus income and incentives,"[8] and distributors can earn more by recruiting other distributors.[9] Herbalife bases this 73% payout figure on the Suggested Retail Price or SRP of the product.[10] Herbalife's 73% formula means that for every dollar a distributor pays for Herbalife product, Herbalife pays $0.46 to $0.64 upline in recruiting rewards, regardless of whether the distributor resells the product, either at

---

[2] Complaint, ¶140, Exhibit F, p. 4 of 15.
[3] Complaint ¶148.
[4] Complaint ¶¶35-38, 45-47, 138-150, 154-157.
[5] Complaint ¶¶157, 249, 250.
[6] Complaint Ex. B, p. 2 of 2.
[7] Complaint ¶¶52-55; Ex. B, p. 2 of 2.
[8] Complaint ¶36.
[9] Complaint ¶¶1, 38.
[10] Complaint ¶39.

1    SRP or at all.[11]

2        **A.    Herbalife's Recruiting Rewards and Excessive Fees Price-Out
          Products**

3

4        Because Herbalife pays so much money upline in recruiting rewards, the

5    SRP for the product is much higher than what the market will bear – the product is

6    already significantly marked-up when the distributor purchases it.[12]

7        Herbalife also sets the shipping fees at 2.5% to 4% allegedly for "freight

8    prepaid" to "FedEx." But Bostick has alleged with specific facts that these fees are

9    not a direct pass-through of "freight prepaid" to "FedEx," but instead are secret

10   profit generators.[13] Herbalife also charges the Packaging and Handling ("P&H")

11   fees of 7% of the SRP of the products purchased.[14] It claims *on page 31 of Book 4*

12   *of its 200-plus page* International Business Pack ("IBP") that the 7% P&H fees

13   recoup "processing, handling *and marketing*" costs and that "[c]harging by products

14   ordered is the fairest way to cover these costs."[15] This description differs from what

15   is represented on the more readily available and widely used order forms, which

16   state "Packaging and Handling Fee." Bostick alleges the 7% P&H fees are

17   excessive and not based on actual costs because of the wide discrepancy between

18   Herbalife's reports of revenue on their 10-K's and their reports to the SEC

19   regarding their costs.[16] These fees add to the distributor's cost of the products,

20   making it more difficult to sell products at the SRP and earn the promised income.[17]

21       Bostick found that when he tried to resell Herbalife products, the SRP was

22   too high. When he added the shipping, handling, and packaging fees, his price was

23   even more uncompetitive.[18] He found that other distributors were reselling

24   _____

25       [11] Complaint ¶27, 40, 68-69, 74-75, 80-81, 98-99, 172-174.
         [12] Complaint ¶¶54, 184.
26       [13] Complaint ¶¶176-82, 283.
         [14] Complaint ¶175.
27       [15] Motion to Dismiss, 22:20-22.
         [16] Complaint ¶¶175-180.
         [17] Complaint ¶¶181-182.
28       [18] Complaint ¶¶54.

Herbalife products on Craigslist and EBay for a significant discount off the SRP.[19]

### B.   Mechanics of the Program.

To participate in this "business opportunity," all Herbalife distributors must purchase an Herbalife International Business Pack ("IBP") for $95.95 or a Mini-IBP for $57.75, fill out an application, and be sponsored by an existing Herbalife distributor.[20] All distributors must sign Herbalife's "Agreement of Distributorship."[21] Buried within the hundreds of pages of the IBP (on page 17 of Book 4) is the "Statement of Average Gross Compensation of U.S. Supervisors."[22]

Any distributor at any level may sponsor new distributors, who may themselves sponsor new distributors. A distributor's "organization" of directly and indirectly sponsored distributors is called the "downline," while the sponsor and predecessors constitute the distributor's "upline."[23]

Under Herbalife's "Sales & Marketing Plan," a distributor may be able to qualify for higher levels of compensation depending on the "Volume" of Herbalife products purchased each month.[24] A distributor's Volume is calculated using "Volume Points."[25] Volume Points are calculated based on the SRP of the product, on a dollar to Volume Point Ratio ranging from $1:0.57 VP to $1:0.905 VP.[26]

As a distributor orders products, the distributor collects "Personally Purchased Volume" Points.[27] As a distributor's downline orders products, the distributor collects Volume Points for those orders.[28] Herbalife uses Volume Points qualify distributors for higher levels, commissions, bonuses, and other incentives.[29]

---

[19] Complaint ¶54.
[20] Complaint ¶34.
[21] Complaint ¶50, Exhibit I.
[22] Complaint, Exhibit C, p. 17.
[23] Complaint ¶¶59-60.
[24] Complaint ¶62.
[25] Complaint ¶63.
[26] Complaint, ¶64.
[27] Complaint, ¶65.
[28] Complaint, ¶65.
[29] Complaint, ¶65.

**C.    Herbalife Creates Categories of Distributors With Varying Benefits Based On Inventory Purchased or Recruiting Success.**

First-level Herbalife distributors are called "Distributors."[30] They can purchase Herbalife's products at a 25% discount off the SRP, which Herbalife characterizes as an opportunity to earn 25% in retail profits from reselling the product (if they sell at full SRP plus fees).[31]

Distributors who accumulate 500 or more Volume Points (through Personally Purchased Volume or through downline volume) in a single month, become "Senior Consultants," entitling them to a 35% discount off SRP and a 10% "Wholesale Profit" or recruiting reward on downline Distributor's purchases.[32]

Distributors who place a single order of 1,000 Personally Purchased Volume Points become "Success Builders,"[33] with a 42% discount on that order and on other purchases in the same month they qualify and 10% Wholesale Profits on purchases by downline Distributors.[34] Herbalife promotes this as a way to "get you the highest discount for the least expenditure."[35] With a Volume Point Ratio of $1:905 (and including the 7% fee), the cost to become a Success Builder is at least $718.23.

Distributors become "Qualified Producers" with a 42% discount off SRP (and 17% Wholesale Profits on downline Distributors' purchases) if they purchase 2500 Personally Purchased Volume Points within one to three months or they combine 1,000 downline Volume Points and 1,500 Personally Purchased Volume Points in a single month.[36] Bostick became this after his attempts at qualifying for Supervisor failed.[37] With the same $1:905 ratio and 7% fee, 1,500 Personally Purchased Volume Points would cost at least $1,077.35.

---

[30] Complaint ¶66.
[31] Complaint ¶67.
[32] Complaint ¶¶70-71.
[33] Complaint ¶76.
[34] Complaint ¶76.
[35] Complaint ¶77.
[36] Complaint ¶78.
[37] Complaint ¶53.

Distributors may qualify as "Supervisors" by "achieving" 4,000 Volume Points in a month or 2,500 Volume Points in each of two consecutive months. 1,000 of these Volume Points must be "Unencumbered" under either scenario.[38] "Unencumbered Volume" is defined as "all volume produced by anyone in [a distributor's downline] down to the first qualified Supervisor who achieves less than 2,500 Volume Points in one Volume Month," plus all of the distributor's "Personal Volume," which is defined as the volume purchased by the distributor and all non-Supervisors in her downline, and which is volume that is not used by anyone else for Supervisor qualification purposes.[39] Supervisors can purchase product with a 50% discount off the SRP and can earn from 25% -15%-8% in "Wholesale Profits" off their downline's purchases.[40]

Distributors who do not become Supervisors before their downline distributors become Supervisors have just one year to qualify as Supervisors. If they fail, the downline Supervisors are permanently advanced upline to the first qualified Supervisors.[41]

Only Supervisors who sponsor other Supervisors can earn "Royalty Overrides, bonuses, and other incentives."[42] Herbalife requires a qualifying Supervisor be "sponsored" by the first upline Supervisor. The sponsoring Supervisor must match the qualifying Supervisor's Volume Points in the qualifying month.[43] If the first upline Supervisor fails to match that month, the sponsoring Supervisor must purchase "Matching Volume" within the year or that Supervisor will lose the qualifying Supervisor and that Supervisor's downline (and the ability to earn recruiting rewards from that Supervisor).[44] If the qualifying Supervisor uses

---

[38] Complaint ¶88-89.
[39] Complaint ¶91.
[40] Complaint ¶98.
[41] Complaint ¶94.
[42] Complaint ¶¶98-104.
[43] Complaint ¶95.
[44] Complaint ¶95, Exhibit C, p. 10-11 of 127.

4,000 Volume Points to qualify, with the same $1:0905 ratio and 7% fee, 4000 Personally Purchased Volume Points would cost a Supervisor at least $2,519.24. Supervisors must requalify annually to retain their elevated status, downline, and to continue to be entitled to receive Royalty Overrides and Production Bonuses.[45]

### D.  Royalty Overrides, Bonuses, and Other Incentives.

Supervisors who accumulate 500 to 2500 Volume Points in a month and who have First, Second, and Third-Level Supervisors in their downline may receive "Royalty Override Points."[46] A Royalty Override is essentially a 1% to 5% commission that a Supervisor receives on the products ordered by the Supervisors in three active levels of the Supervisor's downline.[47] The specific percentage of Royalty Overrides to which a Supervisor is entitled depends upon the number of Volume Points the Supervisor accumulates during the month at issue.[48]

To be eligible for Royalty Overrides and other bonuses, Supervisors and above must submit an "Earnings Certificate Form," certifying that they comply with Herbalife's 70% Rule and the 10-Retail Customer Rule.[49] The 70% Rule requires that the distributor sell or consume 70% of the product purchased that month. It allows sales at wholesale to downline distributors and product used for personal or family consumption to count. The 10-Customer Rule requires that the distributor make sales of products to at least ten separate retail customers.[50] It allows a customer to include certain types of sales "to a first-line Distributor."[51] Accruing Royalty Override Points are the key to advancing upward in the pyramid.[52]

### ARGUMENT

---

[45] Complaint ¶105.
[46] Complaint ¶102-103.
[47] Complaint ¶¶102-103.
[48] Complaint ¶103.
[49] Complaint, ¶104, Exhibit C, p. 48 of 127.
[50] Complaint ¶201.
[51] Complaint ¶201.
[52] Complaint ¶¶107-131.

## I.   BOSTICK'S COMPLAINT MEETS THE TEST FOR AN ENDLESS CHAIN AND PYRAMID SCHEME.

In 1968, the California legislature enacted section 327 of the California Penal Code, prohibiting "endless chains." In *Omnitrition*, the Ninth Circuit adopted the FTC's *Koscot* test for pyramid schemes under 15 U.S.C. §45(a):

> Pyramid schemes are "[s]uch contrivances . . . characterized by the payment by participants of money to the company in return for which they receive (1) the right to sell a product and (2) the right to receive in return for recruiting other participants into the program rewards which are unrelated to sale of the product to ultimate users."[53]

The section 327 test and the *Koscot* test are similar enough that the Ninth Circuit characterized them as "equivalent, if not identical."[54] The tests are distinct in that section 327 specifically outlaws endless chains while the FTC actions *Koscot* and *In re Amway Corp.*, outlaw pyramid schemes through Section 5 of the FTC Act (15 U.S.C. §45(a),[55] which prohibits unfair and deceptive acts in interstate commerce.[56]

This is important to the second element of the test – whether compensation is paid based on internal sales and consumption by participants in the scheme. In *Amway*, the Administrative Law Judge allowed compensation based on sales to participants in the scheme but only because Amway had three rules, the 10-customer rule, the 70%-rule, and the buy-back-rule, which it enforced and were effective to encourage retail sales and discourage inventory loading.[57] Compensation based on internal sales, however, "is expressly prohibited by the California statute, while it is only implicit in the *Amway* 'retail sales' defense."[58]

---

[53] *Webster v. Omnitrition*, 79 F.3d 776, 781(9th Cir. 1996) ("*Omnitrition*") (quoting *In the Matter of Koscot Interplanetary, Inc., et al.*, 86 F.T.C. 1106, *59 (1975) ("*Koscot*")).

[54] *Omnitrition*, 79 F.3d 776, 787.

[55] *In re Amway Corp.*, 93 F.T.C. 618, 715-716 (1979) ("*Amway*").

[56] 15 U.S.C. §45.

[57] *Amway, supra*, 93 F.T.C. 618, 646, 668, 716.

[58] *Omnitrition*, 79 F.3d 776, 787; but see *Bounds v. Figurettes, Inc.*, 135 Cal. App. 3d 1, 21, (1982) (finding that the scheme at issue violated section 327 for payment based on internal consumption and dismissing defendant's *Amway* defense).

Bostick sues under section 327 of the Penal Code and section 1689.2 of the California Civil Code, along with claims for violations of sections 17200 and section 17500. These claims rely upon section 327 and not 15 U.S.C. §45(a) (as interpreted by *Koscot* and *Amway*). The only claims dependent on the 15 U.S.C. §45(a) analysis would be Bostick's RICO claims, which he has agreed to dismiss.[59] Even so, Bostick's Complaint alleges facts that satisfy both section 327 and the *Koscot* test– that participants pay money to Herbalife for (1) the right to sell product and (2) the right to receive recruiting rewards, and that Herbalife's *Amway* rules are not *effective* and are not *enforced* to prevent inventory loading.

### A.   Bostick and All Other Herbalife Distributors Paid To Participate.

The first element of the section 327 and *Koscot* test is that the participant pays money to participate. Herbalife argues it does not require distributors to purchase any amount of Herbalife products as an entrance fee or "initial investment," therefore it does not meet the "threshold requirement under *Koscot*" and section 327.[60] This argument fails for four reasons.

First, Herbalife requires that all distributors purchase mini-IBP or IBP for $57.75 or $95.95.[61] Bostick agrees this purchase is not "investment inventory," but does not concede (as Herbalife claims) that payment for the IBP does not constitute "valuable consideration" or "payments of money" as those terms are used in section 327 and *Koscot*.[62] In interpreting "valuable consideration" as used in Chapter 9 of the Penal Code governing lotteries (which also contains §327) *a 10-cent or 25-cent*

---

[59] Herbalife has conceded that if Bostick establishes it is operating a pyramid scheme or an endless chain, then money paid into the scheme would be considered "investment contracts" under state and federal securities law, and that the operation of a pyramid scheme violates Section 10b-5. On the basis of those admissions, Bostick agrees to dismiss his Second, Third, and Fourth Causes of Action.  The factual allegations contained  in those causes of action are not being dropped or conceded.

[60] See e.g., Motion to Dismiss, 11:16-14:11.

[61] Complaint ¶57.

[62] Motion to Dismiss, 11:22-25 citing Complaint ¶¶188-189.

1 *ticket will do.* [63] Here Herbalife charges \$57.75 and \$95.95.[64]

2  Second, to qualify for "Royalty Overrides," Herbalife requires a Supervisor

3 to certify that they "made sales to at least ten (10) separate customers."[65] Thus,

4 Supervisors must purchase inventory to comply with this rule.

5  Third, while Bostick agrees that under the rules a distributor *could* become a

6 Senior Consultant or a Supervisor without purchasing or reselling any Herbalife

7 product, the reality is very different.[66] Judge Gary Feess in this District did not grant

8 motions for summary judgment on a section 327 claim for either side on this issue

9 in *Herbalife International of America, Inc. v. Ford*, because "[w]hether this occurs

10 in reality is another thing, but one that cannot be resolved on this motion."[67] This is

11 because "[w]hether a multi-level marketing plan operates as [an] illegal pyramid

12 scheme is determined by how it functions in practice."[68]

13  In reality, Herbalife's marketing plan drives distributors to purchase product

14 in order to advance. Some distributors get a 50% discount, while others get the

15 same product at a 42%, 35%, or 25% discount. Yet they all compete in the same

16 marketplace.[69] Bostick made a large product purchase to qualify for greater

17 discounts, greater retail profits, and recruiting rewards.[70] He was not "gaming"

18

---

19   [63] See e.g., *People v. Shira*, 62 Cal. App. 3d 442, 461 (1976) (Where 88% of people

20 playing a lottery paid \$0.25 there was "valuable consideration"); *People v. Babdaty*, 139 Cal.

 App. Supp. 791, 793 (App. Dep't Super Ct. 1934) (\$0.10 ticket for a \$5 lottery was valuable

21 consideration); 71 Cal. Op. Att'y Gen. 139 (1988) (describing consideration and "valuable

 consideration" for lotteries); see also Cal. Civ. Code § 1605.

22   [64] Compare *Omnitrition*, 79 F.3d 776, 781 (where Omnitrition did not charge for the right

 to sell products at the distributor level and distributors had no right to receive compensation for

23 recruiting others into the program, the program was not a pyramid scheme).

   [65] Complaint ¶201.

24   [66] Complaint ¶¶70, 76, 78, 91 (but "Success Builder" and "Qualified Producer" require

 Personally Purchased Volume).

25   [67] *Herbalife International of America, Inc. v. Ford et al*, CACD Case No. 2:07-cv-02529-

26 GAF-FMO, "Memorandum and Order Regarding Cross-Motions for Summary Judgment,"

 [Docket No. 374] p. 16, 8/25/2009 < https://ecf.cacd.uscourts.gov/doc1/03118664270?page=16>

27   [68] *Whole Living, Inc. v. Tolman*, 344 F.Supp. 2d 739, 745 (D. Utah 2004).

   [69] Complaint ¶¶ 183, 184, 190.

28   [70] Complaint ¶¶1, 52, 53. 251.

Herbalife – Herbalife tells distributors to "qualify right away" for a 35% discount "with just one order" for "the highest discount for the least expenditure."[71] And Bostick was told "the position determines the pay – meaning, the higher you start the more money you can make."[72]

In reality, to earn recruiting rewards, Herbalife requires its distributors to make constant purchases. To qualify for Supervisor, Herbalife requires "Unencumbered Volume," which is volume that no one else is using for Supervisor qualification purposes. For a Supervisor to sponsor another Supervisor, Herbalife requires "Matching Volume," for that sponsor; otherwise the sponsor can lose that qualifying Supervisor to his upline.[73] If the Supervisor does not match, the sponsoring Supervisor must order "matching volume" (Personally Purchased) within a year or the sponsoring Supervisor loses the qualifying Supervisor and that downline.[74] For 4,000 Volume Points to match, this would cost the sponsoring Supervisor at least $2,519.24. Herbalife requires the same volume points to requalify annually as a Supervisor,[75] and requires distributors to, monthly, have up to 2,500 Total Volume Points to qualify for Royalty Overrides.[76]

It is true that Herbalife's rules caution distributors to "be careful not to order more than you can reasonably consume or sell" and to not purchase product to generate commissions. But Herbalife's rules are a paper tiger – useful in litigation, but forgotten in the field.[77] And as Bostick alleges, the rules also conflict with massive amounts of advertising and promotional materials from Herbalife and its

---

[71] Complaint ¶77.

[72] Complaint ¶¶44-45, 47.

[73] Complaint ¶95.

[74] Complaint ¶95, Exhibit C, p. 11-12.

[75] Complaint ¶105, Exhibit C, p. 12-13 (requiring requalifying Supervisors to "accumulate 10,000 unencumbered Volume Points" to retain their downline Supervisors on an annual basis).

[76] Complaint ¶¶101-103.

[77] Complaint ¶199; see also *U.S. v. Gold Unlimited, Inc.*, 177 F.3d 472, 481 (6th Cir. 1999) (noting that, in determining whether a pyramid exists, evidence of a marketing program's effect deserves "far more weight" than that of its policies).

distributors. The reality is that Herbalife's marketing plan requires distributors to make large purchases to participate and benefit from downline sales. Just as Judge Feess could not resolve this issue on a motion for summary judgment, Herbalife's Motion to Dismiss here on the same basis should be denied.

Fourth, Herbalife repeatedly contends its program allows for advancing and recruiting rewards without purchasing products and this is a good thing exempting it from the requirements of section 327 and *Koscot*. But that's not a feature; it's a flaw. Such a distributor would be advancing solely on recruiting efforts and the purchases of his downline – i.e., "rewards unrelated to [his or her own] product sales" – the *sin qua non* of a pyramid scheme.[78] These rewards unrelated to retail sales create an incentive for distributors to focus on the recruitment side of the business, because "in these tough economic times," it is easier to sell the dream of "business opportunity" and "income" than it is to sell protein shakes and vitamins.[79]

## B. Herbalife Pays Compensation Based On Internal Sales.

### 1. Section 327 Prohibits Payments Based On Internal Sales.

Bostick alleges (and Herbalife agrees) that Herbalife pays compensation based on internal sales and consumption by Herbalife distributors. Herbalife argues that the California legislature did not intend that "sales to distributors for their own consumption may not be counted as a sale to 'ultimate users.'"[80]

Section 327 reflects the legislature's intent. An August 15, 1968 letter from Assemblyman William T. Bagley to Governor Ronald Reagan, details the drama surrounding section 327.[81] He writes of an amendment to the bill "which had the

---

[78] *Omnitrition*, 79 F.3d 776, 78 quoting *Koscot, supra,* 86 F.T.C. 1106, 1181.

[79] See e.g., Complaint ¶¶148, 154 ("If you want to recruit somebody who loves the products and who wants to be your discounted customer…keep doing that…If you want to move the check, you need to find other people that want to make money and represent the Herbalife products and Herbalife opportunity").

[80] Motion to Dismiss, 15:19-26.

[81] See Request for Judicial Notice, Exhibit A, Legislative History for California Penal Code § 327 [Docket No. 26-1 pp. 28-30].

OPPOSITION TO MOTION TO DISMISS

effect of 'watering down' the bill so that it would allow a pyramid sale system which could be disguised as a sale of products rather than a payment for participating in the scheme or bringing others into the scheme." "[T]his loophole was noticed on the Assembly floor," and struck.[82] The redlined struck-out portions below are the loophole amendments and the italicized portions are what were added to the final bill signed into law:

> As used in this section, an "endless chain" means any scheme for the disposal or distribution of property whereby a participant pays a valuable consideration for the chance to receive compensation for ~~primarily~~ introducing one or more additional persons into participation into the scheme for the chance to receive compensation when a person introduced by the participant introduces a new participant. Compensation, as used in this section, does not mean or include payments based upon sales made ~~by such persons or participants~~ *to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme.*[83]

Had these changes been made, Herbalife's legislative intent argument might have merit. But they were not. The version that passed was designed to *prevent* the argument Herbalife makes here.

The California Court of Appeals reiterated in *People v. Bestline Prods., Inc.*, that "compensation for recruitment based upon sales to the recruits . . . is what makes [a marketing plan] a chain scheme under California law."[84] A sales and marketing plan violates section 327 if it offers compensation for recruitment based upon sales to downline recruits, because such a plan "increase[s] the certainty of deception by diverting" distributors' focus from retail sales to the recruitment of

---

[82] RJN, Exhibit A, p. 28.
[83] RJN, Exhibit A, pp. 13.
[84] *People v. Bestline Prods., Inc.*, 132 Cal. Rptr. 767, 789 (1976).

new distributors.[85] A plan limiting compensation for recruitment to payments "based upon sales made to persons who are not participants in the scheme and who are not purchasing in order to participate in the scheme, does not come within the definition of endless chain schemes set forth in Penal Code section 327."[86]

## 2.   There's No "Herbalife Loophole" To Section 327.

Herbalife is bound by section 327 just like every other multi-level marketing company doing business in California. It did not negotiate a loophole for itself when it settled with the Attorney General over 25 years ago. The Court should reject its attempt to carve one out now.

Herbalife argues Bostick's action is barred because he is re-litigating an issue already decided in the AG action.[87] This is incorrect. The California Supreme Court explained that an action by the AG "lacks the fundamental attributes of a consumer class action filed by a private party" because the AG who sues is usually not a class member, "his role as a protector of the public may be inconsistent with the welfare of the class" so he lacks adequacy, and "the claims and defenses are not typical of the class."[88] In *Payne v. National Collection Systems, Inc.*,[89] Herbalife's argument was raised in defense of a class action. The court found that "traditional res judicata principles do not apply to the unfair competition law judgment secured by the prosecutors under the present circumstances" because an action by a prosecutor "is fundamentally different from a class action."[90]

The cases that Herbalife cites for this argument are distinguishable because

---

[85] *Id.* at 789; see also *Bounds v. Figurettes, Inc.*, 135 Cal. App. 3d 1, 19 (1982) ("retail sales do not legalize the pyramid marketing scheme which violates Penal Code section 327. The plan becomes illegal because it is part of the overall marketing plan which depends upon an endless chain of middlemen.").

[86] *Id.* (emphasis added) (internal quotation marks omitted).

[87] Motion to Dismiss, 9:22-23.

[88] *People v. Pacific Land Research Co.* 20 Cal.3d 10, 18 (Cal. 1977)

[89] *Payne v. National Collection Systems, Inc.*, 91 Cal.App.4th 1037 (2001).

[90] *Id.* at 1044-45 (citing *Pacific Land Research*, *supra*, 20 Cal.3d 10, 18); see also *Victa v. Merle Norman Cosmetics, Inc.*, 19 Cal.App.4th 454 (2nd Dist. 1993).

the public entity was in the same position as the private entity. In *Trujillo v. Santa Clara Cnty.,* the plaintiff was a party to a prior EEOC action challenging the same conduct.[91] In *Citizens for Open Access to Sand & Tide, Inc. v. Seadrift Assn.*, the plaintiff, like the state agencies before it, sued for the public seeking the same beach access the state agencies sought.[92] Here the consent order is over 25 years old and was brought for the public, not distributors and not Bostick. Nothing indicates this order should have a *res judicata* effect on private litigation over 25-years later. As to the level of deference the Court should give the Attorney General's "approval of Herbalife's business model,"[93] this is not a formal opinion but a consent judgment.[94] Even if it were, formal opinions are persuasive only "in the absence of controlling authority,"[95] which we have here.[96]

If the Court considers the over 25-year-old consent order, Bostick moves under Rule 12(d) to convert this motion to one for summary judgment and requests a stay of the proceedings under Rule 56(d) to conduct discovery so he can "present all the material that is pertinent to the motion."[97] This includes the nature of the claims, the parties to the order, the facts and circumstances leading to the settlement and order, Herbalife's compliance with the order, Herbalife's changes to its marketing plan since the order, and Herbalife's records of retail sales.

### 3.    Participants in Herbalife Are Not "Ultimate Users."

The second element of *Koscot* prohibits payment "unrelated to sale of the

---

[91] *Trujillo v. Santa Clara Cnty.*, 775 F.2d 1359 (9th Cir. 1985).

[92] *Citizens for Open Access to Sand & Tide, Inc. v. Seadrift Ass'n*, 60 Cal.App.4th 1053 (1st Dist. 1998).

[93] Motion to Dismiss, 16:6-13.

[94] See e.g., *Freedom Newspapers, Inc. v. Orange Cnty. Employees Ret. Sys.*, 6 Cal. 4th 821, 829, 863 P.2d 218 (1993) (AG's manual on Brown Act was designed to advise local compliance); *In re Cnty. of Orange*, 31 F. Supp. 2d 768, 777 (C.D. Cal. 1998) (AG issued an opinion on financial instrument at issue in bankruptcy).

[95] *Napa Valley Educators' Assn. v. Napa Valley Unified Sch. Dist.*, 194 Cal. App. 3d 243, 251, 239 Cal. Rptr. 395 (Ct. App. 1987) (following AG opinions on calculating pay period).

[96] See Penal Code § 327; *People v. Bestline Products, Inc., supra,* 61 Cal. App. 3d 879, 914.

[97] Fed.Civ.R. 12(d).

product to ultimate users." Herbalife redefines "ultimate users" to be "Distributors who joined Herbalife to avail themselves of wholesale purchasing discounts."[98] But Herbalife is not running a buyer's club like Costco or Sam's Club where people are joining to buy product with "wholesale purchasing discounts." If it were, Herbalife would not be paying $0.46 to $0.64 of every dollar that the "ultimate user" pays for product upline in recruiting rewards. It would also comply with applicable statutes and regulations governing discount buying services.[99] And it would not focus its marketing on the "business opportunity" of Herbalife. *Omnitrition* made it clear that "[i]f *Koscot* is to have any teeth, such a sale [for internal consumption] cannot satisfy the requirement that sales be to "ultimate users."[100]

### C.    Herbalife's Refund Policy Does Not Break The Chain.

Herbalife argues that because in August 2012 it changed its return policy to offer a "full refund," it is not an endless chain. This argument fails for six reasons.

First, the argument that if a company offers a refund policy the falsities of its claims are irrelevant and harmless has been repeatedly rejected as a defense to a claim under 15 U.S.C. §45(a)(1).[101] "'Anything might then be advertised as long as unsatisfied customers were returned their money.'"[102]

Second, there is no exception for a refund policy under section 327. Participants in an unlawful chain spend time, money, and effort pursuing an opportunity that does not exist – time, money, and effort that could have been spent on legitimate enterprises. Bostick wanted his business to succeed and so he consumed, gave away, or tried to sell the products he purchased.[103] Because the

---

[98] Motion to Dismiss, 18:5-11.
[99] See e.g. California Civil Code 1812.100 – 1812.129.
[100] *Omnitrition*, 79 F.3d 776, 783.
[101] See e.g. *F.T.C. v. Pantron I Corp.*, 33 F.3d 1088, 1103 (9th Cir. 1994); *F.T.C. v. Think Achievement Corp.*, 312 F.3d 259, 261 (7th Cir. 2002) (finding "a money-back guaranty does not sanitize a fraud"); *Montgomery Ward & Co. v. F.T.C.*, 379 F.2d 666, 671 (7th Cir. 1967); *F.T.C. v. SlimAmerica, Inc.*, 77 F. Supp. 2d 1263, 1272 (S.D. Fla. 1999).
[102] *Pantron I Corp.*, 33 F.3d at 1103 (quoting *Montgomery Ward*, 379 F.2d at 671.)
[103] Complaint ¶¶54-56.

"opportunity" is packaged with the purchase of products, distributors like Bostick have an incentive not to return products but instead to dispose of them any way they can to keep the opportunity alive.

Third, until at least August 2012, Herbalife charged a 10% restocking fee (off of SRP) and did not refund the Packaging and Handling Fee (7%) or the Shipping Fees (2.5%-4%) or the return shipping costs.[104] Because these fees were based on the SRP of a product, distributors were refunded 70% to 79% on their dollar, not including shipping fees charged by Herbalife and costs incurred by distributors to return product.

Fourth, the amended policy is not a "no questions asked" return policy. A distributor must permanently resign, losing their "valuable consideration." Even then, Herbalife "reserves the right to determine which products and quantities fall within the limits of Herbalife's repurchase of inventory policy."[105] And Herbalife does not explicitly refund the 7% "packaging and handling" fee. Amended Rule 10-D provides that "[r]eimbursement to the Distributor will be issued for the full amount paid for the returned product by the Distributor less appropriate setoffs and legal claims," less the shipping paid on the original order and costs to return.[106]

Fifth, Herbalife is still not following the *Amway* rule.[107] Under the old and new Rule 10-D, Herbalife only allows for a return of products "if the products were purchased from Herbalife."[108] This excludes products purchased by distributors from their upline, leaving Herbalife's distributors at the mercy of their upline.[109]

And sixth, Herbalife argues that Bostick should have known of this rule change (hidden within 126 pages of the revised sales plan) because his (a)

---

[104] Complaint ¶¶208-212.
[105] Zifkin Decl., Exhibit A, page 50.
[106] Declaration of David Zifkin, Exhibit A, pp. 65-66, Rule 10-D [Docket 22-2]
[107] Complaint ¶206; *Amway, supra,* 93 F.T.C. 618, 716.
[108] Complaint ¶210, Exhibit C, p. 65 of 127, Rule 10-D; compare Zifkin Declaration, Exhibit A, p. 65, Rule 10-D.
[109] Complaint ¶210.

Agreement for Distribution allowed Herbalife sole and absolute discretion to modify the rules and incorporate those modifications into the agreement and (b) Herbalife published this change on its website. Herbalife's promise to fully refund is illusory as it could rescind it as quickly and quietly as it added it.[110]

## II.   BOSTICK HAS A RIGHT TO COMPLETE RELIEF.

Bostick is a victim of Herbalife's endless chain. He paid $95.95 to join Herbalife. He overpaid for Herbalife products he has purchased, whether for self-consumption, to give away, or to retail. He did not earn recruiting rewards. At the time he did not know he was one of many middlemen and women purchasing Herbalife products at a large markup, paying $0.46 to $0.64 out of every dollar paid for product in upline recruiting rewards, and 7% and 2.5%-4% of the SRP of the product in overcharges, and who did not have a real opportunity to make retail profits and recruiting rewards.

Herbalife argues section 1691 of the California Civil Code requires Bostick to (1) give prompt notice of rescission, and (2) restore to the counterparty everything of value he received under the contract. Herbalife claims that Bostick has not done this and is therefore not entitled to rescission. But under Civil Code section 1691, when notice and an offer has not been made, "the service of a pleading in an action or proceeding that seeks relief based on rescission shall be deemed to be such notice or offer or both."[111] And no offer to restore is necessary when the transactions between the parties are so complicated an accounting is necessary to determine the parties' respective rights,[112] or when, because of no fault of the rescinding party, restoration cannot be made.[113]

---

[110] See *Mattei v. Hopper,* 51 Cal. 2d 119, 122-123 (1958) (a promise is illusory and it provides no consideration if one party is free to perform or withdraw); see also *Morrison v. Amway Corp.*, 517 F.3d 248, 255 (5th Cir.2008) (declining to enforce under Texas law an arbitration clause inserted under clause allowing Amway to unilaterally modify the agreement).

[111] Cal. Civ. Code § 1691 see also Cal. Civ. Code § 1693.

[112] *Klien v. Farmer*, 70 Cal.App.2d 51, 61-62 (1945).

[113] *Carruth v. Fritch*, 36 Cal.2d 426, 430-431 (1950) (defendant's fraud); *Stegeman v. Vandeventer*, 57 Cal.App.2d 753, 760-762 (1943) (same).

Herbalife claims rescission is Bostick's "only remedy," and even then he is not entitled to rescission of his contracts with Herbalife because he should have just returned the product he bought and because he self-consumed or gave away or sold "at or around his purchase costs" the product he bought. [114] But under Civil Code section 1692, Bostick can elect "any other relief to which he may be entitled under the circumstances."[115] "A claim for damages is not inconsistent with a claim for relief based upon rescission." Bostick "shall be awarded complete relief, including restitution of benefits…and any consequential damages to which he is entitled," so long as they are not duplicate or inconsistent.[116]

At the least, Bostick can elect to rescind the purchase of his IBP, which cost him $95.95, and for which his contractual right to receive a refund expired 90 days after he joined.[117] As to the product that Bostick purchased as an Herbalife distributor, it is gone. But that does not mean he cannot elect to seek restitution, offset by the product's value (which can be determined by looking at what Herbalife took from the transaction) and other damages arising out of the purchase of that product, including punitive damages.[118]

## III.   HERBALIFE VIOLATES THE UNFAIR COMPETITION AND FALSE ADVERTISING ACTS.

Herbalife argues that Bostick's claims under sections 17200 *et seq*. (the "UCL" claims) and 17500 *et seq*. (the "false advertising" claims) of the Business and Professions Code should be dismissed by glossing over and sometimes ignoring many of the detailed allegations of the Complaint. *Omnitrition* clarifies that, if a judge or jury finds business practices to violate Penal Code §327, however, those

---

[114] Motion to Dismiss, 18:14-25.
[115] Cal. Civ. Code §1692; *In re Real Estate Associates Ltd. P'ship Litig.,* 223 F. Supp. 2d 1109, 1139 (C.D. Cal. 2002) (If true rescission is no longer possible ..., the court may order its monetary equivalent.").
[116] Cal. Civ. Code §1692.
[117] Complaint, Exhibit C, p. 64 of 127, Rule 10-B.
[118] *See e.g., Douglas v. Ostermeier,* 1 Cal. App. 4th 729, 750 (1991) (allowing recovery based on rescission as partial basis for award of punitive damages arising out of fraud).

practices would violate section 17500 and section 17200's unlawful and fraudulent prongs.[119] Even then, Bostick alleges sufficient facts establishing violations of all three prongs of section 17200 (fraudulent, unfair, and unlawful) and section 17500 regardless of whether there is a violation of section 327.

Whether a business practice violates section 17200 (and 17500) is "usually … a question of fact not appropriate for decision on demurrer."[120] That is true here. Three of the four arguments Herbalife raises – that (1) "Herbalife operates a legal direct-selling business," (2) there is "no basis for asserting that Herbalife made any promises . . . that distributors would achieve specific levels of success," and (3) "no reasonable consumer would be misled by the alleged misrepresentations" – are all fact-intensive and require discovery. The fourth argument, whether Bostick alleges reliance on the misrepresentations, is resolved by examining Bostick's allegations.

As to the first argument, as detailed above, Bostick alleges a violation of section 327. Thus his claim can proceed on the "unlawful" prong.

The second and third arguments are pointed at the "fraudulent" prong of section 17200 and also are raised in relation to the section 17500 claims. Sections 17200 and 17500 "prohibit 'not only advertising which is false, but also advertising which[,] although true, is either actually misleading or which has a capacity, likelihood or tendency to deceive or confuse the public."[121] In *Williams v. Gerber Products,* Gerber promised "fruit juice snacks," but delivered mostly corn syrup and sugar. The court reversed dismissal because reasonable consumers should not have to "look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box."[122]

---

[119] *Omnitrition*, 79 F.3d 776, 788 (citation omitted).

[120] *Williams v. Gerber Prods. Co*., 552 F.3d 934, 938-39 (9th Cir. 2008) (citing *Linear Tech. Corp. v. Applied Materials, Inc.* 152 Cal. App. 4th 115, 134-35 (Cal. App. 2007).

[121] *Kasky v. Nike, Inc.* 27 Cal.4th 939, 950 (2002) (quoting *Leoni v. State Bar*, 39 Cal.3d 609, 626 (1985)).

[122] *Williams v. Gerber Prods. Co*., *supra*, 552 F.3d 934, 939-40, *see also Boschma v. Home Loan Center, Inc*., 198 Cal.App.4th 230, 251-54 (2011) ("reject[ing] the contention that the disclosures actually given to plaintiffs [in signed loan documents] preclude reasonable reliance").

Herbalife and its distributors promised wealth, success, and opportunity, filled with luxury homes, cars, spacious ranches, and vacations.[123] Herbalife repeatedly told Bostick that all he had to do was follow a "tested proven business plan" "designed to maximize rewards for effort and provide substantial and ongoing income,"[124] that he was obtaining "[t]he opportunity to earn more than [he] ever thought possible [to] make [his] dreams come true!",[125] and that he could "[e]arn income in several ways." [126] As Herbalife's CEO Michael Johnson told Bostick and recruits, "[y]our income and lifestyle potential are yours to determine"[127] and "so what are you waiting for…start improving your life right now."[128] Herbalife's magazine and the IBP received by Bostick contained many promises like these. And these statements – as alleged by Bostick – are and were false,[129] and are and were part of a pattern and practice of overstating potential earnings and opportunities.[130]

Using its "disclaimer" (the Statement of Average Gross Compensation), Herbalife now claims that "no reasonable potential Distributor" could have relied on these promises[131] and that any "reasonable potential Distributor" should have known that "even the top Herbalife Distributors, on average, earn only a modest amount of income."[132] Herbalife urges the Court to disregard the multiple promises it made to Bostick and others and hold – as a matter of law – that its "disclaimer" completely shields Herbalife from all liability under sections 17200 and 17500.

---

[123] Complaint, ¶¶138-157.
[124] Complaint ¶35, Exhibit C, p. 2 of 127.
[125] Complaint ¶140, Exhibit F, p. 4 of 15.
[126] Complaint ¶140, Exhibit F, p. 8 of 15.
[127] Complaint Ex. G at 2 of 18.
[128] Complaint ¶150.
[129] Complaint ¶¶249, 250,
[130] Complaint ¶157.
[131] Motion to Dismiss, 11:3-5 citing Complaint ¶48
[132] Motion to Dismiss 11:14-15; but see Michelle Celarier, *NYC Pol: It's Herbsploitation*, NY POST, June 14, 2013 ("'It is disappointing that Councilwoman Ferreras did not reach out to the company,' Herbalife said in a statement, adding that it provides an 'excellent income opportunity' to those in her district.") <http://www.nypost.com/p/news/business/nyc_pol_it_ herb_sploitation_zr63x783q4YqvSA3hReQEM > (visited June 24, 2013).

But as the Complaint alleges, the Statement of Average Gross Compensation only gave Bostick information about the distributors who made money with Herbalife.[133] This bears repeating: Herbalife's "disclosure" of income opportunity only disclosed those distributors who made money with Herbalife. This is like a nutritional label disclosing only the small percentage of "fruit juice" in a snack, but not mentioning the corn syrup and sugar – far worse than what was described in *Gerber Prods. Co*, where everything was disclosed but there were conflicting representations.[134] Here, by only disclosing the winners, Bostick and others could not fully evaluate Herbalife's promised opportunity.

And Herbalife's February 2013 Statement shows why it wanted to only disclose the winners: 434,125 of its 493,862 distributors "received no payments from Herbalife," 39,151 received on average $292, and 11,307 received on average $2,216, not including expenses, which can be substantial.[135] Simply, there was no "business opportunity." Even if the Court finds Herbalife's pre-February 2013 Statements to be an accurate disclosure, Bostick has alleged numerous other representations by Herbalife that contradict these Statements and have the "capacity, likelihood or tendency to deceive or confuse the public."[136]

*Davis v. HSBC Bank*, which Herbalife cites in support, is distinguishable because the defendants there actually disclosed the challenged credit card fee (in oversized, bold-faced font), described it as "important," listed it up-front, and complied with TILA in doing so, thereby resulting in a safe harbor.[137]

Fourth, Herbalife claims that, since Bostick "represent[ed], warrant[ed], and agree[d]" he was "not relying upon any representations as to the financial results [he] might achieve," he cannot rely on the inducements that brought him into the

---

[133] Complaint ¶¶163-171.
[134] *Williams*, *supra*, 552 F.3d at 939-40.
[135] Complaint ¶24, 52-55, Ex. B at 2 of 2.
[136] *Williams*, *supra*, 552 F.3d at 939-940.
[137] See e.g., *Davis v. HSBC Bank Nevada*, 691 F.3d 1152, 1158, 1164-71 (9th Cir. 2012).

1   scheme and also that Bostick "fails to allege that he even viewed most of the

2   materials mentioned in the Complaint, much less that he relied on them in deciding

3   to join Herbalife or purchase products, or that such reliance caused his harm."[138].

4   Self-serving disclaimers are not automatically enforceable under California law.[139]

5   Even if they were enforceable, that disclaimer can be limited to when Bostick

6   agreed and signed his "Agreement of Distributorship" and not after that (when

7   Bostick made his significant purchases).

8        To prevail on a section 17200 fraudulent claim, there must be a showing of

9   actual reliance on the misrepresentation. Reliance is proved by showing that

10  without the defendant's misrepresentation the plaintiff would not have engaged in

11  the injury-producing conduct. While the misrepresentation need not be the sole

12  reason for Bostick's decision, it must play a substantial part in influencing it:

13       [A] presumption, or at least an inference, of reliance arises wherever

14       there is a showing that a misrepresentation was material.... [M]ateriality

15       is generally a question of fact unless the "fact misrepresented is so

16       obviously unimportant that the jury could not reasonably find that a

17       reasonable man would have been influenced by it."[140]

18  Allegations of reliance should not be "defeated merely because there was

19  alternative information available to the consumer-plaintiff."[141]

20       Here, Bostick unequivocally alleges: (1) he received and reviewed the

21  materials of the IBP, (2) he received and reviewed a variety of other promotional

22  materials regarding Herbalife's system, (3) that the materials "contained deceptive

23  _____

24       [138] Motion to Dismiss 2:8-13; 20.

25       [139] See California Civil Code § 1668; *Ron Greenspan Volkswagen, Inc. v. Ford Motor
     Land Dev. Corp.*, 32 Cal. App. 4th 985, 992, (1995); 1 Witkin, Summary of Cal. Law (10th Ed.
     2005) Contracts, § 304, p. 330; but see *Hinesley v. Oakshade Town Ctr.*, 135 Cal. App. 4th 289,

26   301, 37 Cal. Rptr. 3d 364, 373 (2005) (a waiver provision in commercial real estate lease
     agreement was a factor to consider in determining justified and reasonable reliance).

27       [140] *In re Tobacco II Cases*, 46 Cal. 4th 298, 326-327 (2009) (quoting *Engalla v.
     Permanente Medical Group, Inc.* 15 Cal.4th 951, 976–977 (1997)).

28       [141] *Id.* at 328.

and misleading information [and 'material false representations'] regarding the likelihood of success in becoming a Supervisor as well as the average earnings of distributors and the amount of product revenues that are paid out by Herbalife to distributors," (4) that, "[b]ecause of his receipt of the [IBP, including the *Live the Good Life!* magazine, emails, and the other materials], and the representations contained therein, Bostick signed up as an Herbalife distributor, purchased Herbalife products, and recruited others to do the same," and (5) that the misrepresentations caused Bostick harm.[142]

Bostick's section 17200 and 17500 fraud claims allege actual reliance and causation with sufficient specificity and causation. A jury might easily find that the contract, IBP and other advertising material has (and had) "a capacity, likelihood or tendency to deceive or confuse the public,"[143] and that the multiple representations regarding potential earnings and opportunities were not "so obviously unimportant that the jury could not reasonably find that a reasonable man would have been influenced by [them]."[144] Herbalife should not be allowed to hide its advertising campaign of opportunity behind a disclosure that is defective, buried in the IBP, and contradicts numerous overstatements regarding potential earnings and opportunity.

Finally, Herbalife asks the Court to dismiss Bostick's section 17500 claims regarding the shipping fees and P&H fees because the nature of the charges is "crystal clear" and disclosed in forms and the FAQ section of the IBP. But little is clear about these fees, except that Herbalife makes a large amount of money from the fees and there is a large discrepancy between Herbalife's reports to the SEC regarding shipping and handling expenses and its reported revenues.[145]

---

[142] Complaint ¶¶42-57, 249-254, 272, 277, 278, 280, 284, 285.
[143] *Williams*, *supra*, 552 F.3d at 938.
[144] *In re Tobacco II Cases*, *supra*, 46 Cal. 4th at 326-27; *see also Duncan v. The McCaffrey Group, Inc.*, 200 Cal. App. 4th 346, 364-68 (Cal. App. 2011) (reversing dismissal of 17500 claims where advertising campaign contradicted exculpating disclosures) ovr'd on other grounds by *Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n*, 55 Cal. 4th 1169, 291 P.3d 316 (2013).
[145] Complaint ¶¶178, 179.

1    Herbalife claims the 7% way is the "fairest way to cover these costs," but

2    Bostick has alleged with specific facts that the shipping and P& H fees are not a

3    direct pass-through of "freight prepaid" to "FedEx," or the "packaging, handling

4    and marketing," but instead are secret profit generators.[146] These secret profit

5    generators are not even remotely tied to Herbalife's costs, as implied by their name

6    and represented by Herbalife. Herbalife points to including "*marketing*" costs in its

7    P&H fee description in the FAQ—*buried on page 31 of Book 4 of the massive*

8    *IBP*—to save the P&H fees. But this description is different and broader than the

9    "Packaging and Handling" fee more often and more readily disclosed on the order

10   forms and other materials. Why were those not described more accurately, such as

11   "Service Charge," "Administrative Fee," or "Packaging, Handling and Marketing

12   Fee" or candidly, "profit charge"? A reasonable jury could conclude that the totality

13   of the disclosures regarding the fees is misleading and a violation of section

14   17500.[147] *Wayne v. Staples*, the case cited by Herbalife, does not mandate a

15   different result.[148]

16   **IV.   CONCLUSION**

17        Bostick respectfully requests that the Court grant in part Herbalife's Motion

18   to Dismiss as to Bostick's RICO claims and deny Herbalife's Motion to Dismiss as

19   to Bostick's remaining claims, giving him leave to file an amended complaint.

20

21

22

23
_____

24   [146] Complaint ¶¶176-82, 283.

25   [147] If the Court is not convinced, Bostick requests leave to amend its complaint to add
allegations from Herbalife's 2012 10-K, which also states: "Our distributors bear the majority of
our consumer marketing expenses, and sales leaders sponsor and coordinate a large share of

26   distributor recruiting and training initiatives."

27   [148] *Wayne v. Staples,* 135 Cal. App. 4th 466, 471-74, 483-84 (2006) (which occurred at the
*summary judgment* stage not the demurrer stage, which concerned an *optional* declared value
coverage charge (as opposed to the *required* P&H fees here), and which did not concern

28   inconsistent descriptions of the charge, as is the case here).

1    DATED: June 24, 2013                FABIAN & CLENDENIN, P.C.

2

3                                        */s/ Philip D. Dracht*
                                         Philip D. Dracht
4

5                                        Thomas G. Foley, Jr.
                                         Robert A. Curtis
6                                        Justin P. Karczag
                                         FOLEY BEZEK BEHLE & CURTIS, LLP
7

8                                        *Attorneys for Plaintiff*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28