1           UNITED STATES DISTRICT COURT

2     CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

3      HONORABLE BEVERLY REID O'CONNELL, U.S. DISTRICT JUDGE

4

5   DANA BOSTICK, a California citizen on  )
    behalf of himself and all others      )
6   similarly situated, and on behalf of   )
    the general public,                    )
7                                          )
                    Plaintiff,             )
8                                          )
        vs.                                )            Case No.
9                                          )    CV 13-2488 BRO
    HERBALIFE INTERNATIONAL, INC.,         )
10  et al.,                                )
                                           )
11              Defendants.                )
    _____)

12

13                  REPORTER'S TRANSCRIPT OF
                       MOTION TO DISMISS
14                 MONDAY, JULY 29, 2013
                          3:05 P.M.
15              LOS ANGELES, CALIFORNIA

16

17

18

19

20

21

22   _____

23        MYRA PONCE, CSR 11544, RMR, CRR
          FEDERAL OFFICIAL COURT REPORTER
24        312 NORTH SPRING STREET, ROOM 430
          LOS ANGELES, CALIFORNIA 90012
25                (213) 894-2305

1                      **APPEARANCES OF COUNSEL:**

2

3      **FOR THE PLAINTIFF:**

4          FOLEY, BEZEK, BEHLE & CURTIS
           BY:  THOMAS G. FOLEY, JR.
5              Attorney at Law
           15 West Carrillo Street
6          Santa Barbara, California 93101
           (805) 962-9495
7
           FABIAN & CLENDENIN
8          BY:  PHILIP D. DRACHT
               Attorney at Law
9          215 South State Street, Suite 1200
           Salt Lake City, Utah  84111
10         (801) 531-8900

11

12     **FOR THE DEFENDANTS:**

13         BOIES, SCHILLER & FLEXNER
           BY:  DAVID L. ZIFKIN
14             Attorney at Law
           401 Wilshire Boulevard, Suite 850
15         Santa Monica, California 90401
           (310) 752-2400
16
           BOIES, SCHILLER & FLEXNER
17         BY:  JONATHAN D. SCHILLER
               Attorney at Law
18         575 Lexington Avenue, Seventh Floor
           New York, New York  10022
19         (212) 446-2300

20         BOIES, SCHILLER & FLEXNER
           BY:  WILLIAM S. OHLEMEYER
21             Attorney at Law
           333 Main Street
22         Armonk, New York  10504
           (914) 749-8200

23

24

25

**UNITED STATES DISTRICT COURT**

```
 1              LOS ANGELES, CALIFORNIA; MONDAY, JULY 29, 2013

 2                          3:05 P.M.

 3                           -oOo-

 4              THE COURTROOM DEPUTY:  Case No. CV 13-2488 BRO,

 5     Dana Bostick versus Herbalife International of America,

 6     Incorporated, et al.

 7              MR. FOLEY:  Good afternoon, Your Honor.

 8     Thomas Foley for the plaintiff.

 9              MR. DRACHT:  Good morning, Your Honor -- or good

10     afternoon, Your Honor.  Philip Dracht on behalf of the

11     plaintiff as well.

12              MR. SCHILLER:  Good afternoon, Your Honor.

13     Jonathan Schiller on behalf of the Herbalife defendants.

14              MR. OHLEMEYER:  Good afternoon, Judge.

15     Bill Ohlemeyer on behalf of the Herbalife defendant.

16              THE COURT:  Afternoon, folks.  Just one second,

17     please.

18              (Brief pause.)

19              THE COURT:  All right.  I've read and considered the

20     Herbalife defendants' motion to dismiss.  Your motion, I'm

21     going to let you go first.  Plaintiffs will have a chance to

22     respond, then back to the defense.

23         Who wishes to argue?

24              MR. SCHILLER:  With the Court's permission,

25     Jonathan Schiller, Your Honor.
```

```
 1            THE COURT:  Okay.
 2            MR. SCHILLER:  I would like to address the
 3  jurisdictional questions that have been raised and sharpened by
 4  plaintiff's opposition.  And I would like my partner,
 5  Bill Ohlemeyer, to address the arguments that -- if the Court
 6  were to reject, take the idea that it still has jurisdiction,
 7  that they've pled themselves out of all of the state claims.
 8            THE COURT:  All right.  So let's start with you,
 9  then, Mr. Schiller, because as you know, as you folks know, I
10  have a sua sponte obligation to assess subject matter
11  jurisdiction.  And I understand plaintiff has agreed to dismiss
12  the RICO claims.  So I'd like to hear why under CAFA I -- I
13  have jurisdiction.
14            MR. SCHILLER:  Your Honor, may I approach?  CAFA
15  just came up in the ex parte request last week.  Are you
16  asking --
17            THE COURT:  What do you have?  What do you have --
18            MR. SCHILLER:  You're asking plaintiff to respond?
19            THE COURT:  Well, first, you have some stuff that
20  you think is going to help me, some notebooks there?  What do
21  you have, Mr. Schiller?
22            MR. SCHILLER:  I have some demonstrative exhibits
23  that I think particularly help on these late-blooming
24  questions, like I want to amend and CAFA offers diversity.
25            THE COURT:  Okay.  So why don't you -- my clerk will
```

```
1    come get whatever notebook.  You have one for the plaintiffs
2    here.
3              MR. DRACHT:  Your Honor, we haven't seen this.
4              THE COURT:  I know.  You'll have an opportunity.
5    You responded in your reply, as you recall.  So --
6              MR. DRACHT:  I understand.
7              THE COURT:  -- have a seat, review the notebook.
8              MR. DRACHT:  Thank you.
9              (Brief pause.)
10             THE COURT:  Let's -- let me ask the plaintiff why
11   you think that CAFA confers jurisdiction in this context upon
12   me.
13             MR. DRACHT:  Your Honor, under the plain terms of
14   CAFA, this dispute exceeds $5 million.  It also involves a
15   nationwide class where there is diversity or minimum diversity.
16   So under the terms of CAFA, we have CAFA jurisdiction.
17        Now, defendants have raised the issue of whether or not
18   there's a security exception to CAFA.  And we admit there is a
19   securities exception to CAFA.  However, Section 1332,
20   Subsection (d)(9), which has that exception, provides that CAFA
21   jurisdiction does not apply to any class action that solely
22   involves the claim that relates to the rights, duties,
23   including fiduciary duties, and obligations related to or
24   created by or pursuant to any security.
25             THE COURT:  And you say your state court claims give
```

1    you that?

2         MR. DRACHT:  Our state court claims give us exactly

3    that.  We do not have a security unless we can prevail on our

4    state court claims.  The endless chain statute gives us the

5    statutory right to bring this claim that gives us the ability

6    to challenge the -- the Herbalife structure as being an endless

7    chain and also gives us the statutory remedy.  From that, the

8    Court in *Omnitrition* found, because it's an endless chain, it's

9    also a security.  It's a chicken or the egg problem.  We think

10   it's the first.  Defendants want to have both.

11        The other issue is, in their opposition -- or in their

12   motion to dismiss, they raise the issue that our claims could

13   have been brought as a 12(b)(5) securities fraud claim.  There

14   are cases out in other districts.  There's a case called

15   *In Re: Brican* litigation out of the District of Florida, which

16   is attached to our reply to the sur-reply -- or reply to their

17   opposition to our sur-reply, which held -- it explained the

18   case law as it developed in California, and it held that where

19   there's a securities fraud claim, that type of claim also does

20   not fit within the CAFA exemption.  So there is CAFA

21   jurisdiction.

22        The -- the one case that the plaintiffs -- or that the

23   defendants cited, it was, I believe, the *Genton* case.  That was

24   a -- it's a case out of the Southern District of California.

25   In that case the plaintiffs brought all state law claims as

1    well.  They were a breach of contract claim, and it was a

2    breach of good faith and fair dealing claim.  The plaintiffs

3    there were minority shareholders who were challenging under

4    the -- the operation -- or the operation of the company under

5    the operating agreement.

6         The District Court there said, well, the only reason why

7    you have those claims is because you're shareholders.

8    Therefore, it's a 1933 -- or it's an exception under 1332,

9    Subsection (d), Subsection (9).

10        We don't have that here.  We have an independent basis.

11   It's not a "solely" issue.  And therefore, the CAFA exception

12   does not apply.

13             THE COURT:  Okay.  Let's hear from Mr. Schiller on

14   the CAFA exception to the exception.

15             MR. SCHILLER:  Thank you, Judge.

16        In terms of the binder I just gave you, in response to my

17   friend's argument directly, if I can take the Court to Page 14,

18   we -- we're both agreeing that 1332(d)(9)(C) governs the

19   carve-out.  And as we -- as we point out there, there can be no

20   CAFA jurisdiction when the claims, such as Mr. Bostick's

21   claims, all relate to rights, duties, including fiduciary

22   duties -- this is from the statute -- and obligations relating

23   to or created by any security.

24        And there's no question this involves a security.

25   Mr. Bostick has conceded that the *Omnitrition* case, which he

```
 1    wraps his Complaint around, establishes that a pyramid scheme

 2    distribution agreement is a security under federal securities

 3    laws.  That's why he abandoned his RICO claim upon reading our

 4    motion.  That's why he joined our motion.

 5              THE COURT:  Well, I don't -- it's of no moment to me

 6    why -- why you folks do what you do.  I just -- I just want

 7    to -- here's what I know.  There are no longer any RICO claims.

 8              MR. SCHILLER:  Right.

 9              THE COURT:  So where is my jurisdiction?  And the

10    way I read CAFA --

11              MR. SCHILLER:  Yeah.

12              THE COURT:  -- there is the security exception, and

13    the way as I understand the plaintiff's argument is that the

14    state law claims that are being alleged are an exception to

15    that security portion, which then would attach CAFA

16    jurisdiction.

17        Have I appropriately characterized your argument,

18    plaintiff?

19              MR. DRACHT:  Yes, Your Honor.

20              THE COURT:  Okay.  So, Mr. Schiller, please tell me

21    why that argument fails.

22              MR. SCHILLER:  Because the security law claims

23    that -- that he asserts are based entirely on a security that

24    he owns.  And there are cases, including the *Genton* case and

25    the *Carmona* case here, which says if I own a security and my
```

1    rights, my claims, the duties that I -- are owed me come out of

2    that security, then the carve-out applies.

3        And if you look at his -- his pyramid scheme, 327 claim,

4    he alleges at Paragraph 229 that -- and it's not covered by

5    CAFA because of this allegation -- that by operating a pyramid

6    scheme, he says, Herbalife violated its duty to distributors as

7    distributors not to operate a pyramid scheme.  That's the very

8    duty that falls within the CAFA carve-out.

9        If you look at unfair competition, Bostick claims that --

10   and it's not covered by CAFA because it alleges that Herbalife

11   misrepresented the rights of distributors.  You have duty, you

12   have rights, expressed words under the carve-out.

13       On false advertising, a claim that's also not covered by

14   CAFA, because there Bostick alleges that Herbalife

15   misrepresented the duty -- misrepresented the duty of

16   distributors as distributors to pay certain fees associated

17   with the distribution and sale of Herbalife products.

18       So these are the same allegations that supported his RICO

19   claim, which is gone and is gone because they establish a

20   security claim, just as they do here.  And the ownership of

21   that claim by Mr. Bostick and the fact that he's saying that

22   security assured me about certain earnings, that security

23   assured me I wasn't going to have a load of inventory, that

24   security assured me I wasn't going to have excessive fees, that

25   is the heart of the carve-out -- of the CAFA carve-out,

```
 1   Your Honor.
 2            THE COURT:  Okay.  I think I understand what you're
 3   saying.
 4        All right.  Do you have anything to add about that CAFA
 5   carve-out?  No?
 6            MR. DRACHT:  Yes, Your Honor.
 7            THE COURT:  All right.  I'm going to let you
 8   respond, and then we're going to take a break before we get to
 9   the merits so that my court reporter can have a few minutes to
10   rest her fingers.
11        Go ahead.
12            MR. DRACHT:  Thank you, Your Honor.
13        You know, opposing counsel's pointed out that we use the
14   words "duties" and "rights" in our Complaint.  We do use the
15   words "duties" and "rights."  The statute also uses the words
16   "duties" and "rights."  That doesn't mean that they're -- that
17   they mean the same thing.
18        If you look at the statute, it says duties that "relates
19   to the rights, duties (including fiduciary duties), and
20   obligations related to or created by or pursuant to any
21   security."  The duty not to maintain a pyramid scheme isn't
22   something that arises out of a security.  That's a -- you know,
23   that would be a right that arises out of a statute, 327.
24        Again, the duty not to fraudulently induce someone to join
25   into or purchase a security isn't something that arises out of
```

 1  a security.  That would be considered like a 12(b)(5), fraud in

 2  connection with a sale of a security.

 3       The Court in the *Brican* litigation recognized that

 4  distinction between the holders of a security and how that

 5  falls within the CAFA exemption and then also the sort of fraud

 6  in connection, which falls outside of the CAFA exception.

 7       Thank you, Your Honor.

 8            THE COURT:  All right.  Thank you, folks.

 9       We're going to take a 15-minute break, and we'll come back

10  and we'll get to the rest of the arguments.  We'll be in recess

11  for 15 minutes.

12            MR. SCHILLER:  Thanks, Judge.

13            (Break taken.)

14            THE COURT:  All right.  Let's go back to, please,

15  Bostick versus Herbalife with respect to the -- assuming I have

16  subject matter jurisdiction, your motion to dismiss from the

17  Herbalife defendants.

18            MR. OHLEMEYER:  Thank you, Your Honor.

19  Bill Ohlemeyer for the Herbalife defendants.

20       Obviously, in consideration of the length of the papers

21  and the Court's review of them, I'll briefly refine the issue.

22            THE COURT:  And the PowerPoint, reviewing the brief,

23  because it's very similar to your papers.

24            MR. OHLEMEYER:  Yes.  And there are some portions

25  that relate to this part of the issue.

1     I think, quite simply, this -- the sine qua non of a

2   pyramid scheme or endless chain is the payment of money to

3   participate in a scheme that gives you the right to receive

4   money for recruiting people that's unrelated to the sale of a

5   product.

6     Mr. Bostick has filed a very lengthy Complaint.  It reads

7   at times more like an argument or a press release than a

8   Complaint, but it essentially embraces *Omnitrition*.  I think it

9   cites it in 20 -- or I'm sorry, in eight different paragraphs.

10  And *Omnitrition* equates -- as Mr. Schiller said, that the

11  operation of a pyramid scheme to a securities -- a security.

12    But the documents that Mr. Bostick attaches to the

13  Complaint, a Complaint that supplies the definition that he

14  wants to measure Herbalife's marketing program by, those

15  documents make concessions that contradict and disprove his

16  allegations.

17    And if you look first and foremost at Exhibit I, which is

18  the distributor application that Mr. Bostick signed when he

19  became an Herbalife distributor, it makes it very clear that he

20  represents, warrants, and agrees that he's received and

21  reviewed the contents of a previously unopened Herbalife

22  International business pack, which includes products in

23  addition to materials and forms.  He's not relying on any

24  representations as to the financial results he might achieve.

25  He's reviewed the statement of average gross compensation of

U.S. supervisors.  He's acknowledged that it's available online or upon request.

And importantly, he says at Paragraph 7 -- this, again, is Exhibit I to his Complaint -- that as an Herbalife independent distributor who uses best efforts to promote the sale of products to consumers, and his success will come only from sales of Herbalife product and consumption of those by persons he sponsored directly or indirectly.

So there's no dispute that Herbalife doesn't pay -- that distributors are not required to pay for the privilege of becoming an Herbalife distributor.  Herbalife does not pay its distributors to recruit other distributors.  And Herbalife only pays distributors for selling products to people who presumably want to consume them or then want to resell them to others.

Unlike *Omnitrition*, if an Herbalife distributor -- well, first of all, unlike *Omnitrition*, there is no substantial amount of money that has to be paid to Herbalife in the form of large monthly product orders.  That was one of the problems in *Omnitrition*, is you had to buy a lot of inventory unrelated to your ability to sell it.

You couldn't return that inventory in *Omnitrition* unless you did it within three months, which essentially the Court said made the requirement to purchase the inventory a trade-loading or inventory-loading proposition.  There was a restocking fee that would have to be paid, and there was not a

1    satisfaction guaranteed to distributors.

2         Unlike *Omnitrition*, the documents attached to

3    Mr. Bostick's Complaint and the allegations in his Complaint

4    make it clear -- this is Paragraph 91 of his Complaint -- that

5    "a distributor can qualify as a Supervisor without purchasing

6    or reselling any Herbalife products..."

7         Herbalife's rules attached to the Complaint disincentivize

8    inventory loading.  *Omnitrition* limited its purchase/repurchase

9    program to three months.  Herbalife gives the distributor a

10   full year to return product.  There is no restocking fee.

11   There is no restocking fee to return products to Herbalife.

12   And there is a satisfaction guarantee that's available to the

13   distributors that was not available in *Omnitrition*.

14        So the -- the two situations that the case -- that the

15   plaintiffs essentially offer the Court is the definition of a

16   pyramid scheme, and the standard by which to measure

17   Herbalife's program is directly contradicted by the Complaint

18   that's filed and the voluminous exhibits that are attached to

19   those Complaints.

20        If a distributor can't sell his inventory, he or she can

21   return it for a refund.  There's no reward to people up the

22   line for products that are returned by distributors down the

23   line.

24        And the distribution agreement that Mr. Bostick signed

25   makes it very clear what he was required to do and expected to

```
 1   do as an Herbalife distributor, and it was certainly not

 2   something that told him he was going to get paid to recruit

 3   other people or that he was required to buy any inventory at

 4   all if he chose not to.

 5        So quite frankly, unless the Court has questions, I think

 6   that's a very succinct -- I hope it's a very succinct

 7   explanation of why Mr. Bostick has pled himself out of Court,

 8   as the cases suggest is certainly possible, and why his

 9   Complaint and its exhibits contradict the allegations he's

10   trying to advance in this lawsuit.

11             THE COURT:  I don't have any questions.  Thank you.

12        Let's hear from the plaintiff, please.

13             MR. DRACHT:  Just to address a few of the points

14   made by Mr. Ohlemeyer.

15             THE COURT:  Yes.

16             MR. DRACHT:  He claims that we don't -- there's no

17   dispute that distributors have to pay to become a distributor.

18   This is -- directly contradicts both the rules of Herbalife as

19   well as what's been alleged in the Complaint.  We allege in the

20   Complaint that every distributor as a condition to become a

21   distributor must purchase an IBP or mini IBP.  That costs

22   either 57.75 or 95 --

23             THE COURT:  A hundred bucks or 57.75, yes.

24             MR. DRACHT:  And as we point out --

25             THE COURT:  Paragraph 34 of your Complaint.
```

**UNITED STATES DISTRICT COURT**

```
 1              MR. DRACHT:  Yes, Your Honor.

 2         And as we point out in our opposition, in interpreting

 3    valuable -- the term "valuable consideration," as that term is

 4    used in Section 327, Courts in similar cases involving

 5    lotteries, which is where Section 327 is found, have found that

 6    a 25 cent or a 10 cent ticket counts as valuable consideration.

 7         Once a distributor pays that 57.75 or 95.95, they have the

 8    ticket to join Herbalife.  They have the ticket to go sell

 9    product.  And they have the ticket to go recruit others and try

10    to earn profits off those recruits -- recruit purchases.  We

11    have clearly satisfied the payment of money or the valuable

12    consideration prong of Section 327.

13              THE COURT:  Let's talk a little bit about

14    rescission, because everybody cited me to Judge Feess's

15    opinion, and it really doesn't help you.  So --

16              MR. DRACHT:  And I -- Judge Feess's decision --

17              THE COURT:  Why shouldn't I adopt his reasoning

18    under 1689 and 1689.2?  He is a fine and respected jurist in

19    the Central District of California.

20              MR. DRACHT:  Indeed.  And we think that there is

21    merit to Judge Feess's decision as to how he interprets

22    Section 327 and how Herbalife --

23              THE COURT:  I was talking about 1689.

24              MR. DRACHT:  Well, I'll get to that.

25         As to 1689, the plaintiffs in Judge Feess's case were what
```

```
 1    we call the beneficiaries and promoters.  These were people

 2    that had made it to the top of the pyramid.

 3              THE COURT:  But you don't have any -- your client

 4    doesn't have any product left.  Yes or no?

 5              MR. DRACHT:  That's correct.  We don't have any more

 6    product left.

 7              THE COURT:  Okay.

 8              MR. DRACHT:  And it's our position that we're still

 9    entitled to restitution based on that product, and here's how

10    we get to the restitution.

11              THE COURT:  Restitution is different from

12    rescission.

13              MR. DRACHT:  Well, that's true.  And 1690 -- or is

14    it -- 1692 allows -- it's a recessionary remedy, which allows

15    for restitution or damages as a part of the rescission damage

16    -- rescission section.  We think that we've got an -- a right

17    under the statute to seek both rescission and where the parties

18    can't be put back and made whole, because obviously the product

19    is gone, we should be entitled to restitution there.

20              THE COURT:  Right.

21              MR. DRACHT:  Now, it's not going to be easy to come

22    up with restitution.  We think that we've got a -- a plausible

23    theory for how the Court can restore Dana Bostick to his

24    original position had he never joined the fraudulent pyramid

25    scheme.  And we're happy to lay that out in our damages portion
```

1    of the case.  If you'd like to hear it now, I'm happy to

2    explain it to you too.

3              THE COURT:  I don't need to hear it now.  I need to

4    hear why you think you're entitled to rescission, which "we're

5    entitled to damages" doesn't get you to the equitable relief

6    for rescission.  But you're telling me 1690 provides you with

7    that right.

8              MR. DRACHT:  1690 -- I believe 1692 --

9              THE COURT:  Okay.

10             MR. DRACHT:  -- provides us with a right for damages

11   where the parties can't be -- you know, can't be made whole.

12   We can't undo what's happened here.  The product is gone.  If

13   he could have -- if he could have returned it, he would have

14   returned it.

15             THE COURT:  Well, we don't know that.

16             MR. DRACHT:  At the time he was chasing the dream,

17   you know, and thinking that he could advance forward in the

18   system.  He was wrong.

19        So if we don't have rescission here, there's a real

20   problem with the statute.  It seems like it's -- it's a statute

21   with no purpose, because there's -- there -- Dana Bostick is a

22   victim of a pyramid scheme.  He was not a net beneficiary, like

23   the beneficiaries in the Ford case in front of Judge Feess.

24             THE COURT:  Interesting.

25             MR. DRACHT:  The distinction is, truly, if you're

```
 1   receiving recruiting rewards, you know, that -- that may put
 2   you outside of the realm of being able to seek rescission.  If
 3   you don't get the recruiting rewards, then we -- we think that
 4   we're entitled to --
 5            THE COURT:  You think that makes you a victim for
 6   1689.
 7            MR. DRACHT:  Certainly.  We paid recruiting rewards
 8   up the line that were, you know, well out of line of what
 9   should have been paid and were, under the statute, illegal.
10            THE COURT:  Okay.  Anything else?
11            MR. DRACHT:  Okay.  Would the Court like to hear
12   anything else as to the valuable consideration that's been paid
13   or the requirement to purchase product or inventory?
14            THE COURT:  No.  I've read your lengthy papers.
15   I've read the lengthy exhibits to the Complaint.
16            MR. DRACHT:  Okay.  One of the issues is the -- you
17   know, one of the major issues in this case will be compensation
18   based on internal consumption.  Herbalife is trying to make
19   this late argument alleging in their reply that 73 percent of
20   the participants only are there for discount purchases.  In a
21   sense, what they're arguing is that those 73 percent of people
22   are -- are somehow not participants in the scheme because they
23   don't want to move up, they're only just trying to get a
24   discount.
25        Our argument to that is that these people are victims too.
```

```
 1   These people are -- these people were all brought into the
 2   Herbalife scheme.  We don't know why.  What we do know is we
 3   have the IBP in front of us which sells a business opportunity.
 4       At some point maybe those 73 percent of the people -- and
 5   we objected to the use of the 73 percent because it seems like
 6   a made-up statistic and we have no way to test the veracity of
 7   it.  But at some point those 73 percent of the people came into
 8   the system, paid their 57.75, 95.95, signed a very restricted
 9   distributor agreement, agreed to be an independent distributor
10   with Herbalife.
11       We think most of those people are like Dana Bostick.  At
12   some point they realized there were no retail profits to be
13   made because the price -- the initial price that distributors
14   purchased was so high because of all the recruiting rewards
15   that were built into the price that by the time it went to
16   market, no one would buy it.  They could go to GNC and get a
17   comparable or equivalent product.
18            THE COURT:  You made that argument in your papers --
19            MR. DRACHT:  Yes.
20            THE COURT:  -- which I've read.
21            MR. DRACHT:  Thank you for reminding me, Your Honor.
22       Now, the other issue is the return policy.  In August of
23   2012, Herbalife instituted -- or they revised their return
24   policy where they withdrew a 10 percent restocking fee.
25   According to Herbalife, Bostick should have known about this
```

1    because they posted it on their Web site.  And under the rules,

2    he was required to look at the rules and be -- keep abreast of

3    the changes.

4         Now, we'll note that the rules would be Exhibit C to the

5    Complaint, which is about 127 pages.  I think there's an issue

6    for the Court as to whether or not it's realistic, if the Court

7    is concerned about equitable reasons for why it should allow

8    for rescission, as to whether or not it's -- Dana Bostick

9    actually had notice or whether the Court could infer notice,

10   based on this silent change that Herbalife made to the policy.

11        We also raise other issues with respect to the buy-back

12   policy where it's not effective.  It certainly doesn't give the

13   impression that it's a money-back guarantee.  And even if it

14   were a money-back guarantee, there's a certain problem with it.

15   Because no matter how recruitment-focused a pyramid or

16   multilevel marketing scheme could be, no matter how many

17   misrepresentations they could make, this buy-back policy

18   doesn't serve as some sort of get-out-of-jail-free card.

19        There's no get-out-of-jail-free card in the statute,

20   Section 327.  There's nothing that says, well, so long as the

21   party offers a full money-back return, then you can pay

22   valuable -- then you can pay compensation based on internal

23   consumption.  The statute's very clear.  We don't think that a

24   buy-back policy changes that.

25        Now, as to the -- the prior statements of U.S.

```
 1   compensation, Herbalife continues to say that Bostick should
 2   have known based on these prior distributions that it would be
 3   sort of -- he wouldn't be successful or that his likelihood of
 4   success were -- is minimal.  And that even then, the
 5   supervisors only make a minimal amount of money.
 6        Now, Herbalife never actually does the math for the Court
 7   to show how Bostick was supposed to extrapolate from the
 8   25 percent of super- -- of distributors that become
 9   supervisors, which we allege in our Complaint that's a
10   fraudulent statement.  They never explained to the Court,
11   they've never showed the Court the math, how he could have
12   extrapolated from that figure to this statement that's provided
13   so that he could actually get a picture of what his likelihood
14   of success was.
15        It appears that that statement is -- the only purpose of
16   that statement is to create a false impression of success for a
17   potential distributor that's evaluating their economic
18   opportunity.
19             THE COURT:  All right.  Any -- you've got about two
20   minutes to close it up.
21             MR. DRACHT:  Okay.
22             THE COURT:  Please.
23             MR. DRACHT:  Finally, on the 7 percent shipping and
24   handling fee, the 7 percent shipping and handling fee is
25   deceptive because it's based on the suggested retail price.
```

```
 1    I'm going to run the Court through an example of a product for
 2    sale at a hundred dollar SRP.
 3         If it were bought by a supervisor with a 50 percent
 4    discount, that supervisor would pay $50.  Herbalife would take
 5    23 of that $50 and pay it up the line in the form of recruiting
 6    rewards.  They would keep $27.  The 7 percent fee would
 7    translate to another $7 in revenue, giving Herbalife another
 8    30 -- or giving Herbalife a total of $34.
 9         That $7 is about 20 percent of Herbalife's entire revenue
10    from the transaction.  That's a lot of packaging and handling.
11    We've alleged sufficient facts or specific facts that those
12    numbers diverge greatly from their reported expenses for those
13    fees.
14         Now, finally, assuming the Court --
15              THE COURT:  You said "finally" last time, so there's
16    no two finally's.
17              MR. DRACHT:  Okay.  In conclusion --
18              THE COURT:  Wrap it up.
19              MR. DRACHT:  If the Court believes that it has
20    jurisdiction -- we think that we've pled a sufficient case.  If
21    the Court has a concern about the -- this Court's jurisdiction,
22    we'd request leave to amend to at least allow us to add a
23    section -- a Section 1933 Act -- or a 1933 Act claim which
24    would give the Court federal jurisdiction.
25         Thank you.
```

1              THE COURT:  All right.  Thank you.

2         Let Herbalife to have the last word briefly, please.

3              MR. OHLEMEYER:  I will be very brief, Your Honor.

4         Your Honor, we deal with the issue of whether you can

5    amend a Complaint that doesn't allege subject matter

6    jurisdiction in our papers.  I won't respond to that argument.

7         Very simply, Mr. Bostick's not alleging that Herbalife's

8    operating a lottery.  At Page 11 to 14 of our motion, I think

9    you'll find the answer to every issue Mr. Dracht raised.

10        Very simply, with respect to the IBP, Bostick alleged in

11   the Complaint that the price of the IBP is not payment or

12   initial disbursement by a new participant for the right to sell

13   products and the right to receive rewards.  And that, I think,

14   very clearly answers the question of -- of why that is not the

15   kind of payment that then is -- is sent up the line in a

16   pyramid scheme that the endless chain statute and other legal

17   precedents are trying to prevent.

18        Do you have any other questions?  I'd be pleased to answer

19   them.

20             THE COURT:  I don't.  Thank you, counsel.

21        This matter will be submitted.  Thank you very much,

22   folks.

23             MR. DRACHT:  Thank you.

24                  (Whereupon the matter concluded at 3:53 p.m.)

25

1          **CERTIFICATE OF OFFICIAL REPORTER**

2

3     COUNTY OF LOS ANGELES    )
                               )
4     STATE OF CALIFORNIA      )

5

6              I, MYRA PONCE, FEDERAL OFFICIAL REALTIME COURT

7     REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR THE

8     CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT PURSUANT

9     TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE FOREGOING

10    IS A TRUE AND CORRECT TRANSCRIPT OF THE STENOGRAPHICALLY

11    REPORTED PROCEEDINGS HELD IN THE ABOVE-ENTITLED MATTER AND THAT

12    THE TRANSCRIPT PAGE FORMAT IS IN CONFORMANCE WITH THE

13    REGULATIONS OF THE JUDICIAL CONFERENCE OF THE UNITED STATES.

14

15              DATED THIS 8TH DAY OF AUGUST, 2013.

16

17

18

19

20

21              /S/ MYRA PONCE

22    _____
      MYRA PONCE, CSR NO. 11544, RMR, CRR
23    FEDERAL OFFICIAL COURT REPORTER

24

25