Philip D. Dracht, SBN 219044
Scott M. Petersen (admitted *Pro Hac Vice*)
Jason W. Hardin (admitted *Pro Hac Vice*)
**FABIAN & CLENDENIN**
215 South State Street, Suite 1200
Salt Lake City, UT 84151-0210
Telephone: (801) 531-8900
pdracht@fabianlaw.com
spetersen@fabianlaw.com
jhardin@fabianlaw.com

Thomas G. Foley, Jr., SBN 65812
Robert A. Curtis, SBN 203870
Justin P. Karczag, SBN 223764
**FOLEY BEZEK BEHLE & CURTIS, LLP**
15 West Carrillo Street
Santa Barbara, California 93101
Telephone: (805) 962-9495
tfoley@foleybezek.com
rcurtis@foleybezek.com
jkarczag@foleyzek.com

*Attorneys for Plaintiffs Dana Bostick, Anita Vasko,*
*Judi Trotter, Beverly Molnar, and Chester Cote*

## IN THE UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANA BOSTICK, a California Resident, ANITA VASKO, a Pennsylvania resident, JUDI TROTTER, a Washington resident, BEVERLY MOLNAR, a Pennsylvania Resident, CHESTER COTE, a Vermont resident, on behalf of themselves and all others similarly situated, and on behalf of the general public, <br><br> PLAINTIFFS, <br><br> vs. <br><br> HERBALIFE INTERNATIONAL OF AMERICA, INC., a Nevada Corporation, HERBALIFE INTERNATIONAL, INC., a Nevada Corporation, HERBALIFE, LTD a Cayman Island Corporation, <br><br> DEFENDANTS. | Case No.: 2:13-cv-02488-BRO-RZ <br><br> **FIRST AMENDED CLASS ACTION COMPLAINT** <br><br> **DEMAND FOR JURY TRIAL** |

1

## INTRODUCTION TO THE CASE

1.      Herbalife told Plaintiffs Dana Bostick, Anita Vasko, Judi Trotter, Beverly Molnar, and Chester Cote that if they "put in the time, effort, and commitment," they could make money from retail sales and, by recruiting others to become Herbalife distributors, they could make money off them.

2.      Plaintiffs all purchased International Business Packs and became distributors. They ordered Herbalife products – enough products that they jumped up the chain and qualified for additional discounts and commissions from potential recruits' purchases.

3.      However, they did not make money as promised. Like the hundreds of thousands of Herbalife distributors before and after, they failed. They failed even though they were committed and put in the time and effort. They failed because they were doomed from the start by an Herbalife marketing plan that systematically rewards recruiting distributors over retail sales of product. A marketing plan in which Herbalife pays a significant portion of every dollar that Plaintiffs and other distributors pay for Herbalife product to others in the form of recruiting rewards, regardless of the distributors' actual retail sales. A marketing plan that pays millions to those few at the top in recruiting rewards at the expense of the many at the bottom.

4.      Accordingly, Plaintiffs, for themselves, all others similarly situated, and the general public, allege:

## TYPE OF ACTION

5.      Plaintiffs sue for themselves and for all persons who were Herbalife distributors from April 2009 until the present under California's Endless Chain Scheme Law (California's Penal Code § 327 and California Civil Code § 1689.2), California's Unfair Competition Law (Business and Professions Code Section 17200 *et seq.*), and False Advertising Law (Business and Professions Code § 17500), against Herbalife International, Inc., Herbalife International of America,

FIRST AMENDED COMPLAINT

1 Inc., and Herbalife, Ltd for the operation and promotion of an inherently fraudulent
2 endless chain scheme.

3 **PARTIES**

4    6.    Plaintiff Dana Bostick is and at all relevant times was an individual
5 who resides in Los Angeles County, California. Bostick entered into an Agreement
6 of Distribution with Herbalife and became an Herbalife distributor in April of
7 2012.

8    7.    Plaintiff Anita Vasko is and at all relevant times was an individual
9 who resides in Chester County, Pennsylvania. Vasko entered into an Agreement of
10 Distribution with Herbalife and became an Herbalife distributor in December of
11 2012.

12    8.    Plaintiff Judi Trotter is and at all relevant times was an individual
13 who resides in King County, Washington. Trotter entered into an Agreement of
14 Distribution with Herbalife and became an Herbalife distributor in January of
15 2012.

16    9.    Beverly Molnar is and at all relevant times was an individual residing
17 in Allegheny County, Pennsylvania. Molnar entered into an Agreement of
18 Distribution with Herbalife and became an Herbalife distributor in June 2011.
19 Molnar is still registered as an Herbalife distributor although she is not active.

20    10.    Plaintiff Chester G. Cote is an individual who resides in Bellows
21 Falls, Vermont. When he became an Herbalife distributor he was a resident of
22 Connecticut. When his Herbalife distributorship expired, he was a resident of
23 Missouri. He became a distributor in 2009.

24    11.    Defendant Herbalife International of America, Inc. is and at all
25 material times was a Nevada corporation headquartered in Los Angeles. Defendant
26 Herbalife International of America, Inc. is a wholly-owned subsidiary of Herbalife
27 International, Inc. and an indirectly wholly-owned subsidiary of Herbalife, Ltd,
28 and is employed by those entities to conduct their U.S. operations.

FIRST AMENDED COMPLAINT

12.     Defendant Herbalife International, Inc. is and at all material times was a Nevada corporation headquartered in Los Angeles. Herbalife International, Inc. is an indirect wholly-owned subsidiary of Herbalife Ltd. Herbalife International, Inc. was the former parent company of "Herbalife" but it and its subsidiaries were acquired on July 31, 2002 by an entity that became Herbalife Ltd.

13.     Herbalife Ltd. is "one of the largest network marketing companies in the world." Herbalife Ltd. is and at all material times was a corporation organized under the laws of the Cayman Islands with its corporate headquarters in Los Angeles. Herbalife Ltd. is a publicly held corporation traded on the NYSE as "HLF."

### JURISDICTION AND VENUE

14.     Defendants Herbalife International, Inc., Herbalife International of America, Inc., and Herbalife Ltd. are subject to the jurisdiction of this Court. They have been engaged in continuous and systematic business in California. Defendants have designated agents for service of process in this State or have their principal place of business here and have committed tortious acts in this State. Plaintiff Bostick is a resident of California.

15.     As Plaintiffs bring a putative class action where the amount in controversy exceeds $5 million, and in which members of the class of plaintiffs are citizens of a state different than from any Defendant, the Court has jurisdiction over these claims under 28 U.S.C. § 1332(d).

16.     At all material times, Herbalife Ltd. owned, controlled, and had common and/or overlapping management with Herbalife International Inc.; Herbalife International, Inc., owned, controlled, and had common and/or overlapping management with Herbalife International of America, Inc.; and Herbalife Ltd. indirectly owned, directly controlled, and had common and/or overlapping management with Herbalife International of America, Inc. Herbalife

Ltd., Herbalife International, Inc., and Herbalife International of America, Inc. are the principals, agents, affiliates, partners, co-conspirators or alter-egos of each other, and each acted within the course, scope and authority of such relationships so that Herbalife Ltd., Herbalife International, Inc., and Herbalife International, Inc., are alter egos of one another and are jointly and severally liable for the acts alleged herein. In Herbalife's dealings with Plaintiffs and the Class, Herbalife generally does not distinguish between the three corporate entities but instead refers to itself singularly as "Herbalife." This Complaint, therefore, also refers to Herbalife Ltd., Herbalife International, Inc., and Herbalife International of America, Inc. collectively as "Herbalife."

17.    Venue is proper in this District under 28 U.S.C. § 1391(b) and (c) because a substantial number of the acts and transactions that established the claims of the Plaintiff and the class occurred within this District. Defendants conducted business and solicited business relating to the illegal scheme in this district. Defendants transacted their affairs, resided within California and this judicial district, and Defendants' wrongful acts occurred in this District and have directly impacted the general public of this district.

18.    Plaintiffs and the class have also executed an "Agreement of Distributorship" with Herbalife, which requires claims to be "resolved exclusively in a judicial proceeding in either the Superior Court or the United States Court, both located in Los Angeles, California."

## FACTS

## SUMMARY OF FACTS

19.    From 2009-2013, Herbalife made disclosures of "Statements of Average Gross Compensation of U.S. Supervisors" that were deceptive and misleading as to the likelihood that a distributor could reach the level of Supervisor and earn money from the scheme. Herbalife included these disclosures in the Sales and Marketing Plan received by Plaintiffs and the class. Herbalife also posted these

disclosures online. None of these disclosures provided any information that would allow a potential or actual distributor to meaningfully evaluate their likelihood of success in the scheme. Copies of the disclosures made from 2009-February 2013 are attached as **Exhibit A** and are referred to as the **"2008-2011 Statements"**

20.    As recently disclosed by Herbalife in February 2013 in their Statement of Average Gross Compensation Paid by Herbalife to United States Distributors in 2012 (attached as **Exhibit B**, and referred to as the **"2012 Statement"**) the majority of Herbalife's U.S. distributors earn nothing from Herbalife. In 2012, Herbalife's real business opportunity was:

      a.  Herbalife paid nothing to over 87.9% of all distributors;

      b.  Herbalife paid $1 to $1,000 to 8.43% of all distributors;

      c.  Herbalife paid $1,001 to $5,000 to 2.2% of all distributors;

      d.  Herbalife paid $5,001 to $10,000 to 0.5% of all distributors;

      e.  Herbalife paid $10,000 to $25,000 to 0.393% of all distributors;

      f.  Herbalife paid $25,001-$50,000 to 0.230% of all distributors;

      g.  Herbalife paid $50,000-$100,000 to 0.109% of all distributors;

      h.  Herbalife paid $100,001-$250,000 to 0.092% of all distributors; and

      i.  Herbalife paid more than $250,000 to 0.039% of all distributors.

21.    These real numbers are in direct contrast to the deceptive earning claims referenced in Herbalife's promotional materials, including videos on Herbalife's website, YouTube, and Herbalife distributors' websites, often featuring prominent distributors and promoters of the Herbalife scheme, and Herbalife's prior Statements of Average Gross Compensations distributed to Plaintiffs and the class.

22.    An undisclosed fact is that there is little to no opportunity for an Herbalife distributor to earn a "retail profit" on the sales of Herbalife products because Herbalife sets the "Suggested Retail Price" (**"SRP"**) at a price so high that few if any Herbalife distributors can earn retail profits.

23.     Herbalife sets the SRP so high because for every dollar a distributor paid Herbalife for Herbalife product (not including packaging, handling, shipping, and tax) Herbalife paid out $0.46 to $0.64 to its top distributors as recruiting bonuses. Herbalife made these payments upline whether or not the distributor sells the product at retail and whether or not the distributor sells the product at SRP.

24.     Besides setting the SRP at an inflated price, Herbalife charges its distributors a 7% fee for "Packaging and Handling" and a 2.5% to 4% fee for shipping, based solely on the inflated SRP and not on Herbalife's actual or estimated costs for packaging, handling, and shipping. This makes it even harder for a distributor to make retail profits as it drives their retail price even higher.

25.     An undisclosed fact (from at least April 2009 to February 2013) is that a large majority of all distributors (approximately 71%) make few if any retail sales and are forced to self-consume the Herbalife products.

26.     An undisclosed material fact is that the vast majority of participants in Herbalife's endless chain scheme drop out within one year of becoming Herbalife distributors and have usually lost most, if not all, of their investment and thousands of dollars expended to build their supposed "business opportunity."

27.     To avoid being an endless chains scheme, a multi-level marketing plan must have effective provisions to ensure that its distributors sell most products to consumers not a part of the marketing system. Herbalife does or did not employ or enforce such provisions.

**THE HERBALIFE SALES AND MARKETING PLAN**

28.     As a direct-sales company, Herbalife operates a multi-level distribution system – the Herbalife Sales and Marketing Plan – relying on individual distributors to market, promote, and sell its products.

29.     A copy of the Herbalife "Sales and Marketing Plan and Business Rules" (**"Sales and Marketing Plan"**) purchased by Bostick as part of his

FIRST AMENDED COMPLAINT

International Business Pack is attached as **Exhibit C.** The Sales and Marketing Plan is an incredibly complex set of rules and regulations.

30.    Anyone can become an Herbalife distributor if they purchase an Herbalife International Business Pack (**"IBP"**) or a mini-IBP at a cost of $95.95 or $57.75 respectively, apply to become a distributor, and are sponsored by an existing Herbalife distributor.

31.    Herbalife recruits prospective participants by offering them the opportunity to participate in a "tested proven business plan" "designed to maximize rewards for effort and provide substantial and ongoing income."

32.    Herbalife recruits prospective participants by promising them "Immediate Retail Profit," "Daily Wholesale Profit," "Monthly Override Income," "Monthly Production Bonuses," "Annual Bonuses" for Top Achievers, and "Special Vacations and Training Events" that will "teach you how to meet your goals, increase your earning power and build an international business without leaving the comfort of your own home!"

33.    Herbalife's distributors promise recruits and other distributors that they can "be your own boss – take charge of your life," achieve "financial freedom," earn "extra income," "retirement/pension," and "leave a legacy."

34.    Herbalife recruits prospective participants by boasting that the Herbalife Sales and Marketing Plan is "[t]he best Marketing Plan in the industry" and that it pays out up to 73% of product revenues to distributors in "Retail and Wholesale Profits, Royalty and bonus income and incentives." Herbalife stresses:

> Each Distributor's success is dependent on two primary factors: The time, effort and commitment a Distributor puts into their Herbalife business and the product sales made by a Distributor and their downline organization. These two factors raise the importance of a Distributor's responsibility to train, support and motivate their downline organization.

35.     Herbalife divides the "73% of product revenue" by apportioning 23% of the SRP to "Royalty, bonus income, and incentives" and 50% to "Retail and Wholesale Profits." Herbalife's 73% payout claim depends on a distributor reselling the product at 100% of the SRP.

36.     By basing these "Retail and Wholesale Profits, Royalty and bonus income and incentives" off the SRP, Herbalife masked that for every dollar the purchasing distributor spent on Herbalife product, Herbalife paid from $0.46 to $0.64 upline in the form of recruiting rewards.

37.     Because so much money is paid upline in recruiting bonuses so that Herbalife can retain its "most active and productive distributors," Herbalife's SRP is an inflated price that bears no relation to the actual market price distributors can get for Herbalife's products in sales to retail customers.

## BOSTICK IS RECRUITED TO HERBALIFE

### "Position Determines the Pay," "You Determine Your Position"

38.     Dana Bostick responded to an internet advertisement for a "trial offer." It offered an "Internet Business Starter Pack" where Bostick paid $9.95 in Shipping and Handling and would be charged an additional $39.95 if he did not return the package within fourteen days. Interested in earning monthly and residual income, Bostick signed up for the pack. The Internet Business Starter Pack was mailed to Bostick sometime between late-March and early-April 2012.

39.     Bostick reviewed the pack, which is attached as **Exhibit D**, and the DVD video enclosed in that pack, which revealed the "business" as Herbalife.

40.     Bostick watched the DVD. A spokeswoman explained that within Herbalife, "the position determines the pay - meaning, the higher you start the more money you can make."

41.     On the video, Maurice Smith reiterates that "position determines the pay" and that "you determine your position." Smith tells viewers that an average Herbalife distributor earns "between $100 and $300 per month – part-time." And

FIRST AMENDED COMPLAINT

Success Builders "have the opportunity to earn between $400-$600 part-time." Smith encourages recruits to become a "Supervisor," a level in the Herbalife endless chain that requires a significant purchase of product but where distributors, if they have a downline, can start to earn recruiting rewards:

> Supervisor is the highest level you can choose to position yourself at today. And, this is very important to know, Supervisor is the gateway to the rest of the levels of the marketing plan. You cannot get to the higher income levels without first becoming a Supervisor.

42.     The graphics on the video display that Supervisors can earn between $500-$1500 a month. Smith explains that a World Team member can earn $1,500-$3000 a month, GET Team member can earn $3,500-$7,000 a month, Millionaire Team can earn between $7,500-$15,000 a month, and President's Team members typically earn between $25,000-$100,000+ a month. Images of Smith's presentation and representations of potential distributor's earnings are attached as **Exhibit E**.

43.     Smith explains why it is so important to become a Supervisor: "It's the highest paying position that you can start at today. You've set yourself up for retail profits of 50% so you've doubled your money for the same work you've been doing." A Supervisor is at the "gateway to the rest of the marketing plan," because Supervisors can begin to get royalties, production bonuses, spontaneous bonuses, 1% annual bonus pool, and paid vacations.

44.     Bostick viewed this video, Herbalife's website, and various other Herbalife related websites. Upon viewing these materials, Bostick believed that retailing Herbalife products and recruiting distributors would be a way for him to build a business where he could earn both monthly income and residual income.

45.     Bostick ordered and paid for an IBP. It was sent to him by Federal Express. The IBP contained the magazine, Live the Good Life! Herbalife (relevant portions of which are attached as **Exhibit F**) and four distributor workbooks:

"Your Business Basics" (relevant portions of which are attached as **Exhibit G** to the Complaint); "Using and Retailing Your Products"; "Building Your Business" (relevant portions of which are attached as **Exhibit H** to the Complaint); and the "Sales & Marketing Plan and Business Rules" (**Exhibit C**). Bostick reviewed the IBP and the materials in the IBP.

46.    On April 6, 2012, Bostick went online and signed an Agreement of Distribution. That agreement is attached as **Exhibit I.**

47.    Bostick worked hard to build his business. He bought and used products himself so he would know what he was selling. He set up three websites. Two were set up to sell Herbalife products to the public and one was to recruit downline distributors. He paid for "coaching" sessions where the coaches "taught" him how to recruit downline distributors to build a downline. In spite of his hard work, the only recruit he made was a long-time friend.

48.    On April 6, and 26, 2012, May 21, 2012, June 18, 19, 22, and 27, 2012, and July 20, 2012, Plaintiff Bostick ordered products from Herbalife. Besides the purchase price for product, Herbalife added a 7% "Packaging and Handling" fee and a shipping fee of anywhere from 2.5% to 4%, solely based on the SRP of the product and not on the actual or estimated costs.

49.    On June 22, 2012, he attempted to "pay for his position" by coordinating with his friend. They were supposed to both purchase enough product to become a Supervisor, the "gateway to the rest of the marketing plan." On June 22, 2012, he made a single order that cost him $2,133.72. Bostick's downline did not make the purchase and Bostick did not advance to Supervisor.

50.    When he tried to resell the product he purchased to qualify as a Supervisor, Bostick learned that there was little opportunity for him to earn monthly income or residual income with Herbalife. The SRP alone was an uncompetitive price in the market, and, when Bostick would add the shipping, handling, and packaging fees to recoup his costs, the retail price was so high that

1    there were virtually no retail purchasers willing to pay the full retail price. And

2    other distributors were selling Herbalife products online on Craigslist and EBay at

3    or below their cost, making retail profits in the amounts promised by Herbalife

4    even more difficult to achieve.

5        51.    As to the over $3,000 (SRP) worth of Herbalife products that Bostick

6    purchased that he has not self-consumed or given away, Plaintiff Bostick has tried

7    to sell it on Craigslist at or around his purchase cost.

8              **ANITA VASKO IS RECRUITED TO HERBALIFE**

9                        **The Nutrition Club**

10       52.    Anita Vasko was looking to reenter the workforce after being a

11   homemaker for some years. With two children in their early teens and with a

12   health-coach certificate, she went to a "nutrition club" operated by another

13   Herbalife distributor in a nearby town.

14       53.    She told the owner of the Herbalife nutrition club she was looking for

15   a job. He explained the multi-level-marketing concept to her and she thought it

16   sounded interesting. Late December 2012, Vasko purchased an IBP and signed the

17   distributor agreement.

18       54.    She reviewed the IBP and she thought it sounded and looked like a

19   good opportunity.   Based on the representations in the IBP, including the

20   Statement of Average Gross Compensation, she thought that she could earn retail

21   profits by reselling Herbalife products and that she could recruit other distributors

22   and earn profits off of their purchases and sales.  She wanted a part-time and

23   eventual full-time job and Herbalife sounded like it would provide her with that

24   opportunity.

25       55.    She kept "training" at the nutrition club for around four months and

26   became familiar with the products and how to prepare the shakes by consuming

27   them herself.

28

FIRST AMENDED COMPLAINT

56.     In late January/early-February of 2013, Vasko decided to open her own nutrition club. She sub-leased a prime commercial location in Westchester, Pennsylvania. The rent was $725 a month plus common area maintenance charges plus utilities for seven months. She then entered into a three year lease and from August 2013 until January 2014 she shared the rent, which cost a total of $1500 a month with another Herbalife distributor to operate the club. When she opened the Nutrition club in the winter of 2013, Vasko became a Supervisor, purchasing enough products to qualify under the one-month qualification.

57.     The rules for operating the nutrition club made it hard for her to get business. She could only have people come into her club by "invitation," so she would have to go on the street to invite people into the club. Few people responded to her invitation. Under the rules, there could be no sign indicating she was affiliated with Herbalife. She had to place curtains on the windows of the storefront as well. The logo they initially selected was rejected by Herbalife as being "too similar" to Herbalife's logo.

58.     Vasko worked six days a week and sometimes seven, often from eight a.m. to late in the evening. In November of 2013 she had a meeting with her upline distributor and her husband regarding the lack of sales and the lack of interest in the club. Her upline suggested she continue to hand out invites on the street.  Later her upline stopped calling her back when she sought additional help.

59.     When Vasco was actively working on her Herbalife distributorship, she had never seen a copy of the Statement of Average Gross Compensation for 2012, Exhibit B. Vasco Last year Vasko calculated a loss of approximately $12,000 in 2013 on her Herbalife nutrition club, not including the hundreds to thousands of hours spent working at the club. Vasko is also stuck with unopened Herbalife product that cost her over $2,000 to purchase and that she cannot return to Herbalife because it is past the one-year return policy.

FIRST AMENDED COMPLAINT

## JUDI TROTTER IS RECRUITED TO HERBALIFE

### Retirement Gone Wrong

60.     In January of 2012 Judi Trotter saw an advertisement about how to make money at home. She had just retired but her husband was still working. She was bored and looking to earn some extra money so she got in contact with the company, Online Business Systems.

61.     The person recruiting her gave her a high pressure sales pitch, telling her that if she did not have the money to join she should call her bank to get a credit card limit raised. On the first call with her upline, Trotter signed up and paid for enough products to immediately qualify as a Supervisor.

62.     The product and the IBP were delivered to her. When Trotter reviewed the IBP, including the statement of average gross compensation it contained, she believed the IBP when it said Herbalife provided a full-time or part-time opportunity. After reviewing the IBP, including the representations of income, testimonials, and the Statement of Average Gross Compensation, she thought "I could do this."  Based on the representations of the IBP, Trotter thought she would be able to make retail profits and recruit other Herbalife distributors and earn money off of their purchases and sales.

63.     She bought leads of prospective recruits from Online Business System. She signed up other recruits. She sent the product that she purchased to the people that she signed up from her leads – they all got a selection of products provided by Trotter and paid for it as part of their sign up, which cost (including the IBP) the leads around $200. All but one of them cancelled.

64.     Trotter reached the level of "World Team" without ever filling out a 10 Customer Form or a 70% Rule Form.  She earned "mailbox money," or a Royalty Override check, and she never filled a 10 Customer Form or a 70% Form. Trotter reached the level of World Team without making 10 retail sales.

FIRST AMENDED COMPLAINT

65.     Trotter felt uncomfortable following the Online Business System scripts as she felt they were too high pressure. The leads that she purchased were usually very poor quality leads – the leads would be very ignorant about starting a business. By March 2012 she decided she could not in good conscious recruit any more people and that she needed to try to resell product in order to work off the debt she had incurred.

66.     Sometime in May 2012 she went to a conference sponsored by Herbalife. There were Herbalife ethics people there, and she told them about her concerns with recruiting and her difficulty in retailing. When they asked how she became a Supervisor, she told them that she was following the Online Business System way. The Herbalife representatives told her that they did not condone what Online Business Systems was doing.

67.     After that conference, Trotter went back and read her IBP to see if Online Business Systems was legitimate. She found language allowing business and methods tools, which she took to mean that Online Business System was not prohibited under the Herbalife rules. She tried for another couple of months to sell the product that she had not personally consumed or provided to her "leads," and found that it was very difficult to sell. When she ultimately tried to sell her product on Craigslist she found that people were heavily discounting the product. At this point she had lost $8842.11 in pursuing her Herbalife distributorship for product, leads, booklets to send to leads, websites, and other tools.

68.     Trotter resigned from her distributorship in the fall of 2012 and returned the product she had leftover to Herbalife. Trotter did not realize that she had a cause of action against Herbalife until she learned of this action.

## BEVERLY MOLNAR IS RECRUITED TO HERBALIFE

### The Lead Game

69.     In June 2011, Beverly Molnar ordered the $9.95 Online Business System brochure and DVD. She was looking to make some money on the side.

1   She called the upline and from that call she jumped into the program, buying the

2   IBP and enough volume points to become a Supervisor.

3        70.    Molnar reviewed the IBP when it was sent to her. She read the

4   statement of average gross compensation, income projections, and testimonials

5   and thought that she could make money as a Supervisor, both by selling products

6   for retail profit and by recruiting distributors underneath her.

7        71.    The first six months she tried hard to sell product to earn back her

8   initial investment. But she had to give purchasers significant discounts off the

9   suggested retail price in order to sell the product. After that first large purchase,

10  Molnar stopped trying to resell product and just consumed it.

11       72.    She also purchased leads from Online Business System. Molnar was

12  required to purchase packages to send to the leads, which cost a fee for each lead.

13  Molnar had little success with the leads. Online Business System would handle all

14  the shipping of the lead packages and DVD's, but when the leads would return

15  product and the lead package, Molnar was required to pay for their return. The

16  leads that Molnar purchased were often of low quality, with phone numbers and

17  emails that were frequently wrong. If Molnar did not contact the lead within two

18  weeks she lost the lead. Molnar estimates she spent over $11,000 on leads and on

19  other bundled services, such as websites, training, and coaching.

20       73.    Molnar stopped buying leads over a year ago and is trying to pay-

21  down her credit card debt incurred in chasing the Herbalife opportunity.  Molnar

22  did not realize that she had a cause of action against Herbalife until she learned of

23  this action.

24                 **CHESTER COTE IS RECRUITED TO HERBALIFE**

25                             **"Closet Qualified"**

26       74.    In 2009 Chester Cote was laid off. He saw an online opportunity and

27  he called about it. A man from Minnesota returned Cote's call and convinced

28  Chester to join Herbalife as a distributor.

75.     Cote bought an IBP and reviewed it. He liked what he saw and read. Based on his review of the IBP and the representations contained in it, including the Statement of Average Gross Compensation, Cote thought that Herbalife would be a good way to earn money by selling products and earning retail profits and by recruiting other distributors and earning based on those distributors purchases and sales.

76.     Cote bought enough Herbalife product in a single purchase to become a Supervisor.

77.     Cote had trouble recruiting his friends and family into Herbalife.

78.     Cote went to two training programs – one in Minneapolis, Minnesota and one in Phoenix, Arizona. There, Herbalife representatives gave them pep talks about how much money they could earn being Herbalife distributors.

79.     Cote wanted to earn the kind of money these people described, so he tried to recruit online. He also sent out fliers, which he purchased from senior members in his upline.

80.     Cote tried to sell products online, but he found it was difficult because the prices were depressed by other distributors who were selling their products at a significant discount off SRP. Cote still has canisters of Herbalife product that he would like to return but the return period has ended.  Cote did not realize he had a cause of action against Herbalife until he learned of this action – he thought his failure as an Herbalife distributor was due to his own shortcomings as an Herbalife distributor.

81.      All of these Plaintiffs' experience is the same as most Herbalife distributors. As Herbalife's 2012 Statement shows, most Herbalife distributors earn nothing from Herbalife and only 33% of Newly Qualified Supervisors requalify.

82.     Plaintiffs' failure and the other distributors' failure are not for lack of time, effort, or commitment to Herbalife. These failures are due to a marketing

FIRST AMENDED COMPLAINT

plan that, by its design, systematically rewards recruiting over retailing and systematically rewards those distributors at the top at the expense of the many distributors at the bottom.

## MECHANICS OF THE SALES AND MARKETING PROGRAM

83.   Within the Herbalife endless chain, there are 11 levels of Herbalife distributors. The bottom four categories are Distributors,[1] Senior Consultants, Success Builders, and Qualified Producers. Herbalife calls the bottom four categories "Non-Sales Leaders" (**"NSL"**). The top seven categories are Supervisors, World Team, Global Expansion Team, Millionaire's Team, President's Team, Chairman's Club, and Founders Circle. Herbalife calls these distributors "Sales Leaders" (**"SL"**).[2] Bostick was an NSL and Vasko, Trotter, Molnar, and Cote were all SLs.

84.   Herbalife assigns a new distributor to an existing "line of sponsorship" to which the recruiting distributor already belongs. A line of sponsorship includes a hierarchy of distributors starting with the newly-recruited distributor and proceeding by seniority up to a distributor heading the line of sponsorship. These distributors at the heads of the lines of sponsorship are Beneficiaries and Promoters.

85.   Junior (or "downline") distributors purchase products from more senior (or "upline") distributors within their line of sponsorship or from Herbalife directly. Herbalife pays bonuses upline to distributors based on purchases from Herbalife by downline distributors. Any distributor at any level may sponsor new distributors.

---

[1] The use of a lower-case "distributor" refers to all Herbalife distributors, regardless of level. The use of a capitalized "Distributor" refers to the first-level Herbalife distributor.

[2] Members of the Millionaire's Team, President's Team, Chairman's Club and Founders Circle are the primary beneficiaries and promoters of the Herbalife endless chain (**"Beneficiaries and Promoters"**).

86.     Herbalife protects its distributors' downlines. A distributor who wants to change their sponsor must obtain a written, notarized release from their Sponsor and upline distributors. Herbalife can still deny the request. The distributor changing sponsors can only keep their downline if their upline agrees.

87.     To move up the Herbalife endless chain and qualify for higher levels of compensation, Herbalife requires a distributor to "achieve" (either through their own purchases of Herbalife products or through their downline's purchases) specific "Volume" during specified time-periods.

88.     Herbalife calculates a distributor's Volume by using **"Volume Points."** Volume Points are point values that Herbalife assigns to each of their products. In the U.S., Herbalife uses a Volume Point to dollar ratio to assign Value Points to specific products. It displays a product's Value Points on the price sheet.

89.     In 2012 the dollar to Volume Point ratio ranged from approximately $1:0.57VP to approximately $1:0.905VP.

90.     If a distributor orders products the distributor collects "Personally Purchased Volume" points [3] The Volume Points that a distributor accumulates either through Personally Purchased Volume or through the Volume Points purchased by the distributor's downline become the distributor's sales production. Herbalife uses Volume Points to qualify distributors for higher levels, sales commissions, royalties, bonuses, and other incentives and benefits. Herbalife calculates Volume Points monthly.

_____

[3] **"Personally Purchased Volume"** is defined as "The volume purchased directly from Herbalife using your [the distributor's] Herbalife Identification Number." All defined terms from the Sales and Marketing Plan are found on Exhibit C, pp. 21-22.

## NON-SALES LEADERS: DISTRIBUTORS, SENIOR CONSULTANTS, SUCCESS BUILDERS, & QUALIFIED PRODUCERS

### Distributors (NSL)

91.     Herbalife calls its first-level distributors "Distributors."

92.     A Distributor buys Herbalife products at a 25% discount off the SRP whether for personal use or resale. In its promotional materials, Herbalife characterizes the 25% discount as an opportunity for the Distributors to earn 25% in retail profits from reselling the Herbalife products.

93.     Prior to the filing of the Complaint in this case, if a Distributor purchased a product with an SRP of $100, the cost was $75. Herbalife paid the Distributor's upline $48 of the $75 cost – $25 upline in "Wholesale Profits" and $23 in Royalty Overrides, bonuses, and other incentives – even if the Distributor could not resell the product for the $100 SRP. For a Distributor's purchase, $0.64 out of every dollar <u>paid</u> for Herbalife product went upline ($0.33 in Wholesale Profits and $0.31 in royalties, bonuses, and incentives).

### Senior Consultants (NSL)

94.     Herbalife promotes a Distributor to "Senior Consultant" if they buy 500 or more Personally Purchased Volume Points, or, if their recruited distributors provide 500 Volume Points in "Downline Volume."[4]

95.     Senior Consultants buy Herbalife product at a 35% discount off SRP and are eligible for a 10% commission off their downline Distributor's purchases, so long as that distributor remains a Distributor. Herbalife calls this commission "Wholesale Profit."

96.     A Distributor can also qualify for Senior Consultant if the distributor gets 2,000 Volume Points in a month, either through Personally Purchased

---

[4] **"Downline Volume"** is defined as "As a non-Supervisor, Downline volume is based on volume which is placed by your downline Distributors directly from Herbalife or order between 25% to 42% discount.

Volume or through Downline Volume. That Senior Consultant gets a 42% discount off of SRP, both on the qualifying purchase and on purchases in the qualifying month. The next month their discount is 35% off of SRP.

97.     A Distributor can become a Senior Consultant without purchasing or reselling Herbalife product if the Distributor recruits downline distributors and those distributors purchase the required 500 or 2,000 Volume Points in a month.

98.     Prior to filing the Complaint in this action, if a Senior Consultant with a 35% discount purchased a product with an SRP of $100, the cost was $65. Herbalife paid the upline $38 of the $65 cost – $15 in "Wholesale Profits" and $23 in Royalty Overrides, bonuses, and other incentives – even if the Senior Consultant does not resell the product. For a Senior Consultant's purchase with a 35% discount, $0.58 out of every dollar paid for Herbalife product went upline ($0.23 in Wholesale Profits and $0.35 in royalties, bonuses, and incentives).

## Success Builder (NSL)

99.     A Distributor or Senior Consultant becomes a "Success Builder" if the distributor places a single order of 1,000 Personally Purchased Volume Points. Success Builders get a 42% discount on that order and on other purchases in the same month they qualify. A Success Builder becomes a Senior Consultant with a 35% discount the next month.

100.     Herbalife and the Beneficiaries and Promoters encourage Distributors to become Success Builders to get "higher retail profits" because of the discount. In the video called "Senior Consultant & Success Builder," which is hosted at http://www.youtube.com/watch?v=8b2pyw3A6FA and on the official Herbalife website www.video.herbalife.com, Beneficiaries and Promoters John Tartol and Leslie Stanford encourage distributors to become Success Builders. Tartol explains in minutes 5:20-6:18 how a distributor can "qualify right away" for a 35% discount "with just one order" and "enjoy a substantial 42% discount

1    immediately." He tells distributors that "this will get you the highest discount for

2    the least expenditure."

3    **Qualified Producer (NSL)**

4    101.   A Distributor, Senior Consultant, or Success Builder becomes a

5    "Qualified Producer" if the distributor purchases 2,500 Personally Purchased

6    Volume Points within one to three months, or the distributor can combine up to

7    1,000 Downline Volume (Volume placed by downline distributors) Points and

8    1,500 Personally Purchased Volume Points in a single month.

9    102.   A Qualified Producer gets a 42% discount off SRP for a full year and

10   qualifies for up to 7% to 17% of commissions on the Qualified Producer's

11   downline distributors' (below the level of Qualified Producer, Success Builder, or

12   Senior Consultant with a 42% discount) purchases.

13   103.   Prior to the filing of this action, if a Qualified Producer (or Senior

14   Consultant or Success Builder) with a 42% discount purchased a product with an

15   SRP of $100, the cost was $58. Herbalife paid the upline $31 of the $58 cost – $8

16   upline in "Wholesale Profits" and $23 in Royalty Overrides, bonuses, and other

17   incentives – even if the Qualified Producer does not resell the product. For

18   distributors with a 42% discount, $0.53 out of every dollar paid for Herbalife

19   product went upline (~$0.13 in Wholesale Profits and ~$0.40 in royalties, bonuses,

20   and incentives).

21   104.   According to Herbalife's recently revised 2012 Statement,

22   Distributors, Senior Consultants, Success Builders, and Qualified Producers (all

23   NSLs) and Supervisors without a downline made up 83% of their total distributors

24   in 2012.

25   105.   Unless an NSL is participating in the Herbalife Advantage Promotion

26   (an automatic monthly product shipment program) and has orders for 12

27   consecutive months, the NSL must pay an Annual Processing Fee of $15.00 on

28   their "anniversary date" to remain an Herbalife distributor. Supervisors also must

22

pay an Annual Processing Fee of $79.99. Herbalife has described this fee as necessary because "The fee keeps you on our system by letting us know that you are still enjoying working your Herbalife business. If it is not paid then your Distributorship is subject to deletion."

106.   In Herbalife's 2004 and 2005 10-Ks to investors, Herbalife disclosed that for the reporting year, "more than 90% of our distributors that are not supervisors turned over." Herbalife stopped disclosing the turnover rate of Non-Sales Leaders in their 10-Ks and never disclosed turnover rates of its NSL's to Plaintiffs and members of the class. Based on the 2004 and 2005 disclosures and Plaintiff's own experience with distributors in his own upline and downline, Plaintiff is informed and believes that the non-Supervisor turnover rate for 2009-2013 is approximately 90%.

## SALES LEADERS: SUPERVISORS, WORLD TEAM, TAB TEAM, PRESIDENT'S TEAM, FOUNDER'S CIRCLE, CHAIRMAN'S CLUB
### Supervisor (SL)

107.   Becoming a "Supervisor" means a distributor moves from being a "Non-Sales Leader" to a "Sales Leader," or **"SL."**

108.   According to Herbalife's Statements of Average Compensation distributed in 2009-2013 (**Exhibit A**), approximately 25% of Herbalife's Distributors become Supervisors and above.

109.   A distributor can qualify to become a Supervisor in one of three ways:

FIRST AMENDED COMPLAINT

110.   **One-Month Qualification** – by "achieving" 4,000 Volume Points in a month. A minimum of 1,000 of these Volume Points must be "Unencumbered Volume"[5]

111.   **Two-Month Qualification** – by "achieving" 2,500 Volume Points in each of two consecutive months. A minimum of 1,000 of these Volume Points must be "Unencumbered."

112.   **Accumulated Qualification** – by buying 5,000 Personally Purchased Volume Points within 12 months or 1,000 Downline Volume Points with 4,000 Personally Purchased Volume.

113.   Under the One and Two Month Qualifications, a distributor can qualify as a Supervisor without purchasing or reselling any Herbalife products if 1000 of the downline Volume Points are Unencumbered.

114.   A distributor can also qualify for Supervisor under any method making no retail sales.

115.   A distributor who does not become a Supervisor before their downline distributor becomes a Supervisor has one year to become a Supervisor.

---

[5] **"Unencumbered Volume"** is defined as "all volume produced by anyone in [a distributor's downline], down to the first qualified Supervisor who achieves less than 2,500 Volume Points in one Volume Month," plus all of the distributor's "Personal Volume," and which is volume that is not used by anyone else for Supervisor qualification purposes.

**"Personal Volume"** is defined as "The volume purchased by you as a Fully Qualified Supervisor and all others in your downline organization, excluding any 50% orders by Qualifying Supervisors and Qualified Supervisors."

**"Encumbered Volume"** is all volume produced by any downline distributor qualifying for Supervisor, down to the first qualified Supervisor, who achieves 2,500 Volume Points or more at a 25% to 42% discount in one Volume Month. The basic difference between the two forms of volume is that Unencumbered Volume is volume that no other distributor uses to qualify to become a Supervisor.

FIRST AMENDED COMPLAINT

Otherwise, Herbalife takes away that Supervisor and that Supervisor's downline from the distributor and gives them to the first upline Supervisor.

116.   Herbalife requires that a Qualifying Supervisor be sponsored by the first upline Supervisor. The Sponsoring Supervisor must match the Qualifying Supervisor's Volume Points in the qualifying month with "Total Volume."[6]

117.   A Sponsoring Supervisor can sponsor the Qualifying Supervisor without purchasing or reselling any Herbalife products if their downline generates sufficient Total Volume to match the Qualifying Supervisor's Volume Points in that qualifying month.

118.   If the Supervisor sponsors a distributor who becomes a Supervisor that Supervisor is called a first-level Supervisor. If that first-level Supervisor sponsors a Supervisor that Supervisor becomes the original Supervisor's second-level Supervisor. If that second-level Supervisor sponsors a Supervisor that Supervisor becomes the original Supervisor's third-level Supervisor. Supervisors can earn royalties on all three of these downline level Supervisors' volume.

### Benefits for Supervisors

119.   A Supervisor can purchase Herbalife's product at a 50% discount off the SRP and can earn from 25% - 15% - 8% in commissions from their downline's purchases. The commissions decrease as the Supervisor's downline distributors' discounts increase – 25% - 35% - 42%.

120.   Prior to the filing of this action, if a Supervisor purchases a product with an SRP of $100, the cost was $50. Herbalife paid the upline $23 of that $50

---

[6] **"Total Volume"** is defined as "the combined total of Personal Volume plus Group Volume."

**"Group Volume"** is defined as "Orders purchased at a temporary 50% discount, by Qualifying Supervisor(s) in a Supervisor's personal organization."

FIRST AMENDED COMPLAINT

cost in Royalty Overrides, bonuses, and other incentives – even if the Supervisor does not resell the product.

121.   For a Supervisor's purchase, $0.46 out of every dollar paid for Herbalife product went upline in Royalty Overrides, bonuses, and other incentives.

122.   A Supervisor also qualifies for "Royalty Overrides," if that Supervisor has first, or second, or third level Supervisors in their downline.

123.   A Royalty Override is a commission that a Supervisor receives on the Volume Points accrued by that Supervisor's downline (the First, Second, and Third Level Supervisors). In its 10-Ks, Herbalife calls Royalty payments "compensation to distributors for services rendered including the development, retention and the improved productivity of their sales organizations."

124.   The percentage (1%-5%) of Royalty Overrides that a Supervisor can earn depends on the number of Total Volume Points the Supervisor accumulates in that month. Supervisors can qualify for Royalty Overrides from their three levels of downline Supervisors. In their Sales and Marketing Plan, Exhibit C, p. 13, Herbalife illustrates Royalty Override:



| Royalty Override Sliding Scale | |
| --- | --- |
| Your Total Volume Points | Royalty Override Earning % |
| 0–499 | 0% |
| 500–999 | 1% |
| 1,000–1,499 | 2% |
| 1,500–1,999 | 3% |
| 2,000–2,499 | 4% |
| 2,500 plus | 5% |

| Royalty Override Example | | | |
| --- | --- | --- | --- |
| YOU | 2,500 Volume Points | = | Your Total Royalty Override = 1,500  Royalty Points |
| First-Level Supervisor | 10,000 Volume Points | = | 5% = 500 Royalty Points |
| Second-Level Supervisor | 10,000 Volume Points | = | 5% = 500 Royalty Points |
| Third-Level Supervisor | 10,000 Volume Points | = | 5% = 500 Royalty Points |

125.   To qualify for Royalty Overrides, a Supervisor must certify that they comply with Herbalife's "10-Retail Customer Rule" and "70% Rule." Under these rules, a Supervisor "must personally make sales to at least 10 separate retail customers each month," and "at least 70% of the total value of Herbalife products

26

a Distributor purchases each Volume Month must be sold or consumed that month." A copy of the Earnings Certificate form is found on page 48 of Exhibit C.

126.   Herbalife Supervisors must requalify annually by paying the Annual Processing Fee and by meeting similar volume requirements as the original qualification requirements.

127.   In Herbalife's 10-Ks, Herbalife reported that for the years 2012, 2011, 2010, and 2009, its Sales Leader retention rate was approximately 51.10%, 48.6%, 43.3%, and 42.2%, respectively.

### World Team (SL)

128.   Herbalife promotes Supervisors to the World Team if they meet one of the three following requirements. They achieve 10,000 Total Volume Points in one month after becoming a Qualifying or a Fully-Qualified Supervisor. Or if they achieve 2,500 Total Volume Points each month for four consecutive months. Or if they are awarded 500 Royalty Override Points in one month. World Team members get special planning and training sessions targeted to accelerate their progress to TAB Team membership and all the benefits of being a Supervisor.

129.   According to Herbalife's 2012 Statement, World Team members' average annual earnings are $6,224 and the median compensation is $5,659 in payments from Herbalife.

### TAB Team (SL)

130.   Supervisors are eligible to become members of the "Top Achievers Business Team" (**"TAB Team"**), which includes three steps: Global Expansion Team (**"GET"**), Millionaire Team, and President's Team.

131.   TAB team members are eligible for Production Bonuses. The TAB Team Production Bonus is a bonus on the downline Organizational Volume (the volume on which a Supervisor is paid a Royalty Override).

FIRST AMENDED COMPLAINT

### GET Team (SL)

132.   Herbalife promotes a Supervisor to the GET Team if that Supervisor accrues 1,000 Royalty Override Points each month for three consecutive months.

133.   As a GET Team member, the distributor gets all the benefits of a Supervisor and can earn TAB Team Production Bonuses based on the qualification level, can qualify for vacation and training events and can participate in special advanced trainings and conference calls.

134.   A GET Team member can qualify for a monthly 2% TAB Team bonus payment of the downline Organizational Volume, which Herbalife describes as a partial reward for the team member's "undivided loyalty" to the company.

135.   According to Herbalife's 2012 Statement, GET Team members have an average annual earnings of $22,766 and median compensation of $19,417 in payments from Herbalife.

### Millionaire Team (SL)

136.   If a Supervisor achieves 4,000 Royalty Override Points each month for three consecutive months, Herbalife promotes that Supervisor to the Millionaire Team the following month and, after a waiting period of two months, that Millionaire Team member can earn a 2-4% monthly TAB Team bonus off the downline's Organizational Volume. Millionaire Team members also get all the benefits of being a Supervisor.

137.   According to Herbalife's 2012 Statement, Millionaire Team members earn an average of $100,195 and median of $97,303 in payments from Herbalife.

### President's Team (SL)

138.   Herbalife promotes a Supervisor who accrues 10,000 Royalty Override Points in three consecutive months to the President's Team where, after a waiting period of three months the President's Team member can earn a 2%-6% Production Bonus.

139.   To qualify for the President's Team, a Supervisor must accrue 20,000 to 50,000 Royalty Override Points in three months. The TAB Team bonuses range from 2% to 7%, depending on the number of Royalty Override Points the Supervisor accrues.

140.   For all TAB Team members, the Production Bonus decreases from the maximum percentage depending on whether there are other TAB Team members in the Tab Team member's downline earning Production Bonuses on the volume.

141.   According to Herbalife's 2012 Statement, President's Team members (which include the Chairman's Club and Founder's Circle Members) earn an average of $514,638 and median of $336,901 in payments from Herbalife.

## Chairman's Club (SL)

142.   Herbalife promotes a distributor to the Chairman's Club if the distributor has five Fully-Qualified President's Team members in five separate lines of the distributor's downline organization.

143.   Chairman's Club Members are eligible for a percentage of Herbalife's global sales. This bonus is the "Mark Hughes Bonus Award."

144.   The Mark Hughes Bonus Award is a bonus pool representing a 1% of Herbalife's *worldwide* product sales (calculated using SRP). Herbalife distributes this bonus annually among the Chairman's Club and Founder's Circle Members. A copy of the 2010 Mark Hughes Bonus Award Qualifications and Rules is attached as **Exhibit J**.

145.   The rules to qualify for a Mark Hughes Bonus are incredibly complex. They largely depend on a distributor having President's Team Members within their downline who meet certain production requirements, the Royalty Override Points that Herbalife awards the distributor, and their overall organization production. Notably, there are no rules requiring additional retail sales beyond the "10-Retail Customer Rule" and "70% Rule."

146.   Herbalife can also exercise discretion in awarding the MH Bonus. Chairman's Club and Founder's Circle members are encouraged to

Demonstrate leadership and Herbalife spirit. ...Support, promotion and participation in Herbalife efforts, including Company meetings and other efforts such as conference calls, Herbalife Broadband Network (HBN), audio/visual recordings, promotions, marketing and sales, projects, suggestions and working with the Company as it develops strategic plans and leads the effort to enhance the Company's overall business… Attendance of the Distributorship at major events.

147.   Plaintiffs are informed based on information found at http://www.herbalife.com/chairmansclub <visited April 4, 2013> and believe there were only forty-three Chairman's Club members, worldwide, as of April 4, 2013.

## Founders Circle (SL)

148.   The pinnacle of the Herbalife endless chain is the Founder's Circle.

149.   Herbalife promotes a distributor to the Founder's Circle if the distributor has ten first-line, Fully-Qualified President's Team members in ten separate lines of that distributor's downline organization.

150.   Founder's Circle members are also eligible for the "Mark Hughes Bonus Award."

151.   Plaintiffs are informed based on information found at http://www.herbalife.com/chairmansclub that as of April 4, 2013, there are only eight Founder's Circle members, worldwide.

## THE ILLEGAL SCHEME

152.   Herbalife's compensation structure rewards recruiting of new participants over retail sales and leads to abuses.

153.   These abuses include: (1) Herbalife and Beneficiaries and Promoters making outlandish statements about potential earnings and the business

FIRST AMENDED COMPLAINT

opportunity for potential and actual distributors; (2) distributors focusing on recruiting new distributors rather than on making retail sales of products; (3) distributors purchasing more products than they can feasibly sell to actual retail customers to meet volume requirements (a practice known as "inventory loading"); (4) Herbalife and Beneficiaries and Promoters encouraging other distributors to make "one-time" purchases to jump up the chain to higher levels ("pay determines position" and "position determines pay"); and (5) Herbalife and Beneficiaries and Promoters encouraging their downline distributors to recruit other distributors so they can use those distributors' purchases to move higher up the chain and get the Royalty Overrides, bonuses, and other incentives.

154.   Herbalife Ltd.'s 2011 and 2012 10-Ks describes this compensation structure as necessary to keep "its most active and productive distributors" – the Beneficiaries and Promoters:

> Once a distributor becomes a sales leader, he or she has the opportunity to qualify by earning specified amounts of royalty overrides for the Global Expansion Team, the Millionaire Team or the President's Team, and thereby receives production bonuses of up to 7%. We believe that the opportunity for distributors to earn royalty overrides and production bonuses contributes significantly to our ability to retain our most active and productive distributors.

155.   In its 2011 10-K, Herbalife Ltd. admits its business depends upon it success in recruiting and retaining distributors:

> Our ability to remain competitive depends, in significant part, on our success in recruiting and retaining distributors through an attractive compensation plan and other incentives. We believe that our production bonus program, international sponsorship program and other compensation and incentive programs provide our distributors with significant earning potential.

In its 2012 10-K, Herbalife changed that to mention its products: "Our ability to remain competitive depends on having relevant products that meet consumer needs, a rewarding compensation plan, and a financially viable company."

156.   With the 2004 and 2005 disclosures by Herbalife regarding its NSL turnover of 90% (who make up 83% of its total distributors) and disclosures that of the remaining 17% who are Supervisors and above, 43%-51% of its Supervisors do not requalify, historically, most Herbalife distributors will fail.

157.   As illustrated best by Exhibit B, Herbalife's 2012 Statement the Herbalife endless chain scheme makes money for those few at the top– the Beneficiaries and Promoters – and those are the distributors Herbalife tries to retain to remain competitive in the industry – and disappoints the many at the bottom who cannot make retail profits and who give up on the Herbalife "business opportunity" in droves.

### Herbalife's Inducement of New Recruits

158.   Herbalife induces new recruits to join the Herbalife program through material false representations that such recruits can re-sell Herbalife products for retail profit and can move up the endless chain and earn commissions, bonuses, and other incentives because of their recruiting activities.

159.   Besides representations made in the IBP or mini-IBP, Herbalife also promotes the scheme using distributor testimonials. In testimonials Herbalife published on its website, Herbalife tells recruits and distributors:

    a.   Natalie and Justin M. say that "'Now we control our destiny.' … 'We researched different business opportunities,'…'But Herbalife offered the chance to work from home, coupled with solid earning potential.'"

    b.   Scotty M. says that "'After just two years working the business, I was able to quit my job and become a full-time Distributor.' 'I wanted to be my own boss.' … 'I've been able to upgrade to a bigger home and

1       nicer car.'"

2   c.   Wendy W. says "'I'm the owner of an International business!' … 'If

3        you have little or no business experience, don't worry; determination

4        can go a long way!'"

5   These statements taken from Herbalife's website are attached as **Exhibit K**.

6   160.   In Herbalife's IBP and Mini-IBP, Herbalife includes a magazine

7   called *Live the Good Life! HERBALIFE* (**Exhibit F** (excerpts)). There, with

8   images of currency, luxury vehicles, boats, and expensive homes, Herbalife tells

9   recruits that it is a "part-time opportunity," "[a] full-time Opportunity," and "[t]he

10  opportunity to earn more than you ever thought possible and make your dreams

11  come true!" Recruits are also told this is "[a] business opportunity for everyone

12  that's fun, simple and magical!" and that all they need to do is: use the products,

13  wear the button, and talk to people – "Use, Wear, Talk."

14  161.   In *Live the Good Life! Herbalife*, Herbalife provides the following

15  example of potential ways that new recruits can earn income.

16

17

18

19

20

21

22

23

24

25

26

27

28

FIRST AMENDED COMPLAINT

# Earn an income several different ways





**Direct Sales**
- As a Distributor $25 of every $100    **25%**
- As a Success Builder $42 of every $100    **42%**
- As a Supervisor $50 of every $100    **50%**

**Downline organization**
- Commission checks
- Royalty checks
- Bonus checks

## Plus:
- Recognition
- Promotions
- Training

# How to earn even more income

**Example 1**

You = Supervisor (2,500 Volume Points)

You recruit & retain 2 supervisors
- 2 Supervisors each produce 2,500 Organizational Volume Points
- = 5,000 Volume Points   R.O. = $250/month

They each recruit & retain 2 Supervisors
- 4 Supervisors each produce 2,500 Organizational Volume Points
- = 10,000 Volume Points   R.O. = $500/month

They each recruit & retain 2 Supervisors
- 8 Supervisors each produce 2,500 Organizational Volume Points
- = 20,000 Volume Points   R.O. = $1,000/month

Total of 35,000 Volume Points, Your R.O. = $1,750 Plus Production Bonus of 2% = $700

**Total of Checks $2,450/mo.**

**Example 2**

You = Supervisor (2,500 Volume Points)

You recruit & retain 3 supervisors
- 3 Supervisors each produce 2,500 Organizational Volume Points
- = 7,500 Volume Points   R.O. = $375/month

They each recruit & retain 3 Supervisors
- 9 Supervisors each produce 2,500 Organizational Volume Points
- = 22,500 Volume Points   R.O. = $1,125/month

They each recruit & retain 3 Supervisors
- 27 Supervisors each produce 2,500 Organizational Volume Points
- = 67,500 Volume Points   R.O. = $3,375/month

Total of 97,500 Volume Points, Your R.O. = $4,875 Plus Production Bonus of 4% = $3,900

**Total of Checks $8,775/mo.**

# Imagine…4 or 5!

*The incomes presented are applicable to the individuals depicted and are not a guarantee of your income, nor are they typical. For the Statement of Average-Gross Compensation for U.S. Supervisors, go to www.Herbalife.com or www.MyHerbalife.com.

41

162.   Based on Herbalife's 2012 Statement, a distributor receiving checks of $2,450 a month or $8,775 a month would be at least in the top 0.23% or 0.092% of all U.S. distributors, respectively. Prior to Herbalife's 2012 Statement, a prospective or actual distributor had no way to know how atypical Herbalife's examples were.

163.   Herbalife also distributes a magazine called *Herbalife Today*. *Herbalife Today* follows a format where Herbalife's CEO and President, Michael Johnson, has a letter to distributors, as well as product advertisements, as well as a section called "Success Stories," featuring a President's Circle member, along with other success stories of TAB Team and GET Team members.

164.   In the *Herbalife Today* magazine, Issue No.156, which Herbalife distributed in 2012 to Plaintiffs and other members of the class, Michael Johnson writes, "[m]illions of people's lives are being improved through our products and our business opportunity." Selected portions of *Herbalife Today*, Issue No. 156 are attached as **Exhibit L**. Plaintiffs reviewed *Herbalife Today*.

165.   For the "Success Story," *Herbalife Today*, Issue No. 156, p.11-12, features a Chairman's Club member, Paulina Riveros. Herbalife tells a tale of Paulina working part-time using "a proven and surprisingly simple approach to breathe life into her organization: using the products, wearing the button, and talking to people." "This is how Paulina began climbing the Marketing Plan and earning amazing income. … Today she lives in a spacious ranch in Florida, and has a lifestyle that she couldn't have imagined in her wildest dreams."

166.   *Herbalife Today*, No 156, also features a section called "Where Inspiration Meets Success: At a crossroads in their lives, these Distributors took the high road, and turned their inspiration into success." There, distributors like Deisy T., advises readers:

> You only have to put in the hard work along with the dedication, patience and discipline, attributes you can learn at the events. Herbalife is a real

FIRST AMENDED COMPLAINT

opportunity for everyone who is willing to focus and work for his or her goals. Plant a seed every day and you will harvest lifetime success.

167.   *Herbalife Today* is full of "success" stories of distributors. They boast of: their "successful international business that I managed to build from scratch"; leaving high-paying jobs to join the Herbalife business; enjoying "a lifestyle that they always dreamed of"; replacing "two engineering salaries with Herbalife income"; and "making more money than he could have ever imagined." Herbalife has published similar testimonials in *Herbalife Today* for the last four years.

168.   Herbalife also has its own official YouTube channel, http://www.youtube.com/user/HerbalifeIntl. There, a video entitled "Why Herbalife, Why Now? Building your Business" (uploaded on December 22, 2008 and available through April 9, 2013, <http://www.youtube.com/watch?v=-990eOlwchw>) demonstrates the Herbalife "pitch."

169.   Herbalife's Chairman and CEO, Michael Johnson, introduces that video, saying "boy do we have a solution to help you in these tough economic times." Highlighting the economic uncertainty at the time, the video asks "why Herbalife?" To that question, various distributors respond: "it's recession proof." "When everybody else is having troubles, listen – we're flourishing." "When the economy is bad our business is fueled." "I got started in a recession -- this is my fourth recession. I'm more excited about today than ever before." And "This opportunity can be your answer."

170.   In that video, Distributors tell viewers that with Herbalife "you get to be your own boss," "earn extra money," "work from home," "raise your own children," "make your own hours," "make part-time or full-time money," "take your family on vacations," "give your family all the extras that they deserve," "change your lifestyle to do whatever you want to do." When asked again, "why Herbalife, "recruits are told "because you can finally earn what you're worth."

FIRST AMENDED COMPLAINT

171.   The video ends with the Herbalife's Chairman and CEO exclaiming, "So why are you waiting. Come on -- at Herbalife we've got the answer to these tough economic times. Contact the person who sent you this video and start improving your life right now. Become an Herbalife independent distributor today."

172.   Herbalife features the Beneficiaries and Promoters on its website www.herbalife.com/chairmansclub (visited April 8, 2013) and at www.video.herbalife.com. There, many of the Beneficiaries and Promoters have videos detailing their expensive lifestyles, lavish homes, luxury cars, and their "rags-to-riches" stories, all purportedly made possible through Herbalife.

173.   Herbalife also prominently features the Beneficiaries and Promoters in literature, flyers, and public events.

174.   Herbalife sponsors what it calls an "Herbalife Extravaganza." The Herbalife Extravaganza is annual convention that Herbalife promotes in *Herbalife Today*, online and through emails. At the Extravaganza, Herbalife distributors come from around the country for sales and marketing advice and tips from Beneficiaries and Promoters.

175.   In one video taken from the Herbalife 2010 Extravaganza in Los Angeles, California, Beneficiary and Promoter Geri Cvitanovich, in minutes 1:40-3:00, tells a convention hall filled with distributors that the Herbalife plan "is a confidence plan … to take you from where you are to wherever you want to go," grooming them to become multimillionaires:

> all of us are getting groomed to become multi-millionaires. That is an
> awesome opportunity. Now you can take advantage of it. Or you only
> want to make $60,000, $100,000, couple $100,000. But the fact that
> we are all here getting groomed to become millionaires in today's
> marketplace to me is an awesome privilege to be a part of. And I just
> want those of you who are new to know that you are in the right place

1        at the right time. The fastest amount of growth in the shortest amount

2        of time in our history. And we are doing nothing but going up.

3  That video can be found at http://www.youtube.com/watch?v=PmeLJHHKoDk

4  (visited April 8, 2013).

5        176.   In another video taken at the Herbalife 2011 Extravaganza in Las

6  Vegas found at http://www.youtube.com/watch?v=cVbd8bw4MlQ (visited April 8,

7  2013) Beneficiary and Promoter Susan Peterson tells attendees, at minutes 1:03-

8  1:58 that, if they are not getting rich in Herbalife, "it's wrong" and that they are

9  taking things for granted:

10        A lot of us, we built our organizations not when it was easy but when

11        it was hard. When it was terrible. When it was tough. And to make a

12        fortune in the tough times is really something. But to make it in the

13        easy times you would think everyone would do it and to not do [it] is

14        just to me wrong. I mean if you are not getting rich today in Herbalife,

15        I'm going to be honest, it's wrong. It's really wrong. It means you're

16        taking things for granted.

17  Peterson instructs attendees at minutes 3:00-5:42 that to increase their royalty

18  checks, they should focus on recruiting people looking for opportunity:

19        If you want to recruit somebody who loves the products and who

20        wants to be your discounted customer because they love the products

21        … I would say keep doing that and it's wonderful. But you can't

22        count that in business-building recruiting. If you want to move the

23        check, you need to find other people that want to make money and

24        represent the Herbalife products and Herbalife opportunity. People

25        that are like you that want to be distributors….find those people that

26        are looking for opportunity. That want to change their family's lives

27        and their financial situation. [Those are the] people you need to work

28        with. [Those are] the people you need to find. And believe me, there

FIRST AMENDED COMPLAINT

1    has never been an easier time to find people like that, okay, because

2    our economy is bad in America. But at the same time our opportunity

3    has never been stronger. Our brand, our product, our company, our

4    direction. And if you aren't going after this, shame on you. Because

5    you're going to miss the greatest time-period to literally go here

6    [gestures with her hand down] to here [gestures with her hand up]

7    with your royalty check. It doesn't happen often. It has happened two

8    times in my Herbalife career. This is number three. This is the time to

9    work. This is the time to recruit. This is the time to build a new

10   organization. This is the time. There has never been a time this easy.

11   You've gotta go for this.

12         177.   In a video profile of Beneficiary and Promoter Doran Andre found at

13   http://www.youtube.com/watch?v=2dYK605bAaU (visited April 8, 2013) Andre

14   tells about how, at minutes 1:08-2:00, he went from working for a company at 22

15   building his own Herbalife distributorship:

16         There [were] people in the company that wanted to mentor us. There

17         was a support system, an infrastructure, a business model that all we

18         needed to do is execute. And then before you know it, in four months

19         working the same amount of hours, two to three hours a week, [our]

20         income hit $1,500 a month…and in 90 days our income hit $10,000 a

21         month. And our very first calendar year our income hit $350,000. And

22         our second year… our income hit a million one.

23   Andre goes on to remark, after a tour of his luxury home and images of his red

24   Ferrari, at minutes 4:00-4:15:

25         You know it's really amazing. I step out of the Ferrari or Bentley or

26         whatever and people go 'what does that guy do for a living?' and I

27         go I'm an Herbalife independent distributor. And people are

28

absolutely amazed at that that's what I do. It's an incredible quality
of life.

Andre also operates what he calls the "Financial Success System." In a video
found at http://vimeo.com/20317153 (visited April 8, 2013) promoting his system,
he shows his $30,000,000 home, luxury cars and motorcycle and tells his audience:
"the big money hasn't even been made in Herbalife…. The biggest money in the
shortest period of time is going to be in the next 3-5 years."

178.    These types of grand overstatements regarding distributors' potential
earnings and opportunities are part of a pattern and practice throughout the
Herbalife endless chain. One Herbalife distributor's website,
http://www.cwgteam.com/, (visited April 8, 2013) promises that:

how far you take your Herbalife business and the income you require
or desire is your decision. However, you may be interested in the
following statistics:

o       Lottery Win: 1 in 13 million chance of becoming a millionaire

o       Herbalife Distributor: 1 in 26,000 chance of becoming a
millionaire

o       Herbalife Supervisor: 1 in 2,600 chance of becoming a
millionaire

o       Herbalife World Team member: 1 in 800 chance of becoming a
millionaire

o       Herbalife Global Expansion Team member: 1 in 80 chance of
becoming a millionaire

o       Herbalife Millionaire Team member: 1 in 8 chance of becoming
a millionaire

o       Herbalife President's Team member: becoming a millionaire is
a certainty

FIRST AMENDED COMPLAINT

**Herbalife's Deception Regarding Potential Earnings**

179.    When making statements regarding their wealth and the potential wealth for new recruits, Herbalife and the Beneficiaries and Promoters routinely refer the readers or viewers (with an asterisk and a footnote) to the Herbalife "Statement of Average Gross Compensation of U.S. Supervisors." They disclaim, "Incomes applicable to the individual (or example) depicted and not average. For average financial performance data, see the Statement of Average Gross Compensation of U.S. Supervisors at Herbalife.com and MyHerbalife.com."

180.    At a meeting with Wall Street analysts in 2007, Herbalife's Chairman and CEO Michael Johnson characterized these Statements of Average Gross Compensation as "transparent" to distributors:

> We are transparent with our earnings potential among supervisors. The staff [*sic.*] on this page which is the average gross compensation of U.S. supervisors is a public document, it is available on our website and is part of our introductory business pack that all new distributors receive. So, every new distributor in this Company knows exactly where they stand and what their opportunity is inside the Company.

181.    As Johnson explains, throughout 2009-to the present, Herbalife distributed its "Statements of Average Gross Compensation of U.S. Supervisors," to all of its U.S. distributors both in Book 4, the Sales and Marketing Plan, as well as on the internet.

182.    At the bottom of each of its disclosures made from 2009-February 2013 (Exhibit A) Herbalife tells its distributors: "The figures stated above are not a guarantee nor are they a projection of a typical Distributor's earnings or profits. Like any other independent business, the achievement or failure of a Distributor depends upon his or her skill set, commitment and desire to succeed. At Herbalife, the opportunity to earn more is always available to each and every Distributor."

183.   From at least 2009 through February 2013, however, Herbalife cherry-picked the data set that they used to create their 2008-2011 Statements. They only reported the incomes of "Supervisors" and above, and further limited that data set to "Active Leaders" – those who "generated at least 2,500 points of volume in" in the year "after becoming Supervisor."

184.   According to their 2011 Statement, "Active Leaders" only make up 39.4% of Herbalife's "Leaders." Thus, not only did Herbalife fail to disclose any earnings as to majority of distributors who were NSLs, Herbalife failed to disclose the earnings of 60.6% of SLs in their statements distributed in 2012. See Exhibit A. A portion is below:

## STATEMENT OF AVERAGE GROSS COMPENSATION OF U.S. SUPERVISORS

Herbalife offers its Distributors an opportunity to achieve a lifetime of better health through its scientifically advanced weight-management and nutrition products. While many of our Distributors join the Herbalife family simply to enjoy our life-changing products, others want to share their results and take advantage of the many income benefits our business opportunity provides. With Herbalife, you can work part time and earn a supplemental income, or focus solely on your Herbalife Distributorship and increase your financial potential. It's completely up to the individual how much he or she wants to achieve! A Distributor earns profits by buying Herbalife products at wholesale and reselling them at retail. If the Distributor wants to increase his or her involvement in the business and enjoy the possibility of higher levels of income, he or she may sponsor others into the business and develop an organization.

Over 25% of Distributors reach the rank of Supervisor and above ("Leader"), qualifying them for additional compensation, which is paid by Herbalife based upon the sales production of those they have sponsored directly and indirectly. The annual gross compensation paid by Herbalife to all Leaders during 2011 averaged $2,900. Over 39% of Supervisors are "Active" (defined as those who generated at least 2,500 points of volume in 2011 after becoming Supervisor). The annual gross compensation paid by Herbalife to Active Leaders during 2011 averaged approximately $7,300.

| ACTIVE LEADERS | | | |
|---|---|---|---|
| Earning Level | % of Total Leaders | % of Active Leaders | Average Earnings (USD) |
| President's Team | 0.2% | 0.6% | $ 515,689 |
| Millionaire Team | 0.7% | 1.7% | $ 100,195 |
| GET | 2.6% | 6.5% | $  22,766 |
| World Team | 2.9% | 7.3% | $   6,224 |
| Supervisor | 33.1% | 83.9% | $     901 |
| Total | 39.4% | 100.0% | $   7,348 |

The amounts above do not include the income Distributors can earn from their retail or wholesale income, so the actual compensation can be somewhat higher, depending upon each Distributor's personal-selling efforts.

The figures stated above are not a guarantee nor are they a projection of a typical Distributor's earnings or profits. Like any other independent business, the achievement or failure of a Distributor depends upon his or her skill set, commitment and desire to succeed. At Herbalife, the opportunity to earn more is always available to each and every Distributor.

FIRST AMENDED COMPLAINT

185.   In February 2013, Herbalife released an updated and extended disclosure. A full copy is available at Exhibit B. A portion is below:

| Single-Level Distributors (No Downline) | | | |
|---|---|---|---|
| **Economic Opportunity** | Distributors* | | The economic rewards for single-level Distributors are the wholesale pricing received on products for consumption by the Distributor and his or her family as well as the opportunity to retail product to non-Distributors. Neither of these rewards are payments made by the company and therefore are excluded from this schedule |
| | Number | % | |
| • Wholesale price on product purchases<br>• Retail profit on sales to non-Distributors | 351,065 | 71% | |

| Non-Sales Leaders** With a Downline | | | |
|---|---|---|---|
| **Economic Opportunity** | Distributors | | In addition to the economic rewards of the single-level Distributors above, which are not included in this chart, certain non-sales leaders with a downline may be eligible for payments from Herbalife on downline product purchases made directly with Herbalife.<br><br>2,466 of the 4,449 eligible Distributors earned such payments in 2012. The average total payments to the 2,466 Distributors was $104. |
| | Number | % | |
| • Wholesale price on product purchases<br>• Retail profit on sales to non-Distributors<br>• Wholesale profit on sales to another Distributor | 60,333 | 12% | |

| Sales Leaders** With a Downline | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Economic Opportunity** | Distributors | | Average Payments from Herbalife | All Sales Leaders with a Downline | | | |
| | Number | % | | Number of Distributors | % of Total Grouping | Average Gross Payments | |
| • Wholesale price on product purchases<br>• Retail profit on sales to non-Distributors<br>• Wholesale profit on sales to another Distributor<br>• Multi-level compensation on downline sales<br>  • Royalties<br>  • Bonuses | 82,464 | 17% | >$250,000 | 194 | 0.2% | $724,030 | This chart does not include amounts earned by Distributors on their sales of Herbalife products to others |
| | | | $100,001-$250,000 | 452 | 0.5% | $148,808 | |
| | | | $50,001-$100,000 | 539 | 0.7% | $68,912 | |
| | | | $25,001-$50,000 | 1,136 | 1.4% | $35,581 | |
| | | | $10,001-$25,000 | 1,940 | 2.4% | $15,538 | |
| | | | $5,001-$10,000 | 2,552 | 3.1% | $7,008 | |
| | | | $1,001-$5,000 | 11,307 | 13.7% | $2,216 | |
| | | | $1-$1,000 | 39,151 | 47.5% | $292 | |
| | | | 0 | 25,193 | 30.6% | $0 | |
| | | | Total | 82,464 | 100.0% | $4,485 | |

\* 30,621 of the 351,065 single-level Distributors are sales leaders without a downline
\*\* Sales leaders are Distributors that achieved the level of Supervisor or higher. See details on Herbalife's marketing plan at www.myherbalife.com.

FIRST AMENDED COMPLAINT

186.   Plaintiff is informed and believes based on Herbalife's 2012 Statement that Herbalife's representation in its 2008-2011 Statements that "[o]ver 25% of Distributors reach the level of Supervisor and above" is false and misleading. The 2012 Statement disclosed that 83% of all of its distributors in 2012 were NSLs, leaving only 17% as Supervisors and above in 2013. Including the 30,621 distributors who became Supervisors through their own Personally Purchased Volume, brings the percentage of Supervisors to 22.89% of all distributors.

187.   Herbalife's 2012 Statement discloses that 71% of all U.S. Distributors – 351,065 distributors – are "Single-Level Distributors" with no downline.

188.   Herbalife's 2012 Statement discloses that there are only 60,333 NSLs with a downline (Senior Consultants and Qualified Producers). Of that number, only 2,466 of those distributors earned "Wholesale Profits." Even then, the average "wholesale profits" of those 2,466 distributors was $104 for a total payment of $256,464 paid to NSLs in 2012 in "Wholesale Profits."

189.   Herbalife's 2012 Statement also discloses that a "majority of those Distributors who earned in excess of $100,000 in 2012 had reached the level of Herbalife's President's Team. During 2012, 47 U.S. Distributors joined the level of President's Team. They averaged 9 years as an Herbalife Distributor before reaching President's Team, with the longest being 20 years and the shortest being less than three years."

190.   Similarly, Herbalife's 2012 Statement discloses that besides the 82,464 SLs, there are 30,621 SLs who "paid for their position."

191.   In its 2012, 2011, 2010, and 2009 10-K disclosures, Herbalife makes at least some disclosure to investors and potential investors that it retains 51.1%, 48.6%, 43.3%, and 42.2% of its Sales Leaders; until the 2012 Statement; Herbalife, however, failed to disclose this same fact to distributors and potential

distributors. Finally, in the 2012 Statement Herbalife provided distributors the same information that it thinks is important for investors: "51.0% of all sales leaders as of February 1st, 2011, requalified by February 1st, 2012 (including 33% of first time sales leaders)."

192.   All of the information not disclosed in the 2008-2011 Statements are relevant for: recruits deciding if Herbalife really is the "answer to these tough economic times"; recruits deciding to become Herbalife distributors; distributors deciding to purchase Herbalife product; distributors reading glowing profiles on *Herbalife Today*; distributors evaluating their chances of earning "Wholesale profits," distributors deciding whether to purchase product to "pay for position"; distributors deciding whether to recruit other distributors; and distributors evaluating Founder's Circle members telling them they are "groomed to become multi-millionaires" and that if they are not "getting rich today in Herbalife…It's really wrong."

**Herbalife's Recruiting Rewards Price-Out Products**

193.   Because Herbalife sends such a large percentage of every dollar received by it upline as Wholesale Profits, Royalty Overrides, bonuses, and incentives – $0.46 to $0.64 of every dollar paid it for product – Herbalife sets the SRP at an inflated price well over what Herbalife's products sell at in the open marketplace.

194.   While Herbalife's "competitive compensation structure" supposedly pays out up to 73% of product revenues to distributors in "Retail and Wholesale Profits, Royalty and bonus income and incentives," it falls on the Herbalife distributor retailing the product to recoup this 73%.

195.   This inflated markup necessary for the "competitive compensation structure" makes Herbalife's products uncompetitive for retail sale at SRP.

**Overcharges on Packaging and Handling**

196.   On top of this inflated SRP, Herbalife charged a 7% "packaging and handling" fee based on the SRP for products ordered directly from Herbalife. A distributor must add that 7% fee to the SRP to recoup their costs and earn the promised retail profits.

197.   Besides this 7% surcharge, Herbalife charged its distributors from 2.5% to 4% of the SRP if they had products shipped to them instead of picking the products up at an Herbalife distribution center (there are only six centers in the U.S.). For a distributor to earn the promised profit on a retail sale, the distributor would need to resell the product at 109.5% to 111% of SRP.

198.   Based on Herbalife's 2008-2011 10-Ks, Herbalife's average revenue for North America for "packaging and handling" and shipping is 10.33%, 10.50%, 10.59, and 10.7% of its total "Retail Sales" (which it uses the SRP to calculate).

199.   In an April 21, 2011 letter to the SEC, Herbalife states "[t]he shipping and handlings costs for 2010, 2009, and 2008 were $58 million, $49 million and $48 million, respectively." Herbalife's 2010 and 2009 10-Ks, however, account for Herbalife's revenues for North America (which includes Canada, Jamaica, and Aruba) from shipping and handling for 2010, 2009, and 2008 as $102.70 million, $87.30 million, and $80.8 million, respectively.

200.   Plaintiff is informed and believes based on the discrepancy between these reported numbers that Herbalife overcharged members of the class in 2009 and 2010 by millions of dollars for packaging, shipping, and handling. Because Herbalife has not changed its formula to calculate the "Packaging and Handling" and shipping costs since 2009, Plaintiff is informed and believes that Herbalife has similarly overcharged and profited from Plaintiffs and the class from their supposed "Packaging and Handling" and "Shipping" fees during 2011, 2012, and 2013.

FIRST AMENDED COMPLAINT

201.   Plaintiff is further informed and believes that Herbalife uses this surcharge on top of the SRP as a way to avoid having to pay $0.46 to $0.64 of the actual revenue it receives from purchases upline. By using a surcharge, Herbalife can increase its profit margin without dramatically raising the SRP on its products (and without having to share those price increases with the Beneficiaries and Promoters).

202.   Because of the inflated SRP and the packaging, handling, and shipping fees, the prices distributors pay for Herbalife's products are so high that the profit Herbalife promises on retail sales at the Distributor level is almost impossible.

203.   While there is a retail component to the Herbalife endless chain, the inflated SRP of the products and inflated shipping and handling fees make it unlikely that Herbalife distributors have meaningful opportunities to have retail sales. As Herbalife pays out "Wholesale Profits," royalties, bonuses, and other incentives regardless of whether the downline distributor sells the product at SRP there is a systematic incentive to recruit other distributors.

204.   Herbalife's system of graduated discounts depending on position exacerbates this problem. Distributors who purchase Herbalife products at a 25%, 35%, or 42% discount must compete on price with other distributors higher up the endless chain who can purchase products at greater discount and sell those same products at or around cost.

205.   Based on Plaintiffs' experience in selling Herbalife products and competing in the marketplace, they are informed and believe that Herbalife's distributors routinely discount Herbalife products on EBay, Craigslist, and on various websites from the SRP, and there is little opportunity for retail profits.

206.   Because the distributors are Herbalife's actual customers and consumers of its products and those actual customers and consumers are overpaying $0.46 to $0.64 on the dollar for product, those distributors drop out at

47

1   overwhelming numbers, and Herbalife requires an ever expanding network of so-

2   called distributors.

### Herbalife's Sales and Marketing Plan Does Not Have or Follow Safeguards

5   207.   In *In re Amway Corp., 93 F.T.C. 618 (1979)* ("*Amway*") the FTC

6   recognized four rules that may help a direct marketer avoid the characteristics of

7   an FTC Act violation: the initial investment rule, the 70% rule, the buyback rule,

8   and the 10 customer rule.

9   208.   Under the FTC Act, these rules are designed to deter inventory

10   loading and encourage retail sales. In *Omnitrition*, the Ninth Circuit explained that

11   where "a distribution program appears to meet the *Koscot* definition of a pyramid

12   scheme, there must be evidence that the program's safeguards are enforced and

13   actually serve to deter inventory loading and encourage retail sales." *Omnitrition*,

14   79 F.3d 776 (1996).

15   209.   Because Plaintiffs bring their claims under Section 327 of the

16   California Penal Code and not Section 5 of the FTC Act, these rules do not provide

17   a defense to alleged violations of Section 327. *See Omnitrition*, 79 F.3d 776, 787.

18   And even if the *Amway* rules were relevant, Herbalife does not follow or

19   adequately enforce them.

20   210.   **The Initial Investment Rule**. The FTC decision noted that illegal

21   schemes require a payment or initial disbursement by a new participant for the

22   right to sell products and the right to earn rewards, in return for recruiting other

23   participants into the program and which are unrelated to sale of product to the

24   ultimate user.

25   211.   Herbalife requires each new Herbalife distributor to purchase an IBP

26   or mini-IBP at a cost of $95.55 or $57.75, respectively.

27   212.   Because Herbalife increases its discount off the SRP on a graduated

28   basis for Distributors, Senior Consultants, Success Builders, Qualified Producers,

and Supervisors, however, Herbalife requires an initial investment well beyond the price of the IBP if a distributor wants to compete in the marketplace for retail consumers of Herbalife products or move up the Herbalife endless chain to a place where they can earn commissions, Royalty Overrides, bonuses, and incentives.

213.   Following the mantra of "pay for your position" and "position determines the pay," Herbalife and Beneficiaries and Promoters pressure distributors to make a significant investment to "buy their discount" and get the "highest discount for the least expenditure."

214.   In the IBC, Booklet 3, Building Your Business (Exhibit H) Herbalife encourages its distributors on page 18 to invest in product inventory for customer orders:

Here are some areas you may want to consider putting money towards:

● Product Inventory for customer orders

● Personal product inventory

● Advertising for your business

● Training events/seminars

● Business costs, such as office supplies

● And, most of all, yourself!"

215.   In explaining why it is important to build an investment inventory, Herbalife tells distributors on page 19 of Exhibit H:

●You can't sell what you don't have. Carry enough inventory on hand to cover all your local sales …

● Many people purchase product on the spot. Carry enough product on hand to accommodate spur-of-the-moment sales. You don't want to make a paying customer wait …

● If you are doing a one-on-one presentation, don't make the customer wait for product…"

216.  **The "70%" Rule**: The 70% rule is as follows: "[t]o ensure that distributors do not attempt to secure the performance bonus solely on the basis of purchases, Amway requires that, to receive a performance bonus, distributors must resell at least 70% of the products they have purchased each month.... Amway enforces the 70% rule." *Amway*, 93 F.T.C. 618, 646, ¶73.

217.  Herbalife's 70% rule, found at page 71 of Exhibit C is:

In order to qualify for and receive Royalty Overrides, Production Bonuses, and other bonuses paid by Herbalife, at least 70% of the total value of Herbalife products a Distributor purchases each Volume Month must be sold or consumed that month. For the purpose of fulfilling the certification requirements of this Rule, a Distributor may count any or all of the following:

• Sales to retail customers;

• Sales at wholesale to downline Distributors;

• Product used for personal or family consumption; and

• *Product consumed at Nutrition Clubs.

If the Distributor fails to timely certify to Herbalife that they have sold or consumed 70% of the product purchases made that Volume Month, Royalty Overrides, Production Bonuses, and other bonuses will not be paid to the Distributor.

*If a Distributor utilizes Nutrition Club sampling activity towards compliance, the Distributor shall maintain a log of member visits for at least two years, setting forth the name of the member, dates of visits, and contact information, and shall make those records available for verification purposes if requested by the Company.

218.  Herbalife's 70% Rule does not require that Herbalife's distributors resell at least 70% of the Herbalife products to resale customers because it allows "[p]roduct used for personal or family consumption" to satisfy the rule. Self-

1    consumption does not count as a retail sale for purposes of the 70% Rule. *See*

2    *Omnitrition*, 79 F.3d 776, 783 citing *Koscot*, 86 F.T.C. 1106,1181.

3         219.   Herbalife does not require a Supervisor to make *any* retail sales as

4    the rule allows "[s]ales at wholesale to downline Distributors." Thus, it does not

5    meet the 70% Rule.

6         220.   Moreover, the 70% Rule is not applied to NSL distributors (or

7    Supervisors who do not have a First, Second, or Third Level) even though those

8    distributors can qualify for compensation in promotions up the chain, increased

9    discounts on purchases, and commissions on downline purchases.

10        221.   While Herbalife requires Supervisors and above to "certify" that they

11   have complied with the 70% rule, Plaintiff is informed and believes based the

12   Court's finding of fact in its August 25, 2009 Memorandum & Order Regarding

13   Cross-Motions for Summary Judgment, *Herbalife International of America, Inc. v.*

14   *Ford et al. Case* No. 2:07-CV-2529-GAF-FMO (C.D. Cal.), that "Herbalife does

15   not perform audits to determine compliance with the 70% Rule unless there is an

16   ongoing 'ethical investigation' of a Supervisor suspected of violating Herbalife's

17   policies." *See Memorandum & Order* (Docket No. 374), 8:16-19. Moreover, even

18   if Herbalife were to perform audits, it does not promote any meaningful change by

19   its distributors who it finds violates its 70% Rule.

20        222.   **The Ten Customer Rule**: The "ten customer rule" provides that

21   "distributors may not receive a performance bonus unless they prove a sale to each

22   of ten different retail customers during each month. . . ." *Amway*, 93 F.T.C. 618,

23   646, ¶74.

24        223.   Herbalife's Rule is: Rule 18-B The 10 Retail Customers Rule

25             A Distributor must personally make sales to at least ten (10) separate

26             retail customers in a given Volume Month to qualify for and receive

27             Royalty Overrides, Production Bonuses, and other bonuses paid by

28             Herbalife. For the purpose of fulfilling the certification requirements

of this Rule, a Distributor may count any or all of the following each Volume Month.

• A sale to a retail customer;

• A sale to a first-line Distributor with up to 200 Personally Purchased Volume Points (and no downline Distributors) may be counted as a sale to one (1) retail customer; and

• *A Nutrition Club member who consumed products during ten (10) visits to a Nutrition Club within one Volume Month may be counted by the Nutrition Club operator as a sale to one (1) retail customer.

If the Distributor fails to timely certify to Herbalife that they have sold to at least ten (10) retail customers in a given Volume Month, Royalty Overrides, Production Bonuses, and other bonuses will not be paid to the Distributor.

224. Herbalife's Ten Customer Rule does not mandate sales to customers not already Herbalife distributors. Herbalife allows "[a] sale to a first line Distributor with up to 200 personally purchased Volume Points (and no downline Distributors) which may be counted as a sale to one (1) retail customer," to count to satisfy the Retail Customer Rule.

225. Distributors can also satisfy this Herbalife's rule by giving away free samples of Herbalife products at their Nutrition Clubs. This does not constitute an "actual sale" under *Omnitrition* or *Koscot.*

226. Herbalife does not apply the Ten Customer Rule to NSL distributors and Supervisors (who do not have a First, Second, or Third Level), even though they can obtain performance bonuses in promotions up the chain, increased discounts on purchases, and commissions on downline purchases.

227. Herbalife's 10 Customer Rule and 70% Rule are ineffective in ensuring its distributors focus on retailing the products over recruiting. Because

only distributors eligible for Royalty Overrides, bonuses, and other incentives must comply with the rule, to even become a distributor subject to the rules a distributor must recruit heavily and would be in at least the top 10% of all Herbalife distributors.

228. **The Buy Back Rule.** The buy back rule requires participants to buy back from any person they recruited any saleable, unsold inventory upon the recruit's leaving Amway. *Amway*, 93 F.T.C. 618, 716. The purpose of the rule is to "reduce or eliminate the possibility of inventory loading by insuring that program participants do not find themselves saddled with thousands of dollars' worth of unsaleable products." *Omnitrition*, 79 F.3d 776, 784.

229. Herbalife has a 30-Day Money Back Guarantee for "retail customers." When a retail customer returns product, they return the product to the distributor who sold them the product. That distributor is required, within 30 days of paying the refund to the customer, to send back the unused portion of the product or the containers. Then Herbalife exchanges the returned product with an identical replacement product for the Distributor, regardless of whether that distributor has another customer who wants to purchase the product or products.

230. Herbalife has no such "Money Back Guarantee," for a distributor.

231. The distributor can return products *purchased from Herbalife* within the prior 12 months on the following conditions:

    a. The distributor must resign as an Herbalife Distributor (and forfeit all of their downline).

    b. Herbalife reimburses a distributor the SRP of a product less that distributor's discount to purchase the product, less a 10% restocking

FIRST AMENDED COMPLAINT

fee.[7] A distributor does not receive a reimbursement of the 7%
packaging and handling fee of the SRP or the shipping fee.

c.  If the distributor has received Royalty Overrides, that distributor
must return all of their records relative to the 70% rule.

An "Inventory Repurchase Request Form" is found at page 50 of Exhibit C.

232.   If a distributor purchases products from distributors in their upline
(and not directly from Herbalife) this return policy does not apply. As NSLs can
purchase product from their sponsor or their first upline Supervisor, unlike
Amway's rule mandating that participants had to buy back recruit's product,
Herbalife leaves its NSLs at the mercy of their upline to determine whether they
will accept the return.

233.   As Herbalife took a 10% restocking fee from 2009 through August
of 2012, Herbalife has not complied with the "buy back rule."

234.   As Herbalife does not reimburse the distributor for the inflated
packaging and shipping fees, Herbalife has not complied with the "buy back rule."

235.   Herbalife knows of, approves, promotes, and facilitates the
systematic noncompliance with or breach of, the rules that purportedly protect
against the operation of an illegal scheme.

### Herbalife is Bound to Operate as an Endless Chain Scheme

236.   Herbalife cannot fix itself even if it wants to. In Herbalife's 2012 10-
K, it explains it is contractually bound to continue implementing and operating
this endless chain scheme:

This agreement with our distributors provides that we will not change
certain aspects of our marketing plan without the consent of a specified
percentage of our distributors. For example, our agreement with our

---

[7] Plaintiffs are informed and believe that the 10% restocking fee was discontinued
sometime in August of 2012.

54

FIRST AMENDED COMPLAINT

1  distributors provides that we may increase, but not decrease, the discount

2  percentages available to our distributors for the purchase of products or the

3  applicable royalty override percentages, including roll-ups, and production

4  and other bonus percentages available to our distributors at various

5  qualification levels within our distributor hierarchy.

6  237.   As Plaintiffs have not made such an agreement with Herbalife,

7  Plaintiffs are informed and believe that the agreement Herbalife refers to is

8  between Herbalife and Beneficiaries and Promoters and others.

9  **Tolling Applies To Plaintiffs' Claims**

10  238.   As explained herein, Herbalife, through its actions and omissions,

11  intended to, and did, conceal from Plaintiffs and other distributors in the class

12  during the relevant period material facts and information relating to Herbalife's

13  endless chain scheme and its deceptive earnings claims. Plaintiffs did not

14  discover, nor had they reason to discover, the information necessary for the causes

15  of action set forth in this Complaint until at least February 7, 2013, when

16  Herbalife disclosed its most recent Statement of Average Gross Compensation,

17  and/or when the original complaint was filed.

18  239.   Herbalife's acts and omissions constitute a "continuing violation"

19  such that any limitations period for Plaintiffs' claims did not begin to accrue until

20  the date of the last wrong or injury that is the subject of this action.

21  **Class Action Allegations**

22  240.   Plaintiffs bring this action as a class action under Federal Rule of

23  Civil Procedure 23.

24  241.   Plaintiffs seek to represent a nationwide class defined as follows:

25  "All persons who were Herbalife distributors in the United States from April 2009

26  until the present."

27

28

242.    Excluded from the class are the Defendants, their employees, family members, and any distributor who has been a member of the President's Circle, Founder's Circle, Chairman's Club, Millionaire Team, or the GET Team.

243.    Subject to confirmation, clarification and/or modification based on discovery to be conducted in this action, Plaintiffs seek to represent a **subclass** of individuals who signed up to Herbalife under a pre-February 2013 Statement of Average Gross Compensation (**"Pre-February 2013 Statement of Average Gross Compensation Subclass"**) "All persons who were Herbalife distributors in the United States from April 2009 to February 6, 2013 and who received a pre-February 2013 Statement of Average Gross Compensation in their IBP or mini-IBP."

244.    Subject to confirmation, clarification and/or modification based on discovery to be conducted in this action, Plaintiffs seek to represent a subclass of individuals who paid "Packaging and Handling" and/or Shipping charges (the **"Packaging & Handling and FedEx Freight Subclass"**) defined as follows**:** "All persons who were Herbalife distributors in the United States from April 2009 to April 14, 2013 and who paid 'Packaging and Handling' and Shipping charges before April 14, 2013."

245.    Plaintiffs seek relief for themselves and all members of the class who agreed to a choice of law of California under California's Unfair and Deceptive Practices Acts, and California's Fraudulent Advertising Act.

246.    Plaintiffs seek to pursue a private attorney general action for injunctive relief for themselves and all members of the class who agreed to a choice of law of California, and they satisfy the standing and class action requirements.

247.    While the exact number of members in the Class and Subclasses are unknown to Plaintiffs at this time and can only be determined by appropriate discovery, membership in the class and subclasses is ascertainable based upon the

records maintained by Defendant. It is estimated that the members of the Class are greater than 400,000 and each subclass easily number in the hundreds of thousands. Therefore, the Class and Subclasses are so numerous that individual joinder of all Class and Subclass members is impracticable under Fed. R. Civ. P. 23(a)(1).

248. There are questions of law and/or fact common to the class and subclasses, including but not limited to:

    a. Whether Herbalife is operating an endless chain;

    b. Whether distributors paid money to Herbalife for (1) the right to sell a product and (2) the right to receive, in return for recruiting others, rewards which were unrelated to the sale of the product to retail consumers;

    c. Whether *Amway's* four rules apply to Section 327 claims;

    d. If the *Amway* rules do apply, are Herbalife's *Amway* rules effective;

    e. If the *Amway* rules do apply, and Herbalife's *Amway* rules are effective, did Herbalife enforce those rules;

    f. Whether Herbalife or the Beneficiaries and Promoters omitted to inform Bostick and the plaintiff class that they were entering into an illegal scheme where an overwhelming number of participants lose money;

    g. Whether Herbalife's Statements of Average Gross Compensation distributed from 2009 through 2012 were deceptive and misleading;

    h. Whether Herbalife overcharged for Packaging and Handling;

    i. Whether Herbalife overcharged for shipping;

    j. Whether Herbalife's conduct constitutes an unlawful, unfair and/or deceptive trade practice under California state law

    k. Whether Herbalife's conduct constitutes unfair competition under California state law; and

FIRST AMENDED COMPLAINT

i.    Whether Herbalife's conduct constitutes false advertising under California state law and

249.    These and other questions of law and/or fact are common to the class and subclasses and predominate over any question affecting only individual class members.

250.    Plaintiffs' claims are typical of the claims of the class and subclasses in that Plaintiffs were distributors for Defendant Herbalife and lost money because of the illegal scheme, each paid Packaging and Handling" and FedEx freight fees that were based on the SRP of a product and each received a pre-February 2013 Statement of Average Gross Compensation.

251.    Plaintiffs will fairly and adequately represent the interests of the class and subclasses. Plaintiffs' claims are typical of those of the class and subclasses. Plaintiffs' interests are fully aligned with those of the class and subclasses. And Plaintiffs have retained counsel experienced and skilled in complex class action litigation.

252.    Class action treatment is superior to the alternatives for the fair and efficient adjudication of the controversy alleged, because such treatment will allow many similarly-situated persons to pursue their common claims in a single forum simultaneously, efficiently and without unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender.

253.    Plaintiffs know of no difficulty likely to be encountered in the management that would preclude its maintenance as a class action.

## FIRST CLAIM FOR RELIEF

### (ENDLESS CHAIN SCHEME; California Penal Code §327 and Section 1689.2 of the California Civil Code)

### Against All Defendants

### (On Behalf of the Class)

254.    Plaintiffs reallege all allegations.

255.   Section 1689.2 of the California Civil Code provides:

A participant in an endless chain scheme, as defined in Section 327 of the Penal Code, may rescind the contract upon which the scheme is based, and may recover all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme.

256.   Herbalife is operating an endless chain scheme.

257.   Plaintiffs and the class have suffered an injury in fact and have lost money or property because of Herbalife's operation of an endless chain, business acts, omissions, and practices.

258.   Plaintiffs and the class are entitled to:

a.  rescind the contract upon which the scheme is based and recover all consideration paid under the scheme, less any amounts paid or consideration provided to the participant under the scheme;

b.  restitution, compensatory and consequential damages (where not inconsistent with their request for rescission or restitution); and

c.  attorneys' fees, costs, pre- and post-judgment interest.

**SECOND CLAIM FOR RELIEF**

**(Unfair and Deceptive Practices Claims Under**

**Cal. Bus, & Prof. Code § 17200, *et seq.*)**

**(On Behalf of the Class, the Pre-February 2013 Statement of Average Gross**

**Compensation Subclass, and the**

**Packaging & Handling and FedEx Freight Subclass)**

**Against All Defendants**

259.   Plaintiffs reallege all allegations.

260.   All claims brought under this Second Cause of action that refer or relate to the unlawful, fraudulent or unfair "endless chain" of Defendants are brought on behalf of Plaintiffs and the Class.

261.   All claims brought under this Second Cause of Action that refer or relate to the unlawful, fraudulent or unfair pre-February 2013 Statements of Average Gross Compensation and the touted Herbalife "business opportunity" are brought on behalf of Plaintiffs and the Pre-February 2013 Statement of Average Gross Compensation Subclass.

262.   All claims brought under this Second Cause of Action that refer or relate to the unlawful, fraudulent or unfair "Packaging and Handling" or FedEx freight fees before April 14, 2013 are brought on behalf of Plaintiffs and the Packaging & Handling and "Freight Prepaid" to FedEx Shipping Subclass.

263.   Herbalife has engaged in constant and continuous unlawful, fraudulent and unfair business acts or practices, and unfair, deceptive, false and misleading advertising within the meaning of the California Business and Professions Code § 17200, *et seq*. The acts or practices alleged constitute a pattern of behavior, pursued as a wrongful business practice that has victimized and continues to victimize thousands of consumers.

**The Herbalife Sales and Marketing Plan Is Unlawful**

264.   Under California Business and Professions Code § 17200, an "unlawful" business practice is one that violates California law.

265.   Herbalife's business practices are unlawful under § 17200 because they constitute an illegal "endless chain" as defined under, and prohibited by, California Penal Code § 327.

266.   Herbalife utilizes its illegal "endless chain" with the intent, directly or indirectly, to dispose of property in Herbalife products and to convince distributors to recruit others to do the same.

267.   Herbalife's business practices are unlawful §17200 because they violate §17500 et seq., as alleged in the Third Cause of Action.

**The Herbalife Sales and Marketing Plan Is Fraudulent**

FIRST AMENDED COMPLAINT

268.   Under California Business and Professions Code § 17200, a "fraudulent" business practice is one that is likely to deceive the public.

269.   Herbalife's business practices are fraudulent in four separately actionable ways: (1) Herbalife's illegal and deceptive "endless chain;" (2) the touted, yet non-existent, Herbalife "business opportunity" for everyone, including but not limited to Herbalife's massive advertising campaign and the misleading Statements of Average Gross Compensation; (3) the "Packaging and Handling" fees that actually were secret profit generators untied to, and undetermined by, Defendants' actual packaging and handling related costs; and (4) alleged FedEx freight fees that, in fact, were not a direct pass through of freight charges paid by Herbalife to FedEx but were secretly and substantially marked-up by Herbalife to generate more profits.

The Fraudulent "Endless Chain"

270.   First, as detailed herein, Defendants promoted participation in the Herbalife endless chain, which has a compensation program based on payments to participants for the purchase of product by participants, not the retail sale of products or services.

271.   Herbalife has made numerous misleading representations about the business opportunity of Herbalife and the income that a recruit or a distributor can realize by becoming a distributor and participating in the scheme.

272.   Herbalife knew, or should have known, that the representations about the business opportunity of Herbalife were misleading in nature.

273.   As a direct result of Herbalife's fraudulent representations and omissions regarding the Herbalife endless chain described herein, Herbalife wrongly acquired money from Plaintiffs and the members of the classes.

The Fraudulent "Business Opportunity" and Statements of Average Compensation

274.   Second, Herbalife touted, in numerous different ways as part of a massive advertising campaign, a "business opportunity," which Herbalife also

repeatedly and in many ways represented, among other things, as being "for everyone" and allowing "full time" or "part time" opportunities.

275.   The massive advertising campaign included among other things, the IBP or mini-IBP, the magazine *Herbalife Today*, emails, websites, presentations by Herbalife and the Beneficiaries and Promoters, training, word of mouth among distributors, and events.

276.   As part of this campaign and a further inducement to potential distributors, prior to February 2013, Herbalife made and disseminated Statements of Average Gross Compensation that further misled the public, among other things: (1) by using cryptic and technical terms known to Herbalife but not to the general public or to those exploring the claimed "business opportunity," (2) by highlighting the "winners," i.e., those that received compensation from Herbalife, and the average gross compensation paid by Herbalife to those winners, (3) by failing to disclose the actual number of "winners" as compared to the number of distributors who received no compensation from Herbalife (i.e., the "losers"); and (4) by downplaying and omitting the risks and costs involved in starting an Herbalife distributorship and succeeding in such a distributorship.

277.   In reality, the touted "business opportunity" was only for a select few. As disclosed for the first time in the 2013 Statement, 436,591 distributors (or approximately 87.9% of all distributors) received no payments from Herbalife in 2012, and another 39,151 (or approximately 8.4% of all distributors) received an average of only $292 from Herbalife during the entire year. And these numbers did not include expenses incurred by distributors in the operation or promotion of their businesses, meaning there were likely more net losers who made no profit at all.

278.   Herbalife knew, or should have known, that the selective information presented to distributors in the 2008-2011 Statements of Average Gross Compensation and its massive adverting campaign during that time frame touting

its purported "business opportunity" was likely to mislead the public and did in fact mislead the public into believing there was a legitimate "business opportunity" in which distributors, or a large portion of them, could make money in either a full or part time capacity. In fact, however, there was no such "business opportunity," except for a very select few.

279.   As a direct result of Herbalife's fraudulent representations and omissions regarding the 2008-2011 Statements of Average Gross Compensation and the massive adverting campaign during that time frame and thereafter touting Herbalife's purported "business opportunity" described herein, Herbalife wrongly acquired money from Plaintiffs and the members of the classes.

The Fraudulent "Packaging and Handling" Fees

280.   Prior to April 14, 2013, Plaintiffs and the class purchased Herbalife products and were charged a 7% "Packaging and Handling" fee based on the SRP of the products purchased.

281.   Although Herbalife represented to its distributors that the "Packaging and Handling" fees were designed to recover "a great deal of administrative time and labor [related to] . . . processing, handling and marketing," on information and belief, Herbalife set the fees at 7% of product SRP without first doing any analysis of such costs in relation to product SRPs or revenues from product sales. In other words, Herbalife set the amount of these "Packaging and Handling" fees based on what it believed distributors would pay without objection and not in relation to any study or analysis of its administrative time and labor related to processing, handling and marketing, as represented.

282.   Plaintiff is informed and believes that Herbalife's actual "packaging and handling" costs are far lower than the revenues that Herbalife received from its "Packaging and Handling" fees and thus that these fees were secret profit generators as opposed to specific fees tied to, or at least set in relation to, specific costs, as represented.

FIRST AMENDED COMPLAINT

283.   Herbalife knew, or should have known, that the misrepresentations and omissions about the "Packaging and Handling" fees were likely to mislead the public and its distributors.

284.   As a direct result of Herbalife's fraudulent representations and omissions regarding the purported "Packaging and Handling" fees described herein, Herbalife wrongly acquired money from Plaintiffs and the members of the classes.

The Fraudulent FedEx Freight Fees

285.   Fourth, from April 2009 up to at least April 14, 2013, Plaintiffs purchased Herbalife products and were charged a supposedly FedEx freight fee that was based on the SRP of a product.

286.   Herbalife told its distributors, among other things, that "[o]rders shipped via Fed Ex, Herbalife's most popular freight service, are shipped freight prepaid," that "[a]ll other freight service are shipped freight collect," and that "[w]hen you request FedEx as the method of shipment on an order, your delivery and freight will be calculated as indicated in the ground chart."

287.   "Freight prepaid" is a commonly known and used shipping term that means the seller of goods pays the shipper's freight charges.

288.   Also, Herbalife's various product order forms during this time frame described product shipping as occurring through "FedEx Ground"," "FedEx – 2 Day" and "FedEx – 1 Day" and set forth various percentage fees based on which method was chosen.

289.   Herbalife's disclosures, in its IBPs and on its various product forms, represented to the public and Herbalife's distributors that the FedEx freight charges were a direct pass through of the actual freight costs that Herbalife paid to FedEx to deliver goods to distributors.

FIRST AMENDED COMPLAINT

290.   Nowhere did Herbalife state or imply that it would be marking-up or otherwise inflating the freight costs it paid to FedEx to ship products to distributors.

291.   Instead, all of Herbalife's disclosures implied a direct pass through of third party FedEx charges when a distributor chose Herbalife's "freight prepaid" to FedEx method and related charges.

292.   Because of the representations and omissions of Herbalife, Plaintiffs purchased Herbalife products, chose Herbalife's FedEx method of delivery and were misled into not even exploring their "freight collect" options.

293.   On information and belief, there were alternative "freight collect" shipping options that would have cost less than Herbalife's FedEx freight fees.

294.   Furthermore, Plaintiffs are informed and believe that Herbalife's claimed FedEx freight fees were not actually the "freight prepaid" by Herbalife to FedEx and were not even calculated according to the formulas disclosed to distributors on the product order forms.

295.   Instead, Plaintiffs are informed and believe that Herbalife had different agreements with FedEx for lower freight costs and that the actual FedEx freight costs incurred by Herbalife were substantially less than the revenues Herbalife received from the FedEx freight fees charged to its distributors.

296.   As a result, Plaintiffs and the class were misled into paying, and did in fact pay, bogus and inflated FedEx freight fees that were a secret profit generator for Herbalife.

297.   Herbalife knew, or should have known, that its FedEx freight disclosures were untrue and misleading in that they misrepresented the freight fees as directly passing through the actual "freight prepaid" costs of Herbalife to  a third party, FedEx, while Plaintiffs and the class were unknowingly being charged, and paying, separate and undisclosed charges to Defendants.

FIRST AMENDED COMPLAINT

298.   As a direct result of Herbalife's fraudulent representations and omissions regarding the "FedEx freight fees described herein, Herbalife wrongly acquired money from Plaintiffs and the members of the classes.

Standing, Reliance and Materiality

299.   The named Plaintiffs have standing to bring these Section 17200 claims under the fraudulent prong and can demonstrate actual reliance on the alleged fraudulent conduct.

300.   For instance, Plaintiffs received the IBP or mini-IBP, which promoted the Herbalife Scheme and claimed "business opportunity" and contained material false representations regarding the success distributors could achieve through Herbalife by purchasing products and recruiting others to do the same. Because of their receipt of the IBP or mini-IBP, and the representations contained therein, Plaintiffs did not return the IBP for a refund, signed up with Herbalife, purchased Herbalife products, did not immediately return those products, and attempted to and recruited others to do the same.

301.   The IBP or mini-IBP was sent by Herbalife with the purpose and intent of promoting Herbalife's illegal and deceptive scheme and claimed "business opportunity." Plaintiffs received the IBP or mini-IBP, which promoted the Herbalife "business opportunity." Book 4 of the IBP and mini-IBP the Sales and Marketing Plan contained a "Statement of Average Gross Compensation of U.S. Supervisors," referenced above, which contained deceptive and misleading information regarding the likelihood of success in becoming a Supervisor as well as the average earnings of distributors and the amount of product revenues that are paid out by Herbalife to distributors in the form of Wholesale Profits, Royalty and bonus incomes and incentives. Because of their receipt of the IBP or mini-IBP, and the representations contained in the "Statement of Average Gross Compensation of U.S. Supervisors," Plaintiffs reasonably believed they could succeed in the "business opportunity," did not return the IBP or mini-IBP for a

refund, purchased Herbalife products and did not immediately return them, signed up as Herbalife distributors, and attempted to and recruited others to do the same.

302.   There were other representations made to distributors as part of the massive advertising campaign regarding the claimed "business opportunity," on which Plaintiffs or some of them, reasonably believed the representations they could succeed in the "business opportunity," did not return the IBP or mini-IBP for a refund, purchased Herbalife products and did not immediately return them, signed up as Herbalife distributors, and attempted to and recruited others to do the same. These other representations include, but are not limited to the following:

a.   The *Herbalife Today* magazine featuring the "Royalty Achievers" "President's Team," "Millionaire Team," and "Lifetime Achievers," including members of the Beneficiaries and Promoters, which promoted Herbalife and contained material false representations regarding the "business opportunity" and the success that a distributor could achieve through Herbalife by purchasing products and recruiting others to do the same.

b.   Emails from Herbalife that promoted Herbalife and contained material false representations regarding the success that a distributor could achieve through Herbalife by purchasing products and recruiting others to do the same.

c.   Websites, such as www.herbalife.com, https://www.myherbalife.com/, and http://www.herbalifemail.com/, which promoted the fraudulent scheme through videos of Beneficiaries and Promoters containing material false representations regarding the "business opportunity" available to distributors and the wealth that a distributor could get by agreeing to become an Herbalife distributor.

d.  Presentations by Herbalife distributors, such as the one Bostick received in the Internet Business Starter Pack, which contained material false representations regarding the "business opportunity" and the success that a distributor could get through Herbalife by purchasing products and recruiting others to do the same.

e.  Presentations by Herbalife, including the presentations described in this complaint, which contained material false representations regarding the "business opportunity" and the success that a distributor could get through Herbalife by purchasing products and recruiting others to do the same.

f.  Training and events, such as the Extravaganza as described in this complaint, where Herbalife distributors made material false representations regarding the "business opportunity" and the success that a distributor could get through Herbalife by purchasing products and recruiting others to do the same.

303.  Plaintiffs and the class also purchased Herbalife products and were charged 7% "Packaging and Handling" fees that appeared to be designed to recoup "packaging and handling" costs and also were described elsewhere as covering administrative time and labor related to processing, handling and marketing. Plaintiffs and the class relied upon these representations and paid the "Packaging and Handling" fees without objection, believing the fees were recovering actual costs when in fact they were secretly generating additional profits for Herbalife.

304.  Plaintiffs and the class also purchased Herbalife products and were charged FedEx freight fees that implied a direct pass through of shipping costs paid to a third party, FedEx, when in fact they were not direct pass through charges and were instead secret, undisclosed profit generators. The class relied upon these representations and paid the FedEx freight fees without objection, believing they

1  were simply paying the actual shipping costs charged by FedEx, when they were
2  not.

3       305.   To the extent proof of reliance is required of Plaintiffs, Herbalife and
4  the Beneficiaries and Promoters knew that Plaintiffs and the class would
5  reasonably rely on their representations and omissions, which would cause the
6  Plaintiffs and the class joining the fraudulent endless chain scheme and purchasing
7  the products, and Plaintiffs did in fact reasonably rely upon such representations
8  and omissions.

9       306.   Indeed, had Plaintiffs and the class known that Herbalife and its
10 Beneficiaries and Promoters were promoting an endless chain, they would not
11 have become Herbalife distributors in the first place and, if learned after becoming
12 a distributor, they would not have purchased Herbalife products thereafter.

13      307.   Had Plaintiffs and the class known that Herbalife was promoting a
14 "business opportunity" that did not exist except for a select few, they would not
15 have become Herbalife distributors in the first place and, if learned after becoming
16 a distributor, they would not have purchased Herbalife products thereafter.

17      308.   And had Plaintiffs and the class known that the "Packaging and
18 Handling" fees were not calculated or set in relation to actual packaging and
19 handling costs and instead were secret profit generators, they would not have
20 become Herbalife distributors in the first place, would not have purchased
21 Herbalife products, or would have contacted Herbalife to object and attempt to
22 avoid paying the fees.

23      309.   Regarding the FedEx freight fees, had Plaintiffs and the class known
24 that Herbalife was not directly passing through such fees to the shipper, Fed Ex,
25 they could have and would have explored freight collect options that could have
26 saved them money on shipping, or they could have picked up the products in
27 person, or they could have objected and tried to negotiate the actual shipping fees
28 with Herbalife.

FIRST AMENDED COMPLAINT

310.   Finally, the fraudulent acts, representations and omissions described herein were material not only to Plaintiffs and the class (as described in this complaint), but also to reasonable persons. For instance, regarding the alleged "business opportunity" and representations in, and omissions from, the 2008 to 2011 Statements of Average Gross Compensation, and on information and belief, a large percentage of individuals who signed up as Herbalife distributors during this time frame expected that they could and would receive annual compensation at the approximate level of the "average earnings compensation," in total, disclosed in the Statements of Average Gross Compensation. Unfortunately, no such large percentage actually could or did earn such an amount.

**The Herbalife Sales and Marketing Plan Is Unfair**

311.   Under California Business and Professions Code § 17200, a business practice is "unfair" if it violates established public policy or if it is immoral, unethical, oppressive or unscrupulous and causes injury which outweighs its benefits.

312.   For the reasons set forth herein and above, Herbalife's promotion and operation of an unlawful and fraudulent endless chain, and its fraudulent representations and omissions regarding its purported "business opportunity," "Packaging and Handling" fees, and FedEx freight fees are also unethical, oppressive, and unscrupulous in that Herbalife is and has been duping Plaintiffs and the class out of billions, or at least hundreds of millions, of dollars.

313.   Herbalife's actions have few, if any, benefits. Thus, the injury caused to Plaintiffs and the class easily and dramatically outweighs the benefits, if any.

314.   Defendants should be made to disgorge all ill-gotten gains and return to Plaintiffs and the class all wrongfully taken amounts.

315.   Finally, Defendants' unlawful, fraudulent and unfair acts and omissions will not be completely and finally stopped without orders of an injunctive nature. Under California Business and Professions Code section 17203,

**FIRST AMENDED COMPLAINT**

Plaintiffs and the class seek a judicial order of an equitable nature against all Defendants, including, but not limited to, an order declaring such practices as complained of to be unlawful, fraudulent and unfair, and enjoining them from further undertaking any of the unlawful, fraudulent and unfair acts or omissions described herein.

**THIRD CLAIM FOR RELIEF**

**False Advertising**

**(California Business and Professions Code § 17500, *et seq*.)**

**(On Behalf of the Class, the Pre-February 2013 Statement of Average Gross Compensation Subclass, and the Packaging & Handling and FedEx Freight Subclass)**

**Against All Defendants**

316.   Plaintiffs reallege all allegations.

317.   All claims brought under this Third Claim for Relief that refer or relate to the false, untrue, fraudulent or misleading endless chain of Defendants are brought on behalf of Plaintiffs and the Class.

318.   All claims brought under this Third Cause of Action that refer or relate to the false, untrue, fraudulent or misleading pre-February 2013 Statements of Average Gross Compensation and the touted Herbalife "business opportunity" are brought on behalf of Plaintiffs and the Pre-February 2013 Statement of Average Gross Compensation Subclass.

319.   All claims brought under this Third Claim for Relief that refer or relate to the false, untrue, fraudulent or misleading "Packaging and Handling" or FedEx freight fees before April 14, 2013 are brought on behalf of Plaintiffs and the Packaging & Handling and FedEx Freight Subclass.

320.   Defendants' business acts, false advertisements and materially misleading omissions constitute false advertising, in violation of the California Business and Professions Code § 17500, *et seq.*

FIRST AMENDED COMPLAINT

321.   Defendants engaged in false, unfair and misleading business practices, consisting of false advertising and materially misleading omissions regarding the purported "business opportunity," likely to deceive the public and include, but are not limited to, the items set forth above. Herbalife knew, or should have known, that the representations about the business opportunity of Herbalife were misleading in nature.

322.   Defendants' marketing and promotion of the "Packaging and Handling" that appeared to be designed to recoup "packaging and handling" costs, but, in fact, were secret profit generators for Herbalife, as set forth above. Defendants knew or should have known, in exercising reasonable care, that the statements they were making were untrue or misleading and deceived members of the public. Defendants knew or should have known, in exercising reasonable care, that distributors, including Plaintiffs, would rely, and relied on Defendants' misrepresentations and omissions.

323.   Defendants' marketing and promotion of the FedEx freight fees that implied a direct pass through of shipping costs paid to a third party, FedEx, when in fact they were not direct pass through charges and were instead secret, undisclosed profit generators, constitutes false advertising likely to deceive the public and include, but are not limited to, the items set forth above. Defendants knew or should have known, in exercising reasonable care, that the statements they were making were untrue or misleading and deceived members of the public. Defendants knew or should have known, in exercising reasonable care, that distributors, including Plaintiffs, would rely, and relied on Defendants' misrepresentations and omissions.

324.   Because of Defendants' untrue and/or misleading representations, Defendants wrongfully acquired money from Plaintiffs and the class members to which it was not entitled. The Court should order Defendants to disgorge, for the benefit of Plaintiffs and all other Herbalife distributors in the class who signed a

Distributor Agreement with Herbalife governed by California law their profits and compensation and/or make restitution to Plaintiffs and the class.

325.   Under California Business and Professions Code Section 17535, Plaintiffs and the class seek a judicial order directing Defendants to cease and desist all false advertising related to the Defendants' illegal endless chain scheme, and "Packaging and Handling" fee, and such other injunctive relief as the Court finds just and appropriate.

326.   Because of Defendants' untrue and/or misleading representations, Defendants wrongfully acquired money from Plaintiffs and the class members to which it was not entitled. The Court should order Defendants to disgorge, for the benefit of Plaintiffs and all other Herbalife distributors in the class who signed a Distributor Agreement with Herbalife governed by California law their profits and compensation and/or make restitution to Plaintiffs and the class.

327.   Under California Business and Professions Code Section 17535, Plaintiffs and the class seek a judicial order directing Defendants to cease and desist from all false advertising related to the Defendants' illegal e scheme, and "Packaging and Handling" fee, and such other injunctive relief as the Court finds just and appropriate.

## PRAYER FOR RELIEF

The named Plaintiffs and the Plaintiff class and subclasses request the following relief:

a.      Certification of the class and subclasses;

b.      A jury trial and judgment against Defendants;

c.      Rescission of the agreements upon which the scheme is based, and recovery of all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme;

FIRST AMENDED COMPLAINT

d.     Damages for the financial losses incurred by Plaintiffs and by the class and subclasses because of the Herbalife Defendants' conduct and for injury to their business and property;

e.     Restitution and disgorgement of monies;

f.     Temporary and permanent injunctive relief enjoining Herbalife from paying its Distributors recruiting rewards that are unrelated to retail sales to ultimate users and from further unfair, unlawful, fraudulent and/or deceptive acts;

g.     The cost of suit including reasonable attorneys' fees under California Code of Civil Procedure § 1021.5, Civil Code §1689.2, and otherwise by law.

h.     For damages in an amount yet to be ascertained as allowed by law; and

i.     For such other damages, relief and pre- and post-judgment interest as the Court may deem just and proper.

DATED: June 9, 2014                FABIAN & CLENDENIN, P.C.
                                   FOLEY BEZEK BEHLE & CURTIS, LLP


                                   */s/ Philip D. Dracht*
                                   Philip D. Dracht
                                   Scott M. Petersen (Admitted *Pro Hac*)
                                   Jason W. Hardin (Admitted *Pro Hac*)

                                   Thomas G. Foley, Jr.
                                   Robert A. Curtis
                                   Justin P. Karczag
                                   FOLEY BEZEK BEHLE & CURTIS, LLP

                                   *Attorneys for Plaintiffs*


## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial as provided by Rule 38(a) of the Federal Rules of Civil Procedure.

FIRST AMENDED COMPLAINT

DATED: June 9, 2014          FABIAN & CLENDENIN, P.C.
                                        FOLEY BEZEK BEHLE & CURTIS, LLP


                                        */s/ Philip D. Dracht*
                                        Philip D. Dracht
                                        Scott M. Petersen (Admitted *Pro Hac*)
                                        Jason W. Hardin (Admitted *Pro Hac*)


                                        Thomas G. Foley, Jr.
                                        Robert A. Curtis
                                        Justin P. Karczag
                                        FOLEY BEZEK BEHLE & CURTIS, LLP

                                        *Attorneys for Plaintiffs*

4840-8247-4779, v. 1

FIRST AMENDED COMPLAINT