1  Philip D. Dracht (SBN 219044)
      pdracht@fabianlaw.com
2  Scott M. Petersen (*pro hac vice*)
      spetersen@fabianlaw.com
3  Jason W. Hardin (*pro hac vice*)
      jhardin@fabianlaw.com
4  Fabian & Clendenin
   215 South State Street, Suite 1200
5  Salt Lake City, UT 84151-0210
   Telephone: (801) 531-8900
6

7  Thomas G. Foley, Jr., SBN 65812
      tfoley@foleybezek.com
8  Justin P, Karczag, SBN 223764
      jkarczag@foleybezek.com
9  Foley Bezek Behle & Curtis, LLP
   15 West Carrillo Street
10 Santa Barbara, CA 93101
   Telephone: (805) 962-9495

11 Attorneys for Plaintiffs Dana Bostick,
   Anita Vasko, Judi Trotter, Beverly
12 Molnar, and Chester Cote

13

14 ## IN THE UNITED STATES DISTRICT COURT

15 ## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

16

17 DANA BOSTICK, a California
   citizen, *et al.*,
18
19          PLAINTIFF,
20
21   vs.
22
   HERBALIFE INTERNATIONAL
23 OF AMERICA, INC., a Nevada
   Corporation, *et al.*,
24
25          DEFENDANTS.
26

Case No.: 2:13-cv-02488-BRO-RZ

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND CERTIFICATION OF THE CLASS**

Hon. Beverly Reid O'Connell

Complaint filed: April 8, 2013

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................ iii

I. BACKGROUND ..........................................................................1

   A.   The Litigation ...................................................................... 1
   B.   The Mediation Process and Settlement Negotiations ............4
   C.   The Settlement Agreement .................................................7
       1. Economic Relief .........................................................7
       a. Cash Settlement Fund .............................................7
         i. Pro Rata Awards ...............................................9
         ii. Flat Rate Award ...............................................9
         iii. Cy Pres .........................................................10
       b. Product Return Fund ...........................................10
       2. Corporate Reforms ...................................................12
       3. Enforcement and Release ..........................................14
       4. Fees and Costs .........................................................16

II. DISCUSSION ............................................................................17

   A.   The Court Should Certify the Settlement Class. ..................17
       1. Rule 23(a)'s Requirements Are Satisfied .....................18
       a. Numerosity .........................................................18
       b. Commonality .......................................................19
       c. Typicality ...........................................................20
       d. Adequacy ...........................................................21
       i. There Are No Significant Conflicts of Interest .......22
       ii. Plaintiffs Are Represented by Qualified and Competent
         Counsel ...........................................................24
       2. Predominance and Superiority .....................................25
   B.   The Court Should Appoint Plaintiffs' Counsel as Class Counsel ..28
   C.   The Court Should Preliminarily Approve the Settlement. ...............29
       1. The Strength of Plaintiff's Case, the Complexity, Expense and
         Likely Duration of Further Litigation, the Risk of Obtaining Class
         Action Status, and the Risk of Prevailing at Trial All Weigh in
         Favor of Preliminary Approval. ...................................31
       2. The Settlement Amount and Corporate Reforms Are Significant
         and Fair and Support Preliminary Approval. ...................36
       3. The Extent of Discovery Completed and the Stage of the
         Proceedings Support Preliminary Approval. ...................37
       4. The Experience and Views of Plaintiffs' Counsel Support
         Preliminary Approval. ...............................................38

**D.**     **The Court Should Order the Proposed Notice Be Sent to the Settlement Class.**.....................................................................39

**E.**     **The Court Is Requested to Schedule a Fairness Hearing**..................40

**III. CONCLUSION**...............................................................................41

**TABLE OF AUTHORITIES**

**CASES**

*Amchem Prod., Inc. v. Windsor*, 521 U.S. 591 (1997) ..........................18, 24, 25, 26

*Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439 (N.D. Cal. 1994) ...................................................................................................21

*Ballard v. Equifax Check Servs., Inc.*, 186 F.R.D. 589 (E.D. Cal. 1999) .................................................................................................18

*Blackie v. Barrack,* 524 F.2d 891 (9th Cir. 1975) ...................................22

*California v. Levi Strauss & Co.*, 41 Cal.3d 460 (1986); ......................18

*Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004). ........39

*Class Plaintiffs v. City of Seattle*, 955 F.2d 1268 (9th Cir. 1992) ...................31, 39

*Connecticut Ret. Plans & Trust Funds v. Amgen, Inc.*, No. CV07-2536PSG, 2009 WL 2633743, at *6 (C.D. Cal. Aug. 12, 2009)........................21

*Daar v. Yellow Cab Co.*, 67 Cal.2d 695 (1967) ....................................18

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) ............................39

*Fisher Bros. v. Cambridge-Lee Industries, Inc.*, 630 F. Supp. 482, 488 (E.D. Pa. 1985) ...................................................................................38

*Haley v. Medtronic, Inc.*, 169 F.R.D. 643 (C.D. Cal. 1996) ................20

*Hanlon v. Chrysler Corp.*, 150 F. 3d 1011 (9th Cir. Cal. 1998) ......................19, 21

*Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977) ...............................32

*In re Syncor,* 516 F. 3d 1095 (9th Cir. 2008) .......................................40

*In re Conseco Life Ins. Co. Cost of Ins. Litigation,* No. 04-1610, 2005 WL 5678842, *9 (C.D. Cal. Apr. 26, 2005).......................................26

*In re Corrugated Container Antitrust Litig.*, 643 F.2d 195, 205 (5th Cir. 1981).....30

*In re First Alliance Mortg. Co.*, 471 F.3d 977 (9th Cir. 2006) .............19

*In re Matter of Johnson*, 80 B.R. 791 (E.D. Va. 1987) ........................21

*In re Mego Financial Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000) .................................................................................................37

*In re MetLife Demutualization Litig.,* 689 F.Supp.2d 297 (E.D.N.Y. 2010)...............................................................................................22

*In re M.L. Stern Overtime Litigation*, 2009 U.S. Dist. LEXIS 31650 (S.D. Cal. 2009) ...................................................................................30

*In Re Pet Foods Prod. Liab. Litig.,* 629 F.3d 333 (3rd Cir. 2010) ...................22, 23

*In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078 (N.D. Cal. 2007) ...............................................................................................30

*In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 516 (3rd Cir. 2004) ...............................................................................................37

*Linney v. Cellular Alaska P'ship,* 151 F.3d 1234, 1239 (9th Cir. 1998) ...............37

*M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822 (D. Mass. 1987) ..............................................................................31

*Mateo v. MIS KISO,* 805 F. Supp. 761 (N.D. Cal. 1992) ..................................25, 26

*Nguyen v. FundAmerica, Inc.,* No. 90-2090, 1990 WL 165251, *2 (N.D. Cal. Aug. 20 1990). .............................................................................23

*Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615 (9th Cir. 1982) ...............................................................................................31, 39

*Petrovic v. Amoco Oil Co.,* 200 F.3d 1140 (8th Cir. 1999) ...................................22

*Rodriguez v. West Publishing Corp.*, 563 F.3d 948 (9th Cir. 2009) .......................40

*Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992) ..............................................20

*Sandoval v. Tharaldson Employee Mgmt.*, 2009 U.S. Dist. LEXIS 111320 (C.D. Cal. November 19, 2009) ...............................................31

*Staton v. Boeing Co.*, 327 F.3d 938 (9th Cir. 2003) .......................................17, 21

*Sullivan v. Chase Investment Services of Boston, Inc.*, 79 F.R.D. 246 (N.D. Cal. 1978). ...............................................................................21

*United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010) ...............................18

*Vasquez v. Superior Court,* 4 Cal.3d 800, 808 (1971) ...........................................18

*Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) ......................19, 22

*West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970) ...............................................................................32

*Wiener v. Dannon Co., Inc.,* 255 F.R.D. 658, 672 (C.D. Cal. 2009) .....................24

*Willits v. City of Los Angeles*, No. CV 10-05782 CBM RZX, 2011 WL 7767305 at *4 (C.D. Cal. Jan. 3, 2011)...........................................25

*Wolin v. Jaguar Land Rover North Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010) ...........................................................................20, 21

*Xiufang Situ v. Leavitt,* 240 F.R.D. 551 (N.D. Cal. 2007); ...................................24

## STATUTES

8 U.S.C. §§ 1962(a), (c), and (d) ............................................................... 1

Cal. Business & Professions Code

    Section 17200 ......................................................... 1, 12, 20, 33

    Section 17500 ......................................................... 1, 12, 20, 33

Cal. Civ. Code

    Section 1689 ..................................................................... 1, 36

Cal. Penal Code

    Section 327 ..................................................................... passim

Fed. R. Civ. P.

    Rule 23 ......................................................................... passim

## TREATISES

4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions,*
    § 11:41 (4th ed. 2006) ...................................................... 30

7A Charles A. Wright, Federal Practice and Procedure
    § 1764 ............................................................................. 21

7B Fed. Prac. & Proc. Civ.
    § 1797.5 (3d ed.) ............................................................ 29

8 Newberg on Class Actions
    § 12:15 ............................................................................ 23

# I.    BACKGROUND

## A.    The Litigation

The Original Complaint. On April 8, 2013, Plaintiff Dana Bostick, on behalf of himself and a putative class of "others similarly situated," filed this Action in the United States District Court for the Central District California, naming as defendants Herbalife International of America, Inc.; Herbalife International, Inc.; and Herbalife Ltd., alleging the following claims for relief: (1) violations of California's endless chain scheme law under California Penal Code Section 327 and California Civil Code Section 1689.2; (2) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §§ 1962(a), (c), and (d)); (3) unfair and deceptive business practices under California Business and Professions Code Section 17200, *et seq*.; and (4) false advertising under California Business and Professions Code Section 17500, *et seq*. The complaint sought, among other things, damages for the financial losses incurred by Bostick and the class; general, compensatory, and exemplary damages; restitution and disgorgement; temporary and permanent injunctive relief; costs; reasonable attorneys' fees; pre- and post-judgment interest; and other damages the Court may deem just and proper.

The Motion to Dismiss. On May 30, 2013, Defendants moved to dismiss the complaint on several grounds. (Dkt. No. 22.). On October 11, 2013, the Court denied Defendants' motion to dismiss. (Dkt. No. 40.) Defendants answered the complaint on October 29, 2014. (Dkt. No. 41.)

Discovery. The parties exchanged initial disclosures on November 27, 2013. On December 3, 2013, Plaintiffs' counsel served a Request for Production of Documents with 208 separate requests for production. On December 5, 2013, the Court held a scheduling conference where it ordered that discovery be bifurcated between "class" and "merits" discovery. (Dkt. No. 51.) On January 23, 2014, Herbalife responded to the requests, lodging numerous objections and

refusing to produce any documents. (Joint Declaration of Thomas G. Foley and Scott M. Petersen dated October 31, 2014 filed in support of motion for preliminary approval, ¶15, ("Joint Decl.").)

On February 4, 2014, Plaintiffs' counsel served a meet and confer letter pursuant to L.R. 37-1 regarding the deficient discovery responses. (Joint Decl. ¶16.) Unable to resolve the discovery dispute through meeting and conferring, on April 7, 2014, Plaintiffs' counsel served Herbalife with a ninety-four (94) page [Joint] Stipulation on a Motion to Compel as to the certain requests for production. (Joint Decl. ¶16.) Following service of that stipulation, Herbalife agreed to meet and confer again with Plaintiffs' counsel to review their discovery responses, which the parties did the week of April 14, 2014. (Joint Decl. ¶16.) At that meeting, Plaintiffs' counsel agreed to narrow certain requests and Herbalife agreed to produce responsive documents. (Joint Decl. ¶16.) Because of Herbalife's agreement to produce documents relevant to class certification issues in this meet and confer, Plaintiffs' counsel did not move forward with the motion at that time. (Joint Decl. ¶16.)

The Court entered a stipulated Order Re Confidential Documents on April 23, 2014. (Dkt. No. 67.) Thereafter, Herbalife has been producing documents in both the mediation context and in litigation. (Joint Decl. ¶17.) Overall, Herbalife has produced over 18,500 documents (totaling approximately 148,000 pages). (Joint Decl. ¶17.) Many of these documents were produced in their native form, such as Excel spreadsheets and PowerPoint presentations. (Joint Decl. ¶17.) And on April 13, 2014, Defendants produced approximately 4GB of database materials, including approximately 3.5GB of raw data files. (Joint Decl. ¶17.) These data files are equivalent to approximately 2.4 million pages of text files. Plaintiffs' counsel has reviewed these documents. (Joint Decl. ¶17).

Additionally, Defendants provided Plaintiffs' counsel with the means to create their own queries and reports using Defendants' confidential internal

database. (Joint Decl. ¶18.) Together with this database production, Defendants also provided explanatory documentation and answered some questions concerning the database. (Joint Decl. ¶18.) Herbalife supplemented its production of database materials and reports with additional raw data files in July. (Joint Decl. ¶18.) To review and analyze the database contents, Plaintiffs retained an expert to perform database administration, run SQL queries, and assist attorneys in analyzing relevant data sets. (Joint Decl. ¶18.) Among other things the data includes distributor/member contact information, distributor/member levels, and distributor/member purchase information. (Joint Decl. ¶18.)

In addition to the first set of requests for production, Plaintiffs served interrogatories, requests for admission, and more requests for production on all Defendants. (Joint Decl. ¶19.) And Defendants served interrogatories, requests for admission, and requests for production as to each named Plaintiff, to which they responded. (Joint Decl. ¶19.) The parties also conducted several depositions. Defendants deposed all of the named Plaintiffs, except for Beverly Molnar. Plaintiffs took a 30(b)(6) deposition of Herbalife's designated Person Most Knowledgeable ("PMK"). (Joint Decl. ¶19).

Plaintiffs' counsel also investigated several Herbalife nutrition clubs and interviewed numerous members/distributors/consumers, both current and former. (Joint Decl. ¶20.) Finally, Plaintiffs' counsel participated in and oversaw anecdotal sampling of Herbalife's products, from its protein shakes, to its nutrition bars, to its energy and vitamin supplements. (Joint Decl. ¶20.)

Plaintiffs' counsel also inspected Herbalife's quality control facilities, research and development facilities, and corporate headquarters. (Joint Decl. ¶21.) At these locations, Plaintiffs' counsel conducted detailed interviews of several Herbalife executives and management personnel, including its Chief Financial Officer, its director of research and development, the manager of its Los Angeles distribution center, the director of its quality control division, the Vice President

Sales Strategy & Analysis, and the Vice President for Distributor Business & Compliance. (Joint Decl. ¶21.) There were no restrictions placed on the questions that were asked of these Herbalife personnel, except for attorney-client privilege. (Joint Decl. ¶21.)

First Amended Complaint. On July 2, 2014, the Court granted the parties' Stipulation to File First Amended Complaint. (Dkt. No. 76.) The First Amended Complaint, filed on July 7, 2014, added Anita Vasko, Judi Trotter, Beverly Molnar, and Chester Cote as plaintiffs. (Dkt. No. 78.) The First Amended Complaint also removed Plaintiffs' RICO causes of action. (Joint Decl. ¶14.) On August 15, 2014, the parties sought a 63 day extension of certain case management deadlines and Defendants' time to respond to Plaintiffs' First Amended Complaint. (Dkt. No. 82.) The Court granted this stipulation on August 20, 2014. (Dkt. No. 83.) And on October 17, 2014, the parties sought an additional two to three week extension of certain case management deadlines and Defendants' time to respond to Plaintiffs' First Amended Complaint. (Dkt. No. 84.) The Court granted this stipulation on October 22, 2014. (Dkt. No. 85.) Settlement was reached before Defendants had to respond to the First Amended Complaint.

Class Certification. Plaintiffs conducted a large amount of research, analysis and drafting in regard to class certification issues and also sought expert analysis from a well-respected economist in that regard. (Joint Decl. ¶22.) Plaintiffs, however, did not file a motion for class certification because the parties agreed to extend dates while settlement negotiations and formal and informal discovery continued. (Joint Decl. ¶26.) The parties reached settlement before Plaintiffs filed their motion for class certification.

**B.     The Mediation Process and Settlement Negotiations**

On December 9, 2013, the Court entered an order (the "ADR Order") directing the parties to hold proceedings with a private mediator as the ADR

Procedure best suited to the circumstances of this case under Civil Local Rule 26-1. (Dkt. No. 52.) Beginning on February 6, 2014, the parties began a three-step mediation process that allowed Plaintiffs to obtain significant discovery, exchange multiple mediation briefs involving various aspects of Plaintiffs' claims and Herbalife's defenses, and engage in thoughtful and often heated discussion about the merits and risks of the Action. (Joint Decl. ¶25.)

In all, Plaintiffs conducted five formal, essentially "all-day" mediation sessions with Judge Daniel Weinstein (Ret.) who is affiliated with JAMS from February through August 2014, and one additional mediation with his co-mediator, Cathy Yanni. (Joint Decl. ¶26.) In preparation for the mediations, including, inter alia, participating in the drafting of Plaintiffs' mediation briefs and draft motion for class certification, we researched and analyzed numerous published decisions, statutes, articles and treatises related to multi-level marketing cases in which it was alleged the defendant was operating a pyramid scheme, which had been litigated on a class action basis, and familiarized ourselves with the law applicable in the *Bostick* case. (Joint Decl. ¶26.)

In addition, we engaged in direct settlement conferences with Herbalife representatives and legal counsel in at least three additional in-person meetings and numerous telephone conferences. (Joint Decl. ¶27.) Throughout these mediations and settlement meetings, Plaintiffs asserted various positions, theories, arguments, evidence and facts to support the named Plaintiffs' claims and rebut Herbalife's asserted defenses. (Joint Decl. ¶29.) These meetings and negotiations were arms-length and often hotly contested. (Joint Decl. ¶¶27, 29.) It took months and significant effort, work, and legal and factual research to negotiate the monetary terms of the settlement, and once that was accomplished, the parties spent another three months negotiating non-monetary corporate policy changes. (Joint Decl. ¶30.) In the end, Judge Weinstein concluded that the monetary portion of the proposed settlement "is in a range that I believe reasonably reflects the

parties' factual, legal and damages positions." (Joint Decl. ¶28; Declaration of Hon. Daniel Weinstein (Ret.), filed concurrently herewith, ¶12.)

Moreover, to confirm Plaintiffs' valuation of the case, in the heat of these negotiations—and without giving any notice to Herbalife—Plaintiffs retained the Hon. James Larson (Ret.), a retired Chief Magistrate Judge of the Federal District Court for the Northern District of California, to provide Plaintiffs (only) with a neutral, independent valuation of the case given Plaintiffs' claims, alleged facts, factual and legal developments and Herbalife's factual and legal defenses.[1] (Joint Decl. ¶31.) On July 1, 2014, Plaintiffs' counsel met with Judge Larson for over four hours to discuss case evaluation, evidence, administration, weaknesses, and damages. (Joint Decl. ¶32.) Prior to the meeting, we provided Judge Larson with significant briefing and factual summaries highlighting both our perceived legal and factual strengths and weaknesses, including a draft motion for class certification, an in-depth written analysis of the strengths and weaknesses of both Plaintiffs' and Defendants' arguments, and copies of the key reported cases dealing with multi-level marketing and alleged pyramid schemes. (Joint Decl. ¶32.) At the conclusion of the July 1st meeting, Judge Larson provided Plaintiffs' counsel with an oral opinion as to a reasonable settlement range for all claims in the *Bostick* litigation. (Joint Decl. ¶32.) The settlement now being proposed to this Court by Plaintiffs is within the range that Judge Larson opined would be reasonable given the strength of Herbalife's defenses. (Joint Decl. ¶32 & Ex. A.)

---

[1] Thomas Foley had prior experience with Judge Larson when he was appointed as a Special Master by Judge Samuel Conti of the Northern District of California federal district court in *Beauperthuy et al. v. 24 Hour Fitness et al.,* Case No. C 06 0715 SC. In that case and in his role as Special Master, Judge Larson focused counsel on both sides on the strength and weaknesses of their respective cases, and demonstrated a capacity to help counsel on both sides realistically value the potential damages based on the strengths and weaknesses of their respective cases. Judge Conti also appointed Judge Larson to serve as the Special Master to prepare a report and recommendation on special hardship cases in a recent multi-level marketing case involving Amway, which had similar legal issues as the instant litigation, *Pokorny et al.* v. *Quixtar et al.,* Case Nom 3:07-cv-00201-SC. Plaintiffs' Counsels Joint Declaration in support of motion for preliminary approval, ¶ 26.

MEMORANDUM IN SUPPORT OF JOINT MOT. FOR PRELIM. APPROVAL OF SETTLEMENT

## C.     The Settlement Agreement

The Settlement Agreement provides economic relief for the Settlement Class through cash awards and refunds for returned product and also provides agreed upon corporate reform. (*See generally* Stipulation for Settlement, filed concurrently with the Joint Motion ("Settlement Agreement").) The economic value of the quantifiable aspects of the Settlement consists of $15 million in a cash fund and up to $2.5 million of additional cash for product returns. (Settlement Agreement § 4.1.) Herbalife also has agreed to make, or continue to implement, numerous changes to its business model for a contractually agreed upon period of three (3) years from the date of the Settlement. (Settlement Agreement § 5.) Taken together, almost all of the problems identified in the First Amended Complaint are addressed by the Settlement Agreement. The Settlement Agreement, which is attached to the Notice of Joint Motion and Joint Motion for Preliminary Approval of Class Action Settlement filed concurrently herewith, is summarized below.

### 1.     Economic Relief

#### a.     Cash Settlement Fund

A Cash Settlement Fund of $15 million will be created to pay Herbalife distributors/members who file valid claims (as described below), attorneys' fees and costs, and the costs of administering the Settlement. Claims for cash awards focus on compensating legitimate Business Opportunity Claimants, meaning those Class Members who joined Herbalife primarily to pursue a business opportunity (and not primarily for personal and/or family consumption of Herbalife products) and who, in total, lost money on Herbalife products pursuing that business opportunity. (Joint Decl. ¶¶34, 47; Settlement Agreement § 4.1.) The higher levels of Herbalife distributors/members (i.e., GET Team and above) are not part of the Class and thus are not eligible for any cash award to reduce conflicts between the class. (Settlement Agreement § 1.13.1.)

Specifically, the cash awards are based on Class Members' purchases of "Qualified Products" from Herbalife. A "Qualified Product" is one that was: (i) purchased for resale purposes; (ii) purchased from within the United States and shipped to the Claimant at a location in the United States; (iii) not sold for at least the cost of purchase; (iv) not returned through Herbalife's buyback program or Herbalife's satisfaction guarantee; and (v) not the subject of a claim for recovery from the Product Return Fund that has been filed pursuant to this Settlement. (Settlement Agreement § 4.4.) The Settlement Agreement creates two classes of awards based on the amount of Qualified Products purchased by claimants: (i) Pro Rata Awards, and (ii) Flat Rate Awards. (Settlement Agreement §4.4; Joint Decl. ¶49.) Each is discussed below.

Generally speaking, the claimants who purchased larger amounts of product are those more likely to have invested significant funds (possibly borrowed funds) in the purchase of product in order to obtain a higher distributor/member level. (Joint Decl. ¶49.) These claimants would have more product than would be reasonably self-consumed. (Joint Decl. ¶49.) Their large purchases also would suggest that they were seeking to obtain a higher distributor status in order to obtain a greater discount on future products such that they could more easily sell the product for a profit. (Joint Decl. ¶49).

Thus, the Cash Settlement Fund payments (whether Pro Rata or Flat Rate Awards) are designed to benefit those Class Members who were purchasing Herbalife products with the intent to resell those products for more than they paid, but who were unable to sell them for at least their cost. (Joint Decl. ¶53.) These payments address Plaintiffs' claims that the Herbalife business opportunity made it very difficult for those whose status was lower than "GET Team" and who really intended to pursue the business opportunity, to sell Herbalife products at a profit. (Joint Decl. ¶53.) At least some of the evidence obtained from Herbalife

suggests that these Class Members may make up less than one third (or possibly one quarter) of the total Settlement Class. (Joint Decl. ¶53.)

### i.   Pro Rata Awards

A claimant who purchased at least $750 of Qualified Products during any Claims Year may qualify for a pro rata award from the Cash Settlement Fund that is equal to the lesser of 100% of the estimated total loss from the sale of those "Qualified Products" or 50% of the price paid for the aggregate "Qualified Products." (Settlement Agreement § 4.4.5.) A Claims Year is a twelve month period beginning on the first day of the month in which a claimant became an Herbalife member and repeating each year thereafter. (Settlement Agreement § 4.4.4.) The 50% cap is used to ensure that a claimant is compensated only for his or her loss, and not more. (Joint Decl. ¶51.) The $750 threshold was selected because it would have been physically difficult, if not impossible, for someone purchasing that amount of product to have self-consumed it in a year. (Joint Decl. ¶51.) But, those claimants who may have been pursuing the business opportunity and purchased less than $750 of Qualified Products in a Claims Year could have—as an alternative to selling it at retail—simply self-consumed all or a large portion of the products. (Joint Decl. ¶51.) (Or, to the extent such claimants still have product that is unused and unopened, they could return it as part of this settlement. (Joint Decl. ¶51.)) They, therefore, obtained or could obtain a benefit from the Qualified Products despite their inability to sell it. (Joint Decl. ¶51.)

Finally, if claims exceed the amount available for Pro Rata Awards, these awards will be reduced on a proportional basis so that all valid claims can be paid. (Settlement Agreement § 4.4.5.)

### ii.   Flat Rate Award

Claimants who do not meet the $750 Pro Rata Award threshold but who otherwise meet the criteria of Business Opportunity Claimants will be entitled to a $20 Flat Rate Award to be paid from the Cash Settlement Fund. (Settlement

Agreement § 4.4.6.) The aggregate Flat Rate Award is capped at $3 million. (Settlement Agreement § 4.4.6.) If the aggregate Flat Rate Award exceeds this amount, Flat Rate Awards will be reduced on a proportional basis so that all valid claims can be paid. (Settlement Agreement § 4.4.6.) If the aggregate Flat Rate Award is less than $3 million, then the difference shall be available for Pro Rata Awards. (Settlement Agreement § 4.4.6.)

### iii.   *Cy Pres*

With respect to any funds remaining in the Cash Settlement Fund after payment of the Pro Rata and Flat Rate Awards, the parties agree that the Court may oversee the distribution of all such funds pursuant to the *cy pres* doctrine to the Consumer Federation of America – www.consumerfed.org, (Settlement Agreement § 4.1; Joint Decl. ¶54), or such other organization as the parties may agree upon and the Court approves.

### b.   Product Return Fund

Up to $2.5 million of funds in addition to the Cash Settlement Fund discussed above will be available to pay members or distributors who file valid claims for the return of unused and unopened products (excluding International Business Packs and Mini-International Business Packs). (Settlement Agreement § 4.2.) An additional $2.5 million from the Cash Settlement Fund described above may be used to pay for additional product returns if valid product return claims exceed the amount of the Product Return Fund. (Settlement Agreement § 4.1; Joint Decl. ¶42.)

More specifically, Class Members may submit claims for the return of unused and unopened products that they purchased more than one year prior to the deadline for submitting claim forms and after the beginning of the Class Period. (Settlement Agreement § 4.3.) Class Members already have the right to return unused and unopened product to Herbalife for one year, which is why the Settlement Agreement focuses on older product purchases. (Joint Decl. ¶43.) This

benefit to Class Members is significant in that Class Members may return unused and unopened product for a refund even if the shelf life (usually two years based on our investigation) of any such product has expired. (Joint Decl. ¶43.) The Product Return benefit addresses those Class Members who were unable to sell Herbalife products and did not want to consume them. (Joint Decl. ¶43.) It also provides a monetary benefit to those who may have spent significant funds to purchase product in an effort to qualify as a higher level member/distributor, but who thereafter could not sell the product and, given the purchased volume, could not consume it. (Joint Decl. ¶43.) These are the members who have product still in their possession, and who did not return it within Herbalife's one-year return period because they were trying to sell it at retail. (Joint Decl. ¶43.)

The Settlement Agreement requires that claimants: (1) identify any returned products by product SKU, which should be apparent and easily accessible on the product containers, (2) estimate the purchase date of the products to be returned (in order to determine if it was purchased outside Herbalife's normal return policy), and (3) provide the actual amount paid for each returned product so that the Claims Administrator can determine the amount of their benefit. (Settlement Agreement § 4.3.1; Joint Decl. ¶44.) If claimants are unable to provide the actual amount paid for the products, they can certify as much and provide an estimated payment. (Settlement Agreement § 4.3.1.) The Claims Administrator will calculate a claimant's payment as the lesser of her estimated payment or 50% of Herbalife's Suggested Retail Price for the product on the purchase date, i.e., the greatest amount of discount level available for claimants under Herbalife's Sales and Marketing Plan. (Settlement Agreement § 4.3.1; Joint Decl. ¶45.)

Finally, as an additional benefit, Herbalife will use its current product return process to retrieve or collect the products related to properly submitted claims, with no additional cost to claimants. (Settlement Agreement § 4.3.3; Joint Decl. ¶46.) And should any product be returned by means of shipping (whether through

Herbalife's product return process or otherwise), any shipping costs will be paid by settlement funds, not by claimants. (Settlement Agreement § 4.3.3; Joint Decl. ¶47).

### 2.    Corporate Reforms

The Settlement Agreement requires Herbalife to institute or maintain for three (3) years thirteen (13) specific corporate policies that benefit class members in a way related to the claims asserted in the First Amended Complaint. (Settlement Agreement § 5; Joint Decl. ¶35.)

One of the claims of the First Amended Complaint was that Herbalife violated California Business and Professions Code Sections 17200, *et seq*. and 17500, *et seq*. by charging its distributors or members a "Packaging and Handling" fee simultaneously with an "Order Shipping Charge." Plaintiffs claimed that assessing both fees illegally implied that the Order Shipping Charge was a pass-through charge and did not imply any additional income generation by Herbalife, which it in fact did. Herbalife asserted that the charges were not unfair or misleading. The Settlement Agreement addresses this claim by precluding Herbalife from simultaneously and separately charging its members a "Packaging & Handling" fee (or similar fee) and an "Order Shipping Charge" (or similar fee) as was done during the Class Period up until Herbalife adopted its Simplified Pricing Structure, when the two charges were combined into a single "Shipping & Handling" charge. (Settlement Agreement § 5; Joint Decl. ¶36.)

The First Amended Complaint also asserted Herbalife was an endless chain scheme in violation of Penal Code Section 327, and that it illegally encouraged its distributors to recruit other people to become distributors in order to buy large amounts of product that they could not sell. Herbalife denied the allegation in part on the basis that its products were heavily desired by the public and that the vast majority of its distributors became Herbalife distributors for purposes of self-

consuming Herbalife products, either personally, or as a family. (Settlement Agreement § 5; Joint Decl. ¶37.)

The Settlement Agreement addresses these issues in several ways. First, it requires Herbalife to acknowledge its self-consumption position by prohibiting it from defining all of its members as "distributors." Second, it requires implementation and enforcement of rules designed to promote the sale of product and further discourage recruitment over sales. The Settlement Agreement accomplishes this by requiring Herbalife to continue to (1) discourage its members from incurring debt to buy product, (2) pay the shipping charges for product that is legitimately returned by its members, (3) prohibit its members from selling leads to or purchasing leads from other members, (4) prohibit the purchase of product as a condition of being a member, (5) require experience and training of nutrition club members, and (6) maintain procedures for enforcement of these and other rules, including a member compliance department tasked with giving substance to these rules and policies. (Settlement Agreement § 5; Joint Decl. ¶38.)

The Settlement Agreement also ensures transparency of Herbalife member success and failure rates and numbers by requiring Herbalife to include its Statement of Average Gross Compensation (SAGC) of members with any membership application and a requirement that any applicant actually acknowledge having reviewed the SAGC. Moreover, the SAGC must contain the total number and percentage of all members who do not receive any compensation payment directly from Herbalife. In other words, Herbalife, cannot simply disclose those who made money with the Herbalife business opportunity in the preceding year (as it did for multiple years of the Class Period), but also must disclose those who simply chose to consume product or who made no money pursuing the business opportunity. Finally, the Settlement Agreement requires certain clarifications in language in the membership agreement and sales and marketing plan designed to make them less confusing in certain respects. These policies ensure that those

people investigating the Herbalife business opportunity are informed of the risks by showing statistics about those members who received no payments as well as those who did. (Settlement Agreement § 5; Joint Decl. ¶39.)

The changes in Defendants' corporate policies that Herbalife has implemented (or has agreed to implement) and agreed to continue to maintain for the three-year period outlined in the Settlement Agreement enhance and improve the protection of both members/distributors and consumers. (Joint Decl. ¶40.)

### 3.     Enforcement and Release

The Settlement Agreement provides that the thirteen corporate policy changes discussed above shall be continued for no less than three years from the date the Court issues final approval of the Settlement Agreement. (Settlement Agreement §5.1.1.) Accordingly, these corporate policy changes are contractually binding, and any Plaintiff or member of the Settlement Class could seek to enforce those mutually agreed upon terms of the Settlement Agreement if Herbalife violates them. And these potential future claims are not included within the scope of the Release.

In return for the economic and corporate policy changes provided in the Settlement Agreement, the Settlement Class will agree to fully release Herbalife from all claims that were or could have been raised in the complaints in this action. (Settlement Agreement §8.) Importantly, however, Plaintiffs' counsel is aware that the Federal Trade Commission and the Attorneys' General of New York and Illinois have publicly announced investigations into Herbalife's business practices. (Joint Decl. ¶62.) To ensure that this class action and settlement do not interfere with those ongoing investigations or similar investigations of which we are unaware or which possibly arise in the future, and to also permit settling class members to participate in the ultimate future outcomes of those administrative investigations, Plaintiffs' counsel insisted on the following language being included in the Settlement Agreement and proposed release:

"provided, however, that the Released Claims do not include

claims arising out of . . . (2) federal, state, or local government agency or similar authority retains sole jurisdiction and for which there is no private right of action accruing to the Settlement Class Members, either collectively or individually . . ."

(Joint Decl. ¶62.)

Also of significance, the proposed release does not extend to claims against any of the lead generation companies, who sell or sold in the past, lists of potential customers that might be interested in joining Herbalife (i.e., potential "leads") and materials that would supposedly help attract such leads. (Joint Decl. ¶63.) These types of companies have been publicly criticized for inducing new members/distributors to spend large sums of money on lists of potential leads and materials to attract potential leads that, in reality, had little value. (Joint Decl. ¶63.) Because the First Amended Complaint does not name such companies as defendants and because the proposed release does not extend to such companies, Plaintiffs and the Settlement Class remain free to bring viable claims on either a class or individual basis against such companies if actionable conduct occurred and resulted in economic loss. (Joint Decl. ¶63.) On a related note, one of the corporate policy reforms requires Herbalife to "maintain its rule prohibiting members from selling leads to other members or purchasing leads from any source, consistent with Rule 3.3.2 of Herbalife's Member Rules of Conduct." (Joint Decl. ¶63.)

In interviewing distributors who are class members, there were numerous complaints related to third parties, referred to in the multi-level marketing industry as "lead generators", who solicited class members to become Herbalife distributors, and then had the class members become members of the lead generators' "downlines". (Joint Decl. ¶41.) The lead generators then encouraged the class members to purchase lists of purported "leads" of individuals to whom they could sell product, and also to purchase training courses. (Joint Decl. ¶41.) Based on the corporate policy changes, Herbalife has instituted policies which will limit the

involvement of third party lead generators in selling additional services and products

to distributors and members. (Joint Decl. ¶41.) The lead generators are not released

by the terms of the Settlement Agreement, and class members may pursue claims

against lead generators for losses based on their interactions with the lead generators.

(Joint Decl. ¶41).

### 4.      Fees and Costs

In this case, attorneys' fees were not discussed at all until after the

substantive provisions of the Settlement Agreement had been reached. (Joint Decl.

¶64). The Settlement Agreement provides that Plaintiffs' Counsel may apply to the

Court at the Settlement Hearing for an award of attorneys' fees and reimbursement

of their expenses and costs from the Cash Settlement Fund in an amount to be

determined by the Court as a percentage of the value of the monetary terms of the

settlement as a common fund, in accordance with Ninth Circuit Court of Appeals

precedent and the pertinent law. (Settlement Agreement §10.) Plaintiffs' Counsel

will file a separate motion with the Court requesting an award of attorneys' fees,

costs to be reimbursed, and any enhancements from the Settlement Fund in

amounts consistent with established Ninth Circuit precedent. (Joint Decl. ¶64).

Plaintiffs' Counsel anticipates requesting an award of attorneys' fees of thirty

percent (30%) of the total combined economic value of the Monetary Fund, and

Product Return Fund to compensate Class Counsel for all work already performed

in the Action and all work remaining to be performed in documenting the

Settlement, securing Court approval of the Settlement, administering the

Settlement, ensuring that the Settlement is fairly administered and implemented,

and obtaining dismissal of the Action. (Joint Decl. ¶64). Although no additional

attorneys' fees are being requested based on the value of the corporate reforms, the

reforms do further justify the anticipated amount of requested attorneys' fees.

(Joint Decl. ¶64).

Both firms have at all times assumed the responsibility of litigating this Action on a contingent-fee basis and advancing all costs and expenses, such that any attorneys' fees would be paid only upon achieving a recovery for the benefit of Plaintiffs and the Class by settlement or judgment. (Joint Decl. ¶64). Plaintiffs' Counsel also anticipates requesting reimbursement of their expenses and costs from the Settlement Fund in an amount approximating $200,000. (Joint Decl. ¶64). Finally, Plaintiffs' Counsel in the separate motion will request an enhancement payment of $5,000.00 to each class representative, and $10,000.00 to Dana Bostick who served longer in the capacity as a class representative. (Joint Decl. ¶65.)

## II.   DISCUSSION

The parties' Joint Motion initiates the process for judicial approval of a class action settlement. *See* Fed. R. Civ. P. 23(e). When the parties to a putative class action reach a settlement agreement prior to class certification, as here, "courts must peruse the proposed compromise to ratify both the propriety of the certification and the fairness of the settlement." *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003). As discussed in turn below, Plaintiffs request that the Court: (A) certify the Settlement Class; (B) appoint Plaintiffs' counsel as class counsel; (C) preliminarily approve the Settlement Agreement; (D) order dissemination of notice to the class; and (E) schedule a fairness hearing.

### A.   The Court Should Certify the Settlement Class.

The Settlement Class consists of "all persons who are or were Herbalife members or distributors in the United States at any time during the Class Period," excluding "the Defendants, their employees, family members, and any member who has been a member of Herbalife's President's Team, Founder's Circle, Chairman's Club, Millionaire Team, or GET Team" and excluding "all Herbalife members or distributors who have agreed to be subject to the arbitration provisions of the Arbitration Agreement for Disputes Between Members and Herbalife contained in the Member Application Agreement revised during or after September

2013." (Settlement Agreement §1.13). Additionally, the Class Period means "the period beginning April 1, 2009, through and including the date the Preliminary Approval Order is entered." (Settlement Agreement §1.5).

The parties agree that the Court should certify the Settlement Class because the requirements of Rule 23(a) and (b)(3) are satisfied here, as discussed below.

### 1.    Rule 23(a)'s Requirements Are Satisfied

Class certification is appropriate if: "(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law and fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *United Steel, Paper & Forestry, Rubber, Mfg. Energy v. ConocoPhillips Co.*, 593 F.3d 802, 808 (9th Cir. 2010). Further, "Rule 23(a) states four threshold requirements applicable to all class actions," including those subject to a proposed settlement agreement. *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997). And consumer protection claims, like several of the claims at issue here, are ideal for class certification. *See, e.g., Amchem Prods,* 521 U.S. at 625; *In re First Alliance Mortg. Co.*, 471 F.3d 977, 992 (9th Cir. 2006); *California v. Levi Strauss & Co.*, 41 Cal.3d 460, 471 (1986); *Vasquez v. Superior Court,* 4 Cal.3d 800, 808 (1971); *Daar v. Yellow Cab Co.*, 67 Cal.2d 695, 704 (1967); *Ballard v. Equifax Check Servs., Inc.*, 186 F.R.D. 589, 600 (E.D. Cal. 1999) ("Class action certifications to enforce compliance with consumer protection laws are 'desirable and should be encouraged.'"). As detailed below, each of the four requirements is satisfied in this instance.

### a.    Numerosity

Based on discovery to date and data from Herbalife, Plaintiffs estimate that

the Settlement Class consists of approximately 1.3 million former and current members/distributors. Clearly, "the [Settlement C]lass is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a).

### b.   Commonality

Rule 23(a)(2) requires there to be "questions of law or fact common to the class." This Rule "has been construed permissively" and may be met by just one common issue of law or a common core of facts. *Hanlon v. Chrysler Corp.*, 150 F. 3d 1011, 1019 (9th Cir. Cal. 1998); *see also In re First Alliance Mortg. Co.*, 471 F.3d 977, 990-91 (9th Cir. 2006). Commonality under Rule 23(a)(2)—as distinguished from predominance under Rule 23(b)(3)—is liberally construed.

To establish commonality, Plaintiffs must show that "the class members have suffered the same injury . . . [, and their claims] depend upon a common contention . . . of such nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (internal quotation marks and citations omitted). In *Dukes*, the Supreme Court stated: "What matters to class certification . . . is not the raising of common 'questions'—even in droves—but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation." *Id.* at 2554.

Here, common answers to common questions drive the litigation. For example:

- Did Herbalife operate an endless chain as prohibited by California Penal Code section 327?

- Did Herbalife require the payment of money for (a) the right to sell a product and (b) the right to receive, in return for recruiting others, rewards that were unrelated to the sale of the product to retail consumers?

- Does Section 327 allow the *Amway* rules as safeguards or require similar rules as safeguards?
  - If yes, what were the safeguards, were they effective, and were they enforced by Herbalife?
- Does Herbalife's Marketing Plan and the representations made under that plan regarding the alleged "business opportunity" constitute an unfair and/or deceptive trade practice under California Business and Professions Code Section 17200, *et seq*. and/or false advertising under California Business and Professions Code Section 17500, *et seq*.?
- Did Herbalife's Statement of Average Gross Compensation of U.S. Supervisors for years 2008, 2009, 2010, 2011, 2012 and 2013 contain misrepresentations or omissions?
  - If yes, can reasonable minds differ on the question of materiality of such misrepresentations or omissions?

These questions, and many others like them, would generate answers common to the class. They do not turn based on the individual class members considered, and the answers to these questions have driven and would continue to drive this litigation. As a result, the Court should find that "there are questions of law and fact common to the class." Fed. R. Civ. P. 23(a).

### c.    Typicality

Claims are "typical" for Rule 23(a)(3) if they: "(1) arise[] from the same event or practice or course of conduct that gives rise to the claims of other class members; and (2) [are] based on the same legal theory as their claims." *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 648 (C.D. Cal. 1996), citing *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992). "The purpose of the typicality requirement is to assure that the interest of the named representative aligns with the interests of the class." *Wolin v. Jaguar Land Rover North Am., LLC*, 617 F.3d 1168, 1175 (9th Cir. 2010). "Under the rule's permissive standards, representative claims are

'typical' if they are reasonably coextensive with those of absent class members; they need not be substantially identical." *Staton*, 327 F.3d at 957, quoting *Hanlon* 150 F. 3d at 1020. "[T]he requirement may be satisfied even though varying fact patterns support the claims or defenses of individual class members or there is a disparity in the damages claimed by the representative parties and the other members of the class." 7A Charles A. Wright, Federal Practice and Procedure § 1764 at 235- 41; *see also Arnold v. United Artists Theatre Circuit, Inc.*, 158 F.R.D. 439, 449 (N.D. Cal. 1994). "Factual variations are not fatal to a proposed class when the claims arise out of the same remedial and legal theory." *Sullivan v. Chase Investment Services of Boston, Inc.*, 79 F.R.D. 246, 257 (N.D. Cal. 1978).

Here, the named Plaintiffs and the Settlement Class members have suffered losses because of their shared experience as Herbalife members/distributors, and all parties have the same legal claims arising from Herbalife's operations identified in the First Amended Complaint. Plaintiffs' counsel are not aware of any conflicts of interest between the named Plaintiffs and the Settlement Class, and, thus, the typicality requirement is satisfied. *See, e.g.*, *Wolin*, 617 F.3d at 1176 (finding that typicality requirement was satisfied notwithstanding some factual variations among plaintiffs' situations); *see also In re Matter of Johnson*, 80 B.R. 791, 796 (E.D. Va. 1987) (applying Rule 23 and concluding that "the plaintiffs' claims are clearly typical of the class: like all members of the proposed class, the plaintiffs are defrauded investors in Johnson's pyramid scheme").

### d.    Adequacy

Rule 23(a)(4) only permits certification of a class action where "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). In determining whether the representation meets this standard, courts must ask (1) whether the representative plaintiffs or counsel have any conflicts of interest with other class members and (2) whether the class is represented by qualified and competent counsel. *See Connecticut Ret. Plans &*

*Trust Funds v. Amgen, Inc.*, No. CV07-2536PSG, 2009 WL 2633743, at *6 (C.D. Cal. Aug. 12, 2009) aff'd, 660 F.3d 1170 (9th Cir. 2011) aff'd, 133 S. Ct. 1184, (2013); *Dukes*, 603 F.3d at 614. Here, and as detailed below, the five named Plaintiffs' interests are aligned with those of the proposed Settlement Class, there are no conflicts of interest, and the Plaintiffs are adequate representatives of the proposed Settlement Class. Further, Plaintiffs and the Settlement Class are represented by competent counsel who has extensive experience in complex class actions and substantial knowledge of the legal and factual issues involved in this litigation. Thus, the Court should find that the class is adequately represented both by Plaintiffs and Plaintiffs' counsel.

### i.   There Are No Significant Conflicts of Interest.

A named plaintiff cannot simply be disqualified because a conflict of interest allegedly exists. Only a conflict of interest that is "apparent, imminent, and on an issue at the very heart of the suit" will disqualify a named plaintiff from representing a class. *Blackie v. Barrack,* 524 F.2d 891, 909-10 (9th Cir. 1975); *see also Petrovic v. Amoco Oil Co.,* 200 F.3d 1140, 1145 (8th Cir. 1999) (only "stark conflicts" create an adequacy issue); *In re MetLife Demutualization Litig.,* 689 F.Supp.2d 297, 351 (E.D.N.Y. 2010) (same). Named plaintiffs may represent a class in the face of conflicts that are "peripheral, and substantially outweighed by the class members' common interests." *Blackie,* 524 F.2d at 909-10. Here, Plaintiffs' interests are aligned with the class, and there are no conflicts relating to issues at the heart of this case.

First, any alleged differences between Plaintiffs and the Settlement Class relating to the amount of product purchased do not create a conflict of interest. The *type* of injury the Plaintiffs have suffered is consistent among Class Members. And the fact that Class Members will obtain varying relief (here, based on the amount of Qualifying Products purchased) is "not unusual," as "[a]lmost every settlement will involve different awards for various class members." *In Re Pet*

*Foods Prod. Liab. Litig.,* 629 F.3d 333, 346 (3rd Cir. 2010); *see also* 8 Newberg on Class Actions§ 12:15.

Second, Plaintiffs' status as past distributors does not create a conflict with class members who have not terminated their membership/distributorship. Under the terms of the Settlement Agreement, Herbalife members/distributors, *including those that have not yet terminated their membership/distributorship*, can bring a claim under the terms of the Settlement Agreement. In addition, the claims being made by the Settlement Class are against Herbalife, not Herbalife's members/distributors.

Third, and consistent with the foregoing, settlement here does not preclude any potential claims that Settlement Class members/distributors may have against third party lead generators, some of whom might possibly be or have been Herbalife members/distributors. (Joint Decl. ¶41.) As detailed above, such claims have not been brought in this lawsuit and are not being released by this settlement. Plaintiffs and the Settlement Class can pursue separate causes of action against any person or entity other than Herbalife, including lead generation companies. (Joint Decl. ¶41.) Thus, differences in Plaintiffs' and Class Members' recruitment experience, to the extent such differences exist, should not complicate settlement with Herbalife. In any event, the existence of potential claims against uplines or downlines is inherent in pyramid scheme litigation and is not a "disabling conflict" that warrants denial of class certification. *See Nguyen v. FundAmerica, Inc.,* No. 90-2090, 1990 WL 165251, *2 (N.D. Cal. Aug. 20 1990).

Finally, the named Plaintiffs have actively participated in strategy, discovery and settlement negotiations, and they have aggressively sought monetary relief for the class—focusing on those who suffered greater loss from pursuing the Business Opportunity—as well as corporate reform that will benefit current and future members/distributors. (Joint Decl. Exs. B, C, D, E & F).

In the end, issues relating to the distribution of monetary relief and whether claims against individual members exist, "while undoubtedly important, are nevertheless subordinate to the main issue in this case"–whether Defendants are liable under the California Penal Code, Civil Code, and Business and Professions code as alleged in the complaint. *See Amgen, Inc.*, 2009 WL 2633743, at *7. Therefore, Plaintiffs are adequate representatives of the Class and any alleged conflicts that exist are peripheral or subordinate to the core interests common to the Class and its Representatives.

### ii. Plaintiffs Are Represented by Qualified and Competent Counsel.

Plaintiffs' counsel working on this matter has substantial experience in class action litigation as well as in suits involving violations of the Fair Labor Standards Act, consumer fraud claims, and multiple suits involving Ponzi schemes. (Joint Decl. ¶¶6-10.) More specifically, Thomas Foley and the law firm of Foley, Bezek, Behle & Curtis, LLP have prosecuted class action litigation totaling over $400,000,000 in approved settlements. (Joint Decl. ¶6.) Scott Petersen, Jason Hardin, Philip Dracht and the law firm of Fabian & Clendenin also have particular expertise litigating suits involving California Business and Professions Code Sections 17200 and 17500, and defending large class action lawsuits in California and elsewhere. (Joint Decl. ¶9.)

Plaintiffs' counsel does not have any conflicts of interest with the Settlement Class and are prepared to prosecute this complex action through resolution, either by settlement or through continued litigation. (Joint Decl. ¶24.)

Further, Plaintiffs' counsel's experience and resources are sufficient to satisfy the adequacy requirements of Rule 23(a) and Rule 23(g). *See Xiufang Situ v. Leavitt,* 240 F.R.D. 551, 562 (N.D. Cal. 2007); *Wiener v. Dannon Co., Inc.,* 255 F.R.D. 658, 672 (C.D. Cal. 2009). In the absence of affirmative evidence that Plaintiffs' chosen counsel is inadequate, Plaintiffs' choice should be respected.

*See Mateo v. MIS KISO,* 805 F. Supp. 761, 771 (N.D. Cal. 1992); *Willits v. City of Los Angeles*, No. CV 10-05782 CBM RZX, 2011 WL 7767305 at *4 (C.D. Cal. Jan. 3, 2011) ("Adequate representation is usually presumed in the absence of contrary evidence."). Accordingly, this Court should find that the Settlement Class is represented by qualified and competent counsel.

### 2.    Predominance and Superiority

"In addition to satisfying Rule 23(a)'s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3)." *Amchem Prod.*, 521 U.S. at 614. Here, the parties jointly move for certification pursuant to Rule 23(b)(3), which states that a class may be maintained if "the court finds that questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems." *Amchem*, 521 U.S. at 620; *see also* Fed. R. Civ. P. 23(b)(3)(D). Admittedly, however, "other specifications of the Rule" are "designed to protect absentees by blocking unwarranted or overbroad class definitions." *Amchem*, 521 U.S. at 620.

Thus, in deciding whether to certify a settlement class under Rule 23(b)(3), the Court should consider the factors relevant to assessing superiority:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; [and] (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum….

Fed. R. Civ. P. 23(b)(3)(A)-(C). The Court also should consider the substance of the parties' proposed Settlement Agreement insofar as it sheds light upon the

adequacy of absent class members' representation in the litigation and whether the class definition is unwarranted or overbroad. *Amchem*, 521 U.S. at 619-20.

Further, the Court should take note that other "federal courts have upheld the predominance of common issues, and lack of disabling conflict in the pyramid scheme context, and have granted certification to comprehensive plaintiff classes in cases arising from similar multi-level pyramid schemes." *Nguyen v. FundAmerica, Inc.*, 1990 WL 165251, *2 (N.D. Cal. 1990). As discussed below, the Court should reach the same conclusion here because all of the factors contemplated by Rule 23(b)(3) weigh in favor of certification.

First, the value of any individual Settlement Class Member's claim is likely to range from tens of dollars up to possibly ten thousand dollars for a small portion of the Settlement Class. Though these are significant sums, they are not large enough to justify the cost of bringing an individual suit based on an endless chain or consumer fraud, especially given that none of the underlying statutes provide for recovery of attorneys' fees. Thus, Settlement Class members have only minimal interests in individually controlling prosecution of the lawsuit. Of course, if a potential Settlement Class member *would* like to assert his or her own claim, he or she can opt-out of the class and do so. *See*, *e.g.*, *In re Conseco Life Ins. Co. Cost of Ins. Litigation,* No. 04-1610, 2005 WL 5678842, *9 (C.D. Cal. Apr. 26, 2005) (certifying class but allowing opt outs "because some plaintiffs with large claims may prefer to pursue actions individually").

Second, although there have been lawsuits in the past concerning Herbalife's business opportunity, Plaintiffs' counsel is unaware of any litigation currently pending in either state or federal court against Herbalife that involve any of the claims that are being released. And Plaintiffs' counsel is unaware of any competing class action having been filed. In reaching these conclusions, Plaintiff's counsel inquired of such cases from Herbalife and also conducted numerous searches on Google, Westlaw, and the nationwide Pacer case locator. (Joint Decl.

¶73.) Plaintiffs suggest that the absence of such additional or competing lawsuits indicates that this class action is a superior mechanism to resolve these claims. Indeed, this case has progressed through the court system for over a year and a half and represents the Settlement Class members' opportunity for a meaningful recovery.

Third, it is desirable to concentrate this litigation as a class action before this Court, which now has a familiarity with the factual and legal issues involved.

Fourth, absent class members have been adequately represented in this litigation, and the class definition is neither unwarranted nor overbroad. As noted above, Plaintiffs' counsel negotiated a fair release that retains Settlement Class members' ability to participate in any later-obtained government settlement and to separately sue any third party lead generation company. Further, the proposed Settlement Agreement allows Settlement Class members to opt-out if they so choose. And as detailed above, the Settlement Agreement provides substantial economic benefits for absent class members who have old product and want to return it and who suffered losses trying to pursue the Herbalife business opportunity. Finally, the Settlement Class excludes the higher levels of Herbalife members/distributors, who likely made money given their level in the system and also those who signed an arbitration agreement. As a result, the class definition is warranted and tailored to those who potentially could have suffered an economic loss from a failed attempt at pursuing the Herbalife business opportunity.

Accordingly, each of the Rule 23(b)(3) factors weighs in favor of certification. Additionally, common issues of law and fact predominate because the central issue in this litigation, namely, whether elements of Herbalife's business model and Marketing Plan, as set forth in the First Amended Complaint, are consistent with state and federal law. Because that business model is and has been very consistent with respect to marketing, recruitment, pricing, and related activities, the allegations of the First Amended Complaint can be litigated on a

class-wide basis by analyzing Herbalife's business model and class-wide practices. For these reasons, the Court should find that common issues predominate and that a class action is a superior form of resolving the claims against Herbalife.

### B.     The Court Should Appoint Plaintiffs' Counsel as Class Counsel

After certifying the Settlement Class, the court should appoint Plaintiffs' counsel as Class Counsel. Rule 23(g)(1)(B) provides that "a court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1)(B). In making that appointment, a court must consider (1) the work counsel has been done in identifying or investigating potential claims; (2) counsel's knowledge of applicable law; (3) counsel's experience in handling matters of the sort; and (4) the resources that counsel will commit to representing the class. *Id*. Each factor weighs in favor of appointing Foley, Bezek, Behle & Curtis, LLP and Fabian & Clendenin, P.C. as joint Class Counsel. (The analysis applicable here also confirms that the class is adequately represented, as required under Rule 23(a), discussed above.)

Plaintiffs' counsel has spent many hours investigating, researching and analyzing the claims alleged in the Complaint and First Amended Complaint defending against Defendants' Motion to Dismiss, conducting massive amounts of legal research and analysis; requesting, fighting for, and reviewing approximately 148,000 pages of documents and a large database of customer information from Defendants; consulting and working with multiple experts, defending and taking depositions, conducting site inspections, participating in extensive mediations and settlement negotiations, etc. (Joint Decl. ¶¶15-22.)

Additionally, Plaintiffs' counsel has extensive knowledge of the applicable law through their involvement in similar litigation and in pursuing the claims in this case. The strength of counsel's legal work on this case is evident from their defeating Herbalife's motion to dismiss and convincing Herbalife to produce large

MEMORANDUM IN SUPPORT OF JOINT MOT. FOR PRELIM. APPROVAL OF SETTLEMENT

amounts of information and documents after being presented with a ninety-four (94) page [Joint] Stipulation on a Motion to Compel. As stated above, Plaintiffs' counsel has prosecuted and defended multiple claims based on the same principles of law at issue in this case.

Further, Plaintiffs' counsel are well-respected class action attorneys, whose firms have handled scores of complex cases resulting in well over $400,000,000 in relief for class members. *See, e.g.*, *In Re Structured Settlement Litigation*, LASC Case No. BC 244111 (a national class action involving a Ponzi Scheme, which resulted in settlements of $124 million paid by, inter alia, Bankers Trust Company, Merrill Lynch, and Wells Fargo Bank); *Internal Revenue Service ("IRS") §1031 Tax Deferred Exchange Litigation*, Federal District Court of Nevada, Case No. 2:07-cv-1394 (a national class action involving a Ponzi scheme which resulted in settlements in excess of $98 Million paid by, inter alia, Union Bank of Switzerland and Smith Barney & Company); *Hunter v. Okun, et al.*, Federal District Court for the Northern District of California, Case No. 09-cv-02079JW(RSx) (a national class action involving a Ponzi scheme for which approximately $98 Million in settlements have been preliminarily approved by the Court); *Roark v. GTE*, Santa Barbara Superior Court Case No.01035862 (a California $18.5 Million class action settlement). (Joint Decl. ¶6).

In light of the experience of FBBC and Fabian and their extensive involvement and work in this case, the Court should appoint them jointly as class counsel.

## C.     The Court Should Preliminarily Approve the Settlement.

Having certified a Settlement Class and appointed Class Counsel, the Court should preliminarily approve the Settlement Agreement. Though technically not required, it is common for district courts to make a preliminary assessment of proposed class action settlement agreements. *See* 7B Fed. Prac. & Proc. Civ. § 1797.5 (3d ed.) ("[T]he rule does not require or suggest that the court should

preliminarily approve the fairness of a proposed settlement before sending notice to the class, although some courts have followed that approach."). Whereas final approval of a class action settlement is mandatory and requires a finding that the settlement is "fair, reasonable, and adequate," *see* Fed. R. Civ. P. 23(e), preliminary approval should be granted so long as the proposed settlement "contains some merit, is within the range of reasonableness required for a settlement offer, or is presumptively valid." *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (internal citations omitted). And as many district courts have identified, analyzing a class action settlement begins with a presumption that a class settlement is fair and should be approved if it is the product of arm's-length negotiations conducted by capable counsel with extensive experience in complex class action litigation. *See* 4 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions,* § 11:41 (4th ed. 2006).

Thus, at the preliminary approval stage, a court determines whether a proposed settlement is "within the range of possible approval" and whether or not notice should be sent to class members. *In re M.L. Stern Overtime Litigation*, 2009 U.S. Dist. LEXIS 31650 (S.D. Cal. 2009); *see also In re Corrugated Container Antitrust Litig.,* 643 F.2d 195, 205 (5th Cir. 1981). In determining whether a settlement is fair, reasonable, and adequate, courts balance several factors, including:

> the strength of plaintiffs' case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the

presence of a governmental participant; and the reaction of the class members to the proposed settlement.[2]

*Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1291 (9th Cir. 1992), citing *Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615, 625 (9th Cir. 1982).

All of the aforementioned considerations have been met here: Plaintiffs' counsel has extensive experience in class action litigation, (Joint Decl. ¶¶6-10), the settlement was reached only after ample discovery and investigation, (Joint Decl. ¶¶15-22), the settlement was reached only after extensive arm's-length mediation facilitated by an experienced mediator, Honorable Daniel Weinstein (Ret.), substantial additional negotiations about the specific terms of the settlement, and a Plaintiffs-only, independent case valuation by another experienced mediator, Hon. James Larson (Ret.), (Joint Decl. ¶¶25-32). *See M. Berenson Co. v. Faneuil Hall Marketplace, Inc.*, 671 F. Supp. 819, 822 (D. Mass. 1987) ("Where, as here, a proposed class settlement has been reached after meaningful discovery, after arm's length negotiation, conducted by capable counsel, it is presumptively fair" (citation omitted)).

Further, as set forth below, the factors identified in *City of Seattle* weigh heavily in favor of preliminary approval of the proposed settlement.

**1.    The Strength of Plaintiff's Case, the Complexity, Expense and Likely Duration of Further Litigation, the Risk of Obtaining Class Action Status, and the Risk of Prevailing at Trial All Weigh in Favor of Preliminary Approval.**

There were a number of obstacles facing the *Bostick* litigation if it did not settle. While Plaintiffs' counsel for the class is confident, in the absence of a settlement, there would be several risks associated with this case going forward.

---

[2] Case law has held that this factor is often better gauged at the final approval hearing. *See Sandoval v. Tharaldson Employee Mgmt.*, 2009 U.S. Dist. LEXIS 111320 (C.D. Cal. November 19, 2009).

*First,* Defendants have contested liability and class certification vigorously in this case, and it is believed that Defendants would continue to vigorously oppose the merits of the claims even in the event certification is granted. While Plaintiffs' Counsel is confident in obtaining class action status, and in ultimately prevailing at trial, there are always risks inherent in litigation, and the class acknowledges that there are always challenges in proving liability and damages, as well as the possibility that Defendants will raise meritorious defenses to the claims. This is especially true in class action litigation. As one court observed:

> It is known from past experience that no matter how confident one may be of the outcome of litigation, such confidence is often misplaced. Merely by way of example, two instances in this Court may be cited where offers of settlement were rejected by some plaintiffs and were disapproved by this Court. The trial in each case then resulted unfavorably for plaintiffs; in one case they recovered nothing and in the other they recovered less than the amount which had been offered at settlement.

*West Virginia v. Chas. Pfizer & Co.*, 314 F. Supp. 710, 743-44 (S.D.N.Y. 1970), aff'd, 440 F.2d 1079 (2d Cir. 1971), *cert. denied*, 404 U.S. 871 (1971) but disapproved on other grounds by *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977).

*Second*, and more specifically, although Plaintiffs successfully opposed Herbalife's Motion to Dismiss, there remain substantial arguments that Herbalife has made, and which it could make on summary judgment or at trial should the Action continue to be litigated. (Joint Decl. ¶55.) For example, based on the results of multiple surveys, Herbalife claims that approximately 73% of its participants became members/distributors for the purpose of purchasing product for self-consumption, as opposed to pursuing the business opportunity. (Joint Decl. ¶56.) If proven to be true, following Herbalife's arguments, a finder of fact could find that such members/distributors have *not* paid "valuable consideration

for the chance to receive compensation for introducing one or more additional persons into participation in the scheme or for the chance to receive compensation when a person introduced by the participant introduces a new participant." Cal. Penal Code. 327. (Joint Decl. ¶56.) Instead, such members/distributors could be found to have been "not purchasing in order to participate in the scheme," but instead purchasing to consume Herbalife products, which a fact-finder could reasonably conclude is not a violation of Section 327. (Joint Decl. ¶56.) In this way, Herbalife claims to be more like a buyer's club (e.g., Costco or Sam's Club) than a pyramid scheme. (Joint Decl. ¶56.)

Plaintiffs obtained the underlying surveys in discovery. (Joint Decl. ¶57). In the opinion of Plaintiffs' counsel, the survey questions and limited response options could have been better. (Joint Decl. ¶57). Despite such shortcomings, the surveys could be persuasive and increase the risk for continued litigation. (Joint Decl. ¶57). Indeed, another survey with a differently framed question found that approximately half of respondents joined Herbalife with no expectation of making any money at all. (Joint Decl. ¶57). This too could undercut Plaintiffs' endless chain theory. (Joint Decl. ¶57.)

In addition to §327, Plaintiffs also claim violations of Business & Professions Code Sections 17200 and 17500 for unlawful, fraudulent and deceptive representations and false advertising regarding the "business opportunity" of Herbalife. Plaintiffs claim Herbalife (through its IBP, mini-IBP, publications, etc.) promises wealth, success, and opportunity, filled with luxury homes, cars, spacious ranches, and vacations. (Joint Decl. ¶58.) Plaintiffs claim very few that become Herbalife distributors can achieve the claimed results because the system is designed for failure. (Joint Decl. ¶58.) Distributors buy product at inflated prices to pay the few at the top. (Joint Decl. ¶58.) They pay inflated and misleading shipping, handling, and freight charges. (Joint Decl. ¶58.) And in the end, they cannot sell any Herbalife product at a price near Herbalife's

SRP. (Joint Decl. ¶58.) Further, until recently, Herbalife only disclosed the winners in its business opportunity and failed to disclose the hundreds of thousands of members/distributors each year that make no money (i.e., the 88 plus percent of members/distributors who received no payments from Herbalife in a year). (Joint Decl. ¶58.) Plaintiffs claim that had the truth been told to class members before joining or during the period in which they could renounce their distributorships, they would not have joined Herbalife in the first place or would quickly ask for their money back. (Joint Decl. ¶58.)

In response, Herbalife states, and has produced some documents and information indicating, that it has policies and procedures prohibiting its members/distributors from making false or misleading statements about Herbalife or its products and that Herbalife enforces those policies and procedures. (Joint Decl. ¶59.) Second, Herbalife claims that the stories and characterizations it provides are not indicative of ensured results and that such caveats are clearly noted in its Marketing Plan and various promotional material. (Joint Decl. ¶59.) Third, and potentially of most significance, Herbalife claims, and has produced some documents and information indicating, that, since it began to publishing the information regarding the winners and losers in its 2012 Statement of Average Gross Compensation, the number of people becoming new Herbalife members *has not declined at all*. (Joint Decl. ¶59.) In fact, new memberships have increased. (Joint Decl. ¶59.) In other words, Herbalife argues that after it began disclosing more information about those who received no payment from Herbalife in its SAGCs, there was no "impact" on the number of people who wanted to become Herbalife members. (Joint Decl. ¶59.) Although not dispositive, such evidence underscores the risks inherent in continued litigation. (Joint Decl. ¶59.)

Overall, based upon (1) the extensive formal and informal discovery to date, (2) the review and analysis of all of the documents produced by Herbalife as well as others obtained through independent investigation, (3) the claims and defenses

asserted by the parties, (4) the massive amounts of legal research and analysis performed, (5) detailed expert analyses, (6) the independent case valuation of Judge Larson, (7) analyses and discussions with the mediators, (8) the corporate reforms that Defendants have agreed to implement and maintain regarding the manner in which they operate their business with regard to distributors/members, and (9) the totality of the circumstances, Plaintiffs' Counsel believes a finder of fact could reasonably conclude that Herbalife is not currently in violation of California Penal Code Section 327 as Plaintiffs' Counsel understands that statute has been and is being enforced. (Joint Decl. ¶60.) Furthermore, Plaintiffs' Counsel believes a finder of fact could reasonably conclude that: (1) there is substantial demand for Herbalife's products for personal and/or family consumption by both non-members and members and (2) a vast majority of Herbalife members become members primarily for that purpose. (Joint Decl. ¶60.) Plaintiffs' Counsel is not stating that such conclusions are in fact true or that the law compels such conclusions. (Joint Decl. ¶60.) Indeed, a finder of fact could reasonably conclude otherwise. (Joint Decl. ¶60.) But, these statements explain some of the rationale for why settlement at this point in time is fair, adequate, and reasonable under the circumstances.[3] (Joint Decl. ¶60.)

*Third*, based on discovery and investigation conducted to date, it also appears there would be complicated damages issues in view of the difficulties in valuing the damage or estimating the impact that can be attributed to Defendants former corporate policies as applied to members/distributors.

---

[3] Plaintiffs' counsel certainly is not making, or intending to make, any admissions in regard to the claims or facts at issue herein, as the Settlement Agreement expressly notes. (Settlement Agreement §3.2; Joint Decl. ¶60.) Also, Plaintiffs' counsel—and no doubt the Court—is aware of third party hedge fund investors who have substantial economic self-interest in Herbalife's business model not being successful, or being successful. Plaintiffs' counsel has scrupulously avoided becoming involved in any way with representatives of either of those groups and has instead focused on litigating this case and, if possible, settling the claims in the best interests of the Settlement Class based on a reasonable assessment of the risks and benefits. (Joint Decl. ¶61.)

MEMORANDUM IN SUPPORT OF JOINT MOT. FOR PRELIM. APPROVAL OF SETTLEMENT

*Lastly*, there would be extensive discovery regarding the class damages, and the calculation of damages or impact would have required expert analysis. There was extensive document production in this case, and Plaintiffs' Counsel have consulted with an economist expert witness regarding calculating damages on a class-wide basis and the complexities of such calculations. (Joint Decl. ¶22.)

Overall, these factors weigh in favor of preliminary approval of the settlement.

## 2. The Settlement Amount and Corporate Reforms Are Significant and Fair and Support Preliminary Approval.

As discussed in detail above, the Settlement Agreement confers significant benefits upon the Settlement Class. It provides for substantial product refunds beyond Herbalife's normal one year return period and for product that has expired, so long as it is unopened and unused. The Settlement Agreement also provides substantial monetary awards, divided into Pro Rata and Flat Rate Awards, dependent upon the quantified or estimated loss. And lastly it provides substantial corporate reform that is contractually guaranteed for three years.

In addition, a "participant in an endless chain scheme, as defined in Section 327 of the Penal Code, may rescind the contract upon which the scheme is based and may recover all consideration paid pursuant to the scheme, less any amounts paid or consideration provided to the participant pursuant to the scheme." Cal. Civ. Code § 1689.2. As argued by the parties in the Motion to Dismiss, there is a disagreement as to whether damages under the Endless Chain Scheme are limited to rescission (Defendants' position) or if they can also include restitution (Plaintiffs' position). California Civil Code section 1689.2 is silent as to general damages. The Product Return Fund component of the proposed settlement addresses the issue of class members obtaining a full refund for product returned, representing the rescissionary remedy. In addition, qualifying class members are entitled to a cash payment from the Business Opportunity Fund, representing a restitutionary remedy

because it is centered around losses incurred in the retailing of the product purchased by class members.

Finally, "[i]n order to assess the reasonableness of a settlement in cases seeking primarily monetary relief, 'the present value of the damages plaintiffs would likely recover if successful, appropriately discounted for the risk of not prevailing, should be compared with the amount of the proposed settlement.'" *In re Warfarin Sodium Antitrust Litigation*, 391 F.3d 516 (3rd Cir. 2004). The Settlement Agreement here was the product of lengthy settlement negotiations conducted under the supervision of a well-respected former judge with an independent analysis by another well-respected former judge. The declarations of these former judges, Judge Weinstein (Ret.) and Judge Larson (Ret.), filed in support of this Joint Motion for Preliminary Approval of Settlement confirm that the monetary component of the proposed settlement is substantial and reasonable. (Joint Decl. ¶¶ 28, 32.)

When viewed in light of the potential risks discussed above as well as the fact that, in the absence of the settlement, class members might not get any monetary recovery at all, the Court should find that the settlement is significant and fair, which weighs in favor of preliminary approval of the proposed settlement.

### 3.    The Extent of Discovery Completed and the Stage of the Proceedings Support Preliminary Approval.

This factor requires the Court to evaluate whether "the parties have sufficient information to make an informed decision about settlement." *Linney v. Cellular Alaska P'ship*, 151 F.3d 1234, 1239 (9th Cir. 1998). The status of the litigation and discovery is discussed in detail in paragraphs 11 to 22 of the Joint Declaration. As the Ninth Circuit reiterated, "[i]n the context of class action settlements, 'formal discovery is not a necessary ticket to the bargaining table' where the parties have sufficient information to make an informed decision about settlement.'" *In re Mego Financial Corp. Sec. Litig.*, 213 F.3d 454, 459 (9th Cir. 2000). In this instance, discovery and investigation by Plaintiffs' counsel included: (1) preparing the named

plaintiffs for, and defending their depositions, with the exception of Beverly Molnar, (2) preparing for and taking the 30(b)(6) depositions of Herbalife's designated Persons Most Knowledgeable, (3) preparing and overseeing massive written discovery to Herbalife and discovery responses by the named Plaintiffs, (4) overseeing discovery disputes and resolutions between the parties, including the preparation of a ninety-four (94) page motion to compel, (5) overseeing analysis of over 148,000 pages of internal Herbalife documents which were produced, several gigabytes of confidential Herbalife database productions, documents provided by former Herbalife members or distributors and other persons, and review of Herbalife's public materials and other publicly available documents, (6) participating in interviews with former Herbalife members or distributors, (7) participating in site inspections of Herbalife's quality control facilities, research and development facilities, Los Angeles distribution center and a Los Angeles area nutrition club, and (8) selecting and consulting with experts (including an economist for class certification).  (Joint Decl. ¶¶15-22.)  Thus, it is clear that Plaintiffs have sufficient information to make an informed decision about settlement, and this factor weighs in favor of preliminary approval of the proposed settlement.

      **4.**      **The Experience and Views of Plaintiffs' Counsel Support Preliminary Approval.**

The judgment and views of experienced counsel entering into a settlement are entitled to great weight.  Plaintiffs' counsel has extensive experience in complex class action litigation and success in litigating class actions and fully supports this settlement. (Joint Decl. ¶¶6-10.) The fact that qualified and well-informed counsel endorse the settlement as being fair, reasonable and adequate heavily favors this Court's approval of the settlement. Courts recognize that the view of the attorneys conducting the litigation "is entitled to significant weight." *Fisher Bros. v. Cambridge-Lee Industries, Inc.*, 630 F. Supp. 482, 488 (E.D. Pa. 1985).

Overall, the Court should find that the Settlement Agreement is reasonable, both as a matter of process and substance and that it warrants preliminary approval, especially in light of this circuit's "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Class Plaintiffs v. City of Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992); *see also Hanlon*, 150 F.3d at 1027 (district court should give "proper deference to the private consensual decision of the parties"); *In re Syncor,* 516 F. 3d 1095, 1101-02 (9th Cir. 2008) (citing *Officers for Justice v. Civil Serv. Comm'n,* 688 F.2d 615, 624 (9th Cir. 1982)); *Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1276 (9th Cir. 1992).

## D.   The Court Should Order the Proposed Notice Be Sent to the Settlement Class.

Notice must be sent to the potential Settlement Class Members to inform them that a class has been certified and that a settlement has been proposed. *See* Fed. R. Civ. P. 23(c)(2) (certification notice); Fed. R. Civ. P. 23(e)(1) (settlement notice); *see also Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974) (discussing due process implications of notice requirement). Where, as here, the class is certified under Rule 23(b)(3), the settlement notice must inform the class of the nature of the action; the definition of the class certified; the class claims, issues, or defenses; that a class member may enter an appearance through an attorney; that the court will exclude from the class any member who requests exclusion; the time and manner for requesting exclusion; and the binding effect of a class judgment. *See* Fed. R. Civ. P. 23(c)(2)(B). Moreover, the settlement notice must alert the Settlement Class to the existence of the Settlement Agreement. *See* Fed. R. Civ. P. 23(e)(1); *see also Churchill Vill., LLC v. Gen. Elec.*, 361 F.3d 566, 575 (9th Cir. 2004).

In addition to these substantive requirements, class notice is subject to procedural mandates. As to the class certification notice, "the court must direct to

1   class members the best notice that is practicable under the circumstances,

2   including individual notice to all members who can be identified through

3   reasonable effort." Fed. R. Civ. P. 23(c)(2)(B). As to the settlement notice, "[t]he

4   court must direct notice in a reasonable manner to all class members who would

5   be bound by the proposal." Fed. R. Civ. P. 23(e)(1).

6        Here, the parties' proposed notice and plan for notice dissemination comply

7   with all applicable legal requirements, and they should be approved. A proposed

8   notice, summary notice, and claim form are attached to the Settlement Agreement

9   as Exhibits. Procedurally, notice will be distributed through various avenues, with

10  efforts being made to mail or email notice to each Settlement Class member

11  during the Class Period.

12       The notice also will be posted to the Claims Administrator's website, and a

13  summary notice will be published in appropriate public forums. Substantively, the

14  notice is written in plain-English, along with an accompanying Spanish

15  translation, so as to inform each potential Settlement Class member of the nature

16  of the litigation and his or her rights and obligations in connection therewith. *See*

17  Fed. R. Civ. P. 23(c)(2)(B). It contains information about all topics that are subject

18  to the requirements of Rule 23(c)(2)(B), and it also provides an overview of the

19  terms of the Settlement Agreement, along with instructions for obtaining more

20  information. *See, e.g.*, *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 963 (9th

21  Cir. 2009) ("It describes the aggregate amount of the settlement fund and the plan

22  for allocation, thereby complying with what we require."). To facilitate

23  distribution of the settlement fund and to streamline the claims application

24  process, a claims form will be enclosed with the notice, along with instructions for

25  seeking compensation. This information too will be in both English and Spanish.

26  **E.    The Court Is Requested to Schedule a Fairness Hearing**

27       Once potential Settlement Class Members have been notified of the Court's

28  class certification decision and of the proposed Settlement Agreement, they will

have an opportunity to object, opt-out, or file a claim form. At that point, the Court must hold a hearing to take into account the objectors' comments and to assess the fairness, reasonableness, and adequacy of the Settlement Agreement. *See* Fed. R. Civ. P. 23(e)(2). The parties propose that the Court schedule such a hearing approximately 130 days after entering an order granting preliminary approval of the Settlement Agreement and that the deadline for objections and requests for exclusion be set 30 days before that hearing. This schedule will give the parties sufficient time to direct notice to the Settlement Class, and it will give Settlement Class members adequate time to opt-out or object if they so choose.

## III.   CONCLUSION

For the foregoing reasons, Plaintiffs' ask this Court to enter an order certifying the Settlement Class, appointing Plaintiffs' counsel as class counsel, preliminarily approving the Settlement Agreement, directing notice in accordance with the terms of the Settlement Agreement, and scheduling a fairness hearing. A proposed order to this effect is filed concurrently with the Joint Motion.


DATED: October 31, 2014          FABIAN & CLENDENIN, P.C.

FOLEY BEZEK BEHLE & CURTIS, LLP


*/s/Thomas G. Foley, Jr.*
Philip D. Dracht
Scott M. Petersen
Jason W. Hardin

Thomas G. Foley, Jr.
Justin P. Karczag

*Attorneys for Plaintiffs*

MEMORANDUM IN SUPPORT OF JOINT MOT. FOR PRELIM. APPROVAL OF SETTLEMENT