Philip D. Dracht, SBN 219044
  pdracht@fabianlaw.com
Scott M. Petersen (*pro hac vice*)
  spetersen@fabianlaw.com
Jason W. Hardin (*pro hac vice*)
  jhardin@fabianlaw.com
Fabian & Clendenin
215 South State Street, Suite 1200
Salt Lake City, UT 84151-0210
Telephone: (801) 531-8900

Thomas G. Foley, Jr., SBN 65812
  tfoley@foleybezek.com
Justin P, Karczag, SBN 223764
  jkarczag@foleybezek.com
Foley Bezek Behle & Curtis, LLP
15 West Carrillo Street
Santa Barbara, CA 93101
Telephone: (805) 962-9495

*Attorneys for Plaintiffs Dana Bostick,*
*Anita Vasko, Judi Trotter, Beverly Molnar,*
*and Chester Cote*

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DANA BOSTICK, *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>HERBALIFE INTERNATIONAL OF AMERICA, INC., *et al.*,<br><br>Defendants. | CASE NO. 2:13-cv-02488-BRO-RZ<br><br>**JOINT DECLARATION OF THOMAS G. FOLEY, JR. AND SCOTT M. PETERSEN IN SUPPORT OF JOINT MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT AND CERTIFICATION OF THE CLASS**<br><br>Hon. Beverly Reid O'Connell<br><br>Complaint filed: April 8, 2013 |

Thomas G. Foley, Jr. and Scott M. Petersen jointly state and declare as follows:

1. I, Thomas G. Foley, Jr. am an attorney licensed to practice law in the State of California and am counsel for Plaintiffs and the proposed class. I am a founding partner of FOLEY BEZEK BEHLE & CURTIS, LLC ("FBBC"). I make this declaration upon my own personal knowledge, except those matters stated upon information and belief, and as to those matters, I believe them to be true. If called upon to testify to the matters set forth herein, I could and would, testify thereto competently under oath.

2. I, Scott M. Petersen, am an attorney licensed to practice law and am counsel for Plaintiffs and the proposed class. I am a shareholder and member of the Board of Directors at FABIAN & CLENDENIN, P.C. ("Fabian"). I have been admitted in this case *pro hac vice*. I make this declaration upon my own personal knowledge, except those matters stated upon information and belief, and as to those matters, I believe them to be true. If called upon to testify to the matters set forth herein, I could and would, testify thereto competently under oath.

3. Together we have personal knowledge of all of the facts set forth below.

4. We submit this Declaration for the purpose of demonstrating to the Court that the Settlement entered into by the parties is fair, adequate, and a reasonable resolution of the Settlement Class's disputes with Defendants and is preferable to continued litigation.

5. Thomas Foley, Jr. graduated from the University of Notre Dame Law School in 1975, where he was an Assistant Editor of the Notre Dame Law Review. Since 1975, Mr. Foley has been licensed to practice law in the State of California, and his practice has primarily involved litigation. Mr. Foley has lectured on litigation at seminars sponsored by the American Bar Association, the California Continuing Education of the Bar, the American Trial Lawyers Association, and the Continuing Legal Education Institute in New York City. He has tried in excess of

JOINT DECLARATION ISO MEMORANDUM IN SUPPORT OF JOINT MOT. FOR PRELIM.
APPROVAL OF SETTLEMENT

twenty-five jury trials to verdict in both state and federal district courts. Martindale Hubble has assigned Mr. Foley an "AV" rating, and he has also been designated as a "Super Lawyer" in the field of business litigation in Southern California for 2006 to 2014.

6.     Both FBBC and Mr. Foley have experience in prosecuting and defending class actions. FBBC has been appointed lead counsel or co-lead counsel to represent plaintiffs in cases that were certified as class actions and have settled including, *In Re Structured Settlement Litigation*, LASC Case No. BC 244111 (a national class action involving a Ponzi Scheme, which resulted in settlements of $124 million paid by, inter alia, Bankers Trust Company, Merrill Lynch, and Wells Fargo Bank); *Internal Revenue Service ("IRS") §1031 Tax Deferred Exchange Litigation*, Federal District Court of Nevada, Case No. 2:07-cv-1394 (a national class action involving a Ponzi scheme which resulted in settlements in excess of $98 Million paid by, inter alia, Union Bank of Switzerland and Smith Barney & Company); *Hunter v. Okun, et al.*, Federal District Court for the Northern District of California, Case No. 09-cv-02079JW(RSx) (a national class action involving a Ponzi scheme for which approximately $98 Million in settlements were approved by the Court.); *Roark v. GTE*, Santa Barbara Superior Court Case No.01035862 (a California $20 Million class action settlement); *Coldiron v. Bank of America*, Los Angeles Superior Court Case No. BC 121154; *Kirksey v. Chicago Title Ins. Co.*, LASC Case No. 106189; *Young v. Western Cities Mortgage Corp.*, LASC Case No. BC 121782; *Fletcher v. Brown & Brown*, Santa Barbara Superior Court, Case No. 01131631; *Blinkinsop, et al. v. Vegas Grand*, Federal District Court for Nevada (Las Vegas Branch), Case No. CV-S-05-0714–M (RJJ); *Scott, et al. v. Vegas Icon*, Federal District Court for Nevada (Las Vegas Branch) Case No. 2:06-cv-00082-JCM-PAL, and *Vinson v. Idearc Media*, Riverside Superior Court Case No. INC055768; *Dana Denison, et al. v. Salvation Army*, Los Angeles Superior Court Case No. BC 368827, a $12,000,000.00 settlement of a wage and hour class action; *Beauperthuy et al. v. 24 Hour Fitness*, Federal District Court for the

JOINT DECLARATION ISO MEMORANDUM IN SUPPORT OF JOINT MOT. FOR PRELIM. APPROVAL OF SETTLEMENT

Northern District of California, Case No. C 06 0715 SC, a wage and hour collective action under the Fair Labor Standards Act ("FLSA") which settled for $17,448,500; *Schulein et al. v. Petroleum Development Corporation*, Case No. SAVC 11-1891 AG, a certified class action currently pending in the Santa Ana Branch of the Central District of California which is in the process of settling and obtaining preliminary approval for a settlement in excess of $37,000,000.00. Mr. Foley has also served as lead counsel in other putative class actions in which certification was denied, and the putative class members received no economic benefit. Based on these cases and his other experience in litigation, Mr. Foley has developed experience in prosecuting class actions which he drew upon in both prosecuting the *Bostick* litigation and negotiating the proposed class settlement.

7.      Mr. Foley was the attorney at FBBC who had primary responsibility for prosecuting the *Bostick* litigation. He personally met with members of the class and reviewed hundreds of pages of documents produced by class members whose depositions he defended. Mr. Foley defended the depositions of class representatives Dana Bostick and Chester Cote, participated in the deposition preparation and attended the depositions of Anita Vasko and Judy Trotter, and also attended the depositions of the two Persons Most Knowledgeable designated by Herbalife. Mr. Foley also reviewed thousands of pages of documents produced in the *Bostick litigation* by Herbalife to assist in formulating litigation strategy with attorneys from Fabian & Clendenin, co-counsel for the putative class.

8.      Scott M. Petersen is a shareholder and director of Fabian & Clendenin, P.C. He graduated Order of the Coif from the J. Reuben Clark Law School in 1996, where he was a member of the BYU Law Review. Since 1996, Mr. Petersen has been licensed to practice law in the State of Utah, and his practice has primarily involved litigation. Mr. Petersen has lectured on various litigation topics at seminars sponsored by the Utah State Bar, co-authored materials published by the American Bar Association, and written in various journals. Mr. Petersen has

JOINT DECLARATION ISO MEMORANDUM IN SUPPORT OF JOINT MOT. FOR PRELIM.
APPROVAL OF SETTLEMENT

substantial trial experience, having been lead counsel in numerous trials and arbitrations. He has been designated a "Top 100" "Super Lawyer" in the Mountain States and been consistently recognized as a "Legal Elite" by Utah Magazine and a Tier 1 attorney in the field of ERISA by Chambers U.S.A.

9.      Fabian and Mr. Petersen have substantial experience in cases involving class actions, unfair business practices and consumer fraud. For instance, they have successfully represented national insurers in class actions relating to claims practices and application of California's mental health parity statute and a large industrial linen supply company in several jurisdictions (including California) in multiple putative class actions involving antitrust, consumer fraud claims, employee wage and hour claims, and allegations of unfair and deceptive business practices under California Business and Professions Code Section 17200, *et seq.* and false advertising under California Business and Professions Code Section 17500, *et seq. See, e.g., Exhaust Unlimited et al. v. Cintas Corp. et al.*, 223 F.R.D. 506 (S.D. Ill. 2004); *Wayne W. v. Blue Cross of California*, Case No. 1:07-CV-00035 PGC (D. Utah 2007). Mr. Petersen has significant experience developing and prosecuting cases, including class actions.

10.     Mr. Petersen has been lead counsel from Fabian in the *Bostick* litigation. He met personally with members of the class, reviewed thousands of pages of documents produced by class members and Herbalife, was heavily involved in drafting litigation and mediation documents, and in negotiating the terms and conditions of settlement. He was involved in the preparation of the class representatives' for their depositions and in taking the 30(b)(6) deposition of Herbalife which he also attended.

# I.      PLAINTIFFS' COMPLAINTS.

11.     On April 8, 2013, Plaintiff Dana Bostick, on behalf of himself and a putative class of "others similarly situated," filed this Action in the United States District Court for the Central District California, naming as defendants Herbalife

International of America, Inc.; Herbalife International, Inc.; and Herbalife Ltd., and alleging: (1) violations of California's endless chain scheme law under California Penal Code Section 327 and California Civil Code Section 1689.2; (2) violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. §§ 1962(a), (c), and (d)); (3) unfair and deceptive business practices under California Business and Professions Code Section 17200, *et seq.*; and (4) false advertising under California Business and Professions Code Section 17500, *et seq.* The complaint sought, among other things, damages for the financial losses incurred by Bostick and the class; general, compensatory, and exemplary damages; restitution and disgorgement; temporary and permanent injunctive relief; costs; reasonable attorneys' fees; pre- and post-judgment interest; and other damages as the Court might deem just and proper.

12. On May 30, 2013, Defendants moved to dismiss the complaint. (Dkt. No. 22.). On October 11, 2013, the Court denied Defendants' motion to dismiss. (Dkt. No. 40). In its order, the Court noted that "[a] party may rebut allegations of a pyramid scheme by showing that its policies prevent inventory loading and encourage retail sales." (Order Re Mot. To Dismiss at 7). However, "there must be evidence that the 'safeguards are enforced and actually serve to deter inventory loading and encourage retail sales.'" (Order Re Mot. To Dismiss at 7) (quoting *Webster v. Omnitrition Int'l, Inc.*, 79 F.3d 776, 782-83 (9th Cir. 1996)).

13. On June 2, 2014, the Ninth Circuit Court of Appeals decided *FTC v. Burnlounge*, 753 F.3d 878 (9th Cir. 2014). In its opinion, the Ninth Circuit noted that "when participants bought packages in part for internal consumption . . ., the participants were the 'ultimate users' of the merchandise and that this internal sale alone does not make [a company] a pyramid scheme." *Id.* at 887.

14. On July 2, 2014, the Court granted the parties' Stipulation to File First Amended Complaint. (Dkt. No. 76). The First Amended Complaint, filed on

July 7, 2014, added four additional named plaintiffs: Anita Vasko, Judi Trotter, Beverly Molnar, and Chester Cote. (Dkt. No. 78). The First Amended Complaint also removed Plaintiffs' RICO causes of action.

## II. PLAINTIFFS' EXTENSIVE DISCOVERY.

15. The parties exchanged initial disclosures on November 27, 2013. On December 3, 2013, we served a Request for Production of Documents with 208 separate requests for production. On December 5, 2013, the Court held a scheduling conference where it ordered that discovery be bifurcated between "class" and "merits" discovery. (Docket No. 51.) On January 23, 2014, Herbalife responded to the requests, lodging numerous objections and refusing to produce any documents.

16. On February 4, 2014, we served a meet and confer letter pursuant to L.R. 37-1 regarding the deficient discovery responses. Unable to resolve the discovery dispute through meeting and conferring, on April 7, 2014, we served Herbalife with a ninety-four (94) page [Joint] Stipulation on a Motion to Compel as to the certain requests for production. Following service of that stipulation, Herbalife agreed to meet and confer again with us to review their discovery responses, which the parties did the week of April 14, 2014. At that meeting, we agreed to narrow certain requests and Herbalife agreed to produce responsive documents. Because of Herbalife's agreement to produce documents relevant to class certification issues in this meet and confer, we did not move forward with the motion at that time.

17. On April 23, 2014, the Court entered a stipulated Order Re Confidential Documents on April 23, 2014. (Dkt. No. 67.) After that order, Herbalife produced and has been producing documents in both the mediation context and in litigation. Overall, Herbalife has produced over 18,500 documents (totaling approximately 148,000 pages). Many of these documents were produced

in their native form, such as Excel spreadsheets and PowerPoint presentations. And on April 13, 2014, Defendants produced approximately 4GB of database materials, including approximately 3.5GB of raw data files. These data files are equivalent to approximately 2.4 million pages of text files. Plaintiffs' counsel has reviewed these documents.

18.     Defendants provided Plaintiffs' counsel with the means to create their own queries and reports using Defendants' confidential internal database. Together with this database production, Defendants also provided explanatory documentation and answered some questions concerning the database. Herbalife supplemented its production of database materials and reports with additional raw data files in July. To review and analyze the database contents, Plaintiffs retained an expert, Chris Smith, to perform database administration, run SQL queries, and assist attorneys in analyzing relevant data sets. Among other things the data includes distributor/member contact information, distributor/member levels, and distributor/member purchase information.

19.     In addition to the first lengthy set of requests for production, Plaintiffs served interrogatories, requests for admission, and more requests for production on all Defendants, to which they responded. And Defendants served interrogatories, requests for admission, and requests for production as to each named Plaintiff, to which they responded. The parties also conducted several depositions. Defendants deposed all of the named Plaintiffs, except for Beverly Molnar. Plaintiffs took a 30(b)(6) deposition of Herbalife's designated Person Most Knowledgeable ("PMK").

20.     We also have investigated several Herbalife nutrition clubs and "fit camps" and interviewed numerous members/distributors/consumers, both current and former. Finally, Plaintiffs' counsel participated in and oversaw anecdotal

JOINT DECLARATION ISO MEMORANDUM IN SUPPORT OF JOINT MOT. FOR PRELIM.
APPROVAL OF SETTLEMENT

sampling of Herbalife's products, from its protein shakes, to its nutrition bars, to its energy and vitamin supplements.

21.     Plaintiffs' counsel also inspected Herbalife's quality control facilities, research and development facilities, and corporate headquarters. At these locations, we conducted detailed interviews of several Herbalife executives and management personnel, including John DeSimone, Chief Financial Officer, Tim Sanson, Vice President with responsibility for Sales Strategy & Analysis, as well as the Vice President with responsibility for Distributor Business Practices & Compliance. We were permitted to question these senior executives in the presence of Herbalife's counsel, with the only limits being attorney-client privileged communications. Subsequently, Mr. Foley caused staff at FBBC to independently confirm several factual statements made to Plaintiffs' Counsel by the senior executives, utilizing documents produced by Herbalife and information available on the internet. Those efforts by FBBC staff to corroborate certain of the statements made by these executives confirmed the statements that were independently investigated. We also interviewed the director of Herbalife's Research & Development department and the director of its Quality Control Division.

22.     Indeed, we have spent significant time and attention to every aspect of this case, both in litigation as well as settlement. In addition to the investigation, both formal and informal, described above, this also included (1) selecting and consulting with experts (including a well-respected economist for class certification issues), (2) researching the applicable law with respect to the claims asserted in the complaints and the potential defenses thereto, (3) maintaining a united and organized front between separate law firms for every aspect of the case, and (4) monitoring every detail of the case.

JOINT DECLARATION ISO MEMORANDUM IN SUPPORT OF JOINT MOT. FOR PRELIM. APPROVAL OF SETTLEMENT

23.     Based on the discovery conducted, we are informed and believe that there are approximately 1.3 million potential members of the putative class which we are seeking to certify.

24.     Based on our interviews with potential class members and the discovery conducted to date, we are not aware of any conflicts of interest between class counsel and members of the putative class, or between the class representatives and the members of the putative class.

## III.   THE EXTENSIVE AND THOROUGH MEDIATION AND SETTLEMENT PROCESS.

25.     On December 9, 2013, the Court entered an order (the "ADR Order") directing the parties to hold proceedings with a private mediator as the ADR Procedure best suited to the circumstances of this case under Civil Local Rule 26-1. [Dkt. No. 52] Beginning on February 6, 2014, the parties began a three-step mediation process that allowed Plaintiffs to obtain significant discovery, exchange multiple mediation briefs involving various aspects of Plaintiffs' claims and Herbalife's defenses, and engage in thoughtful and often contentious discussion about the merits and risks of the Action.

26.     In all, we conducted five formal, essentially "all-day" mediation sessions with Judge Daniel Weinstein (Ret.) who is affiliated with JAMS from February through August 2014, and one additional mediation session with his co-mediator, Cathy Yanni with Judge Weinstein available by telephone. In preparation for the mediations, including, inter alia, participating in the drafting of Plaintiffs' mediation briefs and draft motion for class certification, we researched and analyzed numerous published decisions, statutes, articles and treatises related to multi-level marketing cases in which it was alleged the defendant was operating a pyramid scheme, which had been litigated on a class action basis, and familiarized ourselves with the law applicable in the *Bostick* case. (We ultimately

did not file a motion for class certification because the parties agreed to extend dates while settlement negotiations and formal and informal discovery continued.)

27.   In addition, we engaged in direct settlement conferences with Herbalife representatives and legal counsel in at least three additional in-person meetings and numerous telephone conferences. The settlement negotiations between the parties were both arm's length and adversarial.

28.   A separate declaration by Judge Weinstein is being filed in support of the joint motion for preliminary approval. In the end, Judge Weinstein concluded that the monetary portion of this settlement "is in a range that I believe reasonably reflects the parties' factual, legal and damages positions." (Declaration of Hon. Daniel Weinstein (Ret.), filed concurrently herewith, ¶12.)

29.   Throughout these mediations and settlement meetings, we asserted various positions, theories, arguments, evidence and facts to support the named Plaintiffs' claims and rebut Herbalife's asserted defenses. These meetings were often hotly contested.

30.   It took months and significant effort, work, and legal and factual research to negotiate the monetary terms of the settlement, and once that was accomplished, we spent another three months negotiating non-monetary corporate policy reforms.

31.   Moreover, to confirm our valuations of the case, in the heat of these negotiations, and without giving any notice whatsoever to Herbalife, we retained the Hon. James Larson (Ret.), a retired Chief Magistrate Judge from the Northern District of California, to provide just Plaintiffs with a neutral, independent valuation of the case given Plaintiffs' claims, alleged facts, factual and legal developments, and Herbalife's factual and legal defenses. Thomas Foley had prior experience with Judge Larson when he was appointed as a Special Master by Judge Samuel Conti of the Northern District of California federal district court in

*Beauperthuy et al. v. 24 Hour Fitness et al.,* Case No. C 06 0715 SC. In that case and in his role as Special Master, Judge Larson focused counsel on both sides on the strength and weaknesses of their respective cases, and demonstrated a capacity to help counsel on both sides realistically value the potential damages based on the strengths and weaknesses of their respective cases. Judge Conti also appointed Judge Larson to serve as the Special Master to prepare a report and recommendation on special hardship cases in a recent multi-level marketing case involving Amway, which had similar legal issues as the instant litigation, *Pokorny et al. v. Quixtar et al.,* Case Nom 3:07-cv-00201-SC.

32.     On July 1, 2014 we met with Judge Larson for over four hours to discuss case evaluation, evidence, administration, weaknesses, and damages. Prior to the meeting, we provided Judge Larson with significant briefing and factual summaries highlighting both our perceived legal and factual strengths and weaknesses, including a draft motion for class certification, an in-depth written analysis of the strengths and weaknesses of both Plaintiffs' and Defendants' arguments, and copies of the key reported cases dealing with multi-level marketing and alleged pyramid schemes. At the conclusion of the July 1st meeting, Judge Larson provided Plaintiffs' counsel with an oral opinion as to a reasonable settlement range for all claims in the *Bostick* litigation. The settlement now being proposed to this Court by Plaintiffs is within the range that Judge Larson opined would be reasonable given the strength of Herbalife's defenses. A separate declaration by Judge Larson is attached as Exhibit A.

## IV.     THE SETTLEMENT AGREEMENT IS FAIR, ADEQUATE, AND REASONABLE.

33.     Based on the factual and legal development of this case since April 2013, the risks of proceeding with litigation and the usual hazards of trial as well as those Herbalife defenses that would require significant legal and factual effort

JOINT DECLARATION ISO MEMORANDUM IN SUPPORT OF JOINT MOT. FOR PRELIM. APPROVAL OF SETTLEMENT

1    to overcome, it is our strong belief that the Settlement Agreement reached is a fair,

2    adequate, and reasonable resolution of the Settlement Class's disputes with

3    Herbalife and is preferable to continued litigation.

4        34.    The Settlement Agreement provides economic relief for the

5    Settlement Class through cash awards, refunds for returned product, and

6    significant corporate reforms. The economic value of the quantifiable aspects of

7    the Settlement consists of $15 million in a cash fund and up to $2.5 million of

8    additional cash for product returns. Herbalife also has agreed to make, or continue

9    to implement, numerous changes to its business model for a contractually agreed

10   upon period of three (3) years from the date of the Settlement. Taken together,

11   essentially all of the problems identified in the First Amended Complaint are

12   addressed by the Settlement Agreement.

13       **A.    The Corporate Reforms Benefit All Class Members.**

14       35.    The Settlement Agreement requires Herbalife to institute or maintain

15   for three (3) years thirteen (13) specific corporate policies that benefit class

16   members in a way related to the claims asserted in the First Amended Complaint.

17       36.    One of the claims of the First Amended Complaint was that Herbalife

18   violated California Business and Professions Code Sections 17200, *et seq.* and

19   17500, *et seq.* by charging its distributors or members a "Packaging and

20   Handling" fee simultaneously with an "Order Shipping Charge." Plaintiffs

21   claimed that assessing both fees illegally implied that the Order Shipping Charge

22   was a pass-through charge and did not imply any additional income generation by

23   Herbalife, which it in fact did. Herbalife asserted that the charges were not unfair

24   or misleading. The Settlement Agreement addresses this claim by precluding

25   Herbalife from simultaneously and separately charging its members a "Packaging

26   & Handling" fee (or similar fee) and an "Order Shipping Charge" (or similar fee)

27   as was done during the Class Period up until Herbalife adopted its Simplified

28

Pricing Structure, when the two charges were combined into a single "Shipping & Handling" charge.

37.     The First Amended Complaint also asserted Herbalife was an endless chain scheme in violation of Penal Code Section 327, and that it illegally encouraged its distributors to recruit other people to become distributors in order to buy large amounts of product that they could not sell. Herbalife denied the allegation in part on the basis that its products were heavily desired by the public and that the vast majority of its distributors became Herbalife distributors for purposes of self-consuming Herbalife products, either personally, or as a family.

38.     The Settlement Agreement addresses these issues in several ways. First, it requires Herbalife to acknowledge its self-consumption position by prohibiting it from defining all of its members as "distributors." Second, it requires implementation and enforcement of rules designed to promote the sale of product and discourage recruitment over sales. The Settlement Agreement accomplishes this by requiring Herbalife to continue to (1) discourage its members from incurring debt to buy product, (2) pay the shipping charges for product that is legitimately returned by its members, (3) prohibit its members from selling leads to or purchasing leads from other members, (4) prohibit the purchase of product as a condition of being a member, (5) require experience and training of nutrition club members, and (6) maintain procedures for enforcement of these and other rules, including a member compliance department tasked with giving substance to these rules and policies.

39.     The Settlement Agreement also ensures transparency of Herbalife member success and failure rates and numbers by requiring Herbalife to include its Statement of Average Gross Compensation (SAGC) of members with any membership application and a requirement that any applicant actually acknowledge having reviewed the SAGC. Moreover, the SAGC must contain the

total number and percentage of all members who do not receive any compensation payment directly from Herbalife. In other words, Herbalife, cannot simply disclose those who made money with the Herbalife business opportunity in the preceding year (as it did for multiple years of the Class Period), but also must disclose those who simply chose to consume product or who made no money pursuing the business opportunity. Finally, the Settlement Agreement requires certain clarifications in language in the membership agreement and sales and marketing plan designed to make them less confusing in certain respects. These policies ensure that those people investigating the Herbalife business opportunity are informed of the risks by showing statistics about those members who received no payments as well as those who did.

40.   The corporate reforms that Herbalife has implemented (or has agreed to implement) and agreed to continue to maintain for the three-year period outlined in the Settlement Agreement enhance and improve the protection of both members and consumers.

41.   In interviewing distributors who are class members, there were numerous complaints related to third parties, referred to in the multi-level marketing industry as "lead generators", who solicited class members to become Herbalife distributors, and then had the class members become members of the lead generators' "downlines". The lead generators then encouraged the class members to purchase lists of purported "leads" of individuals to whom they could sell product, and also to purchase training courses. Based on the corporate reforms discussed in this Joint Declaration, Herbalife has instituted policies which will limit the involvement of third party lead generators in selling additional services and products to distributors and members. The lead generators are not released by the terms of the Settlement Agreement, and class members may pursue claims

against lead generators for losses based on their interactions with the lead generators.

**B.     The Product Return Fund Benefits Class Members Who Bought Product, Could Not Sell It and Could No Longer Return It.**

42.     The first component of the up-to $17.5 million settlement is the right to return product. The Settlement Agreement provides for up to $2.5 million of funds (the Product Return Fund) in addition to the Cash Settlement Fund discussed above to pay members or distributors who file valid claims for the return of unused and unopened products (excluding International Business Packs and Mini-International Business Packs). An additional $2.5 million from the Cash Settlement Fund described above may be used to pay for additional product returns if valid product return claims exceed the amount of the Product Return Fund.

43.     Class Members may submit claims for the return of unused and unopened products that they purchased more than one year prior to the deadline for submitting claim forms and after the beginning of the Class Period. Class Members already have the right to return unused and unopened product to Herbalife for one year, which is why the Settlement Agreement focuses on older product purchases. This benefit to Class Members is significant in that Class Members may return unused and unopened product for a refund even if the shelf life (usually two years based on our investigation) of any such product has expired. The Product Return benefit addresses those Class Members who were unable to sell Herbalife products and did not want to consume them. It also provides a monetary benefit to those who may have spent significant funds to purchase product in an effort to qualify as a higher level member/distributor, but who thereafter could not sell the product and, given the purchased volume, could not consume it. These are the members who have product still in their possession,

and who did not return it within Herbalife's one-year return period because they were trying to sell it at retail.

44.     The Settlement Agreement requires that claimants: (1) identify any returned products by product SKU, which should be apparent and easily accessible on the product containers, (2) estimate the purchase date of the products to be returned (in order to determine if it was purchased outside Herbalife's normal return policy), and (3) provide the actual amount paid for each returned product so that the Claims Administrator can determine the amount of their benefit.

45.     If claimants are unable to provide the actual amount paid for the products, they can certify as much and provide an estimated payment. The Claims Administrator will calculate a claimant's payment as the lesser of her estimated payment or 50% of Herbalife's Suggested Retail Price for the product on the purchase date, i.e., the greatest amount of discount level available for claimants under Herbalife's Sales and Marketing Plan.

46.     As an additional benefit, Herbalife will use its current product return process to retrieve or collect the products related to properly submitted claims, with no additional cost to claimants. And should any product be returned by means of shipping (whether through Herbalife's product return process or otherwise), any shipping costs will be paid by settlement funds, not by claimants.

**C.     The Cash Settlement Fund Benefits Class Members Who Lost Money Because They Were Unable to Sell Herbalife Products for a Profit.**

47.     The second component of the settlement is a cash component. The Settlement Agreement provides a Cash Settlement Fund of $15 million to pay Herbalife distributors/members who file valid claims. After payment of attorneys' fees, costs, and expenses to Class Counsel, and the costs of administering the

JOINT DECLARATION ISO MEMORANDUM IN SUPPORT OF JOINT MOT. FOR PRELIM.
APPROVAL OF SETTLEMENT

Settlement. Claims for cash awards from this fund will compensate those Class Members who joined Herbalife primarily to pursue a business opportunity (and not primarily for personal and/or family consumption of Herbalife products) and who, in total, lost money on Herbalife products pursuing that business opportunity. The higher levels of Herbalife distributors/members (i.e., GET Team and above) are not part of the Class and thus are not eligible for any cash award,

48.    The Cash Settlement Fund payments are based on Class Members' purchases of "Qualified Products" from Herbalife. A "Qualified Product" is one that was: (i) purchased for resale purposes; (ii) purchased from within the United States and shipped to the Claimant at a location in the United States; (iii) not sold for at least the cost of purchase; (iv) not returned through Herbalife's buyback program or Herbalife's satisfaction guarantee; and (v) not the subject of a claim for recovery from the Product Return Fund that has been filed pursuant to this Settlement.

49.    The Settlement Agreement creates two classes of awards based on the amount of Qualified Products purchased by claimants: (i) Pro Rata Awards, and (ii) Flat Rate Awards. Each is discussed below. The claimants who purchased larger amounts of product are those more likely to have invested significant funds (possibly borrowed funds) in the purchase of product in order to obtain a higher distributor/member level. These claimants would have more product than would be reasonably self-consumed. Their large purchases also would suggest that they were seeking to obtain a higher distributor status in order to obtain a greater discount on future products such that they could more easily sell the product for a profit.

50.    A claimant who purchased at least $750 of Qualified Products during any Claims Year qualifies for a pro rata award from the Cash Settlement Fund that is equal to the lesser of 100% of the estimated total loss from the sale of those

"Qualified Products" or 50% of the price paid for the aggregate "Qualified Products." A Claims Year is a twelve month period beginning on the first day of the month in which a claimant became a Herbalife member, and repeating each year thereafter.

51.     The 50% cap is used to ensure that a claimant is compensated only for his or her loss, and not more. The $750 threshold was selected because it would have been physically difficult, if not impossible, for someone purchasing that amount of product to have self-consumed it in a year. But, those claimants who may have been pursuing the business opportunity and purchased less than $750 of Qualified Products in a Claims Year could have—as an alternative to selling it retail—simply self-consumed all or a large portion of the products. (Or, to the extent such claimants still have product that is unused and unopened, they could return it as part of this settlement.) They, therefore, obtained or could obtain a benefit from the Qualified Products despite their inability to sell it.

52.     Claimants who do not meet the $750 Pro Rata Award threshold but who otherwise meet the criteria of Business Opportunity Claimants will be entitled to a $20 Flat Rate Award to be paid from the Cash Settlement Fund. The aggregate Flat Rate Award is capped at $3 million. If the aggregate Flat Rate Award exceeds this amount, Flat Rate Awards will be reduced on a proportional basis so that all valid claims can be paid. If the aggregate Flat Rate Award is less than $3 million, then the difference shall be available for Pro Rata Awards.

53.     The Cash Settlement Fund Payments (whether Pro Rata Awards or Flat Rate Awards) are designed to benefit those Class Members who were purchasing Herbalife products with the intent to resell those products for more than they paid, but who were unable to sell them for at least their cost. These payments address Plaintiffs' claims that the Herbalife business opportunity made it very difficult for those whose status was lower than "GET Team" and who

1  really intended to pursue the business opportunity, to sell Herbalife products at a

2  profit. At least some of the evidence obtained from Herbalife suggests that these

3  Class Members may make up less than one third (or possibly one quarter) of the

4  total Settlement Class.

5       54.  With respect to any funds remaining in the Cash Settlement Fund

6  after payment of the Pro Rata and Flat Rate Awards, the parties agree that the

7  Court may oversee the distribution of all such funds pursuant to the *cy pres*

8  doctrine to the Consumer Federation of America – www.consumerfed.org – or

9  such other organization as the parties may agree upon and the Court approves.

10 **V.    THE RESOLUTION OF THIS CASE AND THE RISKS OF**

11        **CONTINUED LITIGATION.**

12      55.  There are numerous risks of litigation that make this Action ripe for

13 settlement and in the interests of Plaintiffs and the Settlement Class. Although

14 Plaintiffs successfully opposed Herbalife's Motion to Dismiss, there remain

15 substantial arguments that Herbalife has made, and which it could make on

16 summary judgment or at trial should the Action continue to be litigated. In making

17 this analysis, Plaintiffs' counsel certainly is not making, or intending to make, any

18 admissions in regard to the claims or facts at issue herein, as the Settlement

19 Agreement provides, but rather seeking to inform the Court as to arguments that

20 represented real litigation risk.

21      56.  For example, based on the results of multiple surveys, Herbalife

22 claims that approximately 73% of its participants became members/distributors

23 for the purpose of purchasing product for self-consumption, as opposed to

24 pursuing the business opportunity. If proven to be true, following Herbalife's

25 arguments, a finder of fact could find that such members/distributors have *not*

26 paid "valuable consideration for the chance to receive compensation for

27 introducing one or more additional persons into participation in the scheme or for

28

the chance to receive compensation when a person introduced by the participant introduces a new participant." Cal. Penal Code. 327. Instead, such members/distributors could be found to have been "not purchasing in order to participate in the scheme," but instead purchasing to consume Herbalife products, which a fact-finder could reasonably conclude is not a violation of Section 327. In this way, Herbalife claims to be more like a buyer's club (e.g., Costco or Sam's Club) than a pyramid scheme.

57.     Plaintiffs obtained the underlying surveys in discovery. In the opinion of Plaintiffs' counsel, the survey questions and limited response options could have been better. Despite such shortcomings, the surveys could be persuasive and increase the risk for continued litigation. Indeed, another survey with a differently framed question found that approximately half of respondents joined Herbalife with no expectation of making any money at all. This too could undercut Plaintiffs' endless chain theory.

58.     In addition to Section 327, Plaintiffs also claim violations of Business & Professions Code Sections 17200 and 17500 for unlawful, fraudulent and deceptive representations and false advertising regarding the "business opportunity" of Herbalife. Plaintiffs claim Herbalife (through its IBP, mini-IBP, publications, etc.) promises wealth, success, and opportunity, filled with luxury homes, cars, spacious ranches, and vacations. Plaintiffs claim very few that become Herbalife distributors can achieve the claimed results because the system is designed for failure. Distributors buy product at inflated prices to pay the few at the top. They pay inflated and misleading shipping, handling, and freight charges. And in the end, they cannot sell any Herbalife product at a price near Herbalife's SRP. Further, until recently, Herbalife only disclosed the winners in its business opportunity and failed to disclose the 88 plus percent of members/distributors who received no payments from Herbalife in the previous year. Plaintiffs claim that

1   had the truth been told to class members before joining or during the period in

2   which they could renounce their memberships/distributorships, they would not

3   have joined Herbalife in the first place or would quickly ask for their money back.

4       59.     In response, Herbalife states, and has produced some documents and

5   information indicating, that it has policies and procedures prohibiting its

6   members/distributors from making false or misleading statements about Herbalife

7   or its products and that Herbalife enforces those policies and procedures. Second,

8   Herbalife claims that the stories and characterizations it provides are not

9   indicative of ensured results and that such caveats are clearly noted in its

10  Marketing Plan and various promotional material. Third, and potentially of most

11  significance, Herbalife claims, and has produced some documents and information

12  indicating, that, since it began to publishing the information regarding the winners

13  and losers in its 2012 Statement of Average Gross Compensation, the number of

14  people becoming new Herbalife members *has not declined at all*. In fact, new

15  memberships have increased. In other words, Herbalife argues that after it began

16  disclosing more information about those who received no payment from Herbalife

17  in its SAGCs, there was no "impact" on the number of people who wanted to

18  become Herbalife members. Although not dispositive, such evidence underscores

19  the risks inherent in continued litigation.

20      60.     Overall, based upon (1) the extensive formal and informal discovery

21  to date, (2) the review and analysis of all of the documents produced by Herbalife

22  as well as others obtained through independent investigation, (3) the claims and

23  defenses asserted by the parties, (4) the massive amounts of legal research and

24  analysis performed, (5) detailed expert analyses, (6) the independent case

25  valuation of Judge Larson, (7) analyses and discussions with the mediators, (8) the

26  corporate reforms that Defendants have agreed to implement and maintain

27  regarding the manner in which they operate their business with regard to

28

JOINT DECLARATION ISO MEMORANDUM IN SUPPORT OF JOINT MOT. FOR PRELIM.
APPROVAL OF SETTLEMENT

distributors/members, and (9) the totality of the circumstances, Plaintiffs' Counsel believe a finder of fact could reasonably conclude that Herbalife is not currently in violation of California Penal Code Section 327 as Plaintiffs' Counsel understand that statute has been and is being enforced. Furthermore, Plaintiffs' Counsel believe a finder of fact could reasonably conclude that: (1) there is substantial demand for Herbalife's products for personal and/or family consumption by both non-members and members and (2) a vast majority of Herbalife members become members primarily for that purpose. We are not stating that such conclusions are in fact true or that the law compels such conclusions. Indeed, a finder of fact could reasonably conclude otherwise. But, we make these statements to explain some of the rationale for why settlement at this point in time is fair, adequate, and reasonable under the circumstances. (Plaintiffs' counsel certainly is not making, or intending to make, any admissions in regard to the claims or facts at issue herein, as the Settlement Agreement expressly notes.)

61.    Of course, Plaintiffs' counsel—and no doubt the Court—is aware of third party hedge fund investors who have substantial economic self-interest in Herbalife's business model not being successful, or being successful. Plaintiffs' counsel has scrupulously avoided becoming involved in any way with representatives of either of those groups and has instead focused on litigating this case and, if possible, settling the claims in the best interests of the Settlement Class based on a reasonable assessment of the risks and benefits.

62.    Plaintiffs' counsel are also aware that the Federal Trade Commission ("FTC") and the Attorneys' General of New York and Illinois have publicly announced investigations into Herbalife's business practices. To ensure that this class action does not interfere with those ongoing investigations or similar investigations of which we are unaware or which possibly arise in the future, and to also permit settling class members to participate in the ultimate future outcomes

of those administrative investigations, we insisted on the following language being included in the Settlement Agreement and proposed release:

> "provided, however, that the Released Claims do not include claims arising out of . . . (2) federal, state, or local government agency or similar authority retains sole jurisdiction and for which there is no private right of action accruing to the Settlement Class Members, either collectively or individually . . ."

63.    Also of significance, the proposed release does not extend to claims against any of the lead generation companies, who sell or sold in the past lists of potential customers that might be interested in joining Herbalife (i.e., potential "leads") and materials that would supposedly help attract such leads. These types of companies have been publicly criticized for inducing new members/distributors to spend large sums of money on lists of potential leads and materials to attract potential leads that, in reality, had little value. Because the First Amended Complaint does not name such companies as defendants and because the proposed release does not extend to such companies, Plaintiffs and the Settlement Class remain free to bring viable claims against such companies if actionable conduct occurred and resulted in economic loss. On a related note, one of the corporate reforms requires Herbalife to "maintain its rule prohibiting members from selling leads to other members or purchasing leads from any source, consistent with Rule 3.3.2 of Herbalife's Member Rules of Conduct."

## VI.    ATTORNEYS' FEES, COSTS, AND COSTS OF NOTICE AND ADMINISTRATION.

64.    In this case, we did not bring up or substantively discuss attorneys' fees or enhancements until after there had been agreement of the substantive provisions of the Settlement Agreement. Fabian and FBBC will file a separate motion for an award of attorneys' fees in the amount of thirty percent (30%) of the

combined economic value of the Monetary Fund, Product Return Fund, which will be approximately $5,250,000.00, to compensate both firms for all work already performed in the Action and all work remaining to be performed in documenting the Settlement, securing Court approval of the Settlement, administering the Settlement, ensuring that the Settlement is fairly administered and implemented, and obtaining dismissal of the Action. Although no additional attorneys' fees are being requested based on the value of the corporate reforms, the reforms do further justify the anticipated amount of requested attorneys' fees. Fabian and FBBC will include in that separate motion a request to be reimbursed for costs and expenses incurred and advanced in the amount of approximately $200,000.00 on behalf of the Class. Both firms have at all times assumed the responsibility of litigating this Action on a contingent-fee basis and advancing all costs and expenses, such that any attorneys' fees would be paid only upon achieving a recovery for the benefit of Plaintiffs and the Class by settlement or judgment.

65.   Subject to Court approval, we also will request in that separate motion an enhancement payment in the amount of $5,000.00 to Class Representatives Anita Vasko, Judi Trotter, Beverly Molnar, and Chester Cote, and $10,000.00 to Class Representative Chester Cote in accordance with current Ninth Circuit precedent, to be paid from the Settlement Fund for their work in producing documents and information, meeting with counsel, preparing for depositions, being deposed, participating in settlement discussions and negotiations, and traveling for such activities. These class representatives all responded to detailed special interrogatories and requests for admission, as well as produced documents in their possession in response to Defendants' Requests for Production of Documents. The reason that an increased enhancement payment will be requested in the separate motion for Mr. Bostick is that he served as a class representative from the time of

the filing of the original complaint, and was involved in numerous conferences and phone calls with Class Counsel to confirm facts prior to the filing of the original Complaint.

66.     Herbalife relied on the FRCP to insist that the class representatives appear for their depositions in the Central District of California. Mr. Cote took three days off work to travel from New Hampshire to California to spend a day with class counsel to prepare for his deposition in Los Angeles, and another day being deposed. Ms. Vasko took three days off work to travel from Pennsylvania to spend a day preparing for her deposition, and the better part of a second day being deposed. Ms. Trotter traveled from Seattle to Los Angeles to spend a day with class counsel preparing for her deposition, and another day being deposed. Mr. Bostick is a resident of Los Angeles. Mr. Bostick took several days of work to consult with class counsel throughout the duration of the case, as well as another day to prepare for his deposition, and another day actually being deposed. Ms. Molnar has anxiety issues with air travel and was not able to travel from her home in Pennsylvania to attend a deposition in Los Angeles. However, she was willing to travel to the Boies Schiller office in Armonk, New York to be deposed. The case settled prior to class counsel having to file a motion for a protective order to compel defendants to depose Ms. Molnar at their own offices in either New Hampshire or New York.

67.     The Declaration of Dana Bostick is attached hereto as Exhibit B.

68.     The Declaration of Anita Vasko is attached hereto as Exhibit C.

69.     The Declaration of Chester Cote is attached hereto as Exhibit D.

70.     The Declaration of Judi Trotter is attached hereto as Exhibit E.

71.     The Declaration of Beverly Molnar is attached hereto as Exhibit F.

72.    If the Court should decide not to approve the proposed settlement, Class Counsel are prepared to continue to prosecute the litigation against the Herbalife Defendants.

73.    We are not aware of any other pending claims in either state or federal court against the Herbalife Defendants that involve any of the claims that are sought to be released by this settlement. Similarly, we are not aware of any competing class actions that have been filed seeking relief or damages for the same claims as are being prosecuted in the *Bostick* litigation. Since the publicity generated by the filing in the *Bostick* litigation of joint requests to continue dates for completing discovery and filing the motion for class certification based on the ongoing settlement discussion, other attorneys have contacted Class Counsel and stated that they might file competing class actions. However, to the best of our knowledge, including speaking with counsel for the Herbalife Defendants, reviewing searches in Google, Westlaw, and the nationwide Pacer case locator, no other competing class actions have been filed as of the date of this Joint Declaration.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 31st day of October, 2014 at Salt Lake City, Utah:



*/s/Scott M. Petersen\**
Scott M. Petersen

JOINT DECLARATION ISO MEMORANDUM IN SUPPORT OF JOINT MOT. FOR PRELIM.
APPROVAL OF SETTLEMENT

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 31st day of October, 2014 at Santa Barbara, California:

/s/Thomas G. Foley, Jr.
Thomas G. Foley, Jr.

*/s/ Thomas G. Foley, Jr., attests that all other signatories listed, and on whose behalf the filing is submitted, concur in the filing's content and have authorized the filing

JOINT DECLARATION ISO MEMORANDUM IN SUPPORT OF JOINT MOT. FOR PRELIM. APPROVAL OF SETTLEMENT