**COHEN MCKEON LLP**
MICHAL L. COHEN (SBN 206253)
cohen@cohenmckeon.com
HEATHER M. MCKEON (SBN 186414)
mckeon@cohenmckeon.com
1910 W. Sunset Boulevard, Suite 440
Los Angeles, California 90026
213-413-6400 (phone)
213-403-6405 (fax)

Douglas M. Brooks (***pending pro hac vice***)
dmbrooks@brooks-law.net
60 Thoreau Street, No. 219
Concord, MA  01742
Telephone: (781) 424-6737

*Attorney for Objectors*

# IN THE UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

|  |  |
|---|---|
| DANA BOSTICK, *et al.,*<br><br>       Plaintiffs,<br><br>   vs.<br><br>HERBALIFE INTERNATIONAL OF AMERICA, INC., *et al.*,<br><br>      Defendants. | **Case No. 2:13-CV-02488-BRO-RZ**<br><br>**OBJECTIONS TO CLASS ACTION SETTLEMENT AND NOTICE OF INTENT TO APPEAR AT FINAL APPROVAL HEARING**<br><br>Hon. Beverly Reid O'Connell |

The following class members object to the proposed class action settlement in this action for the reasons set forth in their Declarations attached hereto and for the reasons set forth in the memorandum below: Elvia Acosta (Exhibit A), Sabas Avila (Exhibit B), Miguel Calderon (Exhibit C), Felipe Colon (Exhibit D), Elizabeth Correa (Exhibit E), Maria Cutzal (Exhibit F), Juana Estala (Exhibit G), Jose G. Garcia (Exhibit H), Valentina Leon (Exhibit I), Rossina Martinez (Exhibit J), Gilberto Melchor Sanchez (Exhibit K), Martil Palma Vallecillo (Exhibit L), Yader A. Pastran (Exhibit M),  Susana Perez (Exhibit N),  Eric Rodensky (Exhibit O),  Jose Tafoya (Exhibit P), Olivia Torres (Exhibit Q) and Julia Ulloa (Exhibit R). The foregoing class members will be collectively referred to herein as "Objectors."

I.     **Summary of Objections**

   **A. The Financial Compensation for the Endless Chain Scheme Claim is Inadequate**

The financial compensation for the Rule 23(b)(3) damages class is grossly inadequate, by at least an order of magnitude.   The parties failed to provide the Court with any information from which the Court could determine the range of possible recovery on any of the claims in the Complaint.   The parties have provided no data concerning the composition of the class or the range of damages suffered by class members.   While Objectors do not have access to the data which Herbalife provided to Plaintiffs' counsel during confirmatory discovery, the information which is available suggests that aggregate damages of the class for the

core claim in the Amended Complaint, violation of the California Endless Chain Scheme Law, range from $700 million to $1.12 billion or more,

**B. The Financial Compensation for the Shipping and Handling Claim is Inadequate**

Objectors estimate that the aggregate class damages for the shipping and handling fee claim are approximately $260 million.   In light of the potential recovery, and considering all of the risks of litigation, the Settlement Fund of $15 million and the Product Return Fund of $2.5 million are patently inadequate.

**C. Some Settlement Class Members Were Wrongfully Excluded from the Rule 23(b)(3) Damages Class.**

The Settlement calls for certification of both a damages class under Rule 23(b)(3) and a broader injunctive relief class under Rule 23(b)(2).  Herbalife distributors who are subject to the arbitration clause (including a class action waiver) which Herbalife began using in distributor agreements during and after September of 2013 are included in the broader injunctive relief class but not the damages class.  However, Herbalife has waived its rights under its unilateral arbitration clause by including distributors who were supposedly subject to the clause in the injunctive relief class, and by reserving the right to make unilateral modifications to the distributor agreement and arbitration clause.  Distributors who were supposedly subject to the arbitration clause should not have been excluded from the Rule 23(b)(3) damages class.

**D. The Failure to Permit Class Members to Recover Consequential Damages is Unfair and Unreasonable.**

Herbalife is well aware of the fact that its distributors incur substantial expenses in the operation of their Herbalife distributorships and Nutrition Clubs.  In light of the clear legal authority permitting the recovery of consequential damages for violation of the Endless Chain Scheme law, the failure to permit class members to recover their consequential damages is unfair and unreasonable.

**E. There is No Adequate Representation of the Injunctive Relief Class**

The Rule 23(b)(2) injunctive relief class was improperly defined to include former distributors who have no interest or stake in whatever injunctive relief is imposed against Herbalife.  None of the named Plaintiffs are current Herbalife distributors.   Representation of the injunctive relief class is therefore not only inadequate, but non-existent.

**F. The Injunctive Relief Provides No Benefit to the Class But Does Provide a Substantial, Improper Benefit to Herbalife**

The thirteen "corporate policies" which Herbalife has agreed to continue for three years are utterly inadequate and fail to address the core allegations of the Complaint, that Herbalife promotes an endless chain scheme in which the vast majority of distributors lose their investments, falsely advertises its business opportunity, and grossly overcharges for shipping and handling.   In reality the injunctive relief benefits only Herbalife, by giving its corporate policies the

judicial imprimatur of this Court, as it prepares to deal with the governmental regulators who are investigating its business practices.

### G. The Settlement Release is Too Broad

The Release in the Settlement Agreement will release claims against high level Herbalife distributors who would otherwise be subject to "claw back" actions by government regulators, receivers or class members.

### H. The Class Notice and Claims Process is Inadequate

The Class Notice was inadequate because it fails to provide class members with any means for estimating how much of their losses they will recover if the Settlement is approved.  It is confusing because it does not make clear that class members who wish to object can, and should, also file a claim.   The on-line claims process is confusing and deceptive because the page on which claimants are advised of the amount of their "Business Opportunity Claim Award" does not disclose that the award may be subject to pro rata reduction.

### I.  The Class Notice Program is Inadequate

The Class Notice program is inadequate because it fails to address the special problems created by Herbalife's aggressive marketing to the Latino community, including undocumented residents who became Herbalife distributors or Herbalife Nutrition Club operators.

## II.    ARGUMENT

Objectors are mindful of the risks of litigation and the benefits of settlement. Their counsel has litigated class actions against large multilevel marketing firms, including Herbalife, and is well aware of all of the things that can go wrong with a case like this.  But this is a settlement where the financial compensation is so small in relation to the potential damages that could be recovered at trial, and where the injunctive relief is so patently inadequate, that it should not be approved.  In addition, this case is highly visible, and is being closely followed by government regulators and both partisans and critics of the multilevel marketing industry.  This settlement will undoubtedly impact the practices of other multilevel marketers and the ongoing investigations of Herbalife by the Federal Trade Commission and several state Attorneys General.  Objectors respectfully request that the Court undertake the searching inquiry that is called for here, and reject the settlement.  *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 946-47 (9th Cir. 2011) (more searching inquiry is required when a settlement comes before a class is certified); *Mirfasihi v. Fleet Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004) ("because class actions are rife with potential conflicts of interest between class counsel and class members, district judges presiding over such actions are expected to give careful scrutiny to the terms of proposed settlements in order to

make sure that class counsel are behaving as honest fiduciaries for the class as a whole.").

### A. The Settlement Fund Represents About 1% to 2% of the Aggregate Damages of the Class for the Endless Chain Scheme Claim – There is No Justification to Settle for Such a Small Fraction of the Potential Recovery

Fifteen million dollars sure sounds like a lot of money. But in order to determine whether the settlement is fair, reasonable and adequate, the Court needs to be able to assess whether the settlement amount is reasonable in relation to the expected recovery. *See Martin v. Cargill, Inc.*, 295 F.R.D. 380, 384 (D. Minn. 2013) ("The primary problem with the parties' submissions is that they provide almost no information enabling the Court to gauge the value of the proposed class's claims and, hence, the fairness and adequacy of the settlement."); *Custom LED, LLC v. eBay, Inc.*, 2013 U.S. Dist. LEXIS 122022, at *25 (N.D. Cal. 2013) (denying a motion to preliminarily approve settlement where, inter alia, the parties "provided the Court with no information as to the class members' potential range of recovery"); *Galloway v. Kansas City Landsmen, LLC*, 2013 U.S. Dist. LEXIS 92650, *12-*17 (W.D. Mo. 2013) (denying a motion for preliminary approval where the court remained concerned that the amended settlement offered insufficient value for class members' claims and the record was insufficient to determine the approximate value of the class members' claims and the amended settlement); *Sobel v. Hertz Corp.*, 2011 U.S. Dist. LEXIS 68984, *33 (D. Nev.

2011) (finding the court could not "even begin th[e] inquiry" where "the parties ha[d] failed to provide . . . evidence of . . . the total amount of . . . fees that were charged to the class members, let alone potential ranges of recovery and the chances of obtaining it"); *Eubank v. Pella Corp.* 753 F.3d 718, 727 (7th Cir. 2014) ("But the district judge did not find that the trial would yield zero damages. He didn't estimate the likely outcome of a trial, as he should have done in order to evaluate the adequacy of the settlement.").

Certainly a reasonable settlement will normally be less than the potential recovery, but how much less?  The proponents of this settlement offer no evidence by which this Court can undertake this crucial calculus.  They do not disclose or provide any estimate of the range of expected recovery at trial, or even provide the data from which the Court could try to estimate the range of recovery.

This failure is inexplicable because Plaintiffs' counsel had access to what was apparently a substantial database of computer records produced by Herbalife. Plaintiffs' counsel state that Herbalife "produced approximately 4GB of database materials, including approximately 3.5GB of raw data files."   Joint Decl., ¶ 17. Moreover, Herbalife "provided Plaintiffs' counsel with the means to create their own queries and reports using Defendants' confidential internal database."  Joint Declaration of Thomas G. Foley, Jr. and Scott M. Peterson in Support of Joint Motion for Preliminary Approval of Class Action Settlement and Certification of

the Class ("Joint Decl."), ¶18.  This provided Plaintiffs' counsel with "the ability to generate reports and cull the database for corroborating data relating to distributor identifications, distributor retention, distributor purchases, distributor volume points, and royalty rewards paid by distributors."   Declaration of Thomas G. Foley in Support of Plaintiffs' Motion for an Award of Attorneys' Fees and Expenses ("Foley Decl."), ¶ 19.

In addition, Plaintiffs' counsel consulted with a forensic economist, who presumably assisted them in reviewing the information in Herbalife's database.[1] Plaintiffs' counsel do not provide any report by this economist concerning the possible range of damages.  They provide no information of any kind from which this Court could make any finding as to whether the amount of the settlement is reasonable.   No estimate, no range of estimates, nothing.[2]

---

[1] At preliminary approval Plaintiffs counsel stated that they had consulted with "a well-respected economist for class certification issues".   Joint Decl., ¶ 22.   In a recent filing they state that they consulted with an "expert witness economist in federal trade commission matters, Hal J. Singer, Ph.D., to develop damages theories for use in both litigation and in mediation."  Foley Decl., ¶ 8

[2] With all of the information that Plaintiffs' counsel had at their disposal, it should have been possible to provide at least a rough estimate of projected class damages, such as was done in *Minton v. Herbalife International, Inc., et al*, No. BC338305 (Cal.Super., Los Angeles Cty.), a class action on behalf of Herbalife distributors who were involved in two lead generation systems.  *See* Declaration of Robert L. Fitzpatrick in Support of Plaintiffs' Motion for Preliminary Approval of Class Action Settlement, Brooks Decl., Exhibit I.

Here is the only thing we know:  The Settlement Class is comprised of about 1.5 million Herbalife distributors.[3]  This may include about 12,750 Herbalife distributors who are excluded from the Class because they reached the "Global Expansion Team" (GET) level or higher.[4]

Here is what we don't know:

•      How many class members are subject to the arbitration clause that Herbalife began using in September of 2013, and are thereby excluded from the damages class?

•      How many class members are "Business Opportunity Claimants" entitled to claim a cash award under the Settlement?

•      How many Business Opportunity Claimants purchased less than $750 worth of Herbalife products, limiting them to a $20 "Flat Rate Award," subject to pro rata diminution?

---

[3] At preliminary approval Plaintiffs' counsel estimated that there are approximately 1.3 million class members.   Joint Decl., ¶23.  The class notice program prepared by the Settlement Claims Administrator states that there are approximately 1.55 million class members.  Stipulation of Settlement, Exhibit 6 (Settlement Notice Program).   Recently Plaintiffs counsel stated that the Class Notice was mailed to 1,533,399 potential class members.  Foley Decl., ¶ 31.

[4] Herbalife's "Statement of Average Gross Compensation of U.S. Supervisors" for 2011, 2010 and 2009 are attached to the Amended Complaint as Exhibit A.  These indicate that 25% of Herbalife distributors reach the rank of Supervisor, and approximately 3.4% of Supervisors reach the GET level or higher, which means that approximately .85% of Herbalife distributors reach the GET level or higher. .85% of 1.5 million = 12,750.

- How many Business Opportunity Claimants purchased $750 or more worth of Herbalife products, entitled them to a "Pro Rata Award," subject to pro rata diminution?

- How many Business Opportunity Claimants reached the "Supervisor" level in the Herbalife compensation plan?

- What are the average losses suffered by Business Opportunity Claimants?

- What is the range of aggregate losses that might be recovered if Plaintiffs were successful at trial?

Some of this information could be ascertained by Herbalife by reviewing its records of distributor purchases, attrition and bonus payments.   Some of it can be estimated using reasonable, conservative assumptions, as described below.   None of this information was provided to this Court by the parties, which makes it impossible for this Court to determine whether the settlement is fair, reasonable or adequate.

The parties were guided through the settlement process by an extremely well qualified and experienced mediator, the Honorable Daniel H. Weinstein (Ret.). The parties have submitted Judge Weinstein's declaration, in which he describes the mediation sessions over which he presided.  Declaration of the Mediator, Hon. Daniel H. Weinstein (Ret.) ("Mediator Decl."), ¶¶7-18.   Judge Weinstein opines that the $15 settlement fund and $2.5 million in product refunds "is in a range that

I believe reasonably reflects the parties' factual, legal, and damages positions." Mediator Decl., ¶12.  He does not, however, state what that range is, nor does he state what information he relied on to derive "the range of potential damages." Mediator Decl., ¶7.

Plaintiffs' counsel also sought the opinion of the Honorable James Larson (Ret.) on "the range of reasonable value of the Plaintiffs' case."  Declaration of the Honorable James Larson (Ret.) in Support of Motion for Preliminary Approval of Settlement ("Larson Decl."), ¶4.  Judge Larson states that he "suggested a settlement range which turned out to be consistent with the proposed settlement agreement."  Larson Decl., ¶11.  Like Judge Weinstein, he does not state what he believes the range to be, or what information he had on which to base his opinion.

Plaintiffs' counsel themselves do not provide any detail concerning the range of damages that could be anticipated at trial.   They merely quote the opinions of both Judge Weinstein and Judge Larson as to the settlement being within the range of reasonable settlement value.   Joint Decl., ¶28 and ¶32.  This is not enough.  In *In re NFL Players' Concussion Injury Litigation*, 961 F. Supp. 2d 708 (E.D.Pa. 2014), Plaintiffs' counsel and the mediator submitted declarations referring to analyses by economists and actuaries, but did not submit these analyses.  The Court stated, "[u]nfortunately, no such analyses were provided to me in support of  the Plaintiffs' Motion. In the absence of additional supporting

evidence, I have concerns about the fairness, reasonableness, and adequacy of the Settlement."  961 F.Supp. at 716.

We do not know whether $15 million reflects a settlement discount of 50%, or 90% or 99%.   In order to determine what the parties intended as a settlement discount, Objectors attempt below to arrive at a rough estimate of aggregate damages.   In order to do that we must go through the following steps:

• Step 1:  Estimate the number of Settlement Class Members who are excluded from the damages class because they are subject to the arbitration clause which Herbalife began using in September of 2013 (but see Section II.C. below, where Objectors argue that this exclusion is unfair)

• Step 2:  Estimate the number of damages class members who attempted to participate in Herbalife's business opportunity.   Under the Settlement, these class members would qualify as "Business Opportunity Claimants."  Settlement Stipulation, ¶4.4.2.

• Step 3:  Estimate the number of Business Opportunity Claimants who qualify for "Pro Rata Awards" because they purchased at least $750 worth of Herbalife products

• Step 4:  Estimate the average losses of Business Opportunity Claimants who qualify for Pro Rata Awards

**Step 1.   Calculating the Number of Distributors Subject to Herbalife's Arbitration Clause.**   In Section II.C. below Objectors estimate the number of Settlement Class Members who are subject to the arbitration clause to be 330,000. Deducting this from 1.5 million leaves 1,170,000 members of the damages class.

**Step 2.   Calculating the Number of Business Opportunity Claimants.** The parties did not explicitly estimate the number of settlement class members who would qualify as "Business Opportunity Claimants" under §4.4 of the Stipulation.  However, Herbalife claims – and Plaintiffs' counsel evidently agree – that "73% of its participants became members/distributors for the purpose of purchasing product for self-consumption, as opposed to pursuing the business opportunity."  Joint Decl., ¶ 56.  Presumably, Herbalife would say that only 27% of class members were motivated by the business opportunity.  If this is correct, then the number of damages class members who joined Herbalife for the purposes of participating in the business opportunity, and who would therefore qualify as Business Opportunity Claimants, would be 315,900 (27% of 1,170,000).

However, the number of class members who attempted to participate in the Herbalife business opportunity is likely far greater than suggested by Herbalife and Plaintiffs' counsel.  The 73% figure is based on a survey conducted by Lieberman (the "Lieberman survey") which Herbalife commissioned after the December 2012

presentation by Pershing Square.[5]  Plaintiffs' counsel hinted that there were flaws in the Lieberman survey, Joint Decl., ¶ 57, and other commentators have raised serious doubts concerning this survey.[6]  The 73% "self-consumption" finding is inconsistent with Herbalife's own representation in a securities filing, in which it stated that of non-Supervisors, "discount buyers" were 27%, "small retailers" were 61% and "potential supervisors" were 12%.[7]  Since about 25% of Herbalife distributors are Supervisors, the discount buyer percentage translates to about 20% of Herbalife's entire distributor force.

The 73% number is also inconsistent with an industry-wide survey conducted by the Direct Selling Association[8]  in August and September of 2014 (the "DSA survey"), which found that 29% of former direct sellers cited "access to discounted products as the reason they initially launched their direct selling

---

[5] The exact methodology used by Lieberman, including how the sample was selected and what questions were asked, has not been released publicly.

[6] http://seekingalpha.com/article/2501015-are-herbalife-members-really-just-discount-buyers

[7]  May 1, 2012 Form 8-K http://www.sec.gov/Archives/edgar/data/1180262/000129993312001046/htm_44925.htm

[8] The DSA is an industry trade association which is primarily comprised of multi-level marketing firms; Herbalife is a member. http://www.dsa.org/forms/CompanyFormPublicMembers/search?action=find&anyName=herbalife (last visited March 23, 2015).

OBJECTIONS TO CLASS ACTION SETTLEMENT - 15

business."[9]   Moreover, of current direct sellers, the DSA Survey found that 40% were seeking supplemental income, 23% wanted to pay down debt, and 25% wanted to save for the future.  Id. at pages 1-2.   This suggests that at least 88% were motivated by the business opportunity as opposed to being motivated exclusively by product discounts.  The DSA Survey also found that 93% of current MLM distributors earned some amount of money, Id. at page 2, a finding which cannot be squared with the Lieberman finding that 73% of Herbalife distributors are seeking only product discounts.

The findings of Herbalife's January 2013 survey are also inconsistent with a survey which Herbalife commissioned by Actionable Research in April of 2011 (the "Actionable Survey"), less than two years before the Lieberman Survey, but before the current controversy over its business practices and various Wall Street investors had begun.   Brooks Decl., Exhibit A.  Among other things, the Actionable Survey concluded that "most former distributors joined Herbalife to supplement their income."  The survey found that 44% joined to supplement their household income, 13% needed a job, 10% saw the opportunity for high income and another 10% wanted to be their own boss.   Accordingly, at least 77% of the respondents were motivated by the business opportunity.   Only 17% joined in

---

[9]
http://directsellingnews.com/index.php/view/groundbreaking_study_reveals_the_real_direct_selling#.VQ-2m410yVs (last visited March 23, 2015)

order to purchase the product at a discounted price.   The Actionable Survey is more credible than the Lieberman Survey, both because the findings are closer to the findings of the DSA Survey and because it was commissioned for business planning purposes, as opposed to the Lieberman Survey, which was commissioned for defensive purposes, in the wake of the Pershing Square presentation.

Neither the May 1, 2012 Form 8-K, the DSA Survey nor the Actionable Survey were mentioned by the proponents of the settlement and there is no indication that Herbalife produced these surveys to Plaintiffs' counsel, or that Plaintiffs' counsel or the mediator had the benefit of these surveys in the course of settlement negotiations.

Herbalife's May 1, 2012 Form 8-K (80% of distributors are business opportunity participants), the DSA Survey (88% of distributors motivated by the business opportunity) and the Actionable Survey (77% of distributors motivated by the business opportunity) suggest that the class includes a much higher number of business opportunity seekers than suggested by the Lieberman Survey (27% motivated by the business opportunity).   Taking the most conservative of these three percentages (the Actionable Survey, commissioned by Herbalife), Objectors assume that 77% of the class joined Herbalife because they were motivated by the business opportunity.   This approach indicates that 900,900 class members are potential Business Opportunity Claimants (77% of 1,170,000).

**Step 3.   Calculating the Number of Business Opportunity Claimants Who Qualify for Pro Rata Awards.**  Objectors are somewhat stymied in attempting to estimate the number of Business Opportunity Claimants who would qualify for Pro Rata Awards based on purchasing over $750 worth of Herbalife products.  Herbalife, of course, has this information readily accessible in its databases.  The best we can do is to estimate the number of class members who reached the rank of Supervisor.   To qualify as a Supervisor, a Herbalife distributor must purchase at least 4,000 volume points worth of Herbalife products, which translates to about $2500 worth of products.  Approximately 25% of Herbalife distributors reach the level of Supervisor.[10]  Approximately 0.85% of Herbalife distributors reach the level of GET or higher and are therefore excluded from the Settlement Class.  Settlement Stip., ¶1.13.1.

Accordingly, the number of Herbalife Supervisors in the damages class is approximately 280,000 (25% of 1,170,000 = 292,500; 3.5% of 292,500 = 10,237; 292,500 minus 10,237 = 282,262).  This understates the number of Business Opportunity Claimants who would qualify for Pro Rata Awards, because the threshold for such claimants ($750) is lower than the threshold for Supervisors (approximately $2500).

---

[10] Amended Complaint, Exhibits A and B (Herbalife Statements of Average Gross Compensation for 2009, 2010, 2011 and 2012).

**Step 4**.  **Calculating the Average and Aggregate Damages.**  There have been two previous class actions against Herbalife which raised similar allegations against Herbalife on behalf of similar, albeit smaller, classes.  Both resulted in class settlements.   The claims data from those settlements provides at least two yardsticks for estimating damages.  In *Jacobs v. Herbalife International, Inc., et al*, No. CV-02-01431 SJO (RCx) (C.D.Cal.), the Court approved a settlement on behalf of a nationwide class of Herbalife Supervisors who had participated in a lead generation program called "The Newest Way to Wealth" which had been operated by a group of high level Herbalife distributors.   Under the settlement, former Supervisors were entitled to file claims for their economic losses in operating their Herbalife distributorships.  There were 7,779 former Supervisors in the class; 2,481 filed claims (a "take rate" of 31%, which is quite high for class actions).    The claims for economic losses totaled $19,731,186., so the average claim was $7,953.[11]

In *Minton v. Herbalife International, Inc., et al*, No. BC338305 (Cal.Super., Los Angeles Cty.), the Court approved a settlement on behalf of a California class of Herbalife distributors who had participated in two other Herbalife lead

---

[11] The claims administrator's declaration is available at: http://factsaboutherbalife.com/media/2012/12/Declaration-of-Michael-Rosenbaum-on-behalf-of-Claims-Administrator-sworn-to-August-23-2005.pdf  (last visited March 23, 2015).

generation programs, "The Freedom Group" and "Vertical Skip Marketing."
There were 1,026 Herbalife distributors in the class; 120 filed claims (a take rate of
11.7%). The claims for economic losses totaled $1,391,318, so the average claim
was $11,434. Brooks Decl., Exhibit B.[12]

The average claims in *Jacobs* ($7,953) and *Minton* ($11,434) appear to be in
the same order of magnitude as the losses suffered by the named Plaintiffs in this
case. Plaintiff Dana Bostick has $3,000 worth of Herbalife products he was unable
to sell. Amended Complaint, ¶¶ 38-51. Plaintiff Anita Vasko ran a Herbalife
Nutrition Club and lost $12,000. Amended Complaint, ¶¶ 52-59. Plaintiff Julie
Trotter participated in a lead generation system called "Online Business Systems"
and lost $8842.11. Amended Complaint, ¶¶ 60-68. Plaintiff Beverly Molnar also
participated in Online Business Systems and spent $11,000 on leads, website,
training and coaching. Amended Complaint, ¶¶ 69-73. The Amended Complaint
does not provide any information concerning the amount of Plaintiff Chester
Cote's losses, although he purchased enough to become a Supervisor. Amended
Complaint, ¶¶ 74-82.

Most of the Objectors' claims for damages are also in this range; a few are
quite a bit higher. Acosta Decl., ¶5 ($20,000); Avila Decl., ¶5 ($7,000, split with
her partner); Calderon Decl., ¶7 ($22,000); Colon Decl., ¶5 ($34,000); Correa

---

12

Decl., ¶5 ($3,000); Cutzal Decl., ¶5 ($113,340); Estala Decl., ¶5 ($5,000); Garcia Decl., ¶5 ($25,000); Leon Decl., ¶5 ($10,000);  Martinez Decl., ¶5 ($118,000); Melchor Decl., ¶5 ($3,275); Palma Decl., ¶5 ($16,000);  Pastran Decl., ¶5 ($11,500); Perez Decl., ¶5 ($100,000); Rodensky Decl., ¶5 ($6,000);Tafoya Decl., ¶5 ($7,800); Torres Decl., ¶5 ($7,000, split with her partner); Ulloa Decl., ¶5 ($50,000).

If we use the lowest of the yardsticks – the average of about $8,000 for the claimants in *Jacobs* – and chop it in half – we get aggregate classwide damages of $1.12 billion (280,000 Supervisors times $4,000 in average losses).  Even if the average loss were $2500, the approximate cost to become a Supervisor, the aggregate losses are $700 million.  While these numbers may seem huge, they are based on average damages amounts that are lower than all of the yardsticks.  And they do not reflect the losses of Business Opportunity Claimants who did not reach the rank of Supervisor.

So, the Settlement Fund of $15 million represents somewhere between 1% and 2% of the potential recovery after trial, maybe less.  The question for this Court is whether the recovery of 1%-2% appropriately quantifies plaintiffs' risk of losing at trial.  In other words, is there a 98% or 99% change that plaintiffs will lose or recover less than $15 million at trial?   Objectors do not believe that the chances of success are so remote.  *See Acosta v. Trans Union, LLC*, 243 F.R.D.

377, 391 (C.D.Cal. 2007) ("Were Plaintiffs claims … grounded in such a tenuous basis that they were hopelessly doomed to fail in court, such a colossal discrepancy between their apparent litigation value and the value of the Settlement may be acceptable.  That is not true here.").

Liability appears to be strong.  Plaintiffs have survived a motion to dismiss. There are well-supported allegations that Herbalife made deceptive earnings claims.  Amended Complaint, ¶¶158-178 .   Herbalife's primary defense to the endless chain scheme claim, that it complied with the 70% Rule and the 10 customer rule, is open to serious attack, given its representations to the SEC that "we do not rely on the 70% rule" in any meaningful way … and do not regard the "70% rule" as material."[13]

Class certification in pyramid scheme cases is difficult, but not impossible. *Webster v. Omnitrition Int'l. Inc.,* 79 F.3d 776 (9th Cir.), *cert. denied*, 136 L.Ed. 2d 115, 117 S.Ct. 174 (1996) (reversing summary judgment against certified litigation class of multi-level marketing distributors); *Davis v. Avco Financial Services, Inc.,* 371 F.Supp. 782 (N.D.Ohio 1974) (certifying litigation class of distributors in multilevel marketing firm Dare to Be Great), *aff'd in relevant part*, 739 F.2d 1057, 1062 (6th Cir. 1984);  *Torres v. SGE Management, LLC*, 2014 U.S.Dist. LEXIS

---

[13] http://www.sec.gov/Archives/edgar/data/1180262/000119312512295202/filename1.htm (last visited March 23, 2015).

3741 (S.D.Tex. 2014) (certifying litigation class of distributors in multilevel

marketing firm Ignite; an appeal is pending); *Nguyen v. FundAmerica, Inc.*, 1990

U.S.Dist. LEXIS 15031, [1990 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶95,497

(N.D.Cal. 1990) (certifying litigation class against multilevel marketer); *Gouldd v.

Lowrance*, 1998 Tex.App. LEXIS 5311 (Tex.App. 1998) (affirming certification of

litigation class of distributors in multilevel marketing firm Equinox); *Walsh v.

National Safety Associates, Inc.*, 695 A.2d 1095 (Conn.Super. 1996) (same), *aff'd*,

694 A.2d 795 (Conn. 1997).  *See also Bell v. Disner*, 2015 U.S. Dist. LEXIS 15815

(W.D.N.C. February 15, 2015) (certifying defendant class of "net winners" in

receiver's action involving multilevel marketing firm Zeekrewards).   Undersigned

counsel obtained orders certifying litigation classes in *Minton v. Herbalife*,

referenced above, and in *Capone v. Nu Skin Canada, Inc.*, Case No. 2:93-CV-

0285-S (D.Utah  May 13, 1998).  Brooks Decl., Exhibit C.

There is a risk that Herbalife could not afford to pay a judgment in the order

of magnitude described above, but with cash and cash equivalents of $645 million

and net after tax income for 2014 of $308 million, it could certainly afford to pay

more than $15 million.[14] The $15 million Settlement Fund reflects about 2.3% of

Herbalife's cash on hand, and about 4.8% of Herbalife's net after tax income for

---

[14] Herbalife 2014 Form 10-K, pp. 40-41.
http://www.sec.gov/Archives/edgar/data/1180262/000119312515065723/d827286
d10k.htm#tx827286_10

2014.   It does not reflect the strength of the case, notwithstanding the risks of continued litigation.  The Settlement should be rejected.

### B. The Shipping and Handling Claim Alone is Worth Almost Twenty Times the Amount of the Settlement Fund

The Amended Complaint includes allegations that Herbalife overcharged its distributors for package, handling and shipping charges.  Amended Complaint, ¶¶196-203.  Plaintiffs sought to certify a "Packaging & Handling and FedEx Freight Subclass," Amended Complaint, ¶ 244," and alleged that these overcharges were unfair and deceptive practices (Second Claim for Relief, Cal. Bus. & Prof. Code, §17200, Amended Complaint, ¶¶  280-98) and false advertising (Third Claim for Relief, Cal. Bus. & Prof. Code, §17500, Amended Complaint, ¶¶  322-23).  In support of this claim, Plaintiffs allege that:

> In an April 21, 2011 letter to the SEC, Herbalife states "[t]he shipping and handlings [sic] costs for 2010, 2009, and 2008 were $58 million, $49 million and $48 million, respectively." Herbalife's 2010 and 2009 10-Ks, however, account for Herbalife's revenues for North America (which includes Canada, Jamaica, and Aruba) from shipping and handling for 2010, 2009, and 2008 as $102.70 million, $87.30 million, and $80.8 million, respectively.

Amended Complaint, ¶199.  In fact, Plaintiffs understated the extraordinary magnitude of these overcharges because they were comparing Herbalife's total, worldwide shipping and handling costs to just the North American shipping and handling revenues.  As an analyst recently reported, using data from Herbalife's Form 10-K's and correspondence between Herbalife and the SEC, until 2014 the overcharges were well over 500% and in several years exceeded 700%.[15]  The analyst suggested that a reasonable markup might be in the range of 30% to 60%.  Even if a reasonable markup was 100%, the excess markup charged by Herbalife and paid by its United States distributors from 2009 through 2013 is approximately $260 million dollars.    Brooks Decl., ¶¶18-23.

Of course, this is only an estimate.   But Herbalife should be able to produce an exact number, and presumably provided the data to plaintiffs' counsel from which they could have calculated this number.   Moreover, this would be a very manageable claim to handle through a class action, whether litigated or settled. Herbalife knows exactly what each class member paid for shipping and handling charges during the class period.   Once a jury determines the amount of the overcharge it would be a relatively simple matter for a claims administrator, using Herbalife's computerized data, to pay claims.   Claims could be paid even without the class member having to file a claim form!

---

[15] http://seekingalpha.com/article/2883006-red-flags-in-herbalifes-shipping-and-handling-revenues (last visited March 23, 2015).

So, what is the class receiving in return for giving up this claim?  They are getting the promise that for the next three years:

Herbalife shall not simultaneously and separately charge its members a "Packaging & Handling" fee (or similar fee) and an "Order Shipping Charge" (or similar fee)" as was done during the Class Period up until Herbalife adopted its Simplified Pricing Structure, when the two charges were combined into a single "Shipping & Handling" charge.

Stipulation, ¶ 5.1.3.  So a potential $260 million claim gets traded for a change in terminology.   But wait, it gets worse.   Here is how Herbalife described this change to its investors (not its distributors):

During 2013 we simplified our pricing structure for most markets by increasing suggested retail prices and reducing total shipping and handling revenues by a similar amount, eliminating a "packaging and handling" line item from our invoices to Members. *These changes did not materially impact our consolidated Net Sales and profitability.*

Herbalife 2014 Form 10-K, p. 59.[16]   That's right, Herbalife lowered its shipping and handling charges while it simultaneously raised its suggested retail prices (and thereby raised the "wholesale" prices paid by distributors) in such a way that there

---

[16] http://www.sec.gov/Archives/edgar/data/1180262/000119312514057107/d646721d10k.htm

was no impact on Herbalife's revenue.  But there's more.  At the same time as it lowered shipping and handling rates and raised suggested retail prices, Herbalife *also* lowered the basis on which it calculates distributor compensation:

> During 2013 we simplified our pricing structure for most markets, increasing suggested retail prices and reducing total shipping and handling fees, eliminating a "packaging and handling" line item from our invoices to Members, with no impact on total Member cost. In conjunction, the method for Distributor Allowances and Marketing Plan payouts now generally utilizes 90% to 95% of suggested retail price, depending on the product and market, to which we apply discounts of up to 50% for Distributor Allowances and payout rates of up to 15% for royalty overrides, up to 7% for production bonuses, and approximately 1% for the Mark Hughes bonus. Consequently, the revision to our pricing structure did not have a meaningful impact on the amounts of Distributor Allowance or payouts under our Marketing Plan and did not materially impact our consolidated Net Sales and profitability.

Herbalife 2014 Form 10-K, p. 55.  This new concept of basing distributor discounts and bonuses on a number that is 90-95% of suggested retail price (instead of just basing it on suggested retail price) is called "Earn Base."   It's all

laid out in an April 2013 presentation on Herbalife's "Simplified Pricing Structure," which, of course, is anything but simple.[17]

For Herbalife to turn around and say to this Court that this is a benefit for class members is a cynical fraud.

Even if the entire $15 million Settlement Fund were attributed to the Shipping and Handling claim, with the Endless Chain Scheme and False Advertising claims being valued at $0.00, it would be inadequate.  There is no explanation for why class members should be settling this very strong claim for less than six cents on the dollar.

### C. Herbalife Distributors Who Are Subject to Herbalife's Arbitration Clause Are Unfairly Excluded From the Damages Class

The Rule 23(b)(3) damages class excludes Herbalife distributors who are subject to the arbitration clause which Herbalife unilaterally imposed on its distributors beginning in September of 2013, about five months after this litigation was filed.  Settlement, ¶ 1.13.2; Order of Preliminary Approval, ¶3.  It was unfair and unreasonable to exclude such distributors from the damages class.  First, Herbalife waived the arbitration clause by failing to assert it timely (or at all) in the litigation; the clause was not even referenced in this litigation until the filing of the Stipulation of Settlement.  Second, Herbalife waived the arbitration clause by

---

[17] http://herbalifemail.com/pdf/pricingstructureexamples_usen.pdf (last visited March 23, 2015).

insisting that distributors subject to the arbitration clause release their rights to arbitrate claims for injunctive relief and agree to the injunctive relief set forth in the Stipulation of Settlement. Finally, the arbitration clause is unenforceable because Herbalife reserves the unilateral right to modify any and all provisions of its distributor agreements, including the arbitration clause itself, rendering the contracts illusory and unenforceable.

The parties did not submit a copy of Herbalife's arbitration clause with their settlement papers, so Objectors are submitting a copy. Brooks Decl., Exhibit D. The arbitration clause is extremely broad, covering all claims arising out the relationship between Herbalife and the "Member" whether based on the agreement, Herbalife's Rules of Conduct, Sales and Marketing Plan or tort, statute, fraud, misrepresentation or any other legal theory. It also covers claims between one Member and another Member. While there is an exclusion for actions brought in small claims court, there is no exclusion for claims for injunctive relief.[18] It also includes a class action waiver.

The parties did not disclose how many Settlement Class Members are subject to Herbalife's arbitration agreement. Presumably, at a minimum, it would include all distributors who joined Herbalife during and after September of 2013.

---

[18] Section 4(c) of the clause provides that "The arbitrator may award declaratory or injunctive relief only in favor of the individual party seeking relief and only to the extent necessary to provide relief warranted by that party's individual claim.

Most likely, it would also include all distributors who had not dropped out or terminated their involvement in Herbalife prior to September of 2013.  This is because Herbalife's Agreement of Distributorship includes a clause which provides that Herbalife may unilaterally amend the agreement from time to time in its sole discretion:

> 4.  The Herbalife International Business Pack ("IBP"), contains (among other things), the Rules of Conduct and Distributor Policies, the Sales and Marketing Plan, Ordering Procedures and Sample Forms.  These documents and such other rules and policies as Herbalife has published, or in the future may publish, *together with such modifications and amendments as Herbalife shall make in its sole and absolute discretion* (collectively, "the Rules"), are each hereby incorporated into this Agreement of Distributorship (each in its then most recently published form).

Amended Complaint, Exhibit C, page 39 (emphasis supplied).  It is difficult to imagine how any Herbalife distributor who remained with the company after September of 2013 would not have been swept up in this clause.  Objectors estimate, very roughly, that of the 1.5 million class members, 330,000 are subject to the arbitration clause.[19]

---

[19] The Class Period runs from April 1, 2009, through December 2, 2014, or about 68 months.  The segment of the Class Period during which the arbitration clause was in effect runs from September of 2013 to December 2, 2014, or about 15

It is unclear whether any of the named Plaintiffs are subject to the arbitration clause.  All of them joined Herbalife before September of 2013.  The Complaint and Amended Complaint are silent on the issue, as are the Plaintiffs' Declarations.  In any event, Herbalife did not raise the arbitration clause in its Motion to Dismiss.  Herbalife's Answer to the Complaint does not raise its arbitration clause as an affirmative defense.  Herbalife never answered the Amended Complaint.  Herbalife never filed a motion to compel arbitration.  The arbitration clause was not mentioned in this litigation until the filing of the preliminary approval papers in October of 2014.

Under the original Settlement Stipulation, class members subject to the arbitration clause were excluded from the Rule 23(b)(3) damages class, but they were still made subject to the broad general release of all claims.  Settlement Stipulation, ¶ 8.1.  Accordingly, such class members were out of luck.  They could not make claims for their losses in the Settlement, but they had released all of their claims and so would be unable to proceed in arbitration.   The recent

months.  There is a fairly constant rate of churn in the ranks of Herbalife distributors, so we will assume that the number of distributors each month did not vary much.  Applying the ratio of 15/68 to the 1.5 million member class yields approximately 330,000 distributors.  The parties may criticize this estimate, but it was their failure to include the number in their papers which has forced us to go through this exercise.

amendment to the settlement includes an attempt to fix this serious flaw, by providing that:

> … the Released Claims shall not include any individual claims for monetary relief that could be asserted in arbitration by any Settlement Class Member who is excluded from the Rule 23(b)(3) class pursuant to Paragraph 1.13.2 and who has agreed to be subject to the arbitration provisions of the Arbitration Agreement for Disputes Between Members and Herbalife contained in the Member Application Agreement revised during or after September 2013.

Amendment to Settlement, ¶ 2 (inserting new ¶ 8.6 into the Settlement Stipulation). This was a positive change, but it still leaves a serious problem. In the Settlement Stipulation, Herbalife and all Settlement Class members are settling all claims for injunctive relief. These means that Settlement Class members who are subject to the arbitration are being required to give up their rights to arbitrate their individual injunctive relief claims, while their damages claims are relegated to arbitration. Herbalife cannot be allowed to have it both ways. *See  In re C&H News Company.* 133 S.W.3d 642, 647 (Tex.App.  2003) (refusing to enforce arbitration clause where one party retained the ability to pick and choose which claims it wanted to arbitrate); *Brunzell Construction Co. v. Harrah's Club*, 253 Cal.App.2d 764, 779 (1967) (party not permitted to pick and choose between

arbitration and litigation).   "The courtroom may not be used as a convenient vestibule to the arbitration hall so as to allow a party to create his own unique structure combining litigation and arbitration." *Christensen v. DeWor Developments* , 33 Cal.3d 778, 784 (1983), *quoting De Sapio v. Kohlmeyer*, 321 N.E.2d 770, 773 (N.Y.App.  1974).

This is not a case where Herbalife simply failed to timely raise the arbitration clause in the litigation, filed a motion to dismiss the case on the merits, and participated in discovery, including taking the depositions of the named Plaintiffs.  Here, Herbalife entered into the class action settlement which purports to release the injunctive relief claims of 330,000 class members.   Herbalife has thereby waived its rights under the arbitration clause.   See *Saint Agnes Medical Center v. Pacificare of California*, 31 Cal.4th 1187, 1204 (2003) (prejudice will be found where party seeking arbitration has "substantially impaired the other side's ability to take advantage of the benefits and efficiencies of arbitration").

Finally, Herbalife's contractual power to modify and amend its distributor agreement, including the arbitration clause, unilaterally and in its "sole and absolute discretion" (Herbalife's words, not ours), renders the contract a nullity. When is a contract not a contract?  When one party reserves the right to change any and all terms at will, without the consent of the other party.   *Day v. Fortune Hi-Tech Marketing*, 2013 U.S.App. LEXIS 19060, **9-11 (6th Cir. 2013) (holding

arbitration agreement unenforceable where defendant multilevel marketing firm retained ability to amend any term of the agreement at any time); *Torres v. S.G.E. Management, L.L.P.*, 2010 U.S. App. LEXIS 20520, *8-*13 (5th Cir. 2010) (holding arbitration agreement illusory where multilevel marketing firm reserved the right to amend contract in its sole discretion); *Morrison v. Amway Corp.*, 517 F.3d 248 (5th Cir. 2008) (multilevel marketer's unilateral ability to amend "Rules of Conduct," including adding arbitration clause, rendered arbitration agreement to be illusory and unenforceable).

It was unfair and unreasonable to exclude Herbalife distributors who are subject to the arbitration clause from the 23(b)(3) damages class.

### D. The Failure to Permit Class Members to Recover Consequential Damages is Unfair and Unreasonable.

Business Opportunity Claimants who meet the $750 threshold to qualify for "Pro Rata Awards" have their damages awards capped at no more than 50% of their aggregate purchases of Herbalife products.   Settlement Stip., ¶ 4.4.5.   This limitation arbitrarily excludes a substantial portion of the economic losses suffered by Herbalife distributors, which are the expenses they incur in operating their distributorships and Herbalife Nutrition Clubs.[20]

---

[20] It was also unfair to create an arbitrary threshold of $750, below which Business Opportunity Claimants are relegated to token claims of $20 or less.  Objectors

The named Plaintiffs incurred such losses.  *See* Bostick Decl., ¶ 8 ("I purchased leads from third parties."); Vasko Decl., ¶2 (subleased a prime commercial location to operate her Herbalife nutrition club); Cote Decl., ¶8 (purchased leads from third parties); Trotter Decl., ¶7 (purchased leads from third parties); Molnar Decl., ¶8 (purchased leads from third parties).   Most of the Objectors incurred expenses in running Nutrition Clubs.  *See, e.g.* Acosta Decl., ¶5; Calderon Decl., ¶7; Colon Decl., ¶5; Cutzal Decl., ¶5; Estala Decl., ¶5; Garcia Decl., ¶5; Leon Decl., ¶5;  Martinez Decl., ¶5; Palma Decl., ¶5;  Pastran Decl., ¶5; Perez Decl., ¶5; Rodensky Decl., ¶5;Tafoya Decl., ¶5; Ulloa Decl., ¶5.

Herbalife knows that its distributors incur more expenses than simply the purchase of Herbalife products.  For instance, Herbalife states to its investors (not to its distributors), that:

> If a distributor wants to pursue the Herbalife business opportunity, the distributor is responsible for growing his or her business and personally pays for the sales activities related to attracting new customers and recruiting distributors by hosting events such as Herbalife Opportunity Meetings or Success Training Seminars; by advertising Herbalife's products; by purchasing and using promotional materials such as t-shirts, buttons and

---

adopt the arguments made in the brief of Amicus Truth in Advertising, Inc. at pages 9-11.

caps; by utilizing and paying for direct mail and print material such as

brochures, flyers, catalogs, business cards, posters and banners and

telephone book listings; by purchasing inventory for sale or use as samples;

and by training, mentoring and following up (in person or via the phone or

internet) with customers and recruits on how to use Herbalife products

and/or pursue the Herbalife business opportunity.

Herbalife 2011 Form 10-K, p. 53.[21]  At a NYSE Investor Day on December 16,

2008, Herbalife's then executive vice president Des Walsh stated: "let's trade on

the fact that when we open up a new nutrition club that we don't spend more than

$5,000."[22]

The parties have not offered any explanation as to why they have precluded

Business Opportunity Claimants to recover consequential damages associated with

Herbalife's business opportunity.  Damages under the Endless Chain law are not

limited to the recovery of consideration paid to the defendant, but can include

compensatory damages.  *See Li v. EFT Holdings, Inc.*, 2015 U.S. LEXIS 1064 at

*5 (C.D.Cal. 2015) (in endless chain scheme case, plaintiffs not limited to recovery

of consideration from the defendants).  This is because in a rescission action the

---

[21]
http://www.sec.gov/Archives/edgar/data/1180262/000119312512070421/d260039
d10k.htm#tx260039_9
[22] http://factsaboutherbalife.com/media/2012/06/081216-HLF-Investor-Day-at-
NYSE.pdf , p. 30 (last visited March 23, 2015).

Court has discretion to "adjust the equities between the parties."   Cal.Civil Code §1692.  The primary purpose of rescission is to "restore both parties to their former position as far as possible" and "to that end [the court] may grant any monetary relief necessary to do so." *Runyan v. Pac. Air Inds., Inc.,* 2 Cal.3d 304, 316, 85 Cal. Rptr. 138, 466 P.2d 682 (1970).   In actions for rescission based on fraud or misrepresentation, courts have required the party that committed the fraud to pay damages in order to avoid unjust enrichment or to make the innocent party whole. *Runyan, supra,* 2 Cal.3d at 317.  Courts have awarded consequential damages to the aggrieved party following rescission of a contract in various contexts.  *See Sharabianlou v. Karp,* 181 Cal. App. 4th 1133,  (Cal. App. 2010) (defrauded real estate purchaser could recover consequential damages, including commissions paid, escrow fees, interest, and attorneys fees); *Snelson v. Ondulando Highlands Corp.,* 5 Cal. App. 3d 243, 253, 84 Cal. Rptr. 800 (1970) (permitting award of closing costs in fraudulent sale of real estate); *Leaf v. Phil Rauch, Inc.,* 47 Cal. App. 3d 371, 120 Cal. Rptr. 749 (1975) (purchaser of defective automobile entitled to rescission and consequential damages, including towing charges and car rental fees).

In light of the clear legal authority for the recovery of consequential damages for violation of the Endless Chain Scheme law, and Herbalife's

knowledge that its distributors were incurring such losses, the failure to permit

class members to recover their consequential damages is unfair and unreasonable.

### E. **There is No Adequate Representation of the Injunctive Relief Class**

The Settlement calls for certification of an injunctive relief class under Rule

23(b)(2), in addition to a damages class under Rule 23(b)(3).   The injunctive relief

is comprised of thirteen corporate policies which Herbalife has already

implemented and, as part of the Settlement, is agreeing to continue for a period of

three years following final approval.   Settlement, ¶¶5.1.1-5.1.15.   The Settlement

states that these corporate policies were implemented "[a]t least in part as a result

of the filing of the lawsuit."  Settlement, ¶5.1.2. [But see, TINA brief and chart]

Curiously, however, Plaintiffs' counsel do not seek a fee for negotiating for these

"corporate reforms."  Joint Decl., ¶64.  Nor do they seek a fee for monitoring

Herbalife's compliance with these reforms.  **Foley Decl., ¶ 46.**  Nor is there any

provision in the Settlement Stipulation which requires Plaintiffs' counsel or any

other third party to monitor Herbalife's compliance with these corporate policies.

Who benefits from the injunctive relief?

The injunctive relief certainly does not benefit any of the named Plaintiffs,

all of whom have ceased operating as Herbalife distributors.  The original named

Plaintiff, Dana Bostick, states that he "left Herbalife in April of 2013, and [does]

not intend on rejoining."  Declaration of Plaintiff Dana Bostick, ¶ 3.   Plaintiff

Anita Vasko apparently ceased operating her Herbalife Nutrition Club in January of 2014, six months before she was added to the case with the filing of the First Amended Complaint, and now wishes to return the product she was unable to sell. Amended Complaint, ¶ 56 (shared rent for her Nutrition Club until January of 2014); ¶ 59 (no longer actively working on her Herbalife distributorship; Declaration of Anita Vasko, ¶ 2 (still has product she was unable to return). Plaintiff Chester Cote's Herbalife distributorship has expired, and he has product he wishes to return.  Amended Complaint, ¶ 10; Declaration of Chester Cote, ¶ 3. Plaintiff Judi Trotter resigned from her Herbalife distributorship in the Fall of 2012.   Amended Complaint, ¶ 68.   Plaintiff Beverly Molnar was still registered as a Herbalife distributor when the Amended Complaint was filed, but was not active. Amended Complaint, ¶ 9; ¶ 71 (after her first large purchase of Herbalife products, "Molnar stopped trying to resell product and just consumed it"); ¶ 73 (Molnar "stopped buying leads over a year ago).   She still has product she wants to return. Declaration of Beverly Molnar, ¶ 3.   Three of the named Plaintiffs (Molnar, Cote and Vasko) still have Herbalife inventory and want to return it.  This is significant, because a Herbalife distributor may ask Herbalife to repurchase their inventory only if they resign their distributorship.[23]   Accordingly, all of the named Plaintiffs

---

[23] *See* Herbalife Sales and Marketing Plan and Business Rules, pp. 49-50, attached to Amended Complaint as Exhibit C.

are former Herbalife distributors, with no interest in Herbalife's future corporate policies.

The Rule 23(b)(2) class presumably includes some current Herbalife distributors who might be affected by Herbalife's corporate policies over the next three years, i.e., persons who joined Herbalife prior to or during the Class Period and have remained with Herbalife to date.   However, most of the Rule 23(b)(2) class is comprised of former distributors, like all of the named Plaintiffs (and, incidentally, all of the Objectors), and the number of current distributors in the class is inevitably declining as distributors resign, fail to renew, or simply become inactive as their Herbalife businesses fail.

The Supreme Court has instructed that certification of such a class is improper:

> The predominance test would also require the District Court to reevaluate the roster of **class** members continually. The Ninth Circuit recognized the necessity for this when it concluded that those plaintiffs no longer employed by Wal-Mart lack **standing** to seek **injunctive** or declaratory relief against its employment practices. The Court of Appeals' response to that difficulty, however, was not to eliminate *all* former employees from the certified **class,** but to eliminate only those who had left the company's employ by the date the complaint was filed. That solution has no logical connection to the

problem, since those who have left their Wal-Mart jobs *since* the complaint was filed have no more need for prospective relief than those who left beforehand. As a consequence, even though the validity of a (b)(2) **class** depends on whether "final **injunctive** relief or corresponding declaratory relief is appropriate respecting the **class** *as a whole*," Rule 23(b)(2) (emphasis added), about half the members of the **class** approved by the Ninth Circuit have no claim for injunctive or declaratory relief at all. *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2559-60 180 L.Ed.2d 374 (2011). Accordingly, the proper approach here would be to limit the Rule 23(b)(2) class to current Herbalife distributors.   The dilemma for the Plaintiffs and Herbalife is that none of the named Plaintiffs could represent such a class, because they would not be members.  Accordingly, the Rule 23(b)(2) class should not have been certified.

The question remains, given that all of the named Plaintiffs have terminated their participation in Herbalife, and given that Plaintiffs' counsel have disclaimed any reliance on the injunctive relief to justify their fee, why include the injunctive relief component in the settlement at all?  The answer is that it is Herbalife which wants the injunctive relief.  Herbalife wants this Court to approve the corporate policies it has adopted over the past several years.  *See Pearson v. NBTY, Inc.*, 772 F.3d 778,  (7th Cir. 2014) ("The injunction actually gives [Rexall] protection by allowing it, with a judicial imprimatur (because it's part of a settlement approved

by the district court), to preserve the substance of the claims by making … purely cosmetic changes in wording, which Rexall in effect is seeking judicial approval of.").

Recent filings in this case make crystal clear that Herbalife's primary motivation in entering into this settlement is to obtain the judicial imprimatur of this Court upon its corporate policies.  On March 6, 2015, the parties filed an amendment to the Settlement stating, among other things, that "[t]he Parties now desire to make clear that the terms of the Settlement Agreement do not purport to limit the authority of any governmental agency in connection with matters relating to the claims asserted in this Action."  Amendment to Stipulation of Settlement, ¶ 4.  The need for such an amendment is somewhat remarkable, since the original Stipulation of Settlement included a clause that was supposed to ensure that the settlement did not interfere with ongoing investigations by the Federal Trade Commission and the New York and Illinois Attorneys General.  Joint Decl., ¶ 62.  The original Settlement provided that Released Claims do not include claims arising from "(2) federal, state or local government statutes, rules, regulations or ordinances over which a federal, state, or local government agency or similar authority retains sole jurisdiction and for which there is no private right of action accruing to the Settlement Class Members, either collectively or individually").  Stipulation of Settlement, ¶ 8.1.   This language was seriously flawed.  For

instance, it would appear to bar claims arising from statutes where government agencies and private plaintiffs both have rights of action (so the government agency does not have "sole" jurisdiction), which is true for many state consumer fraud and anti-pyramid scheme statutes.[24]   The new release language in the Amendment cures this defect and ensures that government agencies and prosecutors will not be prejudiced in their enforcement actions against Herbalife (Amendment, ¶¶ 1 and 2 (rewriting ¶ 8.1 of the Stipulation and adding new ¶ 8.5 and ¶ 8.6). [25]   On March 10, 2015, Plaintiffs' counsel filed declarations in support of their motion for an award of attorneys fees, one of which stated that "Class Counsel and counsel for Defendants have engaged in several substantive meet and confer discussion with Attorneys General for numerous states to confirm that the proposed settlement will not interfere with ongoing investigations by several state Attorneys General, or release claims which could be prosecuted by Attorneys General."  Foley Decl., ¶58.   Objectors speculate with a good deal of confidence that the primary impetus for the Amendment was the concern, apparently raised by "numerous" state Attorneys General, that the original language would interfere with their investigations and potential prosecution of Herbalife.

---

[24] For instance, the California Endless Chain Scheme Law gives rise to both criminal penalties, Cal.Penal Code §327, and a private right of action, Cal.Civil Code §1689.2.

[25] Regulators may still be prejudiced by the amended Release language to the extent that it interferes with potential claw back actions against the "net winners" of the Herbalife scheme, as discussed in Section II.G. below.

With government regulators breathing down its neck, Herbalife wants to position itself for a potential settlement with them.  Herbalife would undoubtedly like to enter into a deal under which it agrees to undergo some corporate reforms, pay a modest fine, or perhaps some additional restitution, and continue doing what it has always done, operate a business opportunity fraud that enriches a tiny few at the expense of the many.   Having this Court approve the "corporate policies" in the Settlement would give just the sort of judicial imprimatur that Judge Posner warned about in *Pearson v. NBTY*.   As discussed in detail below, the corporate policies provide no benefit to former Herbalife distributors, little or no benefit to current and future Herbalife distributors, and fail to address the problems which gave rise to this action in the first place.  The Rule 23(b)(2) class should not have been certified and, since this Court cannot modify the Settlement for the parties, it should be rejected.

### F.  The Injunctive Relief Provided in the Settlement is Illusory and Fails to Address the Allegations of the Amended Complaint

The Amended Complaint seeks injunctive relief "enjoining Herbalife from paying its Distributors recruiting rewards that are unrelated to retail sales to ultimate users and from further unfair, unlawful, fraudulent and/or deceptive acts." Amended Complaint, Prayer for Relief f.   This request goes to the core of what makes Herbalife an endless chain and a deceptive business opportunity.    In lieu of this relief, the Settlement Stipulation includes a set of thirteen "Corporate Policies"

which Herbalife is agreeing to continue for a period of three years following final approval.  Stipulation, ¶5.1.1.  The Stipulation recites that Herbalife "implemented, instituted or continued to maintain" these policies at least in part as a result of the filing of the lawsuit.   Stipulation, ¶5.1.2.  For the reasons detailed below, these Corporate Policies provide illusory relief to the class, and fail to address the allegations of the Complaint.[26]

At the outset it should be noted that there is nothing in the Stipulation that provides for the oversight or enforcement of the corporate policies.  Recently Plaintiffs counsel filed a motion for fees with supporting declarations in which they state that "Class Counsel is not requesting any additional attorneys' fees to be awarded for inducing Herbalife to make those 13 specific corporate reforms, or for monitoring Herbalife's conduct for three years post-settlement to confirm that Herbalife is maintaining those corporate reforms."  Foley Decl., ¶ 46.  There is nothing in the Stipulation that actually obligates Plaintiffs' counsel to do any such monitoring.   There is a provision which calls for this Court to have "exclusive and continuing jurisdiction over the implementation, interpretation, and execution of the Final Judgment and Settlement Agreement."  Stipulation, ¶12.9.   But there is nothing in the Stipulation that calls for this Court take an active role in policing Herbalife's compliance with the corporate policies for the next three years.

---

[26] Objectors also adopt the arguments raised by Amicus Truth in Advertising, Inc. in their brief at pp. 3-9.

Objectors address these corporate policies below, and conclude that the benefit they provide to the class is illusory; the true beneficiary is Herbalife.

### 1. Shipping and Handling Fees

The first corporate policy is as follows:

> Herbalife shall not simultaneously and separately charge its members a "Packaging & Handling" fee (or similar fee) and an "Order Shipping Charge" (or similar fee) as was done in during the Class Period up until Herbalife adopted its Simplified Pricing Structure, when the two charges were combined into a single "Shipping and Handling" charge.

Stipulation, ¶5.1.3.   For the reasons discussed in Section II.B. above, this provision is illusory and provides no benefit at all to class members.

### 2. Change in Terminology from "Distributor" to "Member"

The second corporate policy change also involves a somewhat cryptic change in terminology:

> Herbalife shall not define "Distributor" in its Glossary of Terms as "Everyone who purchases an Official Herbalife Member Pack (HMP) and submits to Herbalife a valid and complete Membership Application and whose Application has been accepted by Herbalife."

Stipulation, ¶5.1.4.  To those uninitiated into the looking glass world of multi-level marketing, the change in terminology from "distributor" to "member" may seem

befuddling.   The driving force behind this change is Herbalife's attempt to distinguish itself as something other than a pyramid scheme.  One of the factors that the FTC and the Courts consider in determining whether a multi-level marketing program is a pyramid scheme is the extent to which products are sold, for a profit, to persons who are not participating in the scheme.  The Amended Complaint alleged that Herbalife's products are difficult to retail for profit. Amended Complaint, ¶¶22-24, 35-37, 50, 193-195.   As discussed above in section II.A., for several years Herbalife has been claiming that many of its "distributors" are in fact merely "discount customers," thereby neatly sidestepping the retail sales controversy – their argument is that if 73% of Herbalife "distributors" are really just members of a buying club, then the whole enterprise is supported by "retail sales," and therefore, not a pyramid.  The change in terminology from "distributor" to "member," is intended to provide a defense to critics and, more importantly, government regulators who are questioning the extent of Herbalife's retail sales.  It does not provide any benefit to the persons who this settlement is ostensibly supposed to benefit, that is, people who joined Herbalife with the intention of participating in the business opportunity.  It would be much more useful to employ terminology that clearly distinguished between Herbalife participants who are solely interested in purchasing the products at a discount and those who intend to participate in the business opportunity.  But this provision does not accomplish this

– it merely continues the same confusion under a different name.  In fact,

"Members" must sign the same one-sided, onerous agreement, which incorporates

by reference hundreds of pages of policies and rules, and a broad, sophisticated

arbitration clause and class action waiver, any and all of which Herbalife can

modify or amend in its sole and absolute discretion, that distributors used to sign.

If "Members" are just "discount buyers" why do they need to sign such a complex

document?  This Corporate Policy benefits only Herbalife.

### 3.  Discouraging Debt

The next Corporate Policy provides that:

> Herbalife shall continue to discourage members from incurring debt to
>
> pursue the Herbalife business opportunity, consistent with Rule 1.1.2 of
>
> Herbalife's Member Rules of Conduct.

Stipulation, ¶5.1.5.  Given the abysmal failure rate of Herbalife distributors, it

certainly would be a good thing for Herbalife to discourage them from incurring

debt to pursue the Herbalife business opportunity.  But this provision of the

settlement requires Herbalife to do nothing more than include it in its rules of

conduct for "members."   It does not require Herbalife to include the

discouragement of incurring debt in its distributor training events, nor does it

require Herbalife to determine whether distributors are actually following its

advice.   A better term would be for Herbalife to discourage participants from

spending their hard earned savings on the pursuit of the Herbalife business

opportunity.  The practical effect of this term is to give Herbalife a defense to any

distributor who brings a claim based in part on the allegation that they went into

debt (e.g., used their credit card) to purchase Herbalife product in order to

participate in the business opportunity.

### 4.  Shipping and Handling Charges

The next corporate policy provides that:

Herbalife shall continue to pay shipping charges for the return of products to

Herbalife in connection with inventory repurchases, consistent with Rule 2.5.3

of Herbalife's Member Rules of Conduct.

Stipulation, ¶5.1.6.  This provision fails to address the real problem with Herbalife,

which is that the compensation plan creates incentives for distributors to purchase

products in order to achieve higher ranks in the plan and to qualify to receive

bonuses and commissions.   A distributor may only take advantage of the inventory

repurchase provision if they terminate their distributorship, thereby forever

forfeiting the right to earn commissions on their downline.  Amended Complaint,

¶231.  Moreover, since Herbalife "claws back" commissions paid to a distributor's

upline when products are returned, there are substantial incentives to refrain from

exercising this right.  Amended Complaint, Exhibit C, p. 49 ("Herbalife will

deduct the amount of Royalty Overides, Commissions, Production Bonuses and

any other earnings or benefits paid on the returned products from the appropriate Distributors, and adjust qualifications as necessary").

### 5. Compliance Department

The next corporate policy calls for Herbalife to continue to have a compliance department:

> Herbalife shall continue to maintain procedures for the enforcement of its rules, including but not limited to continuing to maintain a member compliance department to enforce its policies, procedures and member rules.  Herbalife shall continue to revise and supplement such policies, procedures and member rules as deemed necessary by Herbalife in the exercise of reasonable business judgment.

Stipulation, ¶5.1.7.  Given all of the regulatory scrutiny to which it is subject, Herbalife is going to maintain a compliance department out of self defense, not out of any concern for its distributors.   Herbalife's system is based on plausible deniability; it needs to give its high level distributors – its "heavy hitter" recruiters – as much freedom as possible to misrepresent the chances for success in the Herbalife business opportunity.  In order to preserve the charade Herbalife needs to show regulators it has the power to rein in "over zealous" distributors.

### 6. Prohibition of Selling Leads

The next corporate policy concerns a long standing problem for Herbalife:

> Herbalife shall maintain its rule prohibiting members from selling leads to other members or purchasing leads from any source, consistent with Rule 3.3.2 of Herbalife's Member Rules of Conduct.

Stipulation, ¶ 5.1.8.   For many years Herbalife's high level distributors have promoted various lead generation systems to their downline distributors.  See Section II.G. below.[27]  Herbalife recognized that this was a problem at least fourteen years ago, when then President Francis Tirelli wrote a memo to "All President's Team Members" stating that lead generation was "[o]ne of our greatest opportunities [but] is also one of our greatest risks."  Brooks Decl., Exhibit E.  If, in fact, Herbalife is really prohibiting all lead generation systems, that would be a good thing.  But, as noted above, there is nothing in the Stipulation that provides for monitoring Herbalife's compliance.  The likelihood is that Herbalife's high level distributors will find ways to evade the rule, and Herbalife will look the other way for as long as possible.

### 7.  No Initial Purchase Requirement

Herbalife shall continue to prohibit members from requiring a person to buy product (other than a Mini or Full Member Pack) as a condition to becoming an Herbalife member or distributor.

---

[27] A white paper on Herbalife lead generation systems is available at http://www.herbalifepyramidscheme.com/deceptive-practices-supporting-herbalife-pyramid-scheme-lead-generation/

Stipulation, ¶5.1.9.   This provision is a red herring.   Of course, anyone who can draw breath can become a Herbalife distributor by purchasing an International Business Pack (IPB) or Mini-IBP for less than $100.   Amended Complaint, ¶30. The problems come later, when the distributor finds that in order to qualify for commissions on his or her downline, steep monthly purchase volumes must be met.   *See, e.g.* Amended Complaint, Exhibit C, p. 12 (monthly purchase requirements for payment of Royalty Overrides).   This is just another defensive measure for Herbalife; it enables Herbalife to argue that there is just a minimal payment required to become a distributor.

### 8.  Nutrition Club Rules

Herbalife shall maintain its rule that before signing a lease or opening a Nutrition Club in a non-residential location, the Herbalife member must have been an Herbalife member for at least 90 days and receive mandatory Nutrition Club operator training, consistent with Rule 8.4.1 of Herbalife's Member Rules of Conduct.

Stipulation, ¶5.1.10.   The purpose of the 90 day "training" period is explained in detail in an investigative report, which explains that Nutrition Club trainees are expected to go to other clubs and consume Herbalife shakes, a system of "coerced

consuming," before they are allowed to open their own clubs.[28]  A number of the

Objectors participated in these programs.  Leon Decl., ¶5 ("I was told to attend

trainings and I had to pay for each training."); Estalla Decl., ¶5 ("I was made to

charge people who I brought in to recruit $25 each only to bring them into a

scheme where they too would lose money."); Cutzal Decl., ¶5 ("I started off

working for free for a Herbalife distributor who ran a Herbalife Nutrition Club,

selling Herbalife products and recruiting people for her.  She told me I had to train

like this in order to have my own club."); Pastran Decl., ¶5 ("I spent $600

attending meetings and trainings at Universidad Del Exito in order to learn how to

run a Herbalife Nutrition Club.").  This provision, far from being a benefit for

distributors, is a key part of the Herbalife Nutrition Club scheme.

### 9.  Herbalife Statement of Average Gross Compensation

Four of the thirteen corporate policies concern various aspects of Herbalife's

"Statement of Average Gross Compensation" (SAGC).[29]  They seem to be

designed to give Herbalife a defense in future litigation or regulatory actions.   The

Statement is now part of the "member application" (even if the "member" just

wants to be a discount customer), so no distributor can claim that he or she didn't

---

[28] http://seekingalpha.com/article/2480445-herbalife-whos-consuming-all-those-shakes-and-why

[29] The 2013 SAGC is available here: http://www.herbalife.com/Content/en-US/pdf/business-opportunity/statement-of-average-gross-compensation-usen.pdf (last visited March 23, 2015).

see it.  Stipulation, ¶5.1.11.  Members must acknowledge reviewing the SAGC when they sign the agreement.  Stipulation, ¶5.1.12.   The agreement will include a disclaimer that the "member" is not relying upon "any other written or oral information or representations about the financial results I might achieve." Stipulation, ¶5.1.15.  The only substantive requirement concerning the contents of the SAGC is that "Herbalife shall continue disclosing in its SAGC the total number and percentage of all members who do not receive any compensation or payment directly from Herbalife."   Stipulation, ¶5.1.13.  Accordingly, Herbalife is free to change any other aspect of the SAGC, including the type and format of the "disclosures."

The SAGC terms of the Settlement are deeply flawed:

- There is no requirement that Herbalife disclose the attrition rates of distributors at each level of the compensation plan.  *See* Amended Complaint, ¶106 (annual attrition rate of non-Supervisors is 90%)

- There is no requirement that Herbalife disclose the range and amounts of business expenses that distributors typically incur.

- There is no requirement that Herbalife disclose the additional expenses incurred by Herbalife Nutrition Club operators.

- The SAGC relies on the flawed and deceptive finding of the Lieberman Survey that 73% of Herbalife distributors are "discount customers."   See Section II.A. above.

- Herbalife does not collect retail sales data from its distributors, so there is no basis for the representations made throughout the SAGC that distributors can earn retail profits, and there is no disclosure as to how much profit the average distributor earns.

- There is no disclosure of the complex volume requirements that distributors must meet in order to qualify to earn commissions, royalties and bonuses from Herbalife.

- The disclaimer that the distributor has not relied upon any other financial representations is unfair and deceptive, given Herbalife's heavy reliance on earnings "testimonials" and other earnings claims to recruit new distributors. Amended Complaint, ¶¶158-192

### G. The Release in the Settlement Stipulation is too broad in that it will release claims against high level Herbalife distributors

Plaintiffs' counsel note that numerous class members have complained about "third parties" who solicited them to become Herbalife distributors in their downlines and then sold leads and training courses to class members.  Joint Decl., ¶41.  Objectors agree that the lead generation "business," which has been carried

on by high level Herbalife distributors for many years, is a serious problem.  See

Section II.F.6 above.   Plaintiffs' counsel state that claims against "third party lead

generators" are not being released in the Settlement, and it appears that they intend

to preserve claims by class members against Herbalife distributors who operated

lead generation businesses.  Joint Decl., ¶41.  However, the plain language of the

release in the Settlement Stipulation will be construed to release these high level

Herbalife distributors, who will contend that they fall within one or more of the

broad categories of third parties who are being released.  The Released Parties

include the following:

> Herbalife International of America, Inc.; Herbalife International, Inc.; and
> Herbalife Ltd. (collectively, "Herbalife") and each of their present and
> former, direct and indirect, subsidiaries, parents, affiliates, unincorporated
> entities, divisions, groups, officers, directors, shareholders, partners,
> partnerships, joint ventures, employees, agents, servants, assignees,
> successors, insurers, indemnitees, attorneys, transferees, and/or
> representatives (collectively, the "Released Parties") shall be released and
> forever discharged by the Class Representatives, for themselves and as the
> representatives of each Settlement Class Member …

Stipulation, ¶8.1.  At the outset it should be noted that two high level Herbalife

distributors are members of Herbalife's board of directors, namely Pedro Cardoso

and John Tartol.[30]  Both Mr. Cardoso and Mr. Tartol have operated Herbalife lead generation businesses.[31]  As directors of Herbalife, both of them would clearly be released by the plain language of the Release.  Since the release extends to former directors, it would also protect at least three other high level Herbalife distributors who operated lead generation systems, Leslie Stanford, Leon Waisbein and Larry Thompson (a former Herbalife distributor).[32]

Many other high level Herbalife distributors have operated lead generation systems.[33]  All of these individuals, if sued by class members or government regulators in "claw back" actions, will argue that they are covered under the express language of the Release, which covers Herbalife's "affiliates," "joint ventures," "agents" and "representatives."   For any court which may in the future be called upon to construe the effect of the Release, the intent of the parties to exclude such persons from the scope of the Release would be irrelevant, given its plain language.  *See Rodriguez v. Oto*, 212 Cal.App.4[th] 1020, 1028 (2013) ("if the requisite intent appears unambiguous from the face of the contract, the third party makes a prima facie showing of entitlement merely by proving the contract"); *Fuls*

---

[30] http://ir.herbalife.com/directors.cfm
[31] http://www.herbalifepyramidscheme.com/perpetrators/pedro-cardoso/ and http://www.herbalifepyramidscheme.com/es/perpetrators/john-tartol/
[32] http://www.herbalifepyramidscheme.com/perpetrators/leslie-stanford/ http://www.herbalifepyramidscheme.com/perpetrators/leon-waisbein/ http://www.herbalifepyramidscheme.com/perpetrators/tish-rochin-larry-thompson/

[33] http://www.herbalifepyramidscheme.com/perpetrators/

*v. Shastina Properties, Inc.*, 448 F.Supp. 983, 988 (N.D.Cal. 1978) ("where the words of a release agreement are not ambiguous, the construction of the agreement is a question of law for the court").

The potential for claims against Herbalife's high level distributors is not merely theoretical.   For example, in an action by the receiver arising out of the SEC's prosecution of a multilevel marketing firm known as Zeek Rewards, the court recently certified a defendant class comprised of the "net winners". *Bell v. Disner*, 2015 U.S. Dist. LEXIS 15815 (W.D.N.C. February 15, 2015).  In an action by the Federal Trade Commission and four state Attorneys General against the multilevel marketing firm Fortune Hi-Tech Marketing, the court-appointed receiver recently received approval to commence litigation against "highly compensated representatives."  Brooks Decl., Exhibit F.   Plaintiffs' counsel refer to meetings they have had with State Attorneys General for "numerous states" who are concerned with the scope of the release.  Foley Decl., ¶58.  In the event any state attorney general or the Federal Trade Commission or a receiver decides to bring civil actions against high level Herbalife distributors, this release could interfere with those actions.

### H. The Class Notice and Claims Process is Inadequate

The Class Notice and claims process have serious flaws:

- The Notice fails to provide class members with any information concerning what they might receive under the settlement.  *See Custom LED, LLC,, v. eBay, Inc.,*  2013 U.S. Dist. LEXIS 122022, *20 (N.D.Cal.) ("the notice does not contain a range of the potential recovery that the class members can expect to receive under the settlement. Thus, it is not possible for a member of the proposed class to determine even approximately what percentage of the fees paid to eBay he or she will recover under the settlement.").

- The Notice implies that class members who wish to object to the settlement may nonetheless file claims, which would be the only way they could get paid if their objections are overruled.  The first page of the Notice includes a graphic with the title "Your Legal Rights and Options in This Settlement." The five options include "Submit a Claim Form and/or Refund Claim Form" and "Object."   Listing the options in this fashion suggests that a class member may either file a claim or object, but not do both.  Many of the Objectors were confused by this aspect of the Notice, and failed to file claims.  *See* Acosta Decl., ¶7; Avila Decl., ¶7; Correa Decl., ¶7; Cutzal Decl., ¶7; Estala Decl., ¶7; Garcia Decl., ¶7;  Martinez Decl., ¶7 ; Pastran Decl., ¶7;Tafoya Decl., ¶7; Torres Decl., ¶7.

- Class members could not determine from the notice whether they might be subject to Herbalife's arbitration clause, and thereby excluded from the

damages class.  *See* Acosta Decl., ¶7; Martinez Decl., ¶7; Correa Decl., ¶7; Cutzal Decl., ¶7; Perez Decl., ¶7.

- The Notice fails to advise class members that they will be releasing claims not alleged in the Amended Complaint, such as wage and hour claims arising from the unpaid "internships" which aspiring Nutrition Club operators must undertake.  *See* http://seekingalpha.com/article/2480445-herbalife-whos-consuming-all-those-shakes-and-why

- The claims process included a procedure under which class members could determine their "Business Opportunity Award," but the page which states the amount of the award fails to state that the award is subject to pro rata reduction.  Brooks Decl., Exhibit G.

## I. The Class Notice Program Failed to Reach the Poor, Undocumented Victims of Herbalife's Deceptive Marketing and Endless Chain Scheme

During the Class Period, and for years prior, Herbalife steadily increased its focus on the Latino market.  In November of 2008, Rich Goudis, Herbalife's Chief Operating Office stated as follows:

So our major initiatives for 2009 is to continue to nurture the replication of nutrition clubs in our Latino business.  We still believe we have a lot of

penetration left.   If you look at the number of [Nutrition] clubs as 6,500 [in the U.S.] versus over 25,000 in Mexico.[34]

In December of 2008, Herbalife's President, Des Walsh, stated that:

And what's remarkable is that if you look at the actual percentage of our Latino business, in 2004 it represents 37% of our total U.S. sales.  Now, 2008, 65%.  During that time, our general market business, that is, the non-Latino business, has essentially been flat.[35]

As explained by Amy Greene, Herbalife's head of investor relations, the key to Herbalife's penetration into the Latino market was the development of the "Nutrition Club:"

So that started in Mexico in 2003, took off in Mexico, 20,000, 25,000 home-based Nutrition Clubs in Mexico.  The US Latino distributors, because of their close relationship to Mexico saw this growth happening in Mexico, and said, well, we need to do it too.  And so Nutrition Clubs began to open in the US.  What we see when it happens is an exponential increase in the addressable audience.[36]

---

[34] http://factsaboutherbalife.com/media/2012/06/081118-HLF-Morgan-Stanley-Consumer-Conference.pdf , p. 4 (last visited March 23, 2015).
[35] http://factsaboutherbalife.com/media/2012/06/081216-HLF-Investor-Day-at-NYSE.pdf , p. 25 (last visited March 23, 2015).
[36] http://factsaboutherbalife.com/media/2012/06/120111-HLF-ICR-XChange-Conference.pdf , p. 2 (last visited March 23, 2015).

The class notice program has failed to address the effect of Herbalife's purposeful targeting of the poor Latino population.  Objectors submit the Declaration of Julie Contreras, President of the League of United Latin American Citizens (LULAC) of Lake County, Illinois, who has spoken with at least 280 Latino victims of the Herbalife scam.   Declaration of Julie Contreras (Contreras Decl.), ¶6.[37]  Ms. Contreras observed widespread confusion concerning the class action notices among the Latino victims.   Contreras Decl., ¶7.  Undocumented victims were fearful about having anything to do with the legal system, and there were rumors that Herbalife would have them deported.  Contreras Decl., ¶8.  She avers that the notice program "failed to acknowledge the reality of differences in the culture, language and understanding of the legal system, as well as the undocumented status of many of the victims."  Contreras Decl., ¶9.   She believes that an outreach program in the Latino community should have been included as part of the notice program.  Contreras Decl., ¶¶10-11.

The class notice program was limited to sending emails and post cards.  Settlement Stipulation, Exhibit 6.  There was no advertising in any media, either English or Spanish, and no effort at outreach.  A number of courts have recognized that class notice programs should be tailored to address the communities affected by the alleged wrongdoing, and in some cases traditional notice by mail is simply

---

[37] Brooks Decl., Exhibit H.

not sufficient. *See In re Black Farmers Discrimination Litigation*, 856 F. Supp. 2d 1, 36-37 (D.D.C. 2011) (approving notice program where, in addition to notice by mail and telephone, there was extensive outreach plan; "class counsel will work with community and trade organizations to disseminate news of the settlement by word of mouth"); *Multi-Ethnic Immigrant Workers Organizing Network, v. City Of Los Angeles*, 2009 U.S. Dist. LEXIS 132270, *15 (C.D.Cal. 2009) (Class notice was distributed by five plaintiff associations to inform as many individuals as practicable of the settlement; "[t]he evidence provided to the Court of the outreach efforts reflects an exceptionally successful outreach, including email, hand-outs, and other distribution efforts by the organizations"); *In re Holocaust Victim Assets Litig.*, 105 F. Supp. 2d 139, 144-45 (E.D.N.Y. 2000) (noting effectiveness of notice plan "tailored to the unique circumstances of this case" which included direct mail, publication, public relations, Internet and "grass roots community outreach"). For the same reasons, the brief, 35-day claims period (Preliminary Approval Order, ¶ 44), was inadequate. *See In re Black Farmers Discrimination Litigation*, 856 F. Supp. 2d at 36-37 (approving 180 day claims period where notice program involved extensive outreach program).

## III.     Conclusion and Notice of Intent to Appear

For the reasons set forth above, Objectors respectfully request that this Court deny final approval of the Settlement. Objectors hereby give notice that they

intend to appear through their undersigned counsel at the final approval hearing in this matter.

Dated:  March 24, 2015

_____

Douglas M. Brooks
**Law Offices of Douglas M.**
**Brooks**
(*pending pro hac vice*)

/s/ Heather M. McKeon

**COHEN MCKEON LLP**
HEATHER M. MCKEON

Attorneys for Objectors