Douglas M. Brooks (*pro hac vice*)
  dmbrooks@brooks-law.net
60 Thoreau Street, No. 219
Concord, MA 01742
Telephone: (781) 424-6737


Michael L. Cohen (SBN: 206253)
cohen@cohenmckeon.com
Heather M. McKeon (SBN: 186414)
mckeon@cohenmckeon.com
Cohen McKeon LLP
1910 West Sunset Boulevard, Suite 440
Los Angeles, CA 90026
Telephone: (213) 413-6400
Fax:         (213) 403-6405

*Attorney for Objectors*

## IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DANA BOSTICK, *et al.,* | **Case No. 2:13-CV-02488-BRO-RZ** |
| Plaintiffs, | |
| vs. | **OPPOSITION OF OBJECTORS TO FINAL APPROVAL OF CLASS ACTION SETTLEMENT** |
| HERBALIFE INTERNATIONAL OF AMERICA, INC., *et al.*, | Hon. Beverly Reid O'Connell |
| Defendants. | |

# TABLE OF CONTENTS

I.   INTRODUCTION…………………………………………………………………1

II.  THE CLASS NOTICE PROGRAM

     HAS FAILED…………………………………………………………………3

III. THE PARTIES' SECOND AMENDMENT

     TO THE SETTLEMENT EXCLUDES

     CURRENT HERBALIFE DISTRIBUTORS

     FROM THE CLASS – NO REMAINING

     CLASS MEMBER HAS STANDING TO

     SUE FOR INJUNCTIVE RELIEF…………………………………………11

IV.  THE PARTIES HAVE FAILED TO

     FIX THE OVERBROAD RELEASE…………………………………………16

V.   THE SHIPPING AND HANDLING

     CLAIM IS NOT AS WEAK AS THE

     PARTIES SUGGEST………………………………………………………..19

VI.  COMPENSATORY DAMAGES ARE

     RECOVERABLE IN AN ACTION FOR

     RESCISSION………………………………………………………………..21

VII. CONCLUSION……………………………………………………………...22

1
2

# TABLE OF AUTHORITIES

3
4

## CASES

5
6

*Federal Trade Commission v. Equinox International, Inc.*

Case No. CV-S-99-0969-KJD (PAL) (D. Nev)………………………………………..8

7
8

*Herbalife International, Inc. v. National Union fire Insurance Co. of Pittsburgh, PA,*

Case No. 07-56595 (9th Cir.)……………………………………………………....21

9
10

*Jacobs v. Herbalife International, Inc.*

Case No CV-02-01431 SJO (RCx) (C.d.Cal.)…………………………………....8,11

11
12

*Minton v. Herbalife International, Inc.,*

Case No. BC338305 (Cal. Super., Los Angeles)………………………………...9,11

13

*Pokorny v. Quixtar, Inc.*

Case No. C 07-00201 SC (N.D.Cal)…………………………………………….9,11

14
15

SEC v. Rex Venture Group, LLC

Case No. 3:12-CV-519 (W.D.N.C.)……………………………………………...8

16

17
18

## FEDERAL CASES

19

*5-hour Marketing and Sales Practices Litigation,* (2014)

U.S. District LEXIS 149732 (C.D.Cal.) *25 - *30………………………………...14

20
21

*Cf. Everson v. D'Angelo* (W.D. Wis. 2009)

672 F.Supp.2d 881…………………………………………………………………18

22
23

*Comcast Corp. v. Behrend* (2013)

133 S.Ct. 1426……………………………………………………………………..20

24
25

*Delarosa v. Boiron, Inc.* (2013)

U.S. Dist. LEXIS 44006 (C.D. Cal.) *7-*18………………………………………15

26

27
28

*Ehret v. Uber Technologies, Inc.*, N.D. Cal. 2014)

   U.S. Dist. LEXIS 132125…………………………………………………….20

*Forcellati v. Hyland's, Inc.* (2014)

   U.S. Dist. LEXIS 50600 (C.D.Ca.), *37-*39……………………………………...15

*Henderson v. Gruma* (2011)

   U.S. Dist. LEXIS 41077 (C.D. Cal)………………………………………………14

*In re Conagra Food, Inc.,* (2015)

   U.S. Dist. LEXIS 24971 (C.D.Cal.) *109-*122…………………………………...14

*In re Deepwater Horizon* (5th Cir. 2013)

   739 F.3d 790……………………………………………………………………….20

*In re FFS Data Inc.* (11th Cir. 2015)

   776 F.3d 1299……………………………………………………………………...18

*In re: Packaged Ice Antitrust Litig.,* (2011)

   U.S. Dist. LEXIS 150427 (E.D.Mich)……………………………………………7

*Jermyn v. Best Buy Stores, L.P* (2012 )

   U.S. Dist. LEXIS 90289 (S.D.N.Y)……………………………………………….6

*Leyva v. Medline Indus, Inc.* (9th Cir. 2013)

   716 F.3d 510………………………………………………………………………20

*Miranda v. Coach, Inc.* (2015)

   U.S. Dist. LEXIS 18278 (C.D.Cal.), *9-*10…………………………………......16

*Parks v. Portnoff Law Assocs.* (E.D. PA. 2003)

   243 F.Supp.2d 244………………………………………………………………….7

*Searle v. Wyndham Int'l* (2002)

   102 Cal.App. 4th 1327…………………………………………………………......19

*Slack v. Int'l Union of Operating Engineers,* (2014)

   U.S. Dist. LEXIS 115558 (N.D.Cal.), *76-*77…………………………………...15

*Slayman v. Fedex Ground Package System, Inc.* (9th Cir.2014)

    765 F.3d 1033...................................................................................15

*Spiegler v. Home Depot U.S.A. Inc.* (C.D. Cal. 2008)

    552 F. Supp.2d 1036.........................................................................20

*Sylvester v. Cigna Corp.,* (D.ME. 2005)

    369 F. Supp.2d 34.............................................................................7

*Touhey v. U.S.,* (2011)

    U.S. Dist. LEXIS 81308 (C.D.Cal)......................................................7

*Walmart v. Dukes* (2011)

    131 S.Ct. 2541.....................................................................14,20,21

*White v. Experian Info. Solutions, Inc.* (C.D. Cal. 2011)

    803 F. Supp.2d 1086..........................................................................7

## **RULES AND STATUTES**

Cal. Bus. & Prof. Code §17200................................................................15

Cal. Civil Code § 1689.2.......................................................................21

Rule 23 (b)(2)...................................................................................14

Rule 23(b)(3)....................................................................................20

## I.    INTRODUCTION

Objectors[1] previously detailed why the proposed settlement is unfair, unreasonable and inadequate.   The parties have not only failed to address the serious issues raised by the Objectors, they have made things worse.

In their original Objections, Objectors pointed out serious flaws with the class notice and notice program, including the complete failure to address the impact of Herbalife's aggressive marketing to the poor and undocumented Latino community, the very brief claims period, and the confusing notice and claims form. The parties have since disclosed that they have experienced a disastrously low claims rate of .47%.  This is a clear red flag that the class notice program was inadequate and unfair.

Objectors argued that class members who are subject to Herbalife's arbitration clause, which it began using in September of 2013, were unfairly excluded from the damages class.   In response, the parties have submitted a second amendment to the Settlement, in which they take the drastic step of entirely excluding such distributors from the Settlement Class.  In doing so they have eliminated all current Herbalife distributors from the class, which means that there is no class member

---

[1] The Objectors are Elvia Acosta, Sabas Avila, Miguel Calderon, Felipe Colon, Elizabeth Correa, Maria Cutzal, Juana Estala, Jose G. Garcia, Valentina Leon, Rossina Martinez, Gilberto Melchor Sanchez, Martil Palma Vallecillo,   Yader A. Pastran,  Susana Perez,  Eric Rodensky,  Jose Tafoya, Olivia Torres and Julia Ulloa (collectively "Objectors").

who has standing to seek injunctive relief.  There is therefore no basis for Herbalife

to obtain the judicial imprimatur of this Court on the various corporate policies it

has adopted over the past several years.

   The absence of current Herbalife distributors in the class is reason enough to

decline certification of the injunctive relief class.   But the proposed injunctive

relief will be ineffective for another reason: Herbalife's compensation plan, which

is untouched by the various corporate policy changes, still rewards recruitment of

new distributors rather than retailing products.   Until that changes, the Herbalife

plan will have an "intolerable potential to deceive."   Deceptive earnings claims by

high level Herbalife distributors have been endemic throughout Herbalife's history.

From the enforcement action by the California Attorney General in the mid-

1980's, to the acknowledgement of the problem with lead generation systems by

Herbalife's President and CEO Francis Tirelli in 2001, through the *Jacobs* action

brought by Objectors' counsel in 2002, the settlement of which included rules that

were supposed to, but failed to, rein in lead generation systems, as well as the

*Minton* class action, also brought by Objectors' counsel on behalf of participants in

several Herbalife lead generation systems, through the prosecution of this action,

the existence of deceptive earnings claims has been a constant.   Without changing

the compensation plan to eliminate qualifying purchases, matching volume

requirements and the like, all of the corporate rule changes are just useless

bandaids.   If Herbalife really believes that there is substantial retail demand for its products, there is no need to impose inventory purchase qualifications on its distributors – the products should "sell themselves."

The parties have also failed to address the other objections raised by Objectors, including the overbroad release, the shipping and handling claim, and the failure to provide for consequential damages.   Final Approval should be denied.

## II.    THE CLASS NOTICE PROGRAM HAS FAILED

The Class Notice Program has proven to be an abject failure.   Out of 1,533,399 class members, only 7,238 filed claims, a claims rate of .47%.   Such a low claims rate might be deemed acceptable in a typical, low-value consumer protection action.   But class actions for participants in multi-level marketing programs, many of whom have lost thousands, or tens of thousands of dollars, typically result in much higher claims rates.   There is something wrong here.

Before the parties revealed the disastrously low claims rate, Objectors had raised serious concerns about the class notice, including the failure to include an outreach program to the members of the Latino community who were targeted by Herbalife's marketing, the brief, 35-day claims period, and the confusing class notice and claim form.   Objections to Class Action Settlement and Notice of Intent to Appear at Final Approval Hearing (Dkt. 121) ("Objections"), pp. 58-63. Objectors' predictions have unfortunately come true.

While they do not admit it, the parties were obviously surprised and concerned by the abysmally low claims rate and, on April 9, they extended the claims deadline until April 30.    Declaration of Philip D. Dracht ("Dracht Decl." Dkt. 130-1), ¶11; Declaration of Eric Robin Re: Notice Procedures (Dkt. 130-5) ("Robin Decl."), ¶20.   They did this without explicitly amending the Settlement Stipulation or seeking court approval.   Moreover, they did not provide any public notice of this extended deadline, so the extension is unlikely to result in a material increase in the number of claims.   The parties' decision to extend the claims deadline was not implemented until April 9, so any class member who checked the claims website after February 3 and prior to April 9 would have been advised that it was too late to file a claim, and they would have no reason to check the website again.   It is unfair that class members who happened to learn of the extension after April 9 will be able to file late claims, while most will not.   At a minimum, the parties should have issued a supplemental or reminder notice to advise the class of the opportunity to file late claims.

The parties were also concerned by the low aggregate value of the claims, which is $5,738,761.49.   Plaintiffs' Memorandum in Support of Motion to Increase Awards to Business Opportunity Claimants (Dkt. 125-1), p. 2.   This amount is approximately 38% of the $15 million Settlement Fund. If the Court grants Plaintiffs' motion to increase the business opportunity awards, the aggregate

value of these claims will be $7,299,619.74, which is still less than half of the Settlement Fund.[2] Robin Decl., ¶21.

Plaintiffs explain the tiny claims rate by referring to the Lieberman survey, which supposedly shows that "73% of potential Class Members were not primarily joining for business opportunities but, instead, were joining for personal or family consumption of the products and that approximately half had no expectation of making any money." Plaintiffs' Memorandum in Support of Final Approval of Class Action Settlement ("Pl. Final App. Mem." Dkt. 130), p. 22. Objectors have demonstrated that the Lieberman survey is inconsistent with other surveys and with Herbalife's SEC filings. Objections, pp. 14-17. But even if only half the class joined Herbalife with some expectation of making money, the claims rate would still be less than 1%. Moreover, as Objectors pointed out, approximately 280,000 class members are Herbalife "Supervisors" whose qualifying purchases of at least $2500 clearly demonstrate their intention to participate in the business opportunity. Objections, p. 18. The parties have not disputed (or even mentioned) this estimate, nor have they disclosed how many of the 7,238 claimants were

---

[2] The product return claims were also much lower than anticipated, $902,311.92 versus a cap of $2.5 million. It should be noted that Plaintiffs' counsel have requested a fee based on 30% of both the $15 million Settlement Fund and the $2.5 million Product Return Fund. Since the Product Return Fund is reversionary, the fee attributable to this fund should be based on the actual amounts received by class members, and not based on the approximately $1.5 million which will be returned to Herbalife.

Supervisors.   However, they have disclosed that $76,520 of the aggregate claims

is being paid to "Flat Rate" claimants, who are only entitled to $20 each.

Plaintiffs' Memorandum in Support of Motion to Increase Awards to Business

Opportunity Claimants (Dkt. 125-1), p. 2.   This indicates that there are a total of

3,826 Flat Rate awards.   This leaves a total of 3,412 "Pro Rata" awards, which are

limited to class members who purchased at least $750 worth of Herbalife products.

Comparing the number of the Pro Rata awards to the number of Herbalife

Supervisors (a conservative approach, since the qualifying purchase for a Herbalife

Supervisor is well above $750), indicates a claims rate of 1.22%, still extremely

low for a pyramid scheme case.

Plaintiffs then speculate that the claims rate was affected by the requirement

in the claim form that class members certify that they did not profit from their sale

of Herbalife products.   Pl. Final App. Mem., p. 23.   In essence this is an

argument that the claims form was so confusing and unfair in denying class

members the ability to recover the expenses they incurred in selling Herbalife

products, that class members failed to make claims.

Finally, Plaintiffs cite several cases in which courts approved settlements

notwithstanding low claims rates. Pl. Final App. Mem, p. 24 & nn. 42-43.

Plaintiffs' cases are easily distinguishable.   In *Jermyn v. Best Buy Stores, L.P.*,

2012 U.S. Dist. LEXIS 90289 (S.D. N.Y.) the settlement did not involve a claims

process and class members were not releasing claims for monetary damages; the court cited *Sylvester v. Cigna Corp.*, 369 F.Supp.2d 34 (D.Me. 2005), in which the court found that a claims rate of 19.7%, where each class member who could be located received three separate mailed notices, did not weigh in favor of either approving or rejecting the proposed settlement. 369 F.Supp. at 49. In *In Re Packaged Ice Antitrust Litig.*, 2011 U.S. Dist. LEXIS 150427 (E.D.Mich.), there was a response rate of less than 1%, but the court found that those claims represented 46% of Defendants' total sales of packaged ice during the class period. Id. at 61. In *Touhey v. U.S.*, 2011 U.S. Dist. LEXIS 81308 (C.D.Cal.), the class consisted of persons who had been subject to civil forfeiture actions by U.S. government agencies; given the circumstances giving rise to government forfeiture actions, and the fact that the class was comprised of persons who would want to keep a low profile and avoid being scrutinized by government agencies and prosecutors (the only objection was filed by a federal prisoner), a low response rate was predictable. *Parks v. Portnoff Law Assocs.*, 243 F.Supp.2d 244 (E.D. Pa. 2003) involved a $75,000 settlement of claims for failure to include certain notices in debt collection correspondence; class members suffered no out-of-pocket losses. And in *White v. Experian Info. Solutions, Inc.*, 803 F.Supp.2d 1086 (C.D. Cal. 2011) the court was clearly concerned by the low 5% response rate (an order of magnitude higher than the .47% response rate in this case), stating that it "grappled

with this reality when it crafted the scope of a secondary notice campaign" and characterized the response rate as "underwhelming."   803 F.Supp.2d at 1100. These cases are inapt and certainly do not justify the minuscule claims rate in this case.

Objectors believe that the better approach is to look at the claims rates in other pyramid scheme cases, including two prior class actions against Herbalife.

In the SEC's prosecution of parties involved with a multi-level marketing firm known as ZeekRewards, the Receiver reported that approximately one million "affiliates" (i.e., distributors) paid money into the ZeekRewards program, of whom approximately 174,000 filed claims, a claims rate of 17.4%.[3]

In a joint state and Federal Trade Commission action against the multi-level marketing firm Equinox and several of its principals, the Receiver reported that 64,000 claims were filed after approximately 480,000 claims packages were mailed to potential claimants, a claims rate of 13.3%.[4]

As Objectors previously stated, the claims rate in *Jacobs v. Herbalife International, Inc.*, No. CV-02-01431 SJO (RCx) (C.D.Cal.), for a class limited to

---

[3] *SEC v. Rex Venture Group, LLC*, No. 3:12-CV-519 (W.D.N.C.) (Receiver's Status Report for the Third Quarter of 2013, pp. 3, 20), attached as Exhibit A to the Declaration of Douglas M. Brooks in Support of Opposition to Final Approval of Settlement ("Brooks Final App. Decl.").

[4] *Federal Trade Commission v. Equinox International, Inc.*, Case No. CV-S-99-0969-KJD (PAL) (D.Nev.) (Motion for Order Authorizing Distribution to Approved Claimants; Declaration of Kenton Johnson in Support Thereof, pp. 3, 5) (Brooks Final App Decl., Exhibit B).

Herbalife Supervisors, was 31%, and the claims rate in *Minton v. Herbalife International, Inc.*, No. BC338305 (Cal.Super., Los Angeles Cty.), for a California-only class of Herbalife distributors and Supervisors, was 11.7%. Objections, pp. 19-20.

In a class action against the multi-level firm Quixtar (otherwise known as Amway), the claims rate was between 3.7% and 5.3%.[5] Significantly, the claims administrator had projected a claims rate of 15%, which is consistent with the other pyramid scheme cases referenced above.

Accordingly, in comparable pyramid scheme cases the claims rates have ranged from a low of 3.7% to a high of 31%. Objectors respectfully suggest that the claims rate of .47% in this case is a red flag that compels careful scrutiny by this Court concerning the adequacy of the notice.

Even before the parties reported the poor results of the notice program, Objectors had raised their serious concerns about the class notice program. Objections, pp. 60-63. Objectors had noted that prior to and during the class period Herbalife had increasingly focused its marketing efforts on the Latino community, including the poor, illiterate and undocumented members of that

---

[5] *Pokorny v. Quixtar Inc.*, Case No. C 07-00201 SC (N.D.Cal.) (Quixtar Inc.'s Memorandum in Support of Joint Motion for Final Approval of Settlement, pp. 1-2 & n.4) (Brooks Final App Decl., Exhibit C).

community. *Id.*[6]  Objectors submitted the Declaration of Julie Contreras, leader of

a Latino organization in Illinois (LULAC of Lake County), who attested to

widespread confusion concerning the class notice, and fear of the legal system

among the undocumented victims.   Contreras Decl., ¶7 and ¶8 (attached as Exhibit

H to the Brooks Decl., Dkt. 121-2). Significantly, Plaintiffs' counsel provide some

support for these concerns; Mr. Dracht averred that "[i]t was reported to me by

staff members supervised by myself and Scott Peterson who were responding to

phone calls from Spanish-speaking Class Members that a handful of Spanish-

speaking claimants had concerns about getting into "trouble" for filing a claim."

Dracht Decl.,  ¶9.

Objectors were also concerned with the very short claims period,

approximately 35 days.  Objections, p. 63.  The parties have implicitly agreed

with these concerns, by silently reopening and extending the claims period.  The

other pyramid scheme cases referenced above provided for much longer claims

periods.  In the ZeekRewards case the order approving notice was entered on May

---

[6] Additional evidence of Herbalife's aggressive marketing to the Latino
community is found in an internal Herbalife strategy document, excerpts of which
are attached as Exhibit D to the Brooks Final App. Decl.  This document indicates
that Herbalife's Spanish speaking distributorships in North America were
experiencing much higher growth than non-Spanish distributorships, that
Herbalife's North American Regional Sales and Marketing department was split
into Spanish and non-Spanish teams, and that sales centers primarily intended for
Spanish Nutrition Clubs were planned for Northern California, Chicago and New
York City.

8, 2013 and the deadline for claims was September 5, 2013.[7] In the Equinox case the claims packages were mailed on July 14, 2000 and the claims bar order was not entered until October 1, 2003.[8] In *Jacobs v. Herbalife* the notice was sent on July 15, 2004 and the deadline was October 26, 2004.[9] In *Minton v. Herbalife* the notice was sent May 20, 2009 and the claims deadline was September 17, 2009.[10] In *Pokorny v. Quixtar* the claims period was four months.[11] In light of these examples, and the .47% response rate, the 35-day claims period in this case was clearly inadequate and unfair.

Objectors urge the Court to order a supplemental notice, including outreach to the Latino community.  Even if the Court grants Plaintiffs' motion to increase the Business Opportunity Awards, there will be more than sufficient funds remaining in the Settlement Fund to pay for additional notice to the class.

III. **THE PARTIES' SECOND AMENDMENT TO THE SETTLEMENT EXCLUDES CURRENT HERBALIFE DISTRIBUTORS FROM THE CLASS – NO REMAINING CLASS MEMBER HAS STANDING TO SUE FOR INJUNCTIVE RELIEF**

---

[7] Receiver's Status Report, supra (Brooks Final App Decl., Exhibit A), p. 19.

[8] Receiver's Motion, supra (Brooks Final App Decl., Exhibit B), p. 3.

[9] http://factsaboutherbalife.com/media/2012/12/Declaration-of-Michael-Rosenbaum-on-behalf-of-Claims-Administrator-sworn-to-August-23-2005.pdf, pp. 3-5.

[10] Declaration of Markham Sherwood (Brooks Decl. (Dkt. 121-2), Exhibit B), ¶3 and ¶10.

[11] *Pokorny v. Quixtar, supra* (Order Granting Motion for Approval of Reminder Notice) (Brooks Final App Decl., Exhibit C).

Objectors argued that the Settlement improperly excluded Herbalife distributors who are subject to the arbitration clause which Herbalife began using in September of 2013 from the damages class, while keeping them in the injunctive relief class.  Objections, pp. 28-34.  The parties want to solve this problem by entirely excluding distributors who are subject to the arbitration clause from the Settlement Class, and are proposing the following modification to the Settlement Stipulation:

> 1.13.2 Also excluded from the Settlement Class are all Herbalife members or distributors who have agreed to be subject to the arbitration provisions of the Arbitration Agreement for Disputes Between Members and Herbalife contained in the Member Application Agreement revised during or after September 2013.

Second Amendment to Stipulation of Settlement (Dkt. 127), pp. 2-3.  In a footnote, Herbalife states that "[a]ssuming the Court approves the Parties' stipulation to amend the Settlement to exclude from the class (and the release) Herbalife members who signed an arbitration agreement with Herbalife (Dkt. 127), the Class Period would be truncated to account for the exclusion of such members." Defendants' Notice of Joinder and Joinder in Motion for Final Approval of Class Action Settlement (Dkt. 131) ("Def. Joinder"), p.4 n.5.   Herbalife does not explain how the class should be "truncated," nor do they state how many persons will no

longer be in the class,[12] but it seems to be clear that the Class Period should

terminate in September, 2013 because that is when Herbalife began implementing

its arbitration clause.[13]  In other words, the Settlement Class will exclude any

Herbalife distributor who either joined or remained in Herbalife after September of

2013.[14]

The parties may have solved one problem, but they have made another

problem worse.  Objectors previously showed that there is no representative for

the injunctive relief class.  Objections at pp. 38-41.  Now, as a result of the second

amendment to the settlement, there is no member of the injunctive relief class who

has standing to seek injunctive relief.

---

[12] Objectors estimated that approximately 330,000 class members were subject to Herbalife's arbitration clause and would therefore be "truncated" from the class. Objections, p. 30 n. 19.  The parties have not offered any estimate.

[13] Objectors pointed out previously that given Herbalife's contractual power to make unilateral changes to the distributorship agreement, any Herbalife distributor who either joined or remained in Herbalife after September of 2013 would be subject to the arbitration clause.   Objections, pp. 29-30.

[14] Curiously, the Parties also seek to insert the following clause in the Settlement: "8.6 Notwithstanding any other term of this Settlement Agreement, the Released Claims shall not include any individual claims asserted by any Settlement Class Member who is excluded from the Settlement Class pursuant to Paragraph 1.13.2 and who has agreed to be subject to the arbitration provisions of the Arbitration Agreement for Disputes Between Members and Herbalife contained in the Member Application Agreement revised during or after September 2013."
Second Amendment to Stipulation of Settlement (Dkt. 127), p. 3.  This clause is superfluous and nonsensical. If a distributor is excluded from the Settlement Class then that distributor is not a Settlement Class Member and their claims could not possibly be subject to the release.

Herbalife argues that "Objectors lacking any stake in Herbalife's business model should not be permitted to deprive class members who remain active Herbalife members of the benefits of the corporate changes set forth in the Settlement." Def. Joinder, pp. 10-11. The problem with this argument is that there are no "active Herbalife members" in the class, and there is noone who will be deprived of anything by eliminating the injunctive relief from the Settlement. Herbalife remains free to continue to observe the corporate policies it has already adopted, and to argue to the Federal Trade Commission and state regulators that these policies adequately protect people who attempt to participate in its fraudulent and deceptive business opportunity, without the judicial imprimatur of this Court.

Plaintiffs apparently believe that the injunctive relief class does not need to comply with *Walmart v. Dukes*, 131 S.Ct. 2541 (2011), and they cite *Henderson v. Gruma*, 2011 U.S.Dist. LEXIS 41077 (C.D.Cal.). Pl. Final App. Mem., p. 38. *Henderson v. Gruma*, which was decided two months before *Walmart v. Dukes,* has been criticized for failing to address the Article III standing issues. *See In re Conagra Foods, Inc.*, 2015 U.S.Dist. LEXIS 24971 (C.D.Cal.), *109-*122 (extensive discussion of meeting Article III standing requirements and declining to certify Rule 23(b)(2) class where the class representatives averred that they "might" or "will" consider purchasing the defendant's products in the future). *See also In re 5-hour Energy Marketing and Sales Practices Litigation*, 2014 U.S.Dist.

LEXIS 149732 (C.D.Cal.), *25 - *30; *Forcellati v. Hyland's, Inc.*, 2014 U.S.Dist. LEXIS 50600 (C.D.Cal.), *37 - *39; *Delarosa v. Boiron, Inc.*, 2013 U.S.Dist. LEXIS 44006 (C.D.Cal.), *7 - *18.   There is a split amongst the courts in the Central District on this issue, but this Court does not need to wade into that morass. This is an easier case.   We are not dealing with falsely advertised products that a consumer might or might not purchase again.   We are dealing with a fraudulent business opportunity or pyramid scheme, in which all of the class representatives, absent class members and objectors are former distributors, with no intention of rejoining.   Former distributors, like former employees, have no standing to seek injunctive relief to reform their employers/franchisors.   *See Slayman v. Fedex Ground Package System, Inc.*, 765 F.3d 1033, 1047-48 (9th Cir. 2014) (class representative who was current employee when complaint was filed, but lost his job before class was certified, did not have standing to represent injunctive relief class); *Slack v. Int'l Union of Operating Engineers*, 2014 U.S. Dist. LEXIS 115568 (N.D.Cal.), *76-*77  (former employee does not have standing to pursue injunction because he "would not stand to benefit from an injunction").

Plaintiffs' argument that *Walmart v. Dukes* somehow doesn't apply to claims under Cal.Bus. & Prof. Code §17200 is wrong.  *Miranda v. Coach, Inc.*, 2015 U.S. Dist. LEXIS 18278 (C.D.Cal.), * 9 - *10 (former employees did not have standing to seek injunctive relief under Cal.Bus. & Prof. Code §17200).

Finally, Plaintiffs' argument that Objectors admit that the first amendment to the settlement stipulation cured all of the problems with Herbalife's "corporate reforms" is nonsense; the quoted language clearly concerned only the overbreadth of the release, and was qualified in a footnote which specifically referred to the Objectors argument that the release still improperly protects high level Herbalife distributors who may face claw back actions by government regulators. Objections, p. 43 & n. 25.

## IV.   THE PARTIES HAVE FAILED TO FIX THE OVERBROAD RELEASE

The professed intent of the parties was to preserve class members' claims against "third parties" who sold lead generation systems in conjunction with their Herbalife distributorships.   Def. Joinder, p. 7 ("Class members nevertheless retain their rights to pursue claims against third parties," citing to Section 8.1 of the Settlement Agreement).  Objectors previously showed that notwithstanding this intent, well-settled principles of contract construction will result in the release of the numerous high level Herbalife distributors who sold lead generation materials to their downlines, including but not limited to Herbalife distributors who are current or former members of Herbalife's board of directors.  Objections, pp. 55-58.

Herbalife argues that distributors who are subject to the arbitration clause are not subject to the release.  Def. Joinder, p. 11.  Obviously, if distributors who are

subject to the arbitration clause are not class members, then they are not bound by the release.   But that is a red herring.   The issue is whether the claims of class members against lead sellers, *including lead sellers who are also Herbalife distributors*, are intended to be released.   If Herbalife really intends to preserve those claims, then it would be a simple matter to amend the Settlement Stipulation to effectuate that intent.   The parties have submitted two amendments to the Settlement in the past month; why not do so here?

Herbalife also argues that "Objectors have not cited any legal basis for contending that a release of a corporation's directors covers claims not arising out of conduct performed in that capacity." Def. Joinder, p. 12.   Herbalife does not cite any authority for the proposition that a general release of a director which is not limited to acts in his or her official capacity should be construed to be limited to such acts, nor does Herbalife address the cases cited by Objectors for the proposition that a general release will be construed according to its plain language. Objections, pp. 57-58.   The release in the Settlement Stipulation does not limit claims against directors (or affiliates, or joint ventures, or agents, or representatives), to actions in their capacities as directors.   In fact, the release extends to:

> all claims, demands, rights, liabilities, suits, or causes of action, known or
>
> unknown, as of the Effective Date that (1) were or could have been asserted

in the complaints filed in this Action against Herbalife, *or (2) are based upon, arise out of, or reasonably relate to*: … (vi) *any of the facts, schemes, transactions, events, matters, occurrences, acts, disclosures, statements, misrepresentations, omissions, or failures to act that have been or could have been alleged or asserted in the Action* (collectively, the "Released Claims")

Stipulation of Settlement (Dkt. 90-5), ¶ 8.1 (emphasis supplied).   Following the plain language rule of construction, this broad language will be construed to release the high level distributors who have served as Herbalife's present and former directors, as well as high level distributors who can argue that they should be considered Herbalife's  affiliates, joint ventures, agents, or representatives. *See In re: FFS Data, Inc.*, 776 F.3d 1299, 1303-05 (11th Cir. 2015) (applying plain meaning rule and holding general release of officer and director not limited to acts in his official capacity). *Cf. Everson v. D'Angelo*, 672 F.Supp.2d 881, 888 (W.D.Wis. 2009) (release expressly provided that individual defendant was released "only in his capacity as an agent, officer, employee or director of" city agency).

If the intent of the parties really is to preserve claims against high level Herbalife distributors who operated lead generation systems, it would be a simple matter to amend the Settlement Stipulation to clarify this, and the Court should

direct the parties to do so.

## V.    THE SHIPPING AND HANDLING CLAIM IS NOT AS WEAK AS THE PARTIES SUGGEST

The Shipping and Handling claim is based on the fact that Herbalife's shipping and handling charges to class members were between 500% and 700% of its actual costs as reported in a letter to the SEC.  Objectors did a "back of the envelope" estimate that this claim was worth approximately $260 million. Objections, p. 24-25.

Herbalife states that it "simply did not engage in a practice of overcharging members for shipping" and cites to the declaration by Plaintiffs' counsel in support of preliminary approval.  Def. Joinder, p. 7.  The referenced declaration states in relevant part that:

"Plaintiffs claimed that assessing both fees illegally implied that the Order Shipping Charge was a pass-through charge and did not imply any additional income generation by Herbalife, which it in fact did. Herbalife asserted that the charges were not unfair or misleading."

Joint Declaration In Support of Joint Motion for Preliminary Approval of Settlement (Dkt. 90-2), ¶36.   Accordingly, Herbalife's assertion is without foundation and is contradicted by the only reference it cites.

Plaintiffs argue that Objectors have underestimated the difficulties in proving this claim.  Plaintiffs rely primarily on *Searle v. Wyndham Int'l*, 102 Cal.

App. 4th 1327, 1333-35 (2002), which involved a 17 percent service charge that was actually paid over in full to the defendant's service employees.   Thus, *Searle* involved the opposite situation than what Plaintiffs alleged here, in which a 7% fee bears no reasonable relation to Herbalife's actual expenses.   A more apt case is *Ehret v. Uber Technologies, Inc.*, 2014 U.S.Dist. LEXIS 132125 (N.D.Cal. 2014), which involved a 20% "gratuity" that Uber added to every fare, representing that it was paid to the driver but in fact keeping a substantial portion for itself. Id. at *2-*3.   The court distinguished *Searle* because it did not involve any misrepresentation[15] and held that "even a mandatory charge can be deceptive if it is labeled as something that it is not".   *Id.* at *23-*27 (collecting cases).

Plaintiffs also overstate the potential difficulties with class certification.   Pl. Final App. Mem., pp. 30-31.   In *Wal-Mart Stores, Inc. v. Dukes*, 131 S.Ct. 2541 (2011), the Supreme Court confirmed that "individualized monetary claims belong in Rule 23(b)(3)." 131 S. Ct. at 2558.   Even after *Comcast Corp. v. Behrend*, 133 S.Ct. 1426 (2013), the circuit courts have continued to hold that individualized damages issues do not inevitably destroy predominance.   *See In re Deepwater Horizon*, 739 F.3d 790, 817 (5th Cir. 2014) (holding that predominance under Rule 23(b)(3) did not require a formula for classwide measurement of damages); *Leyva*

---

[15] Similarly in *Spiegler v. Home Depot U.S.A., Inc.*, 552 F.Supp.2d 1036, 1047-48 (C.D.Cal. 2008), also cited by Plaintiffs, there was no representation of the amount of any charge that was incorporated into the final price.

*v. Medline Indus. Inc.*, 716 F.3d 510, 516 (9th Cir. 2013) ("[T]he presence of individualized damages cannot, by itself, defeat class certification under Rule 23(b)(3)," citing *Dukes*).  Objectors do not wish to underestimate the difficulties of proving liability and obtaining class certification, but continue to believe that a $260 million claim should not be settled for a change in terminology.

## VI.   COMPENSATORY DAMAGES ARE RECOVERABLE IN AN ACTION FOR RESCISSION

Herbalife argues that Plaintiffs only sought rescission, not damages. Def.Joinder, p. 6.  Herbalife is wrong – Plaintiffs clearly sought consequential damages in the Amended Complaint (Dkt. 78), ¶258, and argued for such damages in opposing Herbalife's motion to dismiss.   (Dkt. 27, pp. 18-19).   Herbalife is also disingenuous, because in another case it has argued that compensatory damages are recoverable in an action for rescission, including an action under Cal.Civil Code §1689.2.   In a brief filed in the Ninth Circuit, Herbalife argued the point quite clearly and correctly, and concluded that "a plaintiff asserting a rescission claim under Section 1689.2 clearly is entitled to recover compensatory damages." *Herbalife International, Inc v. National Union Fire Insurance Co. of Pittsburgh, PA*, No. 07-56595 (9th Cir.) (Appellant's Corrected Opening Brief, p. 21) (Brooks Final App. Decl., Exhibit E).[16]

---

[16] The case involved a coverage dispute arising from the *Minton v. Herbalife* case. It was settled before any ruling by the Ninth Circuit.

## VII.   CONCLUSION

For the reasons set forth above, and in the Objectors previously filed

submissions, the Court should deny final approval to the proposed class action

settlement.


Dated:  April 20, 2015


                                            s/Douglas M. Brooks
                                            Douglas M. Brooks
                                            60 Thoreau Street, No. 219
                                            Concord, MA  01742
                                            (781) 424-6737
                                            dmbrooks@brooks-law.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that I am over the age of eighteen (18) and not a party to the within action. I am employed in the law firm of Cohen McKeon LLP, 1910 West Sunset Boulevard, Suite 440, Los Angeles, California 90026.

On April 20, 20151, I used the Central District of California's Electronic Case Filing System, with the ECF account registered to Michael L. Cohen, to file the following document(s):

OPPOSITION OF OBJECTORS TO FINAL APPROVAL OF CLASS ACTION SETTLEMENT

The ECF system is designed to send an e-mail message to all parties in the case, which constitutes service. The Parties served by e-mail in this case are found on the Court's Electronic Mail Notice List.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on April 20, 2015, at Los Angeles, California.

/S/ ROBIN GRIER
Robin Grier