Douglas M. Brooks (*pro hac vice*)
dmbrooks@brooks-law.net
60 Thoreau Street, No. 219
Concord, MA  01742
Telephone: (781) 424-6737

Michael L. Cohen (SBN: 206253)
cohen@cohenmckeon.com
Heather M. McKeon (SBN: 186414)
mckeon@cohenmckeon.com
Cohen McKeon LLP
1910 West Sunset Boulevard, Suite 440
Los Angeles, CA  90026
Telephone: (213) 413-6400
Fax:  ((213) 403-6405

*Attorney for Objectors*

# IN THE UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| DANA BOSTICK, *et al.*,<br><br>            Plaintiffs,<br><br>      vs.<br><br>HERBALIFE INTERNATIONAL OF AMERICA, INC., *et al.*,<br><br>            Defendants. | **Case No. 2:13-CV-02488-BRO-RZ**<br><br>**OBJECTORS' MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION**<br><br>Hon. Beverly Reid O'Connell<br><br>Hearing Date: August 24, 2015<br>Time: 1:30 pm<br>Courtroom 14 |

# <u>TABLE OF CONTENTS</u>

I.    Summary of Issues for Reconsideration…………………………………6

II.   The Class Notice Program was Inadequate………………………………6

      A. The Class Notice Program

         Overrelied on Email…………………………………………………..7

      B. The Notice Program Failed

         To Consider Class Demographics……………………………………...10

      C. The Claims Period Was Too Short…………………………………14

      D. The Court Should Appoint a

         Notice Expert…………………………………………………………..15

III.  This Court's Findings that Molnar and Vasko

      Had Standing to Sue for Injunctive Relief was

      Clear Error……………………………………………………………....16

IV.   This Court's Failure to Make an Independent

      Evaluation of Plaintiffs' Claims was Clear

      Error…………………………………………………………………….23

V.    Recent Evidence Demonstrates That Herbalife

      Is Unable or Unwilling to Police Itself…………………………….....25

VI.   Conclusion…………………………………………………………………29

# **TABLE OF AUTHORITIES**

## **FEDERAL CASES**

*Arevalo v. D.J's Underground, Inc.* 2010 U.S. Dist.

LEXIS 109193 (D. Md. 2010) at *8……………………………………..13

*Bates v. United Parcel Service, Inc.* (9th Cir. 2007)

511 F.3d 974………………………………………………………17,23

*Beal v. Lifetouch, Inc.* 2012 U.S. Dist.

LEXIS 122350 (N.D. Cal. 2012)…………………………………...23

*Braunstein v. Arizona Department of Transportation* (9th Cir. 2012)

683 F.3d 1177…………………………………………………………17

*Carroll v. Nakatani* (9th Cir. 2003)

342 F.3d 934………………………………………………………..23

*Chavez v. Lumber Liquidators, Inc.* 2015 U.S. Dist.

LEXIS 60789 at *14……………………………………………..24

*Ellis v. Costco Wholesale Corp.* (9th Cir. 2011)

657 F.3d 970……………………………………………………17,18

*Gonzalez v. USF Reddaway, Inc.*

Case No. 5:10-CV-01514-AHM-OP…………………………………25

*In re Currency Conversion Fee Antitrust Litigation* (S.D.N.Y. 2009)

    263 F.R.D. 110……………………………………………………………..16

*In re Holocaust Victims Assets Litigation*

    105 F. Supp. 2d 139…………………………………………………..11

*In re Black Farmers Discrimination Litigation*

    856 F. Supp, 2d 1, 36-37……………………………………………...12

*Kaufman v. American Express Travel Services, Inc.* (S.D.Ill. 2012)

    283 F.R.D. 404, 405-408……………………………………………...16

*Lusby v. Gamestop Inc.* (N.D. Cal. 2013)

    297 F.R.D. 400, 414………………………………………………….14,24

*Multi-Ethnic Immigrant Workers Organizing Network v. City of Los Angeles* (C.D. Cal. 2009)

    LEXIS 132270. *15…………………………………………………..12

*Neilson v. The Sports Authority* (N.D. Cal. 2012)

    LEXIS 168226, *16…………………………………………………..15

*Nicholas Millan v. Cascade Water Service, Inc.* 2015 U.S. Dist.

    LEXIS 15412, *38-39 (E.D. Cal. 2015)………………………….14,24

*Sanchez v. Johnson* (N.D. Cal. 2004)

    301 F. Supp. 2d 1060…………………………………………………..6

*Slayman v. Dedex Ground Package System Inc.* (9th Cir. 2014)

765 F.3d 1033……………….......................................................18,22

*Steinfield v. Discover Financial Services,* 2013 U.S. Dist.

LEXIS 91429 (N.D. Cal. 2013)……………………………………14

*Tijero v. Aaron Brothers, Inc.* (N.D. Cal. 2012)

LEXIS 183238, *31…………………………………………………...14

*Valdez v. The Neil Jones Food Company* 2014 U.S. Dist.

LEXIS 111766 (E.D. Cal. 2014), at *19-21……………………………13,14

## RULES AND STATUTES

Federal Rules of Civil Procedure §23(b)(2)………………………………….6,16

Federal Rules of Civil Procedure §23(c)(2)(B)……………………………….7

Federal Rules of Civil Procedure §59(e)………………………………………..6

## TREATISES

West v. Car-Fax, Inc. 2009 Ohio App. LEXIS 5758, ***17………………………8

## I.      Summary of Issues for Reconsideration

"Under Rule 59(e) of the Federal Rules of Civil Procedure … , the granting of a motion for reconsideration is a matter of discretion for a district court and is appropriate if the district court: (1) is presented with newly discovered evidence, (2) committed clear error or the initial decision was manifestly unjust, or (3) if there is an intervening change in controlling law."  *Sanchez v. Johnson*, 301 F. Supp. 2d 1060, 1061-62 (N.D.Cal. 2004).

Objectors respectfully submit that the following issues compel reconsideration of this Court's Final Judgment and Order of Dismissal:

A.  Clear error and new evidence concerning the adequacy of the Class Notice Program.

B.  Clear error concerning the standing of Plaintiffs Beverly Molnar and Anita Vasko to represent the Rule 23(b)(2) Injunctive Relief class.

C.  Clear error in the failure to make independent findings concerning the valuation of Plaintiff's claims.

D.  New evidence demonstrating Herbalife's inability or unwillingness to police its high level distributors.

## II.  The Class Notice Program was Inadequate

In its order on final approval, this Court "recognize[d] that the class response rate is low, as only 7,457 class members have filed a claim for relief. … This

equates to a response rate of less than 1%."[1]  In response to Objectors' arguments concerning the failure of the notice program, this Court stated that it "agrees in theory that a broader notice campaign could have benefitted the class."  Order, p. 47.  But Rule 23(c)(2)(B) does not provide that the class notice is sufficient if it meets some minimum standard.   The Rule mandates that the class must receive the "best notice that is practicable under the circumstances."   Fed.R.Civ.P. 23(c)(2)(B).  This Court's judgment that the notice met that standard, despite the claims rate of less than ½ of 1% and its own finding that a broader notice campaign would have been better, was clear error.  Objectors respectfully submit that the Court should vacate its judgment approving the settlement, and appoint an independent notice expert to assess the effectiveness of the class notice program and, if appropriate, design a new notice program tailored to the circumstances of this case and the class.

## A.  The Class Notice Program Overrelied on Email

The Stipulation of Settlement called for the parties to request a preliminary approval order that called for "maximum use of notice by e-mail and other electronic means."   Stipulation of Settlement (Dkt. 90-5), ¶6.1.10.   Accordingly,

---

[1] *See* Order Re: (1) Plaintiffs' Motions for Final Approval of Class Action Settlement, to Increase the Awards to Business Opportunity Claimants, and for an Award of Attorneys Fees and Expenses [110, 125, 129]; (2) Defendants' Motion for Joinder [131]; and (3) Amici's Motions for Leave to File Amicus Curiae Briefs [114, 117] ("Order"), p. 48.

the parties adopted a "cheaper is better" approach to class notice.  Email may be cheap, but it does not necessarily meet the "best practicable" standard for class notice.  The Federal Judicial Center has published a checklist for Courts to use in evaluating class notice programs.  Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide (Federal Judicial Center 2010) ("FJC Checklist").[2]  The FJC Checklist warns against overreliance on email:

> **Will e-mailed notice be used instead of postal mailings?**
>
> If available, parties should use postal mailing addresses, which are generally more effective than e-mail in reaching class members: mail-forwarding services reach movers, and the influx of "SPAM" e-mail messages can cause valid e-mails to go unread.  If e-mail will be used – e.g., to active e-mail addresses the defendant currently uses to communicate with class members – be careful to require sophisticated design of the subject line, the sender, and the body of the message, to overcome SPAM filters and ensure readership.

FJC Checklist, p. 3.

Sending a class notice via email may be appropriate where the defendant's business was primarily conducted electronically.  *See, e.g.*, West v. Car-Fax, Inc.,

---

[2]  available at
http://www.fjc.gov/public/pdf.nsf/lookup/NotCheck.pdf/$file/NotCheck.pdf

2009 Ohio App. LEXIS 5758, **17 (Ohio App. 2009) (Trapp., P.J., concurring) (discussing problems with email notice and noting that "the courts have deemed email notice particularly suitable in cases where … class members' claims arise from their visits to the defendant's Internet business.").   Herbalife, however, employs a person-to-person marketing system where new distributors are recruited by existing distributors, not by Herbalife itself.   Accordingly, the preference for email notice in this case was not justified.

An example of the problems with email notice was provided to undersigned counsel after the final approval hearing.   On May 18, 2015, Brent Wilkes, National Executive Director of the League of United Latin American Citizens, wrote to undersigned counsel and stated that he was a current Herbalife distributor but that the notice was diverted to his spam filter, and it was a "miracle" that he noticed it.  *See* Declaration of Douglas M. Brooks in Support of Motion for Reconsideration ("Brooks Decl."), ¶2 and Exhibit A.   Further, Mr. Wilkes advised that he received "daily messages from Herbalife … None of them go to my spam folder."  *Id.*  Mr. Wilkes cannot be the only class member who experienced this problem.   In fact, five of the Objectors submitted declarations stating that they did not receive the class notice.   Declaration of Objector Miguel Calderon (Dkt. 121-1), ¶9; Declaration of Objector Felipe Colon (Dkt. 121-1); ¶8; Declaration of Objector Valentina Leon (Dkt. 121-1), ¶7; Declaration of Objector Gilberto

Melchor Sanchez (Dkt. 121-1), ¶7; Declaration of Objector Martil Palma Vallecillo (Dkt. 121-1), ¶7.   That five out of the eighteen objectors represented by undersigned counsel did not receive the class notice suggests that the "reach" calculated by the notice administrator, and upon which the Court relief, was inflated.[3]

### B.  The Notice Program Failed to Consider Class Demographics

The FJC Checklist also provides that the Court should consider the demographics of the class:

**Is the notice plan conducive to reaching the demographics of the class?**

The notice plan should include an analysis of the makeup of the class.  There may be more women than men; it may skew older; it may be less educated than average.  Each audience can be matched with the most efficient and effective methods of notice for reaching those people.

FJC Checklist, p. 2.  The Federal Judicial Center has also published a Pocket Guide for Judges dealing with class actions.  The Guide advises that the Court should:

Make sure the notice plan takes into account any cultural and language barriers to notifying class members. For example, the class actions involving

[3]  The Order states that "Objectors do not dispute that the combined email and postcard notices reached approximately 92.91% of the class."  Order, pp. 47-48. In light of these declarations and the correspondence from Mr. Wilkes, that finding was not correct.   Some unknown percentage of the class were sent the notice via emails which were diverted to their "spam" folders, making the notice administrator's "reach" statistics suspect.

assets of Holocaust victims demanded a far- reaching notice campaign to notify the many dispersed Jewish survivors as well as gays, Jehovah's Witnesses, and Romani ("gypsy") migrants. The judge approved a 'multifaceted plan' that included 'worldwide publication, public relations (i.e., 'earned media'), Internet, and grass roots community outreach.' In re Holocaust Victims Assets Litigation, 105 F. Supp. 2d 139, 144–45 (E.D.N.Y. 2000). As the judge in the Holocaust victims' class actions was, be alert to cultural differences that might affect the attention recipients will give to the proposed notices. A class of migrant farm workers, for example, might rely on radio more often than urban factory workers would. A class of people challenging searches and seizures as unreasonable might respond differently to official court notices than, say, people who have never been arrested.

Class Action Pocket Guide (Federal Judicial Center, 3d ed.) ("FJC Guide"), pp. 29-30. The FJC Guide suggests a number of actions the Court can take in response to a low claims rate, including the use of outreach programs:

If you anticipate or find evidence of a low claims rate, ask counsel whether they have considered alternatives that might enhance the reach of the claims process and tailor it to the characteristics of class members, such as using surveys to determine reasons for nonresponses, improving the clarity of the

claims forms, and adding outreach programs. See Francis E. McGovern, Distribution of Funds in Class Actions-Claims Administration, 35 J. Corp. L. 123 (2009).

Class Action Pocket Guide (3d ed.), p. 30.  *See also In re Black Farmers Discrimination Litigation*, 856 F. Supp. 2d 1, 36-37  (D.D.C. 2011); *Multi-Ethnic Immigrant Workers Organizing Network v. City Of Los Angeles*, 2009 U.S. Dist. LEXIS 132270, *15 (C.D.Cal. 2009).

The Federal Trade Commission has also recognized the importance of using creative methods to communicate with immigrant communities affected by fraud. Commissioner Terrell McSweeney recently spoke on this issue:

> The best way to combat fraud is to empower consumers and foster collaboration across stakeholder groups, so that we can quickly identify new scams and work together to stop them. All too often consumers are unaware that they can come complain to us, to their state AG, to their local Better Business Bureau – and that their complaints are taken seriously.
>
> That's why we are redoubling our efforts to reach out to underserved communities, or groups that might be particularly targeted. Our Division of Consumer and Business Education has found that merely translating materials from English into a native language isn't always effective in conveying information to an immigrant community. So we are retooling

consumer education pieces to make them culturally aware and meaningful.

As an example, we have begun using graphic fotonovelas for some of our

Spanish language outreach.

Common Ground Conference (November 19, 2014, Seattle, Washington)

Keynote Remarks of Commissioner Terrell McSweeny. [4]

In this case, given the evidence of Herbalife's aggressive marketing to the

Latino community,[5] the notice plan should have been designed to actually reach

that community.   *See Valdez v. The Neil Jones Food Company*, 2014 U.S. Dist.

LEXIS 111766 (E.D.Cal. 2014), at *19-21 (where class included migrant workers,

notice limited to mailing to their last known address was inadequate); *Arevalo v.*

*D.J.'s Underground, Inc.*, 2010 U.S. Dist. LEXIS 109193 (D. Md. 2010) at *8

(after notice by mail resulted in an opt-in rate of only 10%, the Court ordered

additional notice, noting that "given the common characteristics of the collective

class members, notice by publication in a Spanish language daily newspaper and

via Hispanic community organizations may prove to be more effective than would

---

[4] Available at
https://www.ftc.gov/system/files/documents/public_statements/601281/mcsweeny
_-_common_ground_conference_11-19-14.pdf   An example of this creative
approach, referenced by Commissioner McSweeney, is the FTC's "fotonovela"
concerning income opportunity scams.
http://www.consumidor.ftc.gov/articulos/spdf-0197-estafa-de-ingresos.pdf

[5] *See* Objections to Class Action Settlement (Dkt. 121), pp. 60-62; Opposition to
Final Approval of Class Action Settlement (Dkt. 134), pp. 9-10.

OBJECTORS' MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION- 13

contact by phone.").

In this case, for example, the notice program should have addressed the "digital divide" between whites and Hispanics, and between English-dominant Hispanics, Spanish-Dominant Hispanics and foreign born Hispanics, especially considering the notice program's overreliance on email notice as discussed above.[6]

### C. The Claims Period Was Too Short

The FJC Checklist states that while 30 days is the minimum, a claims period of from 60-90 days is preferred:

> **Does the notice plan allow enough time to act on rights after notice exposure?**
>
> Class members need time to receive a notice by mail or in a publication. A minimum of 30 days is necessary from completed dissemination before deadlines, with 60–90 days preferred. This allows for re- mailings, fulfillment of requests for more information, and consideration of rights and options.

FJC Checklist, p. 4. District courts in the Ninth Circuit have been increasingly inclined to find that 30 days notice is too short. *See Nicholas Millan v. Cascade Water Services, Inc.*, 2015 U.S. Dist. LEXIS 15412, *38-39 (E.D.Cal. 2015) (45

_____

[6] *See generally* Closing the Digital Divide: Latinos and Technology Adoption (Pew Research Center 2012), available at http://www.pewhispanic.org/files/2013/03/Latinos_Social_Media_and_Mobile_Tech_03-2013_final.pdf

OBJECTORS' MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION- 14

days was too short, 60 to 90 days is preferable); *Valdez v. The Neil Jones Food Company*, 2014 U.S. Dist. LEXIS 111766, *21-22 (E.D.Cal. 2014) (45 days was inadequate); *Steinfeld v. Discover Financial Services*, 2013 U.S. Dist. LEXIS 91429, *2 (N.D.Cal. 2013) (30 days was "unnecessarily brief"); *Lusby v. Gamestop Inc*., 297 F.R.D. 400, 414 (N.D. Cal. 2013) (30 days was inadequate); *Tijero v. Aaron Brothers, Inc.*, 2012 U.S. Dist. LEXIS 183238, *31 (N.D.Cal. 2012) (30 days was inadequate); *Nielson v. The Sports Authority*, 2012 U.S. Dist. LEXIS 168226, *16 (N.D.Cal. 2012) (30 days was inadequate).  At minimum, the Court should have required the parties to articulate why they wanted such a brief notice period.   Since 60 to 90 days is preferred and increasingly becoming the norm, using a shorter period should be based on some justification.   There is no basis in the record for imposing such a brief claims deadline.

### D.  The Court Should Appoint a Notice Expert

There is ample authority for this Court to appoint an independent expert to assess the adequacy of the class notice program.   The FJC Checklist states as follows:

**Do you have unbiased evidence supporting the plan's adequacy?**

Be careful if the notice plan was developed by a vendor who submitted a low bid and might have incentives to cut corners or cover up any gaps in the notice program. *In order to find the "best practicable" notice as Rule 23*

*requires, your own expert report may be advisable.*  This is especially true in the diminished adversarial posture in which settlement places the parties.  It is also true at preliminary approval, before outsiders are aware of the proposed notice plan, which itself may limit the parties' awareness, in turn impacting your final approval decision.

FJC Checklist, p. 2, (emphasis supplied).  The extremely low claims rate in this case was a storm warning that the notice program was inadequate.  In keeping with the guidelines of the Federal Judicial Center, this Court should appoint an expert on class action notice to assess the effectiveness of the class notice and to design a more effective program. *See, e.g.*, *Kaufman v. American Express Travel Services, Inc.,* 283 F.R.D. 404, 405-408 (S.D.Ill. 2012) (where class notice resulted in extremely low claims rate, court ordered the appointment of an class notice expert to design a second round of notice).   Similarly, during the initial notice program in *In Re Currency Conversion Fee Antitrust Litigation***,** 263 F.R.D. 110 (S.D.N.Y. 2009), the Court received "storm warnings," including a low claims rate of approximately 1/3 of 1%.  263 F.R.D. at 118-119.  To address this issue, the Court appointed a Special Master who proposed revisions to the notice and claims procedures.  263 F.R.D. at 119-120.   The revised notice program was a "resounding success," resulting in a claims rate of over 26%.  263 F.R.D. at 120-121 & n.2.

### III.  This Court's Finding that Molnar and Vasko Had Standing to Sue for Injunctive Relief was Clear Error

Objectors initially argued that there was no adequate representation for the Rule 23(b)(2) injunctive relief class because none of the named plaintiffs were current Herbalife distributors.   Objections to Class Action Settlement (Dkt. 121), pp. 38-44.  After the parties amended the Settlement to exclude Herbalife distributors who are subject to the arbitration clause implemented in September of 2013, Objectors argued that not only did the named plaintiffs lack standing but that none of the remaining members of the injunctive relief class had standing. Opposition to Final Approval of Class Action Settlement (Dkt. 134), pp. 11-16. Plaintiffs then filed their Reply (Dkt. 138), along with declarations by two of the named plaintiffs, Anita Vasko and Beverly Molnar, who asserted that they have "remained continuously" Herbalife distributors.  This Court rejected Objectors' standing arguments on the strength of these two declarations.   Order re: Final Approval of Class Action Settlement (Dkt. 145), pp. 25-26.  In doing so, the Court committed a clear error of law which merits reconsideration.

"In a class action, the plaintiff class bears the burden of showing that Article III standing exists." *Ellis v. Costco Wholesale Corp*., 657 F.3d 970, 978 (9th Cir. 2011).  "To satisfy Article III standing, a plaintiff must show (1) he has suffered an "injury in fact" that is concrete and particularized and actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged

action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Braunstein v. Arizona Department of Transportation*, 683 F.3d 1177, 1184 (9th Cir. 2012).

A plaintiff seeking prospective injunctive relief "must demonstrate that he has suffered or is threatened with a concrete and particularized harm, coupled with a sufficient likelihood that he will again be wronged in a similar way." *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 985 (9th Cir. 2007). To satisfy the second requirement, there must be a "real and immediate threat of repeated injury." Id.

When evaluating standing, "[the court] must look at the facts as they exist at the time the complaint was filed." *Slayman v. Fedex Ground Package System Inc.*, 765 F.3d 1033, 1047 (9th Cir. 2014). The original complaint in this case was filed in April of 2013. At that time Bostick was the sole named plaintiff. Mr. Bostick has submitted a declaration stating that "I left Herbalife in April of 2013, and do not intend on rejoining." Declaration of Plaintiff Dana Bostick (Dkt 90-3), ¶ 3. Accordingly, when the case was filed, Bostick "lacked standing to seek injunctive or declaratory relief because [he] would not stand to benefit from such relief." *Slayman*, 765 F.3d at 1047-48); *see also Ellis*, 657 F.3d at 988 ("[O]nly current employees have standing to seek injunctive relief.").

In June of 2014 the Amended Complaint was filed, adding four named plaintiffs.  There is no dispute that two of the newly named plaintiffs have no standing to seek injunctive relief.  Plaintiff Chester Cote's Herbalife distributorship has expired, and he has product he wishes to return.  Amended Complaint (Dkt 78), ¶ 10; Declaration of Chester Cote (Dkt. 90-3), ¶ 3.  Plaintiff Judi Trotter resigned from her Herbalife distributorship in the Fall of 2012.   Amended Complaint, ¶ 68.

There should be no dispute that the other two named plaintiffs also have no standing to seek injunctive relief.  Plaintiff Anita Vasko ceased operating her Herbalife Nutrition Club in January of 2014, six months before she was added to the case.  Amended Complaint, ¶ 56.   As of the filing of the Amended Complaint she was no longer "actively working on her Herbalife distributorship" and was stuck with product she was unable to sell.  Amended Complaint, ¶ 59.  Vasko still has product she was unable to return because she purchased it more than one year before she wanted to return it.  Declaration of Anita Vasko (Dkt. 90-3), ¶ 2.

While Plaintiff Beverly Molnar was still registered as a Herbalife distributor when the Amended Complaint was filed, she was "not active."  Amended Complaint, ¶ 9.  Six months after her first large purchase of Herbalife products in June, 2011, "Molnar stopped trying to resell product and just consumed it."  Amended Complaint, ¶71.  Molnar "stopped buying leads over a year ago", i.e.,

before June of 2013.   Amended Complaint, ¶ 73.  Molnar still has Herbalife

inventory and wants to return it.  Declaration of Beverly Molnar (Dkt. 90-3), ¶ 3.

The fact that both Molnar and Vasko want to return their remaining

inventory to Herbalife is significant, both because a Herbalife distributor may ask

Herbalife to repurchase their inventory only if they resign their distributorship,[6]

and because it indicates that neither of them intend to resume operating as

Herbalife distributors in the future.

Plaintiffs argued that Vasko and Molnar still have "Active" status with

Herbalife.  Plaintiffs' Reply to Opposition to Motion for Final Approval (Dkt

138), p. 6.  This is simply not true.  Beverly Molnar averred that:

3.      I became an Herbalife distributor in 2011.  Since that date I have

remained continuously an Herbalife distributor or member.

Declaration of Class Representative Beverly Molnar in Support of Motion for Final

Approval of Settlement (Dkt 138-2).   Similarly, Anita Vasko averred that:

\*      **I became an Herbalife distributor in approximately September of**

**2012.  Since that date I have remained continuously an Herbalife**

**distributor**.

Declaration of Class Representative Anita Vasko in Support of Motion for Final

Approval of Settlement (Dkt 138-2) (emphasis in original).

---

[6]  *See* Herbalife Sales and Marketing Plan and Business Rules, pp. 49-50, attached
to Amended Complaint as Exhibit C.

OBJECTORS' MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION- 20

Neither Vasko nor Molnar explicitly disown or repudiate their prior declarations or pleadings, which indicate that they ceased operating as Herbalife distributors in January of 2014 (Vasko) or June of 2013 (Molnar), long before the certification of the settlement class on December 2, 2014.   While Plaintiffs use the term "Active" in their Reply, neither Vasko nor Molnar aver that they were "Active" Herbalife distributors when the class was certified.   If they had done so they would have been contradicting their sworn Declarations and the allegations of the Amended Complaint.

Notably, Herbalife did not file any declaration on this issue.   In Herbalife parlance, the word "Active" has a very specific meaning:  in order to be "Active" the distributor must have purchased ("generated") 2500 volume points of Herbalife product in one year.   Amended Complaint, Exhibit A (Dkt 78-1) (Herbalife statements of average gross compensation for U.S. Supervisors in 2011, 2010, 2009 and 2008).   There is no evidence that either Vasko or Molnar purchased any Herbalife products in the year prior to this Court's order certifying the settlement class.   There is no evidence that either of them were operating as Herbalife distributors when the class was certified.   There is no evidence that either of them intended to resume operating as Herbalife distributors in the future.[7]   In fact, all of

---

[7] The absence of any evidence that Molnar or Vasko intends to resume operating as Herbalife distributors distinguishes this case from those cited in Plaintiffs' Reply,

the evidence compels a finding that both Molnar nor Vasko had ceased operating

as Herbalife distributors many months before the class was certified and that

neither of them had any intention of operating as Herbalife distributors in the

future.

Since both Molnar and Vasko had ceased operating their Herbalife

distributorships prior to the certification of the settlement class, "[their] claims for

prospective relief became moot because [they] could no longer benefit from such

relief." *Slayman*, 765 F.3d at 1048.  "[W]here, as here, the plaintiff's claim

becomes moot before the district court certifies the class, the class action normally

also becomes moot."   Id.

As noted above, in their most recent declarations Molnar and Vasko do <u>not</u>

aver that they are still "Active" Herbalife distributors; rather, they claim that they

are have "remained continuously" Herbalife distributors.   Neither Molnar nor

Vasko explain how they can have "remained continuously" Herbalife distributors

despite their prior allegations and declarations that they have ceased operating as

Herbalife distributors.  There may be a clue in the Amended Complaint, ¶9, which

states that "Molnar is still registered as an Herbalife distributor although she is not

active".  It may be that both Molnar and Vasko were still "registered" as Herbalife

---

p. 7 nn. 5 & 6, where the plaintiffs averred that they might purchase defendants'
falsely advertised products in the future.

distributors when the class was certified.   But, whatever being "registered" means, it does not mean that they were "active" distributors with a stake in Herbalife's future operations.

If Molnar and Vasko were "registered" Herbalife distributors, but not active, would they have standing to sue for injunctive relief?   No.   An inactive distributor, who has ceased operations and desires to return her inventory for a refund, cannot possibly "demonstrate that [she] has suffered or is threatened with a concrete and particularized harm, coupled with a sufficient likelihood that [she] will again be wronged in a similar way." *Bates v. United Parcel Service, Inc*., 511 F.3d 974, 985 (9th Cir. 2007).   The fact that Molnar and Vasko may appear on a list of inactive Herbalife distributors does not give them any cognizable stake in Herbalife's future operations.   The Ninth Circuit has refused to find standing where the plaintiff has merely a "symbolic" grievance.   In *Carroll v. Nakatani*, 342 F.3d 934, 941-42 (9th Cir. 2003), the Ninth Circuit held that a plaintiff lacked standing to challenge racial preferences in a government loan program where the plaintiff filed only a "symbolic, incomplete application" and did not demonstrate an "ability to compete" for the loan.   *See also Beal v. Lifetouch, Inc.*, 2012 U.S. Dist. LEXIS 122350 (C.D.Cal. 2012), *9 ("Even if Plaintiff did have standing as a shareholder, the injury to Plaintiff's financial interests as a result of Defendants' employment practices is not the same type of injury suffered by current

employees."). Similarly, here, Molnar and Vasko's supposed status as "registered" Herbalife distributors is an empty formality that cannot be found sufficient to give them Article III standing to sue for injunctive relief.

## IV. This Court's Failure to Make an Independent Evaluation of Plaintiffs' Claims was Clear Error

In its Order this Court states that "[a]lthough Plaintiffs' failure to provide the Court with other documentary evidence prevents the Court from arriving at its own independent estimate of the value of Plaintiffs' case, the Court does not find this failure to be fatal given the objective third party evaluations supporting the settlement's fairness and reasonableness.." Order, p. 37. While the parties' use of mediators may be helpful, it does not excuse this Court from making its own evaluation of the value of plaintiffs' claims. *See, e.g. Chavez v. Lumber Liquidators, Inc.*, 2015 U.S. Dist. LEXIS 60789 at *14 (N.D.Cal. May 8, 2015) ("the Court notes that the parties have not provided enough information about the potential value of the class' claims if they are taken to verdict. This information is important because the damages the class may receive at trial are an important factor in assessing the amount offered in the settlement"); *Nicholas Millan v. Cascade Water Services, Inc.*, 2015 U.S. Dist. LEXIS 15412, *33 (E.D.Cal. 2015) ("However, the lack of percipient facts presented in the Motion makes the value of the claims difficult to assess. Thus, the parties are advised that, should they decide

to seek approval of the settlement again, they should include information detailing the value of the claims"); *Lusby v. Gamestop Inc.*, 297 F.R.D. 400, 416 (N.D. Cal. 2013) ("Plaintiff did not submit any information that would enable the Court to determine that the settlement falls within the range of possible approval, including information establishing the maximum recovery Plaintiff could have obtained if the action were concluded on the merits in his favor").

The evaluation of Plaintiffs' claims is important not only for determining whether the settlement is fair, reasonable and adequate, but also for providing information to class members concerning the claims they will be releasing if they do not opt out or object to the settlement.   For instance, in *Gonzalez v. USF Reddaway, Inc.,* Case No. 5:10-CV-01514-AHM-OP (C.D.Cal.), Judge Matz denied preliminary approval because the parties had failed to include any information about the anticipated claims amount in the class notice; in their amended motion the plaintiffs revised the notice to include the minimum and maximum amount that could be awarded to each class member, as well as including each class member's unique "claim share" in each class notice. Plaintiff's Notice of Amended Motion and Motion for Preliminary Approval of Class Action Settlement, ¶¶10-11 (Brooks Decl., Exhibit D).

## V.   Recent Evidence Demonstrates That Herbalife Is Unable or Unwilling to Police Itself

In its Order this Court rejected Objectors' arguments that there was no enforcement mechanism for the corporate reforms included in the Settlement Stipulation.   Order, p. 39.   Following the issuance of the Order, new evidence has come to light that justifies Objectors' concerns and warrants reconsideration.   On June 25, 2015, the New York Post reported that it had viewed a 2005 video in which Herbalife's CEO, Michael Johnson, giving a speech to high level Herbalife distributors, admitted that:

- Success in Herbalife is a "lottery ticket" with few making it to the top ranks

- Herbalife distributors had sometimes engaged in "false promises, claims, in hopes for product, for money, for recruiting, for customers, for pyramiding."

- The recruiting that had made the top ranks of Herbalife distributors multimillionaires would always be the "most vital part of our bloodstream"

- Sales tactics that "top dog" Herbalife distributors used had sometimes led people "down a false road" where $4,000 would buy any "instant distributorship."

- "When the credit card bill comes, the spouse says, 'How are we going to pay this?  You didn't sell this stuff.  It's in the garage.  It's in the pantry.

What are we going to do?"

- "You guys [top level Herbalife distributors] gotta do things right because Rich [Goudis, then Herbalife's CFO] and I have one major job … to stay out of jail."  Johnson said "We go to the gray-bar hotel together if you don't operate with ethics."

- Johnson called lead generation the "source of many evils" that put people "in debt up to their ears."

*See* Brooks Decl., ¶3 and Exhibit B.[8]  Undersigned counsel has not seen the video, which is not publicly available, but the reported statements confirm many of the allegations of the complaint, and suggest that Herbalife was experiencing considerable frustration in policing its high level distributors.

Fast forward ten years, and on July 10, 2015, the St. Louis Post-Dispatch reported on a Herbalife distributor convention - an "Extravaganza" – being held at the America's Center in St. Louis.   *See* Brooks Decl., ¶4 and Exhibit C.   The reporter interviewed several newly recruited Herbalife distributors:

- Brian Couvillon traveled from Orlando, Fla., to the Herbalife convention because he says he believes in the product and the company's

---

[8] Available at http://nypost.com/2015/06/25/video-reveals-herbalife-boss-saw-pyramiding-signs-early-on/   On the following day the New York Post reported that the Pershing Square hedge fund has called for Herbalife to release the video, which is not publicly available.  *See* http://nypost.com/2015/06/26/herbalife-foe-ackman-demands-release-of-pyramiding-video/

compensation structure. … Couvillon, who has been pursuing Herbalife sales for the past seven months on a part-time basis, is in a level the company calls "Future Millionaire."

- Another "Future Millionaire" is Antwoine Love, 39 of Dalton, Ga., a father of 14 children with a 15th on the way.  Love said he got involved with selling Herbalife products full-time a month ago…

- Though Love has not made a significant profit selling Herbalife and has yet to recruit a downseller, "the guy who got me into this market makes $7,000 a month," Love said.

The use of terms like "future millionaire" and testimonial earnings claims are exactly the sorts of deceptive practices alleged in the Amended Complaint, and in Michael Johnson's 2005 speech.  The conduct at last week's Herbalife Extravaganza in St. Louis indicates that Michael Johnson's warnings to Herbalife's high level distributors have been ignored, and that Herbalife is not serious about enforcing them.  The ink is barely dry on this Court's final approval order and Herbalife has already demonstrated that it cannot or will not police itself.   It is simply not realistic for this Court to take an active role in the enforcement of rules governing the conduct of hundreds of thousands of Herbalife distributors across the country, when Herbalife itself clearly can't do the job.   The Court should reconsider its approval of Herbalife's "corporate reforms."

OBJECTORS' MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION- 28

## VII.   CONCLUSION

For the reasons set forth above and in the Objectors' previous submissions, Objectors respectfully request that the Court vacate its Final Judgment and Order of Dismissal.


Dated:  July 15, 2015


s/Douglas M. Brooks
Douglas M. Brooks
60 Thoreau Street, No. 219
Concord, MA  01742
(781) 424-6737
dmbrooks@brooks-law.net

CERTIFICATE OF SERVICE

The undersigned hereby certifies that I am over the age of eighteen (18) and not a party to the within action. I am employed in the law firm of Cohen McKeon LLP, 1910 West Sunset Boulevard, Suite 440, Los Angeles, California 90026.

On July 15, 2015, I used the Central District of California's Electronic Case Filing System, with the ECF account registered to Michael L. Cohen, to file the following document(s):

**OBJECTORS' MEMORANDUM IN SUPPORT OF MOTION FOR RECONSIDERATION**

The ECF system is designed to send an e-mail message to all parties in the case, which constitutes service. The Parties served by e-mail in this case are found on the Court's Electronic Mail Notice List.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on July 15, 2015, at Los Angeles, California.

/S/ ROBIN GRIER
Robin Grier