**IN THE UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION**

| | |
|---|---|
| DANA BOSTICK, a California citizen, *et al.*,<br><br>PLAINTIFF,<br><br>vs.<br><br>HERBALIFE INTERNATIONAL OF AMERICA, INC., a Nevada Corporation, *et al.*,<br><br>DEFENDANTS. | Case No.: 2:13-cv-02488-BRO-RZ<br><br>**DECLARATION OF ERIC ROBIN RE: NOTICE PROCEDURES**<br><br>Hon. Beverly Reid O'Connell<br><br>Hearing Date: August 24, 2015<br>Time: 1:30 p.m.<br>Courtroom: 14 |

I, ERIC ROBIN, declare:

1. I am a Consultant at Kurtzman Carson Consultants LLC ("KCC"), located at 75 Rowland Way, Suite 250, Novato, California. I am over 21 years of age and am not a party to this action. I have personal knowledge of the facts set forth herein and, if called as a witness, could and would testify competently thereto.

2. The purpose of this declaration is to provide the Parties and the Court with an explanation of the measures taken to ensure that where email notices were relied upon

for providing notice to class members in the *Bostick v. Herbalife International of America, Inc. et al.* settlement, such emails reached the class member.

3. As described more fully in my previous declarations filed in connection with this case, postcard notices were mailed to class members for whom only postal mailing addresses were known. Where email addresses were known, KCC emailed notices to the class members.

4. On December 30, 2014, KCC emailed the Email Notice to each of the 1,051,342 email addresses on the Settlement Class Member List. This email notice provided information regarding the settlement, including a link to the Settlement Website, located at www.HerbalifeClassActionSettlement.com, where Settlement Class Members could submit an online Claim Form. Three attempts were made to deliver the Email Notice if it was initially undeliverable. As of January 8, 2015, 736,556 emails (70.06%) were reported as having been successfully delivered and 314,786 (29.94%) as undeliverable.

5. On January 9, 2015, KCC mailed the Postcard Notice to the 314,711 people whose Email Notice was undeliverable and for whom KCC had a valid physical address. Thus, the only class members who received notice solely by email were those for whom the email was successful.

6. KCC's vendors employ several different industry-standard methods for minimizing the likelihood that email notices will be flagged as spam. Emails flagged as spam are typically still readable by the recipient, but analogous to junk mail received through the postal system. Such emails are assigned to a spam folder that may receive less attention from the recipient.

7. The first step in KCC's vendor's process is to review the language used in the email notice to avoid words and phrases that are commonly associated with spam emails and therefore more likely to be flagged by email systems as spam. For example, phrases such as "no purchase necessary" and "affordable" may trigger a spam filter.

8. To send the email notice, KCC uses a vendor who has deliverability measures in place so that email notices do not get flagged as spam.  While the vendor, Quad/Graphics, cannot guarantee an email will not get flagged as spam, they have strong relationships with internet service providers ("ISPs") and spam security companies, which allows Quad/Graphics to reach out directly to most ISPs and spam security companies to ensure Quad/Graphics is not blacklisted.  By remaining whitelisted (i.e., not blacklisted), Quad/Graphics improves the overall rate of deliverable email notice messages and avoids such notices as being flagged as spam.

9. For the *Bostick* case, Quad/Graphics sent the email notices over an IP range of 8 IP addresses.  This meant that even if one of the IP address was flagged by an ISP as potential spam, it would not impact the bulk of the other emails sent to that ISP.

10. Quad/Graphics monitor their IP addresses.  If a blacklisting occurs, they are notified and contact the ISP to get whitelisted to the extent permitted by the ISP.

11. Quad/Graphics can identify when an email is unsuccessful (in which case post cards were sent), but it is impossible to know for a given email address whether the given email was flagged as spam.  But, as described here, Quad/Graphics used state-of-the-art techniques to minimize the risk that emails would be flagged as spam.  And, as described here, Quad/Graphics would know if the email notices were, in aggregate, tending to be flagged as spam based on the feedback Quad/Graphics receives from the ISPs in real-time.  The email notices in the *Bostick v. Herbalife* settlement were sent and monitored consistent with Quad/Graphics' standard practices, and we encountered no unusual problems.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge and that this declaration was executed this 3rd day of August, 2015 at Novato, California.

Eric Robin